## UNITED STATES COURT OF INTERNATIONAL TRADE

NEWTREND USA CO., LTD., STARILLE, LTD., AND NUTRAWAVE CO., LTD.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

**Court No. 22-00347**

## <u>COMPLAINT</u>

Plaintiffs, Newtrend USA Co., Ltd. ("Newtrend USA"), Starille, Ltd. ("Starille"), and Nutrawave Co., Ltd. ("Nutrawave") (collectively "Plaintiffs" or "Importers"), by and through its attorneys, hereby allege the following for its Complaint against the United States, acting by and through U.S. Customs and Border Protection ("CBP"):

## CONTESTED DETERMINATION

1.      This action is an appeal from CBP's final affirmative determination of evasion of the antidumping ("AD") and countervailing duty ("CVD") orders, A-570-836 and C-570-081, respectively, covering glycine from the People's Republic of China ("China") (collectively, the "Orders"). CBP's final determination is identified by "EAPA Consolidated Case No. 7647."

2.      CBP issued the final affirmative determination of evasion on July 22, 2022. *See* U.S. Customs and Border Protection, *Notice of Determination as to Evasion—EAPA Consolidated Case Number 7647 (July 22, 2022)* ("TRLED China Determination"). CBP affirmed the TRLED China Determination in an administrative review dated November 30, 2022. *See Admin. Review Determination in EAPA Consolidated Case No. 7647*, CBP Office of Trade Regulations & Rulings (Nov. 30, 2022) ("Administrative Review Determination").

US.354565412.04

**JURISDICTION**

3.      This action is brought pursuant to section 1517(g) of the Tariff Act of 1930, as amended by the Trade Facilitation and Trade Enforcement Act of 2015 ("EAPA"), to contest CBP's Nov. 30, 2022 Decision.  *See* 19 U.S.C. § 1517(g).

4.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1581(c), which provides the Court with exclusive jurisdiction over all civil actions commenced under 19 U.S.C. § 1517.

**STANDING**

5.      Plaintiffs are U.S. importers of merchandise subject to CBP's evasion investigation and are interested parties within the meaning of 19 U.S.C. § 1517(a)(6) and 28 U.S.C. § 2631(k)(1).

6.      Further, following CBP's determination of evasion, Plaintiffs are subject to antidumping and countervailing duties and are therefore adversely affected or aggrieved by agency action within the meaning of section 702 of the Administrative Procedure Act, as amended, 5 U.S.C. § 702, and is entitled to commence this action pursuant to 28 U.S.C. § 2631(i).

**TIMELINESS**

7.      Plaintiffs are commencing this action with the concurrent filing of a summons and complaint, within 30 business days after publication of the Nov. 30, 2022 Decision, and have adhered to all the service and notification requirements as set out by the Rules of this Court.  *See*

US.354565412.04

USCIT R. 3, 4.  Accordingly, Plaintiffs have commenced this action within the statutorily-prescribed time limits specified in 19 U.S.C. § 1517(g)(1).

## STATEMENT OF FACTS

8.     On March 29, 1995, the U.S. Department of Commerce ("Commerce") issued an AD order covering glycine from China.  *Antidumping Duty Order: Glycine From the People's Republic of China*, 60 Fed. Reg. 16,115 (Mar. 29, 1995).  On June 21, 2019, Commerce issued a CVD order covering glycine from China.  *Glycine from India and the People's Republic of China: Countervailing Duty Orders*, 84 Fed. Reg. 29,173 (Jun. 21, 2019).

9.     On July 9, 2021, GEO Specialty Chemicals, Inc. ("GEO") filed an EAPA allegation (as amended) with CBP's Trade Remedy & Law Enforcement Directorate ("TRLED"), contending that Nutrawave and Starille were importing glycine of Chinese origin into the United States by transshipment through Indonesia to evade the payment of AD and CVD duties on glycine from China.  On September 7, 2021, GEO filed an EAPA allegation against Newtrend USA, also alleging transshipment of Chinese-origin glycine through Indonesia.  TRLED acknowledged receipt of the allegations on July 12, 2021 and September 9, 2021, respectively.

10.     Also, on July 9, 2021, GEO filed an EAPA allegation with TRLED, contending that Nutrawave and Starille were importing glycine of Thai origin into the United States by transshipment through Indonesia to evade the payment of AD duties on glycine from Thailand.  On September 7, 2021, GEO filed an EAPA allegation against Newtrend USA, also alleging transshipment of Thai-origin glycine through Indonesia.  TRLED acknowledged receipt of the allegations on July 12, 2021 and September 9, 2021, respectively.

US.354565412.04

11.     On October 26, 2021, CBP provided notice to Plaintiffs that it had initiated a consolidated investigation, under EAPA Cons. Case Number 7647, regarding alleged transshipment of Chinese-origin glycine through Indonesia.  *See* Notice of Initiation of Investigation and Interim Measures—EAPA Consolidated Case Number 7647 (Oct. 26, 2021) ("EAPA China Initiation Notice").

12.     Also, on October 26, 2021, CBP provided notice to Plaintiffs that it had initiated a consolidated investigation, under EAPA Cons. Case Number 7663, regarding alleged transshipment of Thai-origin glycine through Indonesia.  *See* Notice of Initiation of Investigation and Interim Measures—EAPA Consolidated Case Number 7663 (Oct. 26, 2021).

13.     On October 27, 2021, TRLED issued separate Request for Information ("RFI") questionnaires in both Case No. 7647 and Case No. 7663, to each of the Importers, requesting a wide range of information, including entry summary documents, production documents, sales documents, country of origin certificates, and mill certificates.  TRLED sent a "Business Confidential Version" of each of the RFI questionnaires, which included confidential information released back to the Importers, *e.g.*, full entry numbers, entry dates, and applicable Harmonized Tariff Schedule numbers.

14.     Also, on October 27, 2021, TRLED issued an RFI questionnaire to PT Newtrend Nutrition Ingredient ("PTNNI"), which is an Indonesian producer of glycine and an affiliate of Newtrend Technology Co., Ltd. ("Newtrend Technology"), which in turn is a company that is registered in China.  TRLED also sent a "Business Confidential Version" of the RFI questionnaire to PTNNI, which included confidential information of the Importers, *e.g.*, full entry numbers, entry dates, and applicable Harmonized Tariff Schedule numbers.

15.     On November 26, 2021, the Importers each submitted timely responses to the RFI

questionnaires in Case Nos. 7646 and 7663 ("Importers' November 26, 2021 RFI Responses").

16.     On December 3, 2021, PTNNI submitted a timely response to the RFI questionnaire in Case Nos. 7647 and 7663  ("PTNNI December 3, 2021 Response").

17.     On December 13, 2021, GEO submitted comments and factual information in response to the Importers' November 26, 2021 RFI Responses, and to PTNNI's December 3, 2021 RFI Response ("GEO December 13 Comments").

18.     In the GEO December 13, Comments, GEO redacted significant amounts of information and provided a copy of the redacted public version to PTNNI and the Importers.

19.     On December 15, 2021, PTNNI and the Importers submitted letters in each of the investigations (7647 and 7663), asking TRLED to reject GEO's December 13 Comments, on the grounds that GEO redacted substantial information from the public version that did not meet the standard for Business Confidential Information, and that many of the "public summaries" that GEO provided for redacted information were not in sufficient detail to permit a reasonable understanding of the substance of the information.

20.     On December 21, 2021, GEO, in response to a request from TRLED, resubmitted the public version its December 13, 2021 comments with public summaries of the redacted confidential information.  Again, GEO provided copy of the redacted public version.

21.     On December 17, 2021, TRLED issued supplemental RFI questionnaires to PTNNI and the Importers.  The supplemental RFI questionnaires sought additional information about the relationships between the Importers and Newtrend Group, additional production information, and clarification about material consumption at PTNNI.  TRLED sent a "Business Confidential Version" of the supplemental RFI questionnaire to PTNNI, which included voluminous confidential information of PTNNI and the Importers.

US.354565412.04

22.     On January 11, 2022, the Importers each timely submitted their supplemental RFI responses.  On January 18, 2022, PTNNI timely submitted its supplemental RFI response.

23.     On January 3, 2022, PTNNI and the Importers submitted rebuttal factual information in response to GEO's December 21, 2021 submission.

24.     On February 8, 2022, TRLED issued second supplemental RFI questionnaires to PTNNI and each of the Importers.  TRLED sent a "Business Confidential Version" of the second supplemental RFI questionnaire to PTNNI, which included voluminous confidential information of PTNNI and the Importers.

25.     On February 14, 2022, PTNNI and the Importers submitted additional voluntary factual information.

26.     On March 4, 2022, each of the Importers timely submitted their second supplemental RFI responses.  On March 9, 2022, PTNNI timely submitted its second supplemental RFI response.

27.     On April 25, 2021, TRLED sent to PTNNI "Business Confidential Versions" of two "Site Visit Engagement Letters" to PTNNI (one each for case nos. 7647 and 7663).  In the Site Visit Engagement Letters," TRLED provided essentially an outline of its planned on-site verification at PTNNI.  The Site Visit Engagement Letters also contained confidential information of the Importers, in particular listing the details of five entries that TRLED intended to examine during the verification and a list of documents that TRLED wished to examine in connection with each of those entries.

28.     From May 3-6, 2022, TRLED officials visited PTNNI's factory in Karawang, Indonesia to verify PTNNI's responses.

29.     On May 13, 2022, at the request and direction of TRLED, PTNNI submitted all of

US.354565412.04

the exhibits that TRLED collected during its verification of PTNNI.

30.    On May 20, 2022, GEO submitted rebuttal factual information and comments with respect to the verification exhibits collected by TRLED for the administrative record.

31.    On May 24, 2022, PTNNI submitted surrebuttal factual information ("Factual Verification Summary")  to the rebuttal factual information submitted on May 20, 2022 by GEO. Among other things, the Factual Verification Summary includes a detailed factual summary of records reviewed by TRLED at the verification in Indonesia that TRLED did *not* include in the verification exhibits, including records regarding use of methanol as a primary raw ingredient, records regarding ammonium chloride, other production records, other records relating to raw materials, records regarding the PTNNI facility, employment records, and accounting records. *See* Factual Verification Summary, at 4-6.

32.    On June 3, 2022, PTNNI requested that when TRLED issues a verification report, TRLED should provide the unredacted confidential version of the report to its affiliate, Newtrend USA, and to PTNNI as mandated by the Administrative Procedures Act.

33.    On June 13, 2022, TRLED issued to PTNNI and the Importers a report summarizing its verification findings.  *See* U.S. Customs and Border Protection, Office of Trade, Verification Report, Enforce and Protect Act Case Number 7647 (June 13, 2022) ("Verification Report").  TRLED redacted significant amounts of information in the Verification Report and provided a copy of the redacted public version to PTNNI and the Importers.

34.    Also, on June 13, 2022, the Importers were informed—for the first time—that the deadline to submit written arguments for both cases was June 16, 2022, just *three days* after TRLED issued the Verification Report to PTNNI and the Importers.

35.    On June 14, 2022, the Importers filed letters to TRLED requesting an extension of

US.354565412.04

the written argument deadline.  Om June 15, 2022, TRLED transmitted a response denying the request.

36.    Also, on June 15, 2022 at 5:02 PM Eastern, TRLED served the interested parties three memoranda containing additional information for the records.  Only in case no. 7647, TRLED provided a wholly public document, including Indonesian trade statistics on imports of glycine from China during 2019-2021, a CBP analysis of that data, a patent for a particular method of glycine manufacturing, and two articles about alleged hazards of certain inputs used by PTNNI as an input in the production process.  The additional two memoranda (one each in case nos. 7663 and 7674) contained "business confidential trade data" from a redacted source, with the attachment completely redacted.  TRLED gave both the alleger and the importers until June 27, 2022 to submit information and arguments in response to TRLED's June 15, 2022 memo.

37.    On June 27, 2022, GEO submitted factual information in rebuttal to TRLED's June 15, 2022 memorandum ("GEO June 27 Rebuttal Factual Information").

38.    Also on June 27, 2022, the Importers submitted factual information in rebuttal to TRLED's June 15, 2022 memorandum ("Importers June 27 Rebuttal Factual Information").

39.    On June 16, 2022, the Importers filed their Written Arguments in both case nos. 7663 and 7464.  The Importers refiled their Written Arguments on June 24, 2022 June 29, 2022, in response to a request by TRLED to either remove certain information that was purportedly "new factual information" or to point to support from the record evidence.  ("Importers Written Arguments").

40.    On July 1, 2022, GEO filed its Rebuttal Written Arguments in both case nos. 7663 and 7464 ("GEO Rebuttal Written Arguments").

US.354565412.04

41.     On July 22, 2022, TRLED issued a determination in case no. 7647, in which it determined that substantial evidence demonstrates that the Importers entered glycine from China into the United States after transshipping the merchandise through Indonesia.  *See* TRLED China Determination.

42.     Also on July 22, 2022, TRLED issued a determination in case no. 7663, in which it determined that there is *not* substantial evidence that the importers imported glycine from Thailand into the United States after transshipping merchandise through Indonesia because the merchandise imported was not Thai-origin.  *See* U.S. Customs and Border Protection, Notice of Determination as to Evasion—EAPA Consolidated Case Number 7647 (July 22, 2022) ("TRLED Thailand Determination").

43.     As with the Verification Report, TRLED redacted significant amounts of information in the TRLED China Determination and TRLED Thailand Determination, and provided only a copy of the redacted public versions to PTNNI and the Importers.

44.     On September 1, 2022, Starille and Nutrawave submitted to CBP, Office of Trade, Regulations and Rulings ("RR"), a request for a *de novo* administrative review of the TRLED China Determination; and Newtrend USA submitted to RR a request for a *de novo* administrative review of the TRLED China Determination (collectively, the "Administrative Review Requests").

45.     On September 16, 2022, GEO filed a response to the Administrative Review Requests ("GEO A.R. Response").

46.     In the GEO A.R. Response, GEO redacted significant amounts of information and provided a copy of the redacted public version to PTNNI and the Importers.

47.     On November 30, 2022, RR issued the Administrative Review Determination in

US.354565412.04

response to the administrative review request by Starille and Nutrawave, and the administrative review request by Newtrend USA.

48.     As with the Verification Report, the TRLED China Determination, and the TRLED Thailand Determination, RR provided only a redacted public version of the Administrative Review Determination to PTNNI and the Importers.

## STATEMENT OF CLAIMS

## COUNT I

49.     The allegations of paragraphs 1 through 48 are hereby incorporated by reference.

50.     Under an immutable due process principle, when the Government takes an action against a party, and the reasonableness of the action depends on findings of fact, all of the evidence used to prove the Government's case must be disclosed to the party so that the party has an opportunity to show that it is untrue.  *Ramirez v. Dep't of Homeland Sec.*, 975 F.3d 1342, 1350 (Fed. Cir. 2020).  Further, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation.  *Bowman Trans., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 288 n.4 (1974).

51.     In the Verification Report, the TRLED China Determination, the TRLED Thailand Determination, and the Administrative Review Determination, TRLED refused to provide to Plaintiffs critical evidence that is based on detailed calculations of *PTNNI's own numerical data* and details of *PTNNI's own description* of its inputs and production processes, and not of confidential information of CBP, GEO, or any other entity involved in the investigation.

52.     The "Public Version" of the Verification Report, the TRLED China

Determination, the TRLED Thailand Determination, and the Administrative Review Determination redacted wide swaths of *PTNNI's own information* with vague descriptors such as "process" or "input" or "figures" or "substance" or "#" or "employee roles" or "date" or "activity" or "various activities" or "translation" or "description of tank."

53.     Information and data submitted by PTNNI and the Importers cannot—by definition—be considered "confidential" *to PTNNI and the Importers*.

54.     Even TRLED recognized this obvious principle, given that TRLED sent PTNNI and the Importers each original RFI questionnaires, plus two supplemental questionnaires, which contained confidential information of PTNNI and the Importers, and were marked at the top of each questionnaire "Business Confidential Version."

55.     Even if TRLED only needed to provide adequate "public summaries" of the redacted information in order to meet due process requirements (which is not the case), the public summaries that TRLED provided in its Verification Report, TRLED China Determination, and TRLED Thailand Determination, and that RR provided in its Administrative review Determination, were not adequate because they did not provide enough detail and/or explanation for the PTNNI and the Importers to understand the information that was redacted.

56.     TRLED's and RR's refusal, in its determinations, to provide PTNNI with all information and explanations that is *PTNNI's own information*, and TRLED's and RR's failure to provide adequate summaries of the redacted information, violates the right of PTNNI and the Importers to due process, and is otherwise arbitrary, capricious, an abuse of discretion, and/or is otherwise not in accordance with law.

**COUNT II**

11

57.     The allegations of paragraphs 1 through 56 are hereby incorporated by reference.

58.     Under due process principles, "an importer participating in an administrative proceeding has a procedural due process right to 'notice and a meaningful opportunity to be heard,' *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761-62 (Fed. Cir. 2012) (quoting *LaChance v. Erickson*, 522 U.S. 262, 266 (1998)); *Royal Brush Manufacturing, Inc. v. United States*, 44 CIT ___, ___483 F. Supp. 3d 1294 1305 (2020) (same).  In general "notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afform them an opportunity to present their objections.  Such opportunity must occur at a meaningful time and in a meaningful manner."  *Royal Brush*, 44 CIT at ___, 483 F. Supp. 3d at 1305-06 (cleaned up).  "Thus, to comply with due process, Customs' procedures must afford adequate opportunity for importers to respond to the evidence used against them." *Id*. at ___, 483 F. Supp. 3d at 1306.

59.     In this investigation, TRLED transmitted its Verification Report to Importers' counsel on June 13, 2022, and in that same transmittal, TRLED informed Importers' counsel that the deadline to submit written argument is June 16, 2022, just *three days* after TRLED released its Verification Report to Importers' counsel.

60.     On June 14, 2022, the Importers requested that TRLED extend its deadline for written argument until June 23, 2022.

61.     On June 15, 2022, TRLED denied the Importers' extension request, because TRLED had a statutory deadline to make its determination by July 1, 2022, and because the investigations were initiated on July 21, 2021 and therefore the Importers "have already had ample time to submit written arguments."

62.     Also on June 15, 2022, TRLED submitted a memorandum containing additional

US.354565412.04

information for the record and gave both the alleger and the importers until June 27, 2022 to

submit information and arguments in response to TRLED's June 15, 2022 memo.

63.     On June 16, 2022, the Importers submitted their Written Arguments.

64.     On June 27, 2022, both GEO and the Importers submitted Rebuttal Factual

Information in response to the factual information that TRLED submitted for the record on June

15, 2022.

65.     On July 22, 2022, TRLED issued its TRLED China Determination and TRLED

Thailand Determination.

66.     As explained in Importers' Written Arguments, the focus of the written arguments

in this case was a detailed, one-side, highly inaccurate, and heavily redacted Verification Report,

which was released only *three days* before the deadline, and that did not provide sufficient time

to correct TRLED's many factual and analytical errors by any reasonable measure.  The

Importers could not have foreseen the type or extent of TRLED's errors included in the

Verification Report and therefore could not prepare its overall comments in the Written

Arguments during the time before TRLED released its Verification Report.

67.     TRLED's insistence on requiring the Importers to prepare and submit their

Written Arguments within three days after release of the Verification Report, and TRLED's

refusal to grant any extension whatsoever of the deadline, prevented the Importers from

providing a fulsome list of all of the errors in their Written Comments and thus deprived the

Importers of their due process right a full opportunity to be heard at a meaningful time and in a

meaningful manner.

68.     In addition, TRLED's refusal to grant an extension for the Importers to submit

Written Arguments was arbitrary and capricious, and an abuse of discretion, because TRLED

US.354565412.04

claimed that statutory time constraints prevented it from extending the deadline for Written

Arguments by a week until June 23, 2022, yet TRLED itself submitted additional factual

information for the record on June 15, 2022 and allowed all parties to submit rebuttal factual

information as late as June 27, 2022.

## COUNT III

69.     The allegations of paragraphs 1 through 68 are hereby incorporated by reference.

70.     EAPA directs the Court to determine whether an EAPA determination or

administrative review was "conducted in accordance with those subsections."  19 U.S.C. §

1517(g)(1).  Among other things, the Court must determine "whether any determination, finding,

or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  *Id*. § 1517(g)(2).

71.     "An abuse of discretion occurs [when] the decision is based on an erroneous

interpretation of the law, on factual findings that are not supported by substantial evidence, or

represents an unreasonable judgment in weighing relevant factors."  *Royal Brush*, 44 CIT at ___,

483 F. Supp. 3d at 1302 (quoting *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269

(Fed. Cir. 2005)).

72.     When an agency acts with insufficient evidence before it and fails to gather

needed facts, the agency decision is arbitrary and capricious and unsupported by substantial

evidence.  *Cross-Sound Ferry Services, Inc. v. I.C.C.*, 738 F.2d 481, 487 (D.C. Cir. 1984).

73.     On May 24, 2022, PTNNI submitted the Factual Verification Summary, which

includes a detailed factual summary of a multitude of records reviewed by TRLED at the

verification in Indonesia that TRLED did *not* include in the verification exhibits, including

records regarding use of methanol as a primary raw ingredient, records regarding ammonium

chloride, other production records, other records relating to raw materials, records regarding the PTNNI facility, employment records, and accounting records.  *See* Factual Verification Summary, at 4-6.

74.     In the Verification Report, TRLED admitted that it "did not take all of the [fully reviewed] documents as verification exhibits to place on the administrative record of this EAPA investigation."  Verification Report, at 8.

75.     In its Administrative Review Requests, the Importers argued that RR should reject the TRLED China Determination because TRLED failed to include in the administrative record a multitude of documents that CBP officials reviewed during verification.

76.     In its Administrative Review Determination, RR notes the Importers' argument "that TRLED selectively omitted from the administrative record various documents physically presented to TRLED by PTNNI during verification," but RR's only response to this argument is as follows: "Having reviewed the July 22 Determination and the record, we see no evidence that TRLED relied upon facts not on the record."

77.     Because TRLED and RR, in their determinations, relied on an administrative record that omitted a significant number of documents presented to TRLED by PTNNI during verification, TRLED's and RR's determinations are arbitrary and capricious, and are not supported by substantial evidence.

## COUNT IV

78.     The allegations of paragraphs 1 through 77 are hereby incorporated by reference.

79.     The substantial evidence standard of review requires review of the administrative record as a whole, including that which fairly detracts from its weight.  *Nippon Steel Corp. v.*

*United States*, 458 F.3d 1345, 1351 (Fed, Cir, 2006).  "Substantial evidence is more than a

scintilla, and must do more than create a suspicion of the existence of the fact to be established."

*Id*. (cleaned up and quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300

(1939)).

80.     From the beginning of this investigation, TRLED ignored its obligation to

conduct an impartial investigation, citing Newtrend USA's and PTNNI's "strong ties to China"

as one of its reasons for initiating the investigation.  EAPA China Initiation Notice, at 3.

81.     TRLED conducted a one-sided investigation that disregarded evidence provided

by PTNNI and the Importers.  The investigators ignored facts, created a selective record, and

substituted suspicion for judgment.

82.     During the verification, TRLED often chose to speculate and substitute its own

preconceptions rather than *verifying* facts with PTNNI.

83.     In the Verification Report, in the TRLED China Determination, and in the

TRLED Thailand Determination, TRLED ignored data already provided by PTNNI at

verification or elsewhere on the record, constructed its own data analysis without giving PTNNI

an opportunity to comment, or cherry-picked data, all of which were designed to draw

unreasonable inferences from benign circumstances.

84.     In its Administrative Review Determination, RR glossed over the myriad of

problems with TRLED's Verification Report and the TRLED China Determination, ignoring

TRLED's speculation and refusing to engage with the Importers' allegations that the evidence

that TRLED cited consisted of numerous half-truths, cherry-picked data, and unreasonable

inferences.

85.     PTNNI and the Importers discussed at length many dozens of situations in which

US.354565412.04

TRLED made findings and reached conclusions that were not supported by the administrative record.  Plaintiffs shall not describe all of the TRLED flawed findings and conclusions unsupported by substantial evidence in this Complaint, but a couple of examples are worth noting.

86.     As one example of the gross inaccuracies in the Verification Report, in a section entitled "Unsupported Third-Party Verification Records," the Verification Report claims as follows:

> **Evidence Lacking for Utilities** – PTNNI indicated that it paid for most of utilities with [ source ]; however, CBP could not verify the payments for utilities for some months due to the lack of evidence supporting the alleged [ method ] payments documented PTNNI's [ type of record ].

Verification Report, at 11 (bracketed redactions and "summaries" in original).  The Verification Report then includes a table in which it claims that payments for utilities were not supported by third-party documentation.  *Id*. at 12.

87.     In making the claim that third-party evidence of utility payments was lacking, TRLED disregarded the extensive third-party evidence regarding PTNNI's utilities reviewed during verification, including each invoice for electricity, water, and natural gas, as well as the original contracts for the provision of these utilities.  Factual Verification Summary, at 5.

88.     Moreover, the table in the Verification Report claiming that PTNNI did not provide electricity payment documentation from February 2021 to September 2021 (*id*. at 12), is directly contradicted by evidence on the record, showing electricity payment documentation for each of those months, both in a verification exhibit, and in PTNNI's December 3, 2021 Response.  *See* Importers' Written Arguments, at 12 (identifying precisely where in the administrative record the electricity payment documentation existed).

89.     As another example, in the Verification Report, TRLED claims that PTTNI did

US.354565412.04

not purchase enough raw materials, such as methanol, to produce the amount of glycine reported. Verification Report, at 16.

90.     To come to this conclusion, CBP relies on an extrapolated calculation that was not disclosed at verification to PTNNI or in the course of the investigation to any of the interested parties and did not rely on a single piece of verification evidence.

91.     Moreover, TRLED inexplicably chose to rely on average consumption rate from the Importers' CBP Form CF-28 responses to extrapolate this formula, when there is a full accounting of PTNNI's consumption on the administrative record.

92.     A basic understanding of cost accounting shows that there are fundamental flaws in TRLED's analysis because it fails to take into account existing inventory.

93.     Specifically, with respect to an alleged shortage of methanol, PTNNI explained on the administrative record in multiple instances and explained again at verification that methanol is not fully consumed during production, but rather recycled for use, and therefore TRLED could not reasonably expect to compare consumption quantity and purchase quantity for methanol and reach any reliable conclusion.  Importers' Written Arguments, at 18.

94.     Undeterred, TRLED took the hopelessly flawed calculations in the Verification Report and reiterated the unreasonable conclusions it drew therefrom in the TRLED China Determination (at 30-31).

95.     In the Administrative Review Requests, the Importers explained in great detail why TRLED's analysis of PTNNI's methanol consumption was designed to manipulate the record.  Administrative Review Requests, at 16-21.

96.     In its Administrative Review Determination, RR simply cited again to the same flawed extrapolated calculation from the Verification Report that PTNNI demonstrated was

US.354565412.04

unsupported by the record evidence.

97.     As a result, the TRLED China Determination and RR's Administrative Review Determination is unsupported by substantial evidence and its conclusions are arbitrary and capricious.

**COUNT V**

98.     The allegations of paragraphs 1 through 97 are hereby incorporated by reference.

99.     Even if TRLED's findings that PTNNI produced no glycine or produced quantities of glycine insufficient to account for U.S. imports by the Importers, TRLED must provide substantial evidence that some or all of the glycine that the Importers entered into the United States was specifically of Chinese origin (for case 7647) or Thai origin (for case 7663).

100.    In the TRLED Thailand Determination, TRLED made the same arguments that PTNNI produced no glycine or produced quantities of glycine insufficient to account for U.S. imports by the Importers.  However, TRLED concluded that "there is not substantial evidence that the importers imported glycine from Thailand into the United States after transshipping the merchandise through Indonesia because the merchandise was not Thai-Origin.  TRLED Thailand Determination, at 1.

101.    In the TRLED China Determination, TRLED asserted that the glycine that PTNNI sold to the Importers was Chinese-origin, because: (1) all the glycine purchased by the importers was made by the Newtrend Group; (2) the only Newtrend Group affiliates that could have produced the glycine allegedly transshipped are Chinese, because Newtrend Thailand stopped producing glycine, Chinese Newtrend Group affiliates continued to produce glycine during the POI, and sales reconciliations show that Newtrend Thailand did not sell any glycine to Indonesia; (3) allegedly "[t]rade data and sales reconciliations show exports of glycine from

Chinese Newtrend Group affiliates to Indonesia; and (4) some individual—whose name is redacted—attempted to sell some product—the name and description of which is redacted—to the alleger's market researcher when the market researcher sought Indonesian-made glycine.

102.    In its Administrative Review Determination, RR asserted that "the record evidence further indicates that the glycine PTNNI sold to the Importers was likely of Chinese origin," Administrative Review Determination, at 14.

103.    In support of its assertion that the glycine PTNNI sold to the Importers "was likely of Chinese origin," RR pointed to essentially three "facts": (1) the relationship of PTNNI and Newtrend USA to Chinese companies; (2) GEO's "investigative report," all of the contents which were redacted from all documents from GEO, TRLED, and RR that were served on PTNNI and the Importers; and (3) repeated citations of Indonesian trade statistics on merchandise entering Indonesia from China that came under a Harmonized Tariff Schedule basket code category that is much broader than just glycine.  Administrative Review Determination, at 14.

104.    The first "fact" to which RR points (relationship of PTNNI and Newtrend USA to Chinese companies) does not amount to even a scintilla of evidence, much less substantial evidence, in support of a determination that the Importers are transshipping Chinese glycine through Indonesia.

105.    The second "fact" to which RR points is based on an "investigative report" by GEO.  To this day, PTNNI and the Importers have not seen the "investigative report," either in whole or even in part.  For RR to rely on this to support its claim of Chinese transshipment is essentially a "Star Chamber" move that cannot constitute substantial evidence, but does give rise to a clear Due Process violation.

US.354565412.04

106.    Finally, the third "fact" to which RR points (repeated citation of Indonesian trade statistics) is entirely speculative, because the trade statistics cited are to a basket category that covers many products other than just glycine.

107.    Despite being put on notice that the import category represents a basket category that covers much more than glycine, TRLED repeatedly refers to it as "glycine" in the TRLED China Determination.

108.    RR's response to the point that the trade statistics refer to a basket category is to state that "alternative trade data offered by the Importer also shows Chinese glycine exports to Indonesia at several times greater than PTNNI's production during the POI."  Administrative Review Determination, at 14.  However, the PTNNI made clear that the "alternative trade data" *also* covered a basket category of goods, not just glycine.

109.    Even if this Court were to determine that the TRLED China Determination and RR's Administrative Review Determination reasonably concluded that PTNNI somehow did not produce glycine in Indonesia throughout the period of review (which it should not), CBP's conclusion that the glycine that the Importers imported into the United States was specifically of Chinese origin is speculative and cannot be credited as constituting substantial evidence of transshipment through China.

## DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in its favor and against the Defendant:

(1) Holding unlawful and setting aside the TRLED China Determination and RR's

Administrative Review Determination;

21

US.354565412.04

(2) Ordering CBP to refund Plaintiffs any monies collected on its imports as a result of

CBP's evasion investigation in EAPA Consolidated Case No. 7647; and

(3) Granting any such additional relief as the Court may deem just and proper in the

circumstances.

Respectfully submitted,

/s/ Richard P. Ferrin
Douglas J. Heffner
Wm. Randolph Rucker
Richard P. Ferrin
Carrie Bethea Connolly
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005
Telephone: (202) 230-5803

*Counsel to Newtrend USA, Starille, and Nutrawave*

December 23, 2022