**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

NEWTREND USA CO., LTD., STARILLE, LTD.,
and NUTRAWAVE CO., LTD.,

                    Plaintiffs,

     v.

UNITED STATES,

                    Defendant,

     and

GEO SPECIALTY CHEMICALS, INC.
                    Defendant-Intervenor.

Court No. 22-347

**PUBLIC VERSION**
Business Proprietary Information
deleted from within Brackets [ ]

**MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFFS**
**IN SUPPORT OF RULE 56.2 MOTION**
**FOR JUDGMENT ON THE AGENCY RECORD**

Douglas J. Heffner
D. Alicia Hickok
Wm. Randolph Rucker
Richard P. Ferrin
Carolyn Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel for Plaintiffs*

Dated: May 26, 2022

PUBLIC VERSION

## TABLE OF CONTENTS

RULE 56.2 STATEMENT ................................................................. 1

Administrative Determination Sought to Be Reviewed ............................. 1

Issues of Law Together With the Reasons for Contesting the Administrative Determination....... 1

ARGUMENT ................................................................................. 3

I.    INTRODUCTION. ....................................................................... 3

II.    RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY OF THE ADMINISTRATIVE PROCEEDING. .................................................. 5

    A.    Background Regarding the Importers and PTNNI and the Underlying AD/CVD Orders on Glycine from China. .................................................................. 5

    B.    Procedural History of the EAPA Investigation. .............................. 5

        1.    Allegation and Initiation of EAPA Investigation. ................... 5

        2.    TRLED Investigation. ............................................. 6

        3.    ORR Administrative Review. ...................................... 12

III.    STANDARD OF REVIEW. .......................................................... 13

IV.    CBP'S FINDING OF TRANSSHIPMENT THROUGH CHINA IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND IS SQUARELY REFUTED BY *PRIMA FACIE* EVIDENCE THAT CBP FAILED TO DISCLOSE TO PTNNI AND THE IMPORTERS DURING THE INVESTIGATION. ........................................................ 15

    A.    TO ESTABLISH AN EAPA VIOLATION, CBP MUST PROVIDE SUBSTANTIAL EVIDENCE THAT MERCHANDISE SUBJECT TO AN ANTIDUMPING AND/OR COUNTERVAILING DUTY ORDER IS ENTERING THE UNITED STATES WITHOUT PAYMENT OF DUTIES. ................................................................. 15

    B.    TRLED Failed to Provide Anything Other Than Speculation That the Glycine Entering the United States Was Produced in China. .............................. 16

    C.    ORR Failed to Provide Anything Other Than Recycle TRLED's Speculation That the Glycine Entering the United States Was Produced in China. ................... 19

    D.    CBP Tries to Hide the Revealed Memo and Is *Still* Withholding Information That Should Be on the Administrative Record. ...................................... 20

V.    CBP VIOLATED PLAINTIFFS' DUE PROCESS RIGHTS AND OTHERWISE ABUSED ITS DISCRETION BY FAILING TO DISCLOSE CRITICAL INFORMATION NECESSARY FOR THE DEFENSE OF PTNNI AND THE IMPORTERS. ................................ 23

    A.    Legal Standard for Analyzing Whether CBP Violated Petitioner's Due Process Rights by Failing to Disclose Critical Information. .......................... 23

    B.    CBP Denied Plaintiffs' Fundamental Right to Be Apprised of Critical Assertions of Fact in the Verification Report Regarding PTNNI's Operations. ................ 24

PUBLIC VERSION

C.      CBP Denied PTTNI's and the Importers' Fundamental Right to be Apprised of Crucial Evidence by Over-Redacting and by Failing to Provide an Adequate Public Summary of "The Revealed Memo." ........................................................................................................... 29

VI.    CBP ACTED ARBITRARILY AND CAPRICIOUSLY BY SELECTIVELY OMITTING FROM THE ADMINISTRATIVE RECORD NUMEROUS EXCULPATORY DOCUMENTS THAT TRLED REVIEWED DURING VERIFICATION ........................................................ 31

VII.   CBP'S FINDING THAT PTNNI "COULD NOT HAVE PRODUCED ALL THE GLYCINE" THAT IT SOLD TO THE IMPORTERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ...................................................................................................................... 33

A.      The EAPA Statute Requires Customs to Bear the Ultimate Burden of Proof That Evasion Occurred. ...................................................................................................... 33

B.      CBP's Determination that PTNNI Was Incapable of Production is Arbitrary and Capricious as Substantial Evidence Supports PTNNI's Production. ........................................ 35

1.      CBP Failed to Adequately Analyze the Record With Respect to Evidence Supporting PTNNI's October 2020 Production Start Date. .................................................... 36

2.      CBP's Analysis of PTNNI's Methanol Consumption is Designed to Prevent PTNNI from Raising a Defense. ............................................................................................ 40

3.      CBP's Analysis of PTNNI's Activated Carbon Consumption is Fundamentally Flawed. ............................................................................................................................ 42

4.      CBP's Analysis of PTNNI's Labor Force Intentionally Disregards Substantial Evidence in Support of its Sufficiency for Production. ....................................................... 46

VIII.    CONCLUSION AND PRAYER FOR RELIEF. ........................................................ 48

PUBLIC VERSION

## TABLE OF AUTHORITIES

### Cases

*Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134 (D.D.C. 2002)........................ 31, 32

*Armstrong v. Manzo*, 380 U.S. 542 (1965) ................................................................. 22

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ..................... 23

*City of Dania Beach v. F.A.A.*, 628 F.3d 581 (D.C. Cir. 2010) ................................................. 32

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ............................................................. 14, 16

*Creswell Trading Co. v. United States*, 15 F.3d 1054 (Fed. Cir. 1994)...................................... 33

*Croman Corp. v. United States*, 724 F.3d 1357 (Fed. Cir. 2013) ................................................. 30

*Cross-Sound Ferry Services, Inc. v. I.C.C.*, 735 F.2d 481 (D.C. Cir. 1984) ............................... 13

*Diamond Tools Tech. LLC v. United States*, 45 CIT ___, 545 F. Supp. 3d 1324 (2021) ..... 14, 15

*District Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15 (D.D.C. 2013) ..................... 31, 32

*DuPont Teijin Films USA v. United States*, 407 F.3d 1211 (Fed. Cir. 2005) ........................ 14, 16

*Gilda Indus., Inc. v. United States*, 453 F.3d 1362 (Fed. Cir. 2006) ........................................ 30

*Grupo Acerero S.A. de C.V. v. United States*, 47 CIT ___, 615 F. Supp. 3d 1339 (2023) ......... 30

*Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320 (Fed. Cir. 2017) .......... 17

*Linyi Chengen Import & Export Co. Ltd. v. United States*, 43 CIT ___, 391 F. Supp. 3d
1283 (2019)................................................................................................................43-44

*Mathews v. Eldridge*, 424 U.S. 319 (1976)........................................................................... 22

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ............. 13, 21, 37

*Motor Vehicle Mfrs. Ass'n of United States Inc. v. State Farm Mutual Automobile
Insurance Co.*, 463 U.S. 29 (1983) ............................................................................... 14

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)...............................*passim*

*NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939) ............................... 13-14

*Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292 (1937)............................ 23, 27

*OSI Pharmaceuticals, LLC v. Apotex Inc.*, 939 F.3d 1375 (Fed. Cir. 2019) .............................. 17

*PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751 (Fed. Cir. 2021) ........................... 23

*Ramirez v. Dep't of Homeland Sec.*, 975 F.3d 1342 (Fed. Cir. 2020) ........................................ 23

*Rodriguez v. Dep't of Veterans' Affairs*, 8 F. 4th 1290 (Fed. Cir. 2021) ............................. 14, 34

*Royal Brush Mfg., Inc. v. United States*, 45 CIT ___, 483 F. Supp. 3d 1294 (2020) ...........22-23

*See Stone v. FDIC*, 179 F.3d 1368 (Fed. Cir. 1999) .................................................................... 23

*Suramerica de Aleaciones Laminadas, C.D. v. United States*, 17 CIT 146, 818 F. Supp. 348 (1993) ....................................................................................................................................... 14

*University of Colorado Health v. Azar*, 486 F. Supp. 3d 185 (D.D.C. 2020) ...................... 31, 32

*Vietnam Firewood Co. Ltd. v. United States*, 44 CIT ___, 466 F. Supp. 3d 1273 (2020) .....14-15

*WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1 (D.D.C. 2009) .......................................... 32

*Wright v. Dep't of Transp.*, 900 F.2d 1541 (Fed. Cir. 1990) ...................................................... 34

*Zero Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141 (10th Cir. 2016) ......... 14

**Statutes**

5 U.S.C. § 555(c) ......................................................................................................................... 28

18 U.S.C. § 1905 .......................................................................................................................... 28

19 U.S.C. § 1517(c) ........................................................................................................... 1, 15, 33

19 U.S.C. § 1517(f) ......................................................................................................................... 1

19 U.S.C. § 1517(g)(2) ................................................................................................................. 13

28 U.S.C. § 1581(c) ........................................................................................................................ 1

**Regulations**

19 C.F.R. § 165.14(e) ................................................................................................................... 30

19 C.F.R. § 165.21 .................................................................................................................. 32, 33

PUBLIC VERSION

**Administrative Determinations**

*Glycine From the People's Republic of China*, 60 Fed. Reg. 16,115 (Mar. 29, 1995)
(antidumping duty order) ................................................................................................. 5

*Glycine From the People's Republic of China*, 84 Fed. Reg. 29,173 (Jun. 21, 2019)
(countervailing duty order) ............................................................................................. 5

TRLED Thailand Initial Determination,
https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/07-22-2022%20-
%20TRLED%20-%20Final%20Determination%20%28508%20complaint%29%20-
%20%287663%29%20-%20PV.pdf ................................................................................ 12

**RULE 56.2 STATEMENT**

**Administrative Determination Sought to Be Reviewed**

1.        In this action, Plaintiffs Newtrend USA Co., Ltd. ("Newtrend USA"), Starille, Ltd.

("Starille"), and Nutrawave Co., Ltd. ("Nutrawave") (collectively "Plaintiffs" or "Importers") ask

the Court to review determinations by U.S. Customs and Border Protection ("CBP") that

Plaintiffs, through PT Newtrend Nutrition Ingredient ("PTNNI"), entered merchandise covered

by the U.S. Department of Commerce ("Commerce") antidumping ("AD") and countervailing

duty ("CVD") orders on glycine from China (the "AD/CVD Orders") through evasion.  The

determinations at issue include: (1) an initial determination issued on June 21, 2021 by CBP's

Trade Remedy Law Enforcement Directorate ("TRLED") ("TRLED Determination"),

Appx90000-Appx90034, pursuant to 19 U.S.C. § 1517(c); and (2) a *de novo* Administrative

Review Determination issued on November 30, 2022, by CBP's Office of Regulations and

Rulings ("ORR") ("AR Determination"), Appx90289-Appx90306, pursuant to 19 U.S.C. §

1517(f).  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §

1581(c).

**Issues of Law Together With the Reasons for Contesting the Administrative
Determination.**

2.        **Issue:** Is CBP's finding that China was the "true" country of origin of glycine imported

by Plaintiffs unsupported by substantial evidence?

3.        **Answer**: Yes, CBP's finding that China was the "true" country of origin of glycine

imported by Plaintiffs is unsupported by evidence and is *clearly rebutted* by the *only direct*

evidence on the record, including: (1) evidence CBP failed to disclose until Defendant submitted

the confidential administrative record for this proceeding; and (2) other evidence that Plaintiffs

presented to CBP but which CBP never made a part of the administrative record.

4.      **Issue:** Did CBP violate Plaintiffs' right to be timely apprised of critical factual information upon which CBP relied for its decision, by withholding it despite its clear relevance to Plaintiffs' defense?

5.      **Answer:** Yes, CBP violated Plaintiffs' right to be timely apprised in three ways: (1) by refusing to disclose to Plaintiffs the information in TRLED's verification report, TRLED's determination, and ORR's administrative review determination that *PTNNI itself provided to CBP*; (2) by failing to provide public summaries that provided adequate detail in the confidential administrative record; and (3) by introducing new "facts" for the first time in TRLED's determination, long after an opportunity had passed for Plaintiffs to respond.

6.      **Issue:** Did CBP arbitrarily and capriciously refuse to consider and selectively omit from the administrative record numerous exculpatory documents that PTNNI presented to TRLED at verification?

7.      **Answer:** Yes, CBP had before it thousands of pages of exculpatory original documentation that Plaintiffs provided to it for examination by TRLED during the course of verification, but CBP arbitrarily and capriciously refused to include those pages as verification exhibits and failed to reference most of these documents at all in its Verification Report.

8.      **Issue:** Is CBP's conclusion that PTNNI "could not have produced all the glycine" that it sold to the Plaintiffs unsupported by substantial evidence?

9.      **Answer:** Yes, CBP's finding that PTTNI "could not have produced all the glycine" that it sold the Plaintiffs is based entirely on theoretical postulation, not empirical findings, and therefore is unsupported by substantial evidence.

**ARGUMENT**

**I.    INTRODUCTION.**

This case *is not* a matter of mere disagreement as to how CBP weighed the evidence on the record.  Instead, this case is one in which CBP used a scattershot approach to connect dots that were not there to be connected, drew inferences out of thin air, and trampled on Plaintiffs' fundamental right to a fair investigation.  In the end, CBP searched for a way—*any* way—to justify an affirmative finding that the Plaintiffs evaded the AD/CVD Orders, and when its investigation came up short of credible evidence, CBP nevertheless reached the determination that it wanted, but only by process and findings that were arbitrary and capricious in every sense.

In a commitment to reach its preferred conclusion, CBP ignored—and indeed tried to cover up—*prima facie* evidence on the administrative record that PTNNI did not import *any* glycine from China during the period of investigation ("POI"), and it ignored or attempted to explain away the documentation that Plaintiffs provided to it.  Instead, CBP relied on nothing more than conjecture and supposition to infer evasion.

CBP denied Plaintiffs' fundamental right to know and be permitted to respond to the information upon which TRLED would rely in its Verification Report.  Indeed, there was significant information withheld from Plaintiffs that *PTNNI itself* provided to CBP at verification.  CBP justified withholding this factual information from PTNNI and Plaintiffs because it contained business confidential information ("BCI"), but while CBP was justified in redacting that information from the version of the verification report that CBP provided to the public at large, CBP cannot reasonably prevent PTNNI and Plaintiffs from reviewing statements and characterizations by CBP of their own business confidential information.  Second, CBP failed to provide an adequate public summary of what may be the single most important document in the confidential administrative record, specifically, the *prima facie* evidence noted

above that PTNNI did not import *any* glycine from China during the POI.  Instead, CBP released

that document redacted almost in its entirety, save for a vague phrase noting that it contained

"business confidential trade data" from a redacted source.  Plaintiffs' counsel became aware of

the information redacted from the public version of this document only after Defendant

submitted the administrative record to this Court, long after Plaintiffs' opportunity to be heard in

the administrative proceedings before TRLED and ORR had passed.  Finally, CBP also denied

Plaintiffs the opportunity to be heard when CBP included new "facts" for the first time in

TRLED's final determination, with no opportunity for Plaintiffs to challenge the validity of those

"facts" in its written comments to TRLED.  Further, TRLED presented the "facts" as a

conversation that CBP claims to have had with PTNNI officials during verification, but which is

not supported by anything in the Verification Report itself.

CBP arbitrarily and capriciously failed to include in the administrative record a multitude

of exculpatory documents that CBP was provided at verification.  Those documents included

extensive production, sales, and other business records that corroborated PTNNI's statements

that it produced the glycine in question.  All of these documents were presented to TRLED at

verification and should have been included in the administrative record but were neither

mentioned in the Verification Report nor included in the verification exhibits.  PTNNI attempted

to reference these documents in its written comments, but TRLED ordered PTNNI to remove the

references.

Finally, CBP's finding that PTNNI "could not have produced all the glycine" that it sold

to the Plaintiffs is unsupported by substantial evidence.  Rather than providing actual empirical

findings as evidence that PTNNI could not have produced the glycine in question, CBP provided

a raft of theoretical postulation, all of which could have been addressed at verification had CBP expressed its concerns at that time.

## II.    RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY OF THE ADMINISTRATIVE PROCEEDING.

### A.    Background Regarding the Importers and PTNNI and the Underlying AD/CVD Orders on Glycine from China.

Plaintiffs Newtrend USA, Starille, and Nutrawave are each U.S. importers/distributors of glycine.  Appx82699 (Newtrend USA), Appx83208 (Starille), 83010 (Nutrawave).  PTNNI is a producer of glycine located in Indonesia, which began production in October 2020.  Appx84045-Appx84046.  Newtrend USA is an affiliate of PTNNI through common control by Newtrend Technology Co., Ltd., a company that is registered in China.  Appx84049-Appx84050, Appx84098.

On March 29, 1995, the U.S. Department of Commerce ("Commerce") issued an AD order covering glycine from China.  *Antidumping Duty Order: Glycine From the People's Republic of China*, 60 Fed. Reg. 16,115 (Mar. 29, 1995).  On June 21, 2019, Commerce issued a CVD order covering glycine from China.  *Glycine from India and the People's Republic of China: Countervailing Duty Orders*, 84 Fed. Reg. 29,173 (Jun. 21, 2019).

### B.    Procedural History of the EAPA Investigation.

#### 1.    Allegation and Initiation of EAPA Investigation.

On April 30, 2021, Defendant-Intervenor GEO Specialty Chemicals, Inc. ("GEO") filed an EAPA allegation with TRLED, contending that Nutrawave and Starille were importing glycine of Chinese origin into the United States by transshipment through Indonesia to evade the payment of AD and CVD duties on glycine from China.  Appx80421 (Nutrawave), Appx80426 (Starille).   On September 7, 2021, GEO filed an EAPA allegation against Newtrend USA, also alleging transshipment of Chinese-origin glycine through Indonesia.  Appx80644.  TRLED

initiated investigations on July 21, 2021 for Nutrawave (Appx80421) and Starille (Appx80426), and September 13, 2021 for Newtrend USA (Appx80644).

On October 26, 2021, CBP provided notice to Plaintiffs that it had initiated a consolidated investigation, under EAPA Cons. Case Number 7647, alleging transshipment of *Chinese*-origin glycine through Indonesia.  Appx82530.

Also, on July 21, 2021, TRLED initiated investigations under EAPA Cons. Case Numbers 7663 and 7664, alleging transshipment by Starille and Nutrawave of *Thai*-origin glycine through Indonesia.  *See* Appx80415 (e-mail noting initiation of EAPA investigations 7663 and 7664 alleging transshipment of glycine through *Thailand*).

## 2.    TRLED Investigation.

On October 27, 2021, TRLED issued separate Request for Information ("RFI") questionnaires in Cons. Case Number 7647, to each of the Importers, requesting a wide range of information, including corporate structure, accounting/financial practices, sales documents, and sales reconciliations.  Appx82542-Appx82561 (Newtrend USA), Appx82578-Appx82597 (Nutrawave), Appx82654-82673 (Starille).  Also on October 27, 2021, TRLED issued an RFI to PTNNI in the same case, also requesting a wide range of information, including the same topics as noted above with respect to the Importers, plus detailed production information.  Appx82614-Appx82637.

On November 26, 2021, each of the Importers submitted timely responses to the RFI questionnaires.  Appx82692 (Newtrend USA), Appx83205 (Starille), Appx83004 (Nutrawave).  On December 3, 2021, PTNNI submitted a timely response to the RFI questionnaire ("PTNNI December 3, 2021 Response").  Appx84040.

On December 13, 2021, GEO submitted comments and factual information in response to the Importers' November 26, 2021 RFI responses, and to PTNNI's December 3, 2021 RFI

Response ("GEO December 13 Comments").  Appx90360-Appx90566.  In the GEO December

13, Comments, GEO redacted the vast majority of information from the BPI version of the

submission and provided a copy of only the redacted public version to PTNNI and the Importers.

Appx5085-Appx5120.

On December 15, 2021, PTNNI and the Importers submitted a letter asking TRLED to

reject GEO's December 13 Comments, on the grounds that GEO redacted substantial

information from the public version that did not meet the standard for Business Confidential

Information, and that many of the "public summaries" that GEO provided for redacted

information were not in sufficient detail to permit a reasonable understanding of the substance of

the information.  Appx5122-Appx51268

On December 21, 2021, GEO, in response to a request from TRLED, resubmitted the

public version of its December 13, 2021 comments with public summaries of the redacted

confidential information.  GEO provided to PTNNI and the Importers a copy of the redacted

public version only.  Appx5174-Appx5208.

On January 3, 2022, PT and the Importers submitted factual information in rebuttal to

GEO's December 13 Comments.  Appx84639-Appx84784.

On January 11, 2022, the Importers each submitted timely responses to supplemental RFI

questionnaires issued by TRLED.  Appx84786 (Newtrend USA), Appx84845 (Nutrawave),

Appx84948 (Starille). On January 18, 2022, PTNNI submitted its timely supplemental RFI

response.  Appx85062.

On February 8, 2022, TRLED sent a "Business Confidential Version" of the second

supplemental RFI questionnaire to Newtrend USA (Appx90313-Appx90315), Nutrawave

(Appx90317-90319), Starille (Appx90338-Appx90340), and PTNNI (Appx90322-Appx90336).

Each of these questionnaires included questions that contained confidential information of the Importers and/or PTNNI.

On February 14, 2022, PTNNI and the Importers submitted additional factual information for the record. Appx86340. Also on February 14, 2022, GEO submitted additional factual information for the record. Appx90157.

On March 4, 2022, each of the Importers timely submitted their second supplemental RFI responses. Appx86409 (Newtrend USA), Appx86665 (Nutrawave), Appx86815 (Starille). On March 9, 2022, PTNNI timely submitted its second supplemental RFI response. Appx86915.

On April 25, 2021, TRLED sent to PTNNI a "Business Confidential Version" of a "Site Visit Engagement Letter" to PTNNI. Appx88034-Appx88038. In the Site Visit Engagement Letter," TRLED provided essentially an outline of its planned on-site verification at PTNNI. The Site Visit Engagement Letters also contained confidential information of the Importers, in particular listing the details of five entries that TRLED intended to examine during the verification and a list of documents that TRLED wished to examine in connection with each of those entries.

From May 3 through May 6, 2022, TRLED officials visited PTNNI's glycine factory in Karawang, Indonesia to verify PTNNI's responses. Appx89568.

On May 13, 2022, at the request and direction of TRLED, PTNNI submitted for the administrative record all of the exhibits that TRLED collected during its verification of PTNNI. A list of the verification exhibits is provided in the Verification Report at Appx89586.

On May 20, 2022, GEO submitted rebuttal factual information and comments with respect to the verification exhibits collected by TRLED for the administrative record. Appx9700.

On May 24, 2022, PTNNI submitted surrebuttal factual information ("Factual Verification Summary") to the rebuttal factual information submitted on May 20, 2022 by GEO. Appx89526-Appx89566.  Among other things, the Factual Verification Summary includes a detailed factual summary of records received by TRLED at the verification in Indonesia that TRLED did *not* include in the verification exhibits, including records regarding: use of methanol as a primary raw ingredient, ammonium chloride, other production details, raw materials, the PTNNI facility, employment, and accounting.  *See* Appx89533-Appx89535.

On June 3, 2022, PTNNI requested that TRLED provide the unredacted confidential version of the report to its counsel, as mandated by the Administrative Procedures Act when it issued the verification report ("PTNNI Request to Release").  Appx9809-Appx9811.

On June 7, 2022, TRLED generated both a confidential version and a public version of its Verification Report.  Appx89568-Appx89600 (confidential version), Appx 9815-Appx.  TRLED redacted significant amounts of information in the Verification Report and provided a copy only of the redacted public version to PTNNI and the Importers.  Appx9815-Appx9856.  Moreover, TRLED did not transmit the public version to PTNNI and the Importers until June 13, 2022. Appx9860.

Also, on June 13, 2022, the Importers were informed—for the first time—that the deadline to submit written arguments for both cases was June 16, 2022, just *three days* after TRLED issued the Verification Report to PTNNI and the Importers.  Appx9862.

On June 14, 2022, the Importers filed letters to TRLED requesting an extension of the written argument deadline.  Appx9865-Appx9868.   In its extension request, the Importers pointed out that "{d}espite completing verification of {PTNNI} over a month ago, {CBP} just released the verification report on June 13, 2022, despite being dated June 7, 2022," and that

CBP also on June 13, 2022 "provided notice to parties that the deadline for written argument would be three days later on June 16, 2022."  Appx 9865.  The Importers noted that the verification report—not counting the exhibits—was 17 pages with 22 alleged findings.  *Id*.  The Importers argued that "{g}iven the significant delay of CBP itself in releasing the verification report, it would be manifestly unfair for CBP to provide the Importers with only 3 days to prepare and submit written comments."  *Id*.

On June 15, 2022, TRLED transmitted a response denying the request, stating that "these investigations were initiated on July 21, 2021 and the written arguments deadline in these investigations was originally March 8, 2022, 230 calendar days after the date of initiation" and therefore "the parties to these investigations have already had ample time to submit written arguments."  Appx9968.

Compounding the pressure, TRLED served the interested parties two memoranda containing additional information for the records at the close of business (5:02 p.m.) on the same day.  Appx9970.  One memorandum (which was entirely public) contained Indonesian trade statistics on imports of glycine from China during 2019-2021, a CBP analysis of that data, a patent for a particular method of glycine manufacturing, and two articles about alleged hazards of certain inputs used by PTNNI as an input in the production process.  Appx9870-Appx9963.

The other memorandum that CBP released to the Importers was a heavily redacted public version that revealed nothing to the Importers other than it contained "business confidential trade data" from a redacted source, with the attachment completely redacted.  Appx9965-Appx9966.  For the convenience of the Court, Plaintiffs have attached that redacted public version to this brief, as **Exhibit 1** (hereinafter "The Invisible Memo").  The confidential version of the memorandum, which was not provided to Plaintiffs' counsel until February 1, 2023, through the

transmittal of the confidential version of the administrative record *to this Court*, is attached to this brief as **Exhibit 2** (hereinafter "The Revealed Memo").    CM/ECF 29 (Declaration of Derek R. King dated February 1, 2023); CM/ECF 38 (February 1, 2023 CM/ECF entry attaching Conf. Record Doc. 104); Appx89602-Appx89605.

TRLED gave both the alleger and the importers until June 25, 2022 to submit information and arguments in response to both of the memoranda that TRLED added to the record on June 15, 2022 memo, including the invisible one.  Appx9976-Appx9979.

On June 16, 2022, the Importers filed their Written Arguments in response.  On June 21 and again on June 23, TRLED rejected the Importers' Written Arguments asserting that certain of the arguments either contained information outside the administrative record or did not contain citations to the administrative record.  Appx9978, Appx 9989. After further back and forth, on June 29, the Importers transmitted a resubmission of their Written Arguments that TRLED ultimately accepted.  Appx10212-10268.

On June 27, 2022, the Importers submitted factual information in rebuttal to TRLED's June 15, 2022 memorandum.  Appx89655-Appx89860.  On the same day, GEO also submitted rebuttal factual information, but on June 28, 2022 TRLED rejected GEO's submission on the grounds that the confidential version of GEO's document bracketed certain information that should have been treated as public, and that GEO did not provide the required summary of the bracketed information in sufficient detail.  Appx10208.  On June 30, 2022, GEO resubmitted its rebuttal factual information submission, curing the defects identified by TRLED.  Appx89926-Appx89972.

On July 1, 2022, GEO filed its rebuttal to the Importers' written arguments.  Appx89974-Appx89998.

PUBLIC VERSION

On July 22, 2022, TRLED issued its determination, in which it opined that the Importers entered glycine from China into the United States and evaded the AD/CVD Orders on Glycine from China by transshipping the merchandise through Indonesia. Appx90000-Appx90034 (confidential version). As with the Verification Report, TRLED redacted significant amounts of information in the TRLED China Determination and provided a copy only of the redacted public versions to PTNNI and the Importers. *See* Appx10386-Appx10420 (public version), Appx10349 (e-mail from TRLED transmitting public version to Importers).

Simultaneous with its affirmative determination of evasion in the China glycine EAPA investigation, TRLED determined that the Importers did ***not*** enter glycine from Thailand into the United States and did ***not*** evade the AD order on Glycine from Thailand. https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/07-22-2022%20-%20TRLED%20-%20Final%20Determination%20%28508%20complaint%29%20-%20%287663%29%20-%20PV.pdf ("TRLED Thailand Initial Determination"). The findings of fact in TRLED's negative determination of evasion of the AD order on Glycine from Thailand were virtually identical to TRLED's finding of fact in its affirmative determination of evasion of the China AD/CVD Orders, except that TRLED found that the glycine that the Importers entered into the United States could not have been of Thai origin, because "there is no evidence of imports of Glycine from Thailand into Indonesia." *Id*. at 1, 17, 21-22.

### 3.    ORR Administrative Review.

On September 1, 2022, Starille and Nutrawave submitted a request for a *de novo* administrative review of the TRLED China Determination to ORR (Appx90072-90111). Additionally, Newtrend USA submitted a separate request for a *de novo* administrative review of the TRLED China Determination to ORR (Appx 90036-70072) (collectively, the "Administrative Review Requests").

On September 16, 2022, GEO filed a response to the Administrative Review Requests ("GEO A.R. Response").  Appx90116-90155.  In the GEO A.R. Response, GEO redacted significant amounts of information and provided a copy of only the redacted public version to PTNNI and the Importers.  Appx10518-10557.

On November 30, 2022, ORR issued a confidential version of an Administrative Review Determination in response to the administrative review request by Starille and Nutrawave, and the administrative review request by Newtrend USA.  Appx90289-90306.  ORR redacted significant amounts of information and provided a copy of only the redacted public version to PTNNI and the Importers.  Appx10565-10582.

## III.    STANDARD OF REVIEW.

EAPA directs the Court, in relevant part, to determine "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  19 U.S.C. § 1517(g)(2).

When an agency acts with insufficient evidence before it and fails to gather needed facts, the agency decision is arbitrary and capricious and unsupported by substantial evidence.  *Cross-Sound Ferry Services, Inc. v. I.C.C.*, 738 F.2d 481, 487 (D.C. Cir. 1984).

The substantial evidence standard of review requires review of the administrative record as a whole, including that which fairly detracts from its weight.  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed, Cir, 2006); *see also Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380-81 (Fed. Cir. 2008) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight, including contradictory evidence or evidence from which conflicting inferences could be drawn") (cleaned up).  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established."  *Id*. (cleaned up and quoting *NLRB v. Columbian Enameling & Stamping*

*Co.*, 306 U.S. 292, 300 (1939)); *see also Suramerica de Aleaciones Laminadas, C.D. v. United States*, 17 CIT 146, 175, 818 F.Supp. 348, 373 (1993) ("a mere possibility … is not substantial evidence"); *Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141, 1152 (10th Cir. 2016) ("we are confident that mere possibility falls short of {substantial evidence}").

An agency decision is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 39 (1983).

When reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp.*, 458 F.3d at 1350–51. In that assessment, it takes into account the agency's burden to make findings by a preponderance of the evidence. *Rodriguez v. Dep't of Veterans' Affairs*, 8 F.4th 1290, 1298 (Fed. Cir. 2021) (explaining the distinction between the burden of proof and the standard of review). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, (1938)).

The scope of this Court's review is broad. "'The court's review of Customs' determination as to evasion may encompass interim decisions subsumed into the final determination.'" *Diamond Tools Tech. LLC v. United States*, 45 CIT ___, 545 F. Supp. 3d 1324, 1331 (2021) (quoting *Vietnam Firewood Co. Ltd. v. United States*, 44 CIT ___, 466 F. Supp. 3d

1273, 1284 (2020)).  Thus, CBP's determination encompasses both TRLED's July 22, 2022

determination and ORR's November 30, 2022 administrative review determination.

IV.     **CBP'S FINDING OF TRANSSHIPMENT THROUGH CHINA IS
        UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND IS SQUARELY
        REFUTED BY *PRIMA FACIE* EVIDENCE THAT CBP FAILED TO DISCLOSE
        TO PTNNI AND THE IMPORTERS DURING THE INVESTIGATION.**

        A.     **TO ESTABLISH AN EAPA VIOLATION, CBP MUST PROVIDE
               SUBSTANTIAL EVIDENCE THAT MERCHANDISE SUBJECT TO AN
               ANTIDUMPING AND/OR COUNTERVAILING DUTY ORDER IS
               ENTERING THE UNITED STATES WITHOUT PAYMENT OF DUTIES.**

        The EAPA statute requires that "the Commissioner shall make a determination, based on

substantial evidence, with respect to whether such covered merchandise was entered into the

customs territory of the United States through evasion."  19 U.S.C. § 1517(c)(1)(A).  "Covered

merchandise" refers to merchandise that is subject to an antidumping or countervailing duty

order.  *Id*. § 1517(a)(3).  "Evasion" means the following:

> {E}ntering covered merchandise into the customs territory of the United States
> by means of any document or electronically transmitted data or information,
> written or oral statement, or act that is material and false, or any omission that
> is material, and that results in any cash deposit or other security or any amount
> of applicable antidumping or countervailing duties being reduced or not being
> applied with respect to the merchandise.

*Id*. § 1517(a)(5)(A).  This Court has explained that a finding of evasion requires CBP to prove

three elements: "(1) entering covered merchandise into the United States; (2) by means of any

document or data or information, written or oral statement, or act that is material and false, or

any omission that is material; and (3) that results in any applicable cash deposit or other security

being reduced or not applied to the merchandise."  *Diamond Tools Tech. LLC v. United States*,

45 CIT at ___, 545 F. Supp. 3d at 1347.  In other words, a critical component of CBP's burden is

to identify merchandise *subject to an existing AD or CVD order* that was entered into the United

States and to prove that the entry resulted in an applicable *AD/CVD cash deposit* being reduced

or not applied to the merchandise.  In that regard, it is not enough for CBP to establish that the importer made even a material false statement or omission in declaring the country of origin of the merchandise at issue without also establishing that the correct country of origin is a country subject to an AD and/or CVD order with respect to that merchandise.  CBP recognized as much in its finding of no transshipment through Thailand.  *See* TRLED Thailand Initial Determination, at 21-22.

  **B.**  **TRLED Failed to Provide Anything Other Than Speculation That the Glycine Entering the United States Was Produced in China.**

  The administrative record lacks substantial evidence that PTNNI received or purchased *Chinese-origin* glycine, let alone sold such glycine to the Importers.  In its determination, TRLED points to four "facts" that it claims support its conclusion that the glycine PTNNI sold to the Importers was Chinese in origin and therefore covered by the AD/CVD Orders.  First, TRLED states that all the glycine purchased by the importers was made by the Newtrend Group.  Appx90033.  Second, TRLED reasons that the only Newtrend Group affiliates that could have produced the glycine sold by PTNNI to the Importers are Chinese.  *Id*.  Third, TRLED asserts that "{t}rade data and sales reconciliations show exports of glycine from Chinese Newtrend Group affiliates to Indonesia."  *Id*.  Fourth, "[                    ] attempted to sell [                    ] to the alleger's market researcher when the market researcher sought Indonesian-made glycine.  The market research report stated that a [          ] told the researcher that the manufacturer [                         ] but 'could provide [                    ]'" Appx90033-90034.

  None of these "facts" individually, or in combination, constitute "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *See DuPont Teijin Films*, 407 F.3d at 1215 (quoting *Consol. Edison Co.*, 305 U.S. at 229).  First, TRLED's

assertion that all of the glycine purchased by the importers was made by the Newtrend Group is based on sheer speculation. TRLED admits as much: "{i}t is unlikely that, the Newtrend Group would provide loans, [                                        ], and find customers for a competitor's glycine" and "Newtrend USA is a wholly owned subsidiary of the Group and would likely not source glycine from a competitor." Appx90033. "'Mere speculation' is not substantial evidence." *OSI Pharmaceuticals, LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) (citing *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017)).

TRLED's second point, which is that "{t}he only Newtrend Group Affiliates that could have produced the glycine transshipped through Indonesia by PTNNI are Chinese," Appx90033, is entirely derivative of TRLED's speculative assumption that none of the Importers would source glycine from a party *other than* a member of the Newtrend Group.

TRLED's third point is based on "evidence" that "Chinese glycine entered Indonesia in increasing quantities in 2021 compared to 2020, through the ports closest to PTNNI's facility, "the [                                        ]." Here, TRLED relied on Indonesian import statistics of Chinese-origin *amino acids* from Indonesia's Central Statistics Agency, Budan Pusak Statistik. Appx90033, Appx9870, Appx9872-Appx9911. As the Importers explained in their Written Arguments, the import statistics were for a broad category of undifferentiated amino acids, and the data for glycine could not be isolated. (Appx89900). Indeed, the basket category of imports/exports may or may not contain glycine at all. The statistics also have no link whatsoever to PTNNI or the Importers. TRLED's speculation that PTNNI *may have* imported Chinese-origin glycine because of an increase in Chinese-origin amino acids through the port of Jakarta—by far the largest port in Indonesia—

should be afforded no weight as evidence, particularly in light of the affirmative evidence against such speculation, as discussed in Section IV.C *infra*.

The affirmative evidence that the Importers provided—showing that no transshipment of glycine through China occurred—is significant.  PTNNI and the Importers provided sales reconciliations for all of the Chinese and Thai affiliates of PTNNI and Newtrend USA. Appx86341, Appx86360-Appx86397.  These sales reconciliations, supported by original accounting documentation, demonstrate that no sales of glycine were made to PTNNI through its affiliates.  TRLED gave full weight to the validity and accuracy of the sales reconciliation for Newtrend Thailand and cited it as evidence in its circular reasoning that the allegedly transshipped glycine was Chinese.  Appx90033.  Given that the sales reconciliations likewise show that PTNNI's Chinese affiliates did not transship glycine through Indonesia, and TRLED had no basis to find sales reconciliations credible in one case and not another, the sales reconciliations were substantial evidence that there was no evasion.

In sum, while TRLED claims to have relied on the totality of the evidence to render its decision, TRLED relied heavily upon the generalized data on amino acid imports from Indonesia to create a transshipment scheme out of nothing.  The arbitrary and capricious nature of TRLED's reliance on these inapplicable data is juxtaposed against the results of the parallel investigation, EAPA case no. 7663, in which CBP found no evidence that the Importers transshipped glycine through Thailand.  TRLED Thailand Initial Determination, at 22.  While it is also true that the basket category for amino acid from Thailand showed no imports, Appx90102-Appx90104, that was not essential to the determination, nor could it have been.

**C.     ORR Failed to Provide Anything Other Than Recycle TRLED's Speculation That the Glycine Entering the United States Was Produced in China.**

In its Administrative Review Determination, ORR admits that "the administrative record contains no direct evidence of PTNNI's having openly imported glycine from China into Indonesia," but insists "there is nevertheless substantial evidence in the record to support a finding that PTNNI transshipped Chinese-origin glycine …." Appx90302.  ORR first offers up more speculation by pointing to the fact that both PTNNI and Newtrend USA are ultimately owned by the same Chinese parent company.  Appx90302, Appx90303.  But the mere fact of corporate ownership does not support a finding of evasion; there must be proof of conduct by the company being investigated.

Next, ORR attempts to hang its hat on GEO's investigative report, which quotes a [              ] that [

                                                                                    ].  Appx80203, Appx80505.  Bearing in mind that the confidential version of GEO's investigative report was made available to PTNNI's and Importers' counsel only as of February 1, 2023 (when the Defendant transmitted the confidential administrative record to the Court), there was no way to resolve the ambiguity: the message could as easily have been either that the [          ] is [

                  ].

ORR follows TRLED in citing "trade statistics on Indonesian amino acid imports from China," Appx90302.  ORR acknowledges that "the amino acid category is broader than simply

glycine" *id*., but then asserts that "alternative trade data offered by the Importers also shows Chinese *glycine* exports to Indonesia at several times greater than PTNNI's production during the POI." APPX90302 (emphasis added) (citing Appx10050-Appx10062). But the data in the Importers' referenced exhibit is "still a basket category" of amino acids, albeit more specific that the import data cited by CBP. Appx10002-Appx10003. In other words, the "alternative trade data" in the Importers' submission does *not* show *glycine* exports to Indonesia, and therefore nothing can be drawn from the fact that those data are "several times greater than PTNNI's production," because the quantity of exports of a larger number of products cannot be compared to the quantity of exports of a single product.

Overall, ORR completely fails to muster anything that, examined individually on in total, constitutes "substantial evidence" that PTNNI transshipped Chinese-origin glycine.

### D.   CBP Tries to Hide the Revealed Memo and Is *Still* Withholding Information That Should Be on the Administrative Record.

If PTNNI were planning to *transship* Chinese glycine by selling it to the Importers, it would first need to import that glycine from China. But the BPI document dated June 15, 2022, Appx89602-Appx89605, reproduced as **Exhibit 2** to this brief, is a letter from [



], to [

], in which [



].[1]

---

[1] The Court should also note that the [                                    ] letter begins as follows: [

] Appx89604.

Without importing glycine from China, there is no Chinese glycine to transship.  There is

no more direct evidence on importation to Indonesia than the evidence [



].  To its credit, CBP did ask

[                                                                        ], and [

] that supports PTNNI's and the Importers' position

and contradicts CBP's surmise.  Yet, CBP did not account for the evidence it solicited in either

TRLED's determination or ORR's Administrative Review.  In fact, as discussed further below,

circumstantial evidence strongly suggests that CBP hid the answer by redacting it so heavily

from the public administrative record that Plaintiffs could not argue from the evidence prior to

seeing it in this Court.

The significance is twofold.  First, CBP was clearly aware of actual evidence that

contradicts and detracts from its inferences from overly broad statistics and a single ambiguous

statement, but it inexplicably did not acknowledge—much less credit—that evidence.  *Mittal*

*Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380-81 (Fed. Cir. 2008).  Second, by its

non-disclosure of this exonerating evidence, CBP deprived Plaintiffs of critical evidence that

corroborated its own and that would have supported its arguments.

---

During the course of preparing its opening brief, counsel for Plaintiffs contacted counsel for
Defendant by e-mail, asking if CBP would add to the administrative record the letter from [
                                ] that prompted the reply from [                                ].  *See*
**Exhibit 3** attached hereto.  The DOJ attorney later replied that "{t}here was nothing additional
ever placed on the administrative record, to the extent you reference an 'earlier letter.'  I
confirmed this with agency counsel."  *See* **Exhibit 4** attached hereto. This document is
accordingly not in the administrative record and still has never been seen by Plaintiffs' counsel.

As a result, this Court should conclude that CBP's determination is unsupported by substantial evidence, because there is nothing in the initial TRLED determination or in the ORR's administrative review determination indicating that CBP considered the administrative record as a whole, especially The Revealed Memo.  Here, The Revealed Memo is not merely some mere detail in the administrative record that the Court can presume that CBP considered. Instead, it is *prima facie* evidence that PTNNI *could not have* transshipped Chinese-origin glycine through Indonesia to the United States, at least as dispositive (and probably more so) than the evidence CBP cited in the parallel Thailand investigation for concluding that PTNNI did not transship Thai-origin glycine through Indonesia to the United States.  There can be no serious argument that The Revealed Memo seriously detracts from the weight of TRLED's and ORR's findings and conclusions of transshipment.  *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (explaining that substantial evidence standard requires review of the administrative record as a who, including evidence that fairly detracts from its weight); *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380-81 (Fed. Cir. 2008) (same)..  The fact that there is no evidence on the record that CBP considered this crucial evidence suggests that either CBP overlooked it entirely, or worse, deliberately chose to hide it by burying it in the record without reference or comment.  Accordingly, this Court must remand CBP's determination to analyze The Revealed Memo and explain how its findings of transshipment can be squared with it.

V.   CBP VIOLATED PLAINTIFFS' DUE PROCESS RIGHTS AND OTHERWISE
     ABUSED ITS DISCRETION BY FAILING TO DISCLOSE CRITICAL
     INFORMATION NECESSARY FOR THE DEFENSE OF PTNNI AND THE
     IMPORTERS.

     A.   Legal Standard for Analyzing Whether CBP Violated Petitioner's Due
          Process Rights by Failing to Disclose Critical Information.

It is a bedrock principle that "the fundamental requirement of due process is the

opportunity to be heard 'at a meaningful time and in a meaningful manner." *Mathews v.

Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965));

*see also Royal Brush Mfg., Inc. v. United States*, 45 CIT ___, ___, 483 F. Supp. 3d 1294, 1305

(2020) ("an importer participating in an administrative proceeding has a procedural due process

right to 'notice and meaningful opportunity to be heard'") (quoting *PSC VSMPO-Avisma Corp.

v. United States*, 688 F.3d 751, 761-62 (Fed. Cir. 2021).  "A party is entitled … to know the

issues on which decision will turn and to be apprised of the factual material on which the agency

relies for decision so that he may rebut it.  Indeed, the Due Process Clause forbids an agency to

use evidence in a way that forecloses an opportunity to offer a contrary presentation."  *Bowman

Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974).   The Federal

Circuit has explained as follows:

> {T}he courts have recognized that one "relatively immutable" principle of due
> process is that "where governmental action seriously injures an individual, and
> the reasonableness of the action depends on fact findings, the evidence used to
> prove the Government's case must be disclosed to the individual so that he has
> an opportunity to show that it is untrue.

*Ramirez v. Dep't of Homeland Sec.*, 975 F.3d 1342, 1350 (Fed. Cir. 2020) (collecting cases).

     For the same reason, courts do not allow agencies to withhold from a respondent

numerical data upon which it relies in its determination.  This "take our word for it" approach to

administrative adjudication was condemned by the Supreme Court long ago.  An agency may not

"content{} itself with saying that … 'I looked at the statistics … and they teach me thus and so.'

This will never do if hearings and appeals are to be more than empty forms." *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 303 (1937).

Finally, violations of procedural due process cannot be waved away as harmless error. *See Stone v. FDIC*, 179 F.3d 1368, 1377 (Fed. Cir. 1999) (holding that "when a procedural due process violation has occurred because of *ex parte* communications, such a violation is not subject to the harmless error test").

**B.      CBP Denied Plaintiffs' Fundamental Right to Be Apprised of Critical Assertions of Fact in the Verification Report Regarding PTNNI's Operations.**

Even a cursory comparison between the BCI and public versions of TRLED's Verification Report shows that the public version left out an enormous amount of information pertinent to TRLED's verification findings.  Compare Appx89568-Appx89600 (BPI version) to Appx9815-Appx9855 (Public Version).  This problem is endemic throughout the Verification Report, but as just one example, the Verification Report alleges that PTNNI did not purchase enough raw material to produce particular amounts of glycine.  A comparison of the confidential version of pages 16-17 of the Verification Report, point 21 (Appx89583) to the public version of the same (Appx9830-Appx9831) drives the point home:

Confidential Version of Point 21:

[

]

**PUBLIC VERSION**

Public Version of Point 21

21. Insufficient raw material purchases – below is an estimation of raw material need to produce 1 kg of intermediate glycine.
- MCA – [#] kg
- Hexamine – [#] kg
- Methanol – [#] kg

During the POI, PTNNI produced [ # ] kgs of intermediate glycine. Based on the raw materials needed to produce 1 kg of glycine, it appears PTNNI did not purchase enough raw materials to produce the given glycine as shown below.

| | | | | Raw Material Needed to Produce of Intermediate Glycine | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Material | QTY per Batch | Total # of Batches | Total Raw Material (kg) | Intermediate Glycine Output (kg) | Raw Material/ Intermediate Glycine | Total Intermediate Glycine Produced (kg) | Raw Material Needed | Raw Material Purchased | Shortage (Overage) |
| MCA (kg) | [#] | [#] | [#] | [#] | [#] | [#] | [#] | [#] | [#] |
| Hexamine (kg) | [#] | [#] | [#] | [#] | [#] | [#] | [#] | [#] | [#] |
| Liquid ammonia (L) | Varies depending on pH | | | n/a | n/a | n/a | n/a | n/a | n/a |
| Methanol (kg)* | [#] | [#] | [#] | [#] | [#] | [#] | [#] | [≠] | [≠] |

*Please note, methanol was consumed in liters, however, it was purchased and entered into warehouse based on kgs.
Methanol conversion rate from liters to kgs is: 1 ltr = .7913 kgs.

Raw material consumption to produce intermediate glycine based on raw material consumption rates provided by the importer and PTNNI (Exhibit J, CF-28 response).

| Material | Raw Material/KG of Glycine | Intermediate Glycine | Raw Material Needed | Raw Material Purchased | Shortage (Overage) |
|---|---|---|---|---|---|
| MCA (kg) | [#] | [#] | [#] | [#] | [#] |
| Hexamine (kg) | [#] | [#] | [#] | [#] | [#] |
| Liquid ammonia (L) | n/a | [#] | | | n/a |
| Methanol (L)* | [#] | [#] | [#] | [#] | [#] |

Based on the CBP's raw material consumption rate, it appears there is a [ # ] kgs shortage of methanol purchases to produce [ # ] kgs of intermediate glycine. To be conservative, if we use the methanol consumption rate of [ # ] kg per kg of intermediate glycine calculated from the CF-28 responses, the methanol needed to produce [ # ] kgs of intermediate glycine would be [number (calculation using numbers)]. The methanol shortage would be [number (calculation using numbers)] kgs.

**FOR OFFICIAL USE ONLY**

PV-008856

Verification Report, Enforce and Protect Act (EAPA) Case Number 7647
Page 17

It also appears that PTNNI did not remove a sufficient quantity of intermediate glycine from inventory to account for the total volume of finished glycine produced. Based on the finished glycine to intermediate glycine ratio ([calculation using numbers] observed for finished glycine batch #[ number ] (Verification Exhibit 2), the finished glycine yield from [number] kgs of intermediate glycine should be only [number] [(calculation using numbers)] kgs. However, PTNNI records shows they produced [number] kgs of finished glycine, this would require [number (calculation using numbers)] kgs of intermediate glycine. This leads to a shortage of intermediate glycine of [number (calculation using numbers)] kgs.

The shortage of intermediate glycine also would require additional [number (calculation using numbers)] kgs of MCA. Since there was extra MCA of [number] kgs in the warehouse as shown in the table above, we have a MCA net shortage number (calculation using numbers)].

With only the public version disclosed to PTNNI and its counsel in the administrative proceedings below, PTNNI could not have effectively analyzed and rebutted TRLED's claim of its "estimate" of raw material needed to produce 1 kg of intermediate glycine, including MCA, Hexamine, and Methanol, because the numbers are all redacted and replaced by the singularly uninformative "#".  Appx9830.  Likewise, PTNNI could not understand CBP's calculations of these mystery quantities because the calculations were replaced with "calculations using numbers."  Effectively, CBP is telling PTNNI that it must take CBP's "word for it."  But CBP may not "content itself with saying that 'I looked at the statistics and they teach me thus and so.' This will never do if hearings and appeals are to be more than empty forms."  *See Ohio Bell Tel. Co.*, 301 U.S. at 303 (cleaned up).

Limiting PTNNI to the public version of the Verification Report is not meaningful disclosure, given the nature of the redactions in this case.  CBP crippled Plaintiffs in their ability to confront the false accusations and assemble a complete defense.  First, the vast majority of the information withheld from PTNNI in the Public Version was information that *PTNNI itself* provided to CBP at verification.  CBP justified withholding this factual information from PTNNI and Plaintiffs because it contained BCI, but while that justifies CBP redacting that information from the version of the Verification Report that CBP provided to the public at large, CBP cannot reasonably prevent Plaintiffs from reviewing statements and characterizations by CBP *of their own* BCI.  Indeed, Plaintiffs submitted a letter to CBP on June 3, 2022 (a few days before release of the Verification Report), asking TRLED to provide the unredacted confidential version of the Verification Report to the Importers and to PTNNI, as mandated by the Administrative Procedures Act ("APA").  Appx9809-Appx9811.

Anticipating that CBP would try to rely on the Trade Secrets Act (18 U.S.C. § 1905) to justify withholding to the Importers any bracketed information—even information that the Importers or PTNNI provided to CBP—the Importers pointed out that the Trade Secrets Act does not prevent TRLED from releasing to an interested party an unredacted document where the only BCI contained therein is information provided by that party.  That is inherent in the text of the statute itself, which prohibits only disclosure "not authorized by law."  As the Importers noted, TRLED issued supplemental questionnaires using the very information that TRLED claims needed to be kept from the company receiving the questionnaire.   *See* Second Supplemental RFI Questionnaire to Newtrend USA (Appx90313-Appx90315) (containg BCI in the questions), Nutrawave (Appx90317-Appx90319), Starille (Appx90338-Appx90340), and PTNNI (Appx90322-Appx90336).  Thus, the argument that the information needed to remain withheld from TRLED and the Importers as confidential is contradicted by TRLED's own conduct.  And, as PTNNI pointed out, TRLED is *required* to release to a person information that the agency obtained from that person.  *See* 5 U.S.C. § 555(c).  A statutory requirement is certainly "authorized by law."

TRLED denied PTNNI's request for additional disclosure as described above, with its only explanation being that CBP "only releases the public version of the verification report to the parties to the investigation."  Appx9857.  TRLED did not answer PTNNI's argument that the text of the Trade Secrets Act does not require CBP to withhold disclosure of information to an entity that provided the information to CBP in the first instance and the text of 5 U.S.C. § 555(c) does.

This is independently reversible error on the part of CBP, but it is also an element of the manipulation of the information in its possession to deprive Plaintiffs of due process and their right to present a defense.

    **C.**    **CBP Denied PTTNI's and the Importers' Fundamental Right to be Apprised of Crucial Evidence by Over-Redacting and by Failing to Provide an Adequate Public Summary of "The Revealed Memo."**

As stated in Sections II.B.2 and IV.C *supra*, CBP received "The Revealed Memo" on March 17, 2022.  Appx89604.  Yet even though this document may be the single most important document in the confidential administrative record—specifically, *prima facie* evidence that PTNNI did not import *any* glycine from China during the POI—CBP waited nearly *three months* to place what was essentially a blank placeholder on the record (June 15, 2022), just *one day* before written comments were due to TRLED (June 16, 2022).

Further, CBP did not disclose the contents of the document or their exonerating nature in the public summary—redacting virtually everything from the memo.  As shown in **Exhibit 1**, The Invisible Memo contains virtually nothing that so much as hints as to the contents.  It is styled as a memorandum to "The File."  Appx9965.  The subject line is nebulous: "Adding Information to the Administrative Record of EAPA Case 7647."  Appx 9965.  What kind of "information"?  The most that it says is that "**Attachment 1** contains business confidential trade data" from the "source."  Appx 9965.  The cover page to the "**Attachment 1**" says only "**Attachment 1: Trade Data from [source].**"  Appx9966.  What "source"?  The public version gives absolutely no hint of the "source."  Appx9966.  Behind the cover page to **Attachment 1** is *nothing at all*: not even a document with redactions of particular words or phrases.  Appx 9966.  The attachment justifies this on the grounds that the attachment is "Business confidential in its entirety, not susceptible to public summary."  Appx9966.  In short, The Invisible Memo contains evidence that is, well, *invisible*, and gave the Importers absolutely no hint as to what

was contained therein, much less the fact that the attachment *provided direct evidence* regarding

[                                                                    ] or, more specifically, [

                                    ].  Further, the only "public summary" of the bracketed information

consists of exactly one word: "source."  This made The Invisible Memo absolutely useless to the

Importers in their effort to defend themselves before CBP.

     Moreover, PTNNI and the Importers clearly put CBP on notice that this document was

over-redacted and failed to contain an adequately detailed summary, in violation of CBP own

regulation stipulating that "{a}ny information that CBP places on the administrative record,

when obtained other than from an interested party subject to the requirements of this section, will

include a public summary of the business confidential information as described in paragraph

(a)(2) of this section, where applicable."  19 C.F.R. § 165.14(e).  *See* Appx89907 (Importers'

Rebuttal Written Argument).  While CBP's conduct is secondary to the fact that the record

demonstrates that there was no evasion, the systematic concealment of evidence and the

subsequent reliance on speculation at the least undermines public confidence in the impartiality

of the agency.[2]

     To sum up what happened here, on March 17, 2022, CBP got news from [

 ] that undermined its case against PTNNI and the Importers.  CBP sat on the document

---

[2] Plaintiffs understand that "government agents are presumed to act in good faith absent strong
evidence to the contrary."  *Grupo Acerero S.A. de C.V. v. United States*, 47 CIT ___, ___, 615 F.
Supp. 3d 1339, 1345 (2023). Plaintiffs also acknowledge that "{c}courts have always been loath
to find to the contrary, and to induce a court to abandon the presumption of good faith dealing,
requires well-nigh irrefragable proof."  *Croman Corp. v. United States*, 724 F. 3d 1357, 1364
(Fed. Cir. 2013) (cleaned up).  But, as the Court of Appeals for the Federal Circuit has
recognized in a different context, if an agency fails to explain its actions and "frustrate{s}
effective judicial review" a court can require the agency to explain, including to determine
whether the action was justifiable.  *Gilda Indus., Inc. v. United States*, 453 F.3d 1362, 1363 (Fed.
Cir. 2006).

(*i.e.*, "The Revealed Memo") for three months, only to place it in redacted form ("The Invisible Memo") on the record one day before written comments are due.  CBP did *not* place on the record the query that prompted The Revealed Memo, and to this day has not done so.

Although PTNNI and the Importers complained that The Invisible Memo does not have an adequate public summary, CBP did not cure the inadequate summary problem or even mention the issue in TRLED's Determination or ORR's Administrative Review, and neither TRLED nor ORR mentioned a single word about this document in their determinations.  This Court should find this conduct independently to be reversible error.

## VI.    CBP ACTED ARBITRARILY AND CAPRICIOUSLY BY SELECTIVELY OMITTING FROM THE ADMINISTRATIVE RECORD NUMEROUS EXCULPATORY DOCUMENTS THAT TRLED REVIEWED DURING VERIFICATION.

TRLED denied due process to Nutrawave and Starille because it failed to include in the administrative record a multitude of documents that reviewed by CBP officials during verification.  TRLED did not include the "thousands of pages of original documentation reviewed by CBP during the course of its verification" nor were a majority of these documents even referenced in the Verification Report.  Appx. 90097.  An "agency may not skew the record by excluding unfavorable information but must produce the full record that was before the agency at the time the decision was made." *District Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013).  "{A} document will not be excluded {from the administrative record} simply because defendants claim that they did not 'rely' upon it …." *University of Colorado Health v. Azar*, 486 F. Supp. 3d 185, 216 (D.D.C. 2020) (cleaned up); *Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2002) (same).

The courts have explained that an agency must supplement an administrative record "'in one of two ways—either by (1) including evidence that should have been properly a part of the

administrative record but was excluded by the agency, or (2) adding extrajudicial evidence that was not initially before the agency but the party believes should nonetheless be included in the administrative record.'" *District Hosp. Partners*, 971 F. Supp. 2d at 20 (quoting *WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 5 n.4 (D.D.C. 2009)). Supplementation of the administrative record is justified only under one of the following situations: "'(1) if the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) if background information was needed to determine whether the agency considered all the relevant factors, or (3) if the agency failed to explain administrative action so as to frustrate judicial review.'" *Id*. (quoting *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010)).

Here, TRLED failed to include significant documentation on the record reviewed during verification outlined in Starille and Nutrawave's administrative review request as required by 19 C.F.R. § 165.21.  Appx 90100. Moreover, ORR failed to remedy this problem with the record in its administrative review as allowable under 19 C.F.R. § 165.44.  In its Administrative Review Determination, ORR addresses this contention with a single line – "we see no evidence that TRLED relied upon facts not on the record."  ORR's response lacks foundation in the law, not only does *University of Colorado Health* and *Ad Hoc Metals Coalition v. Whitman* demonstrate that reliance on the evidence is not a reason to include or exclude a particular document from the administrative record, but here TRLED and ORR should have relied on these largely exculpatory materials in rendering their determination.  ORR's treatment of the issue is a misguided attempt to treat an EAPA investigation as a double-blind study rather than the transparent administrative process required by law.

Indeed, CBP's lack of reliance on these documents is the very issue put forth by the Plaintiffs as they necessarily include substantial evidence rebutting TRLED and ORR's

Case 1:22-cv-00347-SAV   Document 58   Filed 05/26/23   Page 39 of 68

**PUBLIC VERSION**

unfounded determinations with respect to PTNNI's production capacity.  Moreover, CBP's own

governing regulation, 19 C.F.R. § 165.21, does not provide that the administrative record will

only include information relied upon by the agency in rendering its Initial Determination.

Rather, the regulation provides in relevant part that CBP's administrative record "*will* contain {. .

.} {i}nformation obtained during and the results of any verification{.}" 19 C.F.R. § 165.21

(emphasis added).  Thus, both TRLED and ORR denied Plaintiffs their due process in this regard

during the underlying proceeding.  While Plaintiffs believe that the evidence elsewhere on the

record affirmatively demonstrates that no evasion occurred during the period of investigation, if

the Court were to find otherwise, Plaintiffs respectfully request that the Court remand this

investigation with the directive to reopen the record in this regard.

## VII. CBP'S FINDING THAT PTNNI "COULD NOT HAVE PRODUCED ALL THE GLYCINE" THAT IT SOLD TO THE IMPORTERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.

### A. The EAPA Statute Requires Customs to Bear the Ultimate Burden of Proof That Evasion Occurred.

The EAPA statute requires CBP to "make a determination, based on substantial evidence,

whether respect to whether such covered merchandise was entered into the customs territory of

the United States through evasion."  19 U.S.C. § 1517(c)(1)(A).  This language "sets forth on its

face a statutory condition that {the agency} must establish before it may {take action} against an

investigated party …."  *Creswell Trading Co. v. United States*, 15 F.3d 1054, 1060 (Fed. Cir.

1994).  However, while the substantial evidence standard applies as the *standard of review* for

the Court's review of CBP's overall EAPA determination, CBP in the first instance must

determine whether the respondents engaged in *evasion* of AD/CVD duties.  For that task, CBP

bears the *burden of proof* to establish that this statutory condition—evasion—occurred, and,

notwithstanding the language of the statute, CBP is required to do so by a preponderance of the

evidence. *Rodriguez v. Dep't of Veterans' Affairs*, 8 F.4th 1290, 1299-1300 (Fed. Cir. 2021) (discussing the APA). In contrast to the *substantial evidence standard of review*, the Federal Circuit generally places the *burden of proof* by the weight of the evidence on the agency. Accordingly, in this case, CBP bore the burden to prove that the glycine at issue was made in China, even though the Court reviews its ultimate determination of an EAPA violation under the substantial evidence standard of review. Misplacing the burden of proof is "an egregious error of law." *Wright v. Dep't of Transp.*, 900 F.2d 1541, 1545 (Fed. Cir. 1990). And, of course, it is even more egregious when the burden is shifted without the agency's providing the evidence that it had in its possession, evidence which answered the very question the agency was asking.

In TRLED's determination, CBP has confused the issue of the *burden of proof* with the *standard of review*, stating that "{t}he plain language of the EAPA statute, our regulations, and recent court rulings all set forth substantial evidence as the burden of proof for a finding of evasion in EAPA cases." Appx90020. As a result, it both placed a burden unfairly on PTNNI and placed an unfair burden on it. *Rodriguez,* 8 F.4th at 1298.

Nowhere is the effect more apparent than in CBP's own statements, such as the statements in the Verification Report that "{a}t time of importation, PTNNI *may not have had* production capabilities to produce glycine in Indonesia," Appx89568 (emphasis added), or the statement in the TRLED Determination that "PTNNI *may not have produced* all of the intermediate glycine it claimed in some months," Appx90006 (emphasis added), or the statement in the TRLED Determination that "PTTNI *may not be capable* of the precise pH monitoring needed to sustain industrial-scale glycine production," Appx90012 (emphasis added), or the statement in the TRLED determination that PTNNI "*may not have had adequate training* for large-scale glycine production," Appx90015 (emphasis added), or the statement in ORR's

Administrative Review that "PTNNI *possibly may not have procured* sufficient [

]," Appx90301 (emphasis added).[3]

**B.    CBP's Determination that PTNNI Was Incapable of Production is Arbitrary and Capricious as Substantial Evidence Supports PTNNI's Production.**

As demonstrated below, once given access to the full confidential record, Plaintiffs have been able to easily and directly rebut TRLED's and ORR's factual errors, faulty analysis, and biased interpretations of PTNNI's facility and its ability to produce.  Even ORR in its administrative review determination came to the conclusion that there was evidence to rebut certain alleged inconsistencies TRLED apparently discovered during verification, such as the apparent use of gas ammonia (rebutted by the fact that the stenciling on the liquid ammonia tank is actually a [                    ] in Indonesian which reads [                    ]), discrepancies in gas and electricity consumption (rebutted by a calculation showing differing usage pursuant to the stage of glycine production), and mislabeled merchandise with the wrong date of production (rebutted by the fact that TRLED did not understand the process for labeling merchandise).  *See* Appx. 90303 -04.  Ultimately, though, ORR found that the Importers direct rebuttal of these facts was not "particularly probative on the ultimate question of whether PTNNI was capable of producing glycine on the claimed production start date of October 2020." Appx. 90304.  Plaintiffs disagree as both TRLED's erroneous assumptions and the Importers' ability to easily refute them are direct evidence of the lack of care with which verification was performed.  TRLED chose to conduct verification without engaging with PTNNI on fundamental questions

---

[3] Even ORR, in its Administrative Review, conceded that its speculation that PTNNI "possibly may not have procured sufficient [                    ]" was a bridge too far, recognizing that "such evidence is not particularly probative of whether evasion occurred given the fact that this shortfall in procurement can be explained by a relatively minor discrepancy in consumption rate."  Appx3010.

and ultimately came to conclusions which belied the agency's unfamiliarity with the record and the glycine production process. *See, e.g.,* Appx 89881. CBP's implicit bias against PTNNI simply because of its Chinese ownership pervaded the underlying investigation as evidenced by its findings in this case compared to the parallel case no. 7647. CBP's role as an unbiased arbitrator was simply not fulfilled here, and the Court must remand this decision.

> **1. CBP Failed to Adequately Analyze the Record With Respect to Evidence Supporting PTNNI's October 2020 Production Start Date.**

CBP's failure to consider detracting evidence from its predetermined positions continues with respect to PTNNI's ability to produce glycine during the period of investigation. Both TRLED's determination and ORR's determination cite to photographic evidence of construction equipment to claim that PTNNI's facility was not operational as of October 2020. Appx90029; Appx 90056. However, the photographic evidence relied on by CBP is clearly misinterpreted. TRLED relies on photographs of the factory from the website of the manufacturing development where PTNNI is located, Karawang New Industry City ("KNIC"), which it alleges show construction equipment on-site during production. Appx 90029. However, the construction equipment is not on-site, but rather outside the factory walls. Appx 82389. Thus, there is no inference to be drawn from the photograph except that there is commercial development in the area.

Both TRLED and ORR also rely on photographs included in the investigative report within GEO's allegation which were not publicly summarized and which were only made available to Plaintiffs when the confidential version of the administrative record was transmitted to the Court. Appx 90029; Appx 90299. ORR summarizes the report as containing "extensive photographic evidence of [

].” Appx 90299. ORR also offhandedly dismisses photographic evidence provided by PTNNI of its construction timeline, bizarrely claiming that a photograph dated October 2020 only shows a completed factory exterior despite earlier referencing August 2020 photos from both KNIC and PTNNI which show installed equipment. Appx 90299.  The disregard of this evidence cannot possibly satisfy the standard set forth in *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) and *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1380-81 (Fed. Cir. 2008)

To start, neither TRLED nor ORR's determination address the evidence placed on the record by PTNNI supporting its October 2020 production start date – namely PTNNI's New Exporter Verification, dated October 1, 2020 and produced by the Indonesian Ministry of Trade. Appx84095-94096. The document dated October 1, 2020 states that an Indonesian government official "carried out a careful examination of the company that will carry out the export" of glycine. Appx84095-94096.  In fact, during verification CBP officials interviewed the Indonesian government official responsible for the production of this document. Appx 89581. Yet, eager to find fault, CBP raised concerns regarding the verification of the Ministry of Trade and Industry's attestation that there was a fully functional facility present at his site-visit on October 1, 2020 because it occurred a mere four days before the start of production. Appx89895.

Instead, the agency prioritizes the investigative report submitted by GEO despite that it is [                                                                                              ]. Appx80024-Appx80074.  ORR finds this document "reliable" in its administrative review determination; yet it is full of inconsistencies that are not evaluated by the agency. Appx90299. Specifically, regarding the [

].” Appx80027; Appx 80055 (emphasis added).

Moreover, [



]. Appx 80056; Appx80053.  In fact,

[



].  Appx

80056.  [



].

Appx 80053.  Finally, it must be noted that there are other significant factual errors undermining

the credibility of the investigative report, but that Plaintiffs could not explain and provide

additional evidence in its support on the administrative record, because the report was not

provided to them.

Both TRLED's Determination and ORR's Administrative Review Determination also

misinterpret information provided by PTNNI regarding certain, limited production equipment

installed after October 1, 2020 as indicative of PTNNI's inability to produce glycine. *See* Appx

90029; Appx 90299-300.  In its administrative review request, Newtrend USA explained why

TRLED's interpretation of the installation timing as problematic did not align with the record:

> TRLED also questions the records provided by PTNNI showing equipment
> installed after October 1, 2020, citing to PTNNI's discussion in its second
> supplemental RFI response (even though such evidence has been on the record
> since the CF-28 responses. While TRLED did not ask questions regarding the
> timing of this installation, the correct explanation is evident on the record.
> Specifically, the equipment installed after October 1, 2020 included the
> [                                        ] installed on [                    ].
> This is completely consistent with PTNNI's production records, which do not
> indicate the production of finished glycine for which this machine is used until

[                    ]. ORR should not rely on this information as substantial
evidence that PTNNI's facility was not operational when production began.

Appx 90057.  ORR did not address this point, but rather doubled down that [


                                                              ].  Appx 90299-300.

Once again, ORR's position is unsupportable; the production process and primary

production equipment are included in multiple places on the record and do not show the

equipment installed after [                    ]. *See, e.g.,* Appx 87205; Appx 87207.  The so-called

"large amounts" of "production" equipment installed after December 2020 include merely [     ]

items which can often be discounted as related to production at all including a "control electrical

cabinet" and "alarm system equipment."  ORR appears to be referencing two pieces of

equipment installed on October 1, 2021 (notably, less than a year after claimed production start

date), a "titanium lining tank" and an "electromotor elevator."  Appx 87214.  In the underlying

investigation, TRLED never asked about this equipment either in a supplemental request for

information or at verification, simply inferring that these were not replacement parts or otherwise

routine installations.

ORR makes a similar claim that PTNNI's submissions show "[


                ]."  Appx 90299.  ORR's characterization of these shipments as "production

equipment" stretches reason, given that the shipments include materials either wholly unrelated

to production equipment such as [                    ], [                    ], and [                    ] or are parts,

not full pieces of equipment such as [          ], [                    ], [          ], [

                ].  Appx 84746-84767.  Because the need for parts ***supports*** Plaintiffs' evidence

that there was production ongoing at the time, ORR's characterization is unsupportable.

39

### 2.   CBP's Analysis of PTNNI's Methanol Consumption is Designed to Prevent PTNNI from Raising a Defense.

CBP claims that PTNNI did not procure sufficient methanol to support its claimed production because PTNNI only purchased [      ] kg of methanol during the POI.  Appx 90300. Apparently based on a single production run (TRLED does not actually cite its source for its calculations), TRLED estimated that [      ] kg of methanol is required to produce 1 kg of intermediate glycine.  Appx 89583.  TRLED then uses this calculation to determine that PTNNI did not purchase enough methanol to produce its total reported intermediate glycine production for the period of investigation.  Because PTNNI uses a combination of purchased and recycled methanol in its production, but does not track the exact volume of recycled methanol—a fact openly disclosed on the record--TRLED's analysis would preclude PTNNI from ever showing that it **purchased** sufficient methanol for consumption.

Still, ORR found that PTNNI's reported *purchased* methanol consumption rate of [      ] "unrealistically low" compared to the methanol consumption rate to produce intermediate glycine as that of a third-party glycine producer in India which amounts to [      ] kg per one kg of intermediate glycine.  Appx. 90300.  However, what ORR fails to describe in reaching this consumption rate is that the same chart shows a [          ] recovery of methanol and water in the intermediate glycine production stage, thereby **supporting** PTNNI's reporting of a significantly lower purchased methanol consumption rate of [      ].  *Id.*; *see also* Appx 84582. For the Court's convenience, Plaintiffs have included the relevant portion of the record below for reference.

[




]. Appx 84582.

ORR blames the Importers for failing to account for methanol recycling when calculating

[                                                    ] in their CF-28 responses, prior to even being

provided notice of the EAPA investigation.  Appx 90301. ORR also appears to adopt TRLED's

nonsensical proposition that PTNNI constructed and staffed its methanol recycling tower solely

for the verification, or that the tower was not operational because employees had "limited

understanding of its controls and the methanol recycling process."  Appx 90300.  However, the

hand-written methanol recycling records obtained during verification support PTNNI's position

that the tower was operational during the period of investigation. Appx 89096.  Ultimately,

however, these facts are unnecessary for the Court to reverse, given that the record supports

PTNNI's reporting that methanol is able to be successfully recycled at a nearly [          ]

basis in the production of intermediate glycine.

Finally, ORR cites to TRLED's conclusion that because PTNNI had outstanding invoices

for methanol during the course of the POI, PTNNI did not receive the invoiced methanol and

lacks production capacity.  Appx 90301; *see also* Appx 89580.  Here too, both TRLED and ORR

failed to acknowledge any of the other substantial evidence on the record during verification that

demonstrated the validity of PTNNI's raw material purchases, including invoices, payments, raw

material receipts, raw material requisition forms, import documentation, inland freight to factory, weight verification for liquid materials, *etc.  See* Appx 89887.  It is arbitrary and capricious to use evidence of production as evidence of an inability to produce.

### 3.    CBP's Analysis of PTNNI's Activated Carbon Consumption is Fundamentally Flawed.

TRLED's Verification Report and Initial Determination demonstrate a fundamental lack of understanding with respect to PTNNI's production processes, despite ample evidence on the record to the contrary.  Rather than engage with the Importers' arguments against TRLED's analysis or even scrutinize it as required by a *de novo* review, ORR accepts TRLED's analysis without question.  *See, e.g.,* Appx 90300 (accepting TRLED's calculated consumption rate of [      ] kg of methanol per [      ] of glycine despite no underlying source citations or explanation of the methodology used to calculate this rate provided by TRLED).

As a brief background for the Court, PTNNI's glycine production method is split into three main phases from both a functional production record standpoint and PTNNI's accounting. *See, e.g.,* Appx 89890 – 92. The three phases are the production of intermediate glycine, production of refined glycine (itself a two-part process that includes an undried refined glycine batch and a drying batch), and the production of finished glycine.  *Id.*  Each step builds on the previous and may combine multiple batches produced at an earlier stage into a singular batch at a subsequent stage.  *Id.*  Thus, understanding when raw materials are consumed as well as the nature of PTNNI's process is fundamental for determining whether PTNNI purchased adequate amounts of raw materials.

TRLED claims that PTNNI did not procure sufficient activated carbon to support production, but this too is also based on faulty data.  *See* Appx 90031; Appx 89584. Here, because PTNNI does not recycle activated carbon, the errors TRLED's calculations in are easily

disproven with record evidence.  Without access to the confidential data purportedly supporting

this conclusion, PTNNI initially provided evidence showing its actual consumption and projected

consumption was within bounds of its activated carbon purchases.  Appx 89924.  PTNNI also

noted that TRLED's calculation must be inherently flawed since it analyzed activated carbon

consumption in relationship to finished glycine production when activated carbon is used in the

***earlier***, refined glycine production step.  Appx 89892.  In its initial determination TRLED did

not address the contrary supporting evidence placed on the record in the Importers' written

arguments.  *See, e.g.,* Appx 90014.

ORR ultimately dismissed the difference between TRLED's calculated consumption rate

of [     ] compared to PTNNI's reported consumption rate of [     ] as a potential "minor

discrepancy" that is not "particularly probative" to a finding of evasion without analyzing the

reliability of TRLED's calculation.  Appx 90301.  ORR otherwise reasons that TRLED's

calculation is favorable to PTNNI since the company produces more finished glycine than

refined glycine.  *Id.*  This reasoning is flawed, because TRLED's underlying consumption rate

calculation is flawed, but it is also beside the point.  *Id.*  ORR's acknowledgment of this error

and its refusal to examine TRLED's flawed analysis is arbitrary and capricious. *See Linyi*

*Chengen Import & Export Co. Ltd. v. United States*, 43 CIT ___, ___ 391 F. Supp. 3d 1283,

1293-1294 (2019).

In *Linyi Chengen*, the Court analyzed an analogous Department of Commerce AD/CVD

verification wherein the agency "'made observations' at verification 'that called into question the

accuracy of {the respondent's} records and its ability to substantiate such records,'" specifically

finding the respondent's "reporting of {input} quantities to be imprecise." *Id.* The Court looked

closely at the "perceived inconsistencies" proffered by Commerce and found that Commerce's

"multiple critiques" of the respondent's input calculations to be arbitrary and capricious because Commerce failed "to explain how the record, particularly the verification report and the related exhibits" supported the determination that the provided data was unreliable. The court expressly noted that the determination failed to address supporting documentation that the respondent had provided from its suppliers. Here, too, in its activated carbon analysis TRLED initially failed to address the documentation on the record supporting PTNNI's methanol consumption. And here too, TRLED mischaracterizes the production process and thus does not assess the data or its significance accurately in any regard.

TRLED calculated the activated carbon consumption rate without any citation to its source figures, but the agency did state that it used a single production run included at Exhibit VE-2 as a source for figures in other calculations, and it thus may have been the source of TRLED's activated carbon consumption calculation as well. *See* Appx89584. TRLED's calculation shows that it divided an amount of intermediate glycine output, [      ], by the amount of activated carbon added to a total of [   ] batches of intermediate glycine, [      ]. Appx 89584. But activated carbon is not consumed during the production of intermediate glycine, only during the production of refined glycine. Appx 89584. Moreover, [      ] of activated carbon is combined with [      ] of intermediate glycine to produce a pre-dried batch of refined glycine. *See, e.g.,* Appx 88778. Thus, TRLED's reliance on [      ] kg of intermediate glycine in this calculation does not correlate with the record. Rather, TRLED's citation to [      ] kg appears to actually be a reference to the amount of finished glycine produced from [      ] kg of refined, dried glycine and [   ] kg of anti-caking agent. *See* Appx 88792.

Notably, while Plaintiffs fundamentally disagree with the premise of using a single production run to extrapolate an average consumption rate, the below calculation shows that PTNNI's reported consumption rate aligns with its production data. [      ] of activated carbon is mixed with [        ] of intermediate glycine and [      ] of [                              ] in order to produce a wet batch of refined glycine. PTNNI uses this formula consistently across all production runs. *See, e.g.,* Appx 88884-Appx88887. Because this process occurs in a kettle as part of the centrifugation, PTNNI does not weigh the wet batch of refined glycine. *Id.* Rather, it is at the next production stage--drying and screening--when PTNNI combines batches of wet glycine to create dried refined glycine batches at [    ] kg each. Thus, in order to determine how much activated carbon is consumed to make 1 kg of refined glycine, TRLED should have analyzed the number of pre-drying refined glycine batches relative to the quantity produced in the coordinating dried batches.

| | Refined Glycine (Pre-Drying) | | Refined Glycine (Dried Batch) | Dried Batch Qty (kg) | |
|---|---|---|---|---|---|
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |

| | | *Output* | 9000 | ] |
|---|---|---|---|---|
| **Count of Refined Glycine Pre-Drying Batches** | [ | | | ] |
| **QTY Per Batch** | [ | | | ] |
| **Total Activated Carbon (kg)** | [ | | | ] |
| **Total Raw Material/Output = consumption rate** | [ | | | ] |

Appx 88988-89.  Of course, other production runs may result in consumption rates slightly higher or lower, but they would ultimately average to PTNNI's reported [    ] kg of activated carbon consumed per kg of refined glycine.

For these reasons, TRLED's calculations with respect to activated carbon are flawed and cannot form the basis for a conclusion that PTNNI was incapable of producing--let alone evading.

### 4. CBP's Analysis of PTNNI's Labor Force Intentionally Disregards Substantial Evidence in Support of its Sufficiency for Production.

CBP's determination that PTNNI did not have a sufficient labor force to support production is arbitrary and capricious as it misrepresents the record and applies a "Goldilocks" standard to PTNNI's employment records.  ORR implies that PTNNI did not have a sufficient workforce when production began in October 2020 because the Company only had [       ] Chinese employees and had asserted that it relied on their experience for production operations when the factory was first operational. Appx 90301; *see also* Appx. 85789.  ORR further implies that these workers did not have the requisite experience in production operations as they were largely filling [                                                      ] and were not "directly involved in the production of glycine." Appx 90301.  Yet, their roles involving production are explicitly listed in PTNNI's January 18, 2022 supplemental RFI response which ORR relies on.

Appx 85789.  Namely, the employees' roles include "overseeing {. . .} operation"; "supervising production management"; "management of machinery maintenance and workshop supervisor of intermediate glycine production"; "management of technical quality department and production of refined glycine." *Id.*

Without looking at the evidence, ORR's determination reads as though PTNNI operated its facility with merely these [       ] employees.  However, ORR fails to recognize the [  ] local Indonesian employees that were present in October 2020, including [  ] responsible for [                                                    ] work.  *Id.*  ORR appears to reject the evidence of these employees based on PTNNI's statement that it relied on the expertise of its foreign employees, but the two statement are not at odds.  In fact, the record supports the position that [   ] production managerial staff supervised and trained [  ] unskilled local workers, a ratio of approximately [                                    ].  *See, e.g.,* Appx 85080.

PTNNI put forward evidence, including payment records, sign in sheets, and production records that demonstrate an adequate labor force throughout the entirety of the POI, but CBP dismissed them as "internal records" despite knowing that employment records are almost always internal by nature.  *See* Appx 90301.  It should also be noted that during this critical period in October 2020 where ORR claims that [     ] managerial staff and [  ] local staff were not sufficient for operations, PTNNI did not even claim production of finished glycine, and as of November 2020, only claimed production of [ ] kg of finished glycine.  *See, e.g.,* Appx 89924.

Finally, ORR relies on the unfounded assertion that PTNNI's workers were incapable of engaging in production due to the potentially "lethal consequences of exposure to monochloracetic acid ("MCA")" as based on a National Research Council article on exposure to MCA.  Appx 90302.  Both the inclusion of the underlying article itself by TRLED and the

findings made based upon it by both TRLED and ORR are at odds with the record.  While the report details "acute lethality," this is limited to "oral intoxication" and "after dermal exposure to hot, liquid {MCA}" and even then, few case studies are provided.  Appx. 9933. The article specifically concludes "{n}o studies are available reporting severe toxic effects in humans after inhalation exposure to {MCA}." *Id.*  As reported on the record extensively, and as witnessed by CBP during verification, PTNNI uses ***solid*** MCA flakes in its production process and at no point is the MCA in a hot, liquid form.  Instead, it is dissolved in water *and* ammonia during the first step of production.  *See* Appx 89573 (incorrectly asserting this stage of production is dangerous).

Thus, TRLED and ORR's findings are not based on substantial evidence, but rather take a selective and distorted view of the record in order to reach an arbitrary and capricious decision with respect to PTNNI's labor supply.

Finally, Plaintiffs' refutations of the findings above primarily represent those facts by which ORR relied on to reach its affirmative determination of evasion.  ORR already dismissed several of TRLED's erroneous conclusions in its administrative review determination, (*see* Appx. 90303 -04), and a myriad of other falsehoods perpetuated by TRLED in its verification report and initial determination are addressed in the Importers' written arguments and administrative review requests.  *See generally* Appx 89861 – 924; Appx 90035 – 111.

## VIII.   CONCLUSION AND PRAYER FOR RELIEF.

For all of the above reasons, Plaintiffs respectfully request that the Court:

1)        Enter judgment in favor of Plaintiffs;

2)        Hold and declare that CBP's determination that China was the "true" country of origin of glycine is unsupported by substantial evidence and therefore is arbitrary and capricious;

3)        Hold and declare that CBP violated Plaintiffs' right to be apprised of critical factual information upon which CBP relied in time for Plaintiffs to rebut it;

4)     Hold and declare that CBP arbitrarily and capriciously refused to consider and selectively omitted from the administrative record numerous exculpatory documents that PTNNI presented to TRLED at verification;

5)     Hold and declare that CBP's conclusion that PTNNI "could not have produced all the glycine" that it sold to the Plaintiffs is unsupported by substantial evidence and is therefore arbitrary and capricious;

6)     Remand CBP's determination with instructions to reconsider its ultimate finding of evasion and all subsidiary findings in a manner that is in accordance with law and is no longer arbitrary and capricious; and

7)     Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Richard P. Ferrin
Douglas J. Heffner
D. Alicia Hickok
Wm. Randolph Rucker
Richard P. Ferrin
Carrie Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs Newtrend USA, Co., Inc.,
Starille Ltd, and Nutrawave Co., Ltd.*

May 26, 2023

PUBLIC VERSION

**Certification of Compliance with the March 1, 2023 Scheduling Order**

The undersigned hereby certifies that the foregoing brief contains 13,545 words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitation of 14,000 for primary briefs set forth in the Court's March 1, 2023 Scheduling Order.

/s/ Richard P. Ferrin
Douglas J. Heffner
D. Alicia Hickok
Wm. Randolph Rucker
Richard P. Ferrin
Carrie Bethea Connolly
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs Newtrend USA, Co., Inc.,*
*Starille Ltd, and Nutrawave Co., Ltd.*

## **TABLE OF EXHIBITS**

| Exhibit Number | Description |
| --- | --- |
| 1 | The Invisible Memo |
| 2 | The Revealed Memo |
| 3 | E-Mail from Plaintiffs' Counsel to Defendant's Counsel |
| 4 | E-Mail from Defendant's Counsel to Plaintiffs' Counsel |

**Exhibit 1**



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and Border Protection**

EAPA Case 7647

**PUBLIC VERSION**

DATE:                    June 15, 2022

MEMORANDUM TO:          The File

FROM:                    EAPA Investigations
                         Enforcement Operations Division
                         TRLED, Office of Trade
                         U.S. Customs and Border Protection

SUBJECT:                 Adding Information to the Administrative Record of
                         EAPA Case 7647

---

In accordance with 19 CFR 165.5(a), U.S. Customs and Border Protection (CBP) is adding the following information to the administrative record of Enforce and Protect Act (EAPA) case 7647.

- **Attachment 1** contains business confidential trade data from the [source]

**Appx9965**

**Attachment 1: Trade Data from [source]**

(Business confidential in its entirety, not susceptible to public summary)

**Appx9966**

PV-008992

**Exhibit 2**

**See Exhibit 1 for Redacted Version of Exhibit 2**

**Exhibit 3**

**Ferrin, Richard P.**

| | |
|---|---|
| **From:** | Ferrin, Richard P. |
| **Sent:** | Thursday, April 27, 2023 2:49 PM |
| **To:** | kara.m.westercamp@usdoj.gov |
| **Cc:** | Schwartz, David; Heffner, Douglas J.; Carolyn M. Bethea (carrie.connolly@faegredrinker.com) |
| **Subject:** | Newtrend USA v US (No. 22-347) -- Documents/Pages Missing from Administrative Record |

Hi Kara,

While reviewing the administrative record, we notice some information missing from Confidential Document 104.  All we have is the cover memo and a 1-page letter.

First, the first paragraph refers to an earlier letter from the CBP addressee to the party that sent the letter.  We do not see that earlier letter in the administrative record.  Second, the penultimate paragraph refers to "details attached" to the letter.  We do not see any attachment to the letter.

Please ask your client if they will add these items to the administrative record.

Best regards,
Richard

**Richard Ferrin**
Counsel
Pronouns: he/him/his
richard.ferrin@faegredrinker.com
Connect: vCard

+1 202 230 5803 direct
_____

**Faegre Drinker Biddle & Reath** LLP
1500 K Street, N.W., Ste. 1100
Washington, DC 20005, USA

This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

**Exhibit 4**

**Ferrin, Richard P.**

| | |
|---|---|
| **From:** | Westercamp, Kara M. (CIV) <Kara.M.Westercamp@usdoj.gov> |
| **Sent:** | Monday, May 15, 2023 5:22 PM |
| **To:** | Ferrin, Richard P.; Schwartz, David; Bilge, Kerem; michelle.li@thompsonhine.com |
| **Cc:** | Heffner, Douglas J.; Hickok, Alicia; Connolly, Carrie B.; Rucker, Randy; PETELLE, JENNIFER L (OCC) |
| **Subject:** | RE: Newtrend USA et al. v. United States, No. 22-347--Form 17 Request to Add Alicia Hickok to the Protective Order |

**This Message originated outside your organization.**

Mr. Ferrin,

Apologies for the delay in responding; it's been an intense several weeks with trade arguments and I was also attending to a personal matter, which necessitated some unexpected leave.

To answer your specific questions, Confidential Doc. No. 104 as uploaded in PACER is **complete**, with BC-009664 being the attachment. There was nothing additional ever placed on the administrative record, to the extent that you reference an "earlier letter." I confirmed this with agency counsel.

With respect to Confidential Doc. No. 73 (corresponding ECF No. 36), it appears on PACER that the identified pages (BC-006420, BC-006421, BC-006425, BC-006426, BC-006427, BC-006430, BC-006432, BC-006434, BC-006438, BC-006442, BC-006443, BC-006446, BC-006450, BC-006454, BC-006456, BC-006458, BC-006459, BC-006462, BC-006465, BC-006466) are legible and clear. So I'm not quite sure what you mean by "garbled."

Jennifer Petelle, agency counsel, is copied and so to the extent we can figure out the "garbled" issue, it may be easiest just to get replacement pages for Confidential Doc. No. 73 to you ASAP for the joint appendix.

I know time is of the essence with the opening brief due May 26.

Thanks,
Kara

**From:** Ferrin, Richard P. <richard.ferrin@faegredrinker.com>
**Sent:** Sunday, May 14, 2023 5:16 PM
**To:** Westercamp, Kara M. (CIV) <Kara.M.Westercamp@usdoj.gov>; Schwartz, David <David.Schwartz@thompsonhine.com>; Bilge, Kerem <Kerem.Bilge@thompsonhine.com>; michelle.li@thompsonhine.com
**Cc:** Heffner, Douglas J. <douglas.heffner@faegredrinker.com>; Hickok, Alicia <alicia.hickok@faegredrinker.com>; Connolly, Carrie B. <carrie.connolly@faegredrinker.com>; Rucker, Randy <randy.rucker@faegredrinker.com>
**Subject:** [Not Virus Scanned] [EXTERNAL] [Not Virus Scanned] RE: Newtrend USA et al. v. United States, No. 22-347--Form 17 Request to Add Alicia Hickok to the Protective Order

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Kara,

Could you please give us an update regarding our April 27, 2023 e-mail regarding documents/pages missing from the Administrative Record?  It is important that we get this cleared up quickly given that Plaintiffs' opening brief is due on May 26, 2023.

Also, attached is a copy of the first part of confidential document # 53—the first of two parts of PTNNI's original RFI response of October 27, 2021.  For unknown reasons, this document also was garbled somewhere during the PDF conversion and copying process.  In this case, it looks like it was OK as transmitted by CBP to the Court, but seems to have been garbled at some step on our end.  So here is the document ungarbled and with the bates stamps added again – Appx84040 to Appx84271.  We have password-protected this attachment, and will send you the password in a separate e-mail.

Best regards,
Richard

**Richard Ferrin**
Counsel
Pronouns: he/him/his
richard.ferrin@faegredrinker.com
Connect: vCard

+1 202 230 5803 direct
___

**Faegre Drinker Biddle & Reath** LLP
1500 K Street, N.W., Ste. 1100
Washington, DC 20005, USA

This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

---

**From:** Westercamp, Kara M. (CIV) <Kara.M.Westercamp@usdoj.gov>
**Sent:** Tuesday, May 9, 2023 12:03 PM
**To:** Ferrin, Richard P. <richard.ferrin@faegredrinker.com>; Schwartz, David <David.Schwartz@thompsonhine.com>; Bilge, Kerem <Kerem.Bilge@thompsonhine.com>; michelle.li@thompsonhine.com
**Cc:** Heffner, Douglas J. <douglas.heffner@faegredrinker.com>; Hickok, Alicia <alicia.hickok@faegredrinker.com>; Connolly, Carrie B. <carrie.connolly@faegredrinker.com>; Rucker, Randy <randy.rucker@faegredrinker.com>
**Subject:** RE: Newtrend USA et al. v. United States, No. 22-347--Form 17 Request to Add Alicia Hickok to the Protective Order

**This Message originated outside your organization.**

---

Richard,

That's fine;  I also still need to get back to you about your questions on the record, but I'm in NYC for an argument today and one tomorrow.

Thanks,
Kara

---

**From:** Ferrin, Richard P. <richard.ferrin@faegredrinker.com>
**Sent:** Tuesday, May 09, 2023 11:57 AM
**To:** Westercamp, Kara M. (CIV) <Kara.M.Westercamp@usdoj.gov>; Schwartz, David
<David.Schwartz@thompsonhine.com>; Bilge, Kerem <Kerem.Bilge@thompsonhine.com>;
michelle.li@thompsonhine.com
**Cc:** Heffner, Douglas J. <douglas.heffner@faegredrinker.com>; Hickok, Alicia <alicia.hickok@faegredrinker.com>;
Connolly, Carrie B. <carrie.connolly@faegredrinker.com>; Rucker, Randy <randy.rucker@faegredrinker.com>
**Subject:** [EXTERNAL] Newtrend USA et al. v. United States, No. 22-347--Form 17 Request to Add Alicia Hickok to the
Protective Order

Dear Kara and David,

We would like to add an attorney in our Philadelphia office, Alicia Hickok, to the judicial protective order in this CIT
appeal.  Please let us know whether your client objects to Ms. Hickok's access to proprietary information subject to the
judicial protective order.

Best regards,
Richard

**Richard Ferrin**
Counsel
Pronouns: he/him/his
richard.ferrin@faegredrinker.com
Connect: vCard

+1 202 230 5803 direct

**Faegre Drinker Biddle & Reath** LLP
1500 K Street, N.W., Ste. 1100
Washington, DC 20005, USA

This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and/or privileged
information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact
the sender by reply email and destroy all copies of the original message and any attachments.