**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

NEWTREND USA CO., LTD., STARILLE, LTD.,
and NUTRAWAVE CO., LTD.,

                    Plaintiffs,

        v.

UNITED STATES,

                    Defendant,


        and

DEER PARK GLYCINE, LLC,

                    Defendant-Intervenor.

Court No. 22-347

**<span style="color:red">NONCONFIDENTIAL VERSION</span>**


**PLAINTIFFS' OPENING COMMENTS**
**IN OPPOSITION TO U.S. CUSTOMS AND BORDER PROTECTION**
**REMAND REDETERMINATION**

Douglas J. Heffner
D. Alicia Hickok
Wm. Randolph Rucker
Richard P. Ferrin
Carolyn Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel for Plaintiffs*


Dated: March 4, 2024

NONCONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.    STANDARD OF REVIEW ON REMAND. ............................................................... 1

II.    CBP ENGAGES IN *POST HOC* RATIONALIZATIONS THROUGHOUT ITS REMAND REDETERMINATION, IN VIOLATION OF *REGENTS*. ............................................. 3

    A.    CBP's Treatment of Company-Specific Import Data from the Government of Indonesia Is *Post-Hoc* Rationalization of Evidence That It Ignored in the Original Determination. ......... 3

    B.    Numerous Other Assertions by CBP in Its Remand Redetermination Evince a Pattern of *Post Hoc* Rationalizations. .......................................................................................... 5

III.    CBP's REDETERMINATION PROVIDES ONLY SPECULATION, NOT SUBSTANTIAL EVIDENCE, OF TRANSSHIPMENT THROUGH CHINA. .......................... 11

    A.    CBP's Claim that the Newtrend Group "Orchestrated" All the Transactions in the Importers' Supply Chain Is Nothing More Than Guilt by Association, Leads to a Speculative Conclusion, and Does Not Amount to Substantial Evidence of Transshipment. ..................... 12

    B.    CBP's Assertion Regarding "Data from Diverse Sources" Is Misleading and Speculative and Does Not Constitute Substantial Evidence of Transshipment. ....................... 13

    C.    GEO's Investigative Report is Also Speculative. .......................................................... 14

    D.    CBP's Allegations Regarding Alleged Shipments from a Newtrend Group Company to [           ] Are Unsupported by Substantial Evidence. .......................................... 15

    E.    The Bill of Lading Data on Which CBP Relies Does Not Constitute Substantial Evidence of Transshipment. ................................................................................................ 18

    F.    CBP's Conduct in This Case Is Inconsistent with Its Past Practice in Other EAPA Investigations. ...................................................................................................................... 18

IV.    CBP'S CONCLUSION THAT PTNNI "COULD NOT HAVE PRODUCED ALL THE GLYCINE" THAT IT SOLD TO THE IMPORTERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE. ............................................................................................. 19

    A.    The EAPA Statute Requires Customs to Bear the Ultimate Burden of Proof That Evasion Occurred. ................................................................................................................. 19

    B.    CBP's Determination that PTNNI Was Incapable of Production is Arbitrary and Capricious as Substantial Evidence Supports Only the Conclusion That PTNNI Produced Glycine Throughout the Period Examined. ............................................................................ 21

        1.    CBP Failed to Adequately Analyze the Record With Respect to Evidence Supporting PTNNI's October 2020 Production Start Date. ................................................. 22

        2.    CBP's Analysis of PTNNI's Methanol Consumption is Flawed. ............................. 25

        3.    CBP Does Not Address PTNNI's Activated Carbon Consumption. ......................... 28

        4.    CBP's Analysis of PTNNI's Labor Force Intentionally Disregards Substantial Evidence in Support of its Sufficiency for Production. ....................................................... 28

V.    CONCLUSION AND PRAYER FOR RELIEF. ................................................................ 31

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Am. Mfrs. of Multilayered Wood Flooring v. United States*, 47 CIT ___,
    639 F. Supp. 3d 1216 (2023) ..................................................................................... 11

*Bonnie Forge Corp. v. United States*, 46 CIT ___, 560 F. Supp. 3d 1303 (2022) ...................... 5

*CEK Group LLC v. United States*, 47 CIT ___, 633 F. Supp. 3d 1369 (2023) ........................... 2

*Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318 (Fed. Cir. 2020) ......... 6, 11

*Charlton v. FRC*, 543 F.2d 903, 907 (D.C. Cir. 1976) .............................................................. 19

*Consol. Bearings Co. v. United States*, 412 F.3d 1266 (Fed. Cir. 1995) ..................................... 2

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) .............. 1

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ....................................................................... 6, 25, 29

*Ellwood City Forge Co. v. United States*, 47 CIT ___, 654 F. Supp. 3d 1268 (2023) ................. 1

*Hyundai Heavy Indus. Co., Ltd. v. United States*, 44 CIT ___, 485 F. Supp. 3d 1380 (2020)... 11

*In re NBS Techs., Inc.*, 315 F. App'x 915 (Fed. Cir. 2008) ......................................................... 8

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F. 3d 988 (9th Cir. 2018) ......................................... 8

*Linyi Chengen Imp. & Exp. Co. Ltd. v. United States*, 43 CIT ___,
    391 F. Supp. 3d 1283 (2019) ............................................................................... 28 n.7

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ...................................... 11

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ....................... 23

*Nakorthai Strip Mill Public Co., Ltd. v. United States*, 32 CIT 1272 (2008) .............................. 1

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ...................................... 23

*Nippon Steel Corp. v. Int'l Trade Comm'n*, 494 F.3d 1371 (Fed. Cir. 2007) .............................. 1

*Novosteel S.A. v. United States*, 284 F.3d 1261 (Fed. Cir. 2002) .............................................. 11

*Petrobas America, Inc. v. Samsung Hevy Indus. Co., Ltd.*, 9 F.4th 247 (5th Cir. 2021)............... 8

*Rodriguez v. Dep't Veterans Affairs*, 8 F.4th 1290 (Fed. Cir. 2021) ..................................... 19-20

*SeAH Steel Vina Corp. v. United States*, 950 F.3d 833 (Fed. Cir. 2020)................................. 11

*SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001).................................................. 1

*SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365 (Fed. Cir. 1983) ........................ 19

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005)........................................... 2

*Steadman v. SEC*, 450 U.S. 91, 102 (1981) ................................................................................. 20

*White ex rel. Smith v. Apfel*, 167 F.3d 369 (7th Cir. 1999)....................................................... 11

*Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995)........................................................................... 11

*Wright v. Dep't of Transp.*, 900 F.2d 1541 (Fed. Cir. 1990) .................................................... 19

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ...................................................................................... 10-11

*Yusupov v. Atty. Gen. U.S.*, 650 F.3d 968 (3rd Cir. 2011) ..................................................... 12

**Statutes**

5 U.S.C. § 556(d) ........................................................................................................................ 19

19 U.S.C. § 1517(c)(1)(A) ...................................................................................................... 2, 21

19 U.S.C. § 1517(g)(2)(B) ............................................................................................................ 2

**Regulation**

19 C.F.R. § 165.27(a)................................................................................................................... 2-

**Administrative Determinations**

TRLED, EAPA Case Number: 7270, Notice of Final Determination as to Evasion (Newtrend
    Thailand) (Sept. 25, 2019) ............................................................................................. 12-13

ORR, Enforce and Protect Act ("EAPA") Case Number 7356, 19 U.S.C. § 1517; Minh Phu
    Group (Feb. 11, 2021)..................................................................................................... 18-19

NONCONFIDENTIAL VERSION

## I.    STANDARD OF REVIEW ON REMAND.

"Federal Circuit precedent allows for an agency to request a voluntary remand—without confessing error—to reconsider its position." *Ellwood City Forge Co. v. United States*, 47 CIT ___, 654 F. Supp. 3d 1268, 1276 (2023) (citing *SKF USA Inc. v. United States*, 254 F. 3d 1022, 1029 (Fed. Cir. 2001)).  Under United States Supreme Court precedent, an agency may take one of two paths on remand:

> First, the agency can offer 'fuller explanation of the agency's reasoning *at the time of the agency action.*" … This route has important limitations, when an agency's initial explanation "indicate{s} the determinative reason for the final action taken," the agency may elaborate later on that reason (or reasons) but may not provide new ones.  Alternatively, the agency can "deal with the problem afresh" by taking *new* agency action.  An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action.

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907-08 (2020) (emphasis original) (internal citations omitted).  When the former course is chosen, the Court views the explanation "critically" to ensure the agency has not employed "impermissible 'post hoc' rationalization." *Id*. at 1908.  Tellingly, in *Regents*, the Department of Homeland Security was held to have chosen the first route, because, "having considered" the memorandum, she "decline{d} to disturb" the earlier decision. *Id*. at 1904.

"'The court reviews remand determinations for compliance with the court's order.'" *Ellwood City Forge*, 47 CIT at ___, 654 F. Supp. 3d at 1276 (quoting *Nakornthai Strip Mill Public Co., Ltd. v. United States*, 32 CIT 1272, 1274 (2008)).  "The Court may also issue a further remand order when the remand results are not supported by substantial evidence or otherwise in accord with the law.'" *Ellwood City Forge*, 47 CIT at ___, 654 F. Supp. 3d at 1276 (citing *Nippon Steel Corp. v. Int'l Trade Comm'n*, 494 F.3d 1371, 1379 (Fed. Cir 2007)).

The EAPA statute provides that this Court determine "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 19 U.S.C. § 1517(g)(2)(B).  However, "{a}n abuse of discretion occurs {when} the decision is based on an erroneous interpretation of the law, *on factual findings that are not supported by substantial evidence*, or represents an unreasonable judgment in weighing relevant factors."  *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 1995) (emphasis added); *see also Star Fruits S.N.C. v. United States*, 393 F. 3d 1277, 1281 (Fed. Cir. 2005) (same).

Of course, the purpose of the abuse of discretion analysis is to satisfy the Court that CBP has met the EAPA statute's requirement that CBP "make a determination, based on substantial evidence, whether respect to whether such covered merchandise was entered into the customs territory of the United States through evasion."  19 U.S.C. § 1517(c)(1)(A).  Thus, while the abuse of discretion standard applies as the *standard of review* for the Court's review of CBP's overall EAPA determination, CBP in the first instance must determine whether the respondents engaged in *evasion* of AD/CVD duties and support that determination by substantial evidence.  If CBP fails to support its determination by substantial evidence, then this Court must reject the determination as arbitrary and capricious.  In any event, at the end of the day, "{w}hile the agency bases its determination and decision on substantial evidence and the court reviews the agency's actions to assess whether they are arbitrary and capricious, both standards require an assessment based on a reasonableness standard."  *CEK Group LLC v. United States*, 47 CIT ___, 633 F. Supp. 3d 1369, 1373 (2023) (citations and internal quotation marks omitted).

NONCONFIDENTIAL VERSION

## II.    CBP ENGAGES IN *POST HOC* RATIONALIZATIONS THROUGHOUT ITS REMAND REDETERMINATION, IN VIOLATION OF *REGENTS*.

In its Remand Redetermination, CBP does not state which of the two paths established in *Regents*—(1) explaining in greater detail its determination *at the time of CBP's original determination*; or (2) taking *new* agency action—that it followed on remand.  Indeed, CBP's Redetermination does not mention *Regents* at all.

### A.    CBP's Treatment of Company-Specific Import Data from the Government of Indonesia Is *Post-Hoc* Rationalization of Evidence That It Ignored in the Original Determination.

The leading issue in this case is that CBP's finding of transshipment through China is unsupported by substantial evidence and is squarely refuted by *prima facie* evidence rebutting the transshipment allegation.  Specifically, the *prima facie* evidence is company-specific import data from the Government of Indonesia for PTNNI showing that during the period of July 2020 to June 2022, PTNNI did not import any glycine into Indonesia.  Memorandum of Points and Authorities of Plaintiffs in Support of Rule 56.2 Motion for Judgment on the Agency Record (May 26, 2022), CM/ECF Doc. 57 ("Plaintiffs' Rule 56.2 Brief"), at 15-22.

CBP appears to imply in its Redetermination that it is choosing to explain its original determination in greater detail (the first path discussed in *Regents*) when it states that "{t}he administrative record already included a statement from the Indonesian government that they could find no record of glycine imports into Indonesia by PTNNI, *which CBP did not find persuasive in the original investigation*."  Appx90909 (emphasis added).  In fact, CBP did not make a finding in the original investigation that it found this information "unpersuasive."  In fact CBP did not consider the data at all, and in fact attempted to hide it from the record.

The fact that CBP did not consider the Government of Indonesia letter at all in the original investigation is evident from CBP's false claim that it considered it but "did not find {it}

3

NONCONFIDENTIAL VERSION

persuasive."  CBP footnotes its statement with the following: "*See* Confidential Document No. 104. *See also* Determination, at 3, 12; Admin. Review, at 14."  Appx90909.  This assertion can most charitably be described as misleading because there in fact is no evidence at all that CBP even looked at the statement from the Indonesian government that it received in the original investigation.  The footnote cites Confidential Document No. 104, which is simply the [

] letter from the Government of Indonesia stating that [

] Appx89604.  Neither page

3[1] nor page 12[2] of TRLED's Determination commented on this letter.  Furthermore, page 14 of the Administrative Review Determination also does not comment on this letter.[3]

---

[1] Page 3 of the TRLED Determination states as follows: "CBP also collected entry data from ACE[14] *and trade data from [* *].[15]* These data showed that the importers imported entries of glycine into the U.S.[16] and that the shipments were exported [                                        ]" (emphasis added).  Appx90002.  Page 3 footnote 15 references Attachment 6 to an October 19, 2021 Memo by TRLED.  That attachment contains an [                ] letter from the Government of Indonesia, which also states that [

Appx82509.  But nowhere does page 3 of the TRLED Determination provide any commentary whatsoever on the statements in the [                        ] or [                ] letters from the Government of Indonesia.  Page 3 does not mention at all that TRLED considered and either rejected or discounted the Government of Indonesia's statements that PTNNI did not import glycine from China and/or Thailand to Indonesia, much less state that it considered these statements by the Government of Indonesia to be unpersuasive.

[2] Page 12 of the TRLED Determination states as follows: "They {PTNNI and the importers} also provided publicly available trade statistics from an Indonesian government website to show that Indonesia had no imports of glycine from Thailand during the POI." Appx90011.  The reference to publicly available trade statistics from an Indonesian government website has nothing to do with the letter provided by the Government of Indonesia stating that they could find no record of glycine imports into Indonesia by PTNNI.  Nothing else on page 12 is even remotely relevant.

[3] There is nothing on page 14 of the Administrative Review Determination that discusses anything regarding any document from the Government of Indonesia.  Appx90302.

In short, in the original TRLED Determination or Administrative Review, CBP did not mention the problem that a key document—the letter from the Government of Indonesia stating that its records showed no importation of glycine from China to Indonesia—undermines its position that PTNNI somehow imported glycine. Under those circumstances, CBP cannot claim on remand that it is trying to "explain" its original decision to reject the Government of Indonesia letter in "greater detail" because it never identified that letter in the original determination, much less explained why it determined to discount it. *See Bonnie Forge Corp. v. United States*, 46 CIT ___, 560 F. Supp. 3d 1303, 1313 (2022) (stating that the Court doubted that the agency could satisfy the first alternative in *Regents* by providing a "fuller" explanation of its original determination because the agency "did not initially offer *any* explanation of its reasoning") (emphasis original).

**B.     Numerous Other Assertions by CBP in Its Remand Redetermination Evince a Pattern of *Post Hoc* Rationalizations.**

Like the post-hoc rationalization in *Regents*, CBP's Final Redetermination is peppered with its looking at the parties' respective submissions only to "continue{} to find evasion," characterizing the information that came from Importers as not enough to convince CBP to change its mind. Appx90909, Appx90910, Appx90911, Appx90912, Appx90916, Appx90918, Appx90919, Appx90922. But when the information came from Alleger it did "not detract" from the prior determination, Appx90913, Appx90914, or it provided "support" for the decision or "bolsters CBP's inference", Appx90914, Appx90915, Appx90917.

The substantial evidence standard includes word formulas asking whether a "reasonable mind might accept" a particular evidentiary record as "adequate to support a conclusion" and "requires judges to apply logic and experience to an evidentiary record . . . .." and ensure that the evidence is "sufficient to justify, if the trial were to a jury, a refusal to direct a verdict when the

conclusion sought to be drawn from it is one of fact for the jury." as "determined on the entirety of the record, taking into account the evidence that supports and the evidence that detracts from the agency's conclusion" *Dickinson v. Zurko*, 527 U.S. 150, 162, 163 (1999) (internal quotation marks omitted). But part of the standard includes "intangible factors such as judicial confidence in the fairness of the factfinding process." *Id*. at 163. At a minimum, the reviewing body—whether it be the agency adjudication itself or subsequent review by a court—must "look to the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (cleaned up).

Contrary to its obligation to engage in a fair factfinding process and consider both evidence that supports and fairly detracts from the allegations, in this case CBP engaged in a pattern of grasping at every piece of evidence that seemed to support its predetermined conclusion and rejecting (or ignoring, as noted above) every piece of evidence that detracted from it.

Yet by every objective measure—including the Federal Rules of Evidence—CBP measured the "quality" of the evidence by whether it supported CBP's prior conclusion. There is no justification for extrapolating from an unreliable source while rejecting a reliable one. For example, CBP considered a news report about "single-entry visit visas" and the article's reference to a relaxation of restrictions in October 2020 more authoritative than PTNNI's documentation of supervisory visits, CBP opined:

> According to the news report that Geo placed on the record in its
> November 24, 2023 factual information submission, in October
> 2020, the Indonesian government reopened applications for some
> kinds of "single-entry *visit visas* {emphasis added {by CBP}}"
> which had been previously banned. Although PTNNI did not
> explicitly describe the visas of the Chinese supervisors as "single-

entry," it used the term "[          ]" to describe the visas.  Further, the question of whether or not the Chinese supervisors' visas were single-entry is not pertinent because the article also explained that the Indonesian government relaxed restrictions on foreign travelers in October 2020 after a more stringent set of restrictions were put in place in March 2020 which were a complete "{p}rohibition of entry to the {t}erritory of the Republic of Indonesia for {f}oreigner{s}.  Therefore, publicly available information strongly indicates that the type of visa supposedly obtained by the Chinese supervisors was not allowed when these supervisors purportedly entered in [                    ] because the even more restrictive March regulations were still in effect.

Appx. 90928-Appx90929.

Contrast CBP's treatment of newspaper articles with its short shrift of an official

Government of Indonesia letter dated August 26, 2022 listing all imports by PTNNI for the

period July 2020 to June 30, 2022 (Appx90612-Appx90674).  PTNNI dismissively rejected these

Government of Indonesia import data as follows:

PTNNI's official import data is not definitive proof that PTNNI did not export Chinese-origin glycine to the Importers because import data specific to PTNNI would only include import shipments where PTNNI is the declared import on Indonesian customs declarations.  In the initial determination of evasion, CBP reasoned that trading companies in Indonesia *likely* acted as importers for PTNNI and facilitated importation of vast quantities of glycine into Indonesia on PTNNI's behalf without a single kilogram (kg) of glycine imported under PTNNI's name.  Therefore, given other record evidence, including other rebuttal information described below, this information did not persuade CBP to reverse its determination of evasion.

Appx90909-90910 (emphasis added).

How could CBP disregard an official record of the Indonesian government but credit a

newspaper article that was discussing a different topic than the one for which it was cited?  By

analogy, when applying the Federal Rules of Evidence, courts accord such documents the

opposite weight.  As the Fifth Circuit has explained, in accordance with the plain text of Rule of

Evidence 201, newspaper articles are not judicially noticeable unless they are about facts

7

"generally known" within the court's area or their accuracy cannot reasonably be questioned. *See Petrobas America, Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021); *see also In re NBS Techs, Inc*., 315 F. App'x 915 n.1 (Fed. Cir. 2008) (declining to take judicial notice of a newspaper article). In contrast, documents issued by foreign governmental agencies are properly judicially noticed. *See, e.g., Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1001 (9th Cir. 2018). Nevertheless, here CBP simply evaluated the information on remand in a manner that simply cannot be squared with *Regents*, *Zurko*, *Changzhou Trina*, or its ultimate burden of proof. It is all evidence of CBP engaging in *post hoc* rationalization to bolster its original determination of evasion.

An even more egregious example is CBP's short shrift of its verification. When TRLED conducted its verification of PTNNI's facility, books, and records, it reviewed thousands of original documents including bank records, records of cash transactions, purchase orders for raw materials, invoices for the purchase of raw materials, payments for raw materials, raw material receipts (indicating delivery of the raw materials into inventory), raw material requisition forms (indicating delivery of the raw materials into inventory), inventory reports, and freight transactions while on site at verification. This is precisely what CBP is to do, and it is called "verification" for a reason. If, as CBP speculates, PTNNI surreptitiously set up other importers to import Chinese-origin glycine into Indonesia and then purchased that glycine, CBP would have unearthed it using its standard verification techniques.

But CBP dismissed the massive amount of evidence that PTNNI and the Importers provided during verification, including sales reconciliations (Appx86360-Appx86397), and original accounting records. Instead, CBP pointed to data from a global import datamining vendor—Panjiva, as follows:

NONCONFIDENTIAL VERSION

> Exhibit 5 consists of Panjiva data showing that [
> ] received [        ] kg of glycine from the Chinese Newtrend
> Group Affiliate in 2020, the same year PTNNI began shipping
> glycine to the Importers.  Like Exhibit 3[4] this data shows specific
> shipments explicitly described as glycine, that fall within the
> broader amino acid HS category received by a specific trading
> company from the Chinese Newtrend Group affiliate.  But in
> addition, this data also shows that [        ] received [        ] kg of
> glycine *specifically* from the Chinese Newtrend Group affiliate,
> while the Importers' voluntary factual submission in the original
> investigation dated February 14, 2022 only reported sales of
> [        ] kg of glycine to Segar in 2020.  This suggests that the
> sales reconciliations the Importers placed on the record of the
> investigation were incomplete and unreliable, especially when
> considered along with the fact that the Importers claimed to
> provide sales reconciliations for all Newtrend Group affiliates in
> their February 14, 2022 factual submission while omitting two
> Newtrend Group companies.  This data provides further support
> for CBP's decision to sustain its determination of evasion.

Appx90914-Appx90915 (emphasis original).

CBP also relied on a broad category of amino acid basket import data.  CBP cites to

Indonesian import statistics that show Chinese-origin *amino acids* from Indonesia's Central

Statistics Agency, Budan Pusak Statistik,  Appx90033, Appx9870, Appx9872-Appx9911, but

claims that "aggregate public trade data from official Indonesian sources show{s} increasing

quantities of *glycine shipments from China* to the Indonesian port closest to PTNNI's facility just

before PTNNI began exporting glycine from Indonesia to the United States" and that the same

data "shows that China was the largest source country for Indonesia's *glycine imports*."

Appx90935 (emphasis added).  Then, while never disputing the validity and accuracy of the sales

reconciliation for PTNNI, CBP cites *sales reconciliation data* as evidence that the allegedly

transshipped glycine was Chinese.  Appx90033.  There is no basis to conclude that records that

---

[4] The "Exhibit 3" that CBP referenced in its Remand Redetermination was another Panjiva
printout that purported to show that some unrelated Indonesian import-export trading firm
received Chinese glycine in 2021.  Appx90913.

undermined PTNNI were accurate, but records that supported PTNNI were not. Related, there is no point in the Verification Report or anywhere on the record of this investigation is there a single shred of evidence that PTNNI made any transactions with [                              ], let alone a transaction involving Chinese origin glycine. Appx89568-Appx89584.

At every stage, the Importers have corrected CBP's mischaracterization of the import data. As Plaintiffs explained in the underlying investigation, the underlying administrative review, and in comments on CBP's Draft Remand Redetermination, the import statistics were for a broad category of undifferentiated amino acids, and the data for glycine could not be isolated. Appx89900. The statistics also have no link whatsoever to PTNNI or the Importers. TRLED's speculation that PTNNI *may have* imported Chinese-origin glycine because of an increase in Chinese-origin amino acids through the port of Jakarta—by far the largest port in Indonesia— should be afforded no weight as evidence, particularly in light of the affirmative evidence against such speculation.

Yet CBP itself recognizes that this data is not specific to glycine when discussing its similarity to UN Comtrade data placed on the remand record, which it acknowledges covers "a very broad basket category of amino acids which includes glycine in addition to other chemicals." Appx90913. CBP then goes on to conclude that such "evidence is merely suggestive, but not dispositive of transshipment." Appx90913. And yet, it continues to rely on "suggestive" data while at the same time rejecting the mountains of actual data TRLED reviewed during the verification. Again, this disproportionate weighting makes no sense—except to support a post hoc rationalization of CBP's predetermined conclusions. Such attempts by CBP to backfill the administrative record on remand are post-hoc rationalizations and certainly do not amount to substantial evidence. *Cf. Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,

716 F.3d 1370, 1379 (Fed. Cir. 2013) (finding that agency's "latest attempt to backfill" with additional data did not amount to substantial evidence).

## III.   CBP's REDETERMINATION PROVIDES ONLY SPECULATION, NOT SUBSTANTIAL EVIDENCE, OF TRANSSHIPMENT THROUGH CHINA.

The Federal Circuit has also explained that "{w}e look to the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (cleaned up).  In that examination, "{i}t is well established that speculation does not constitute 'substantial evidence.'"  *Novosteel S.A. v. United States*, 284 F.3d 1261, 1276 (Fed. Cir. 2002) (Dyk, J., dissenting); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) (stating that "an explanation urging jurors to rely on speculation, without more, is often insufficient" and quoting *Novosteel*); *SeAH Steel Vina Corp. v. United States*, 950 F.3d 833, 847 (Fed. Cir. 2020) ("{g}uesswork is no substitute for substantial evidence in justifying decisions") (cleaned up); *Am. Mfrs. of Multilayered Wood Flooring v. United States*, 47 CIT ___, 639 F. Supp. 3d 1216, 1229 (2023) ("{s}peculatory conclusions are not supported by substantial evidence"); *Hyundai Heavy Indus. Co., Ltd. v. United States*, 44 CIT ___, 485 F. Supp. 3d 1380, 1399 (2020) (stating that "{t}he agency may not base its decision on speculation" and citing *Lucent*).  "Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence."  *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999); *see also Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995) (claimant is "entitled to a decision based on the record rather than a hunch").

CBP discounts the Government of Indonesia's documentation, which shows that there was no record of glycine imports by PTNNI into Indonesia through a series of speculations, reasoning that the glycine must be Chinese origin as "Chinese Newtrend Group employees

orchestrated all the transactions in the Importers' glycine supply chain and controlled the key players" and "{d}ata from diverse sources indicates that the Newtrend Group exported glycine to Indonesia and that Chinese glycine from the Newtrend Group was available to PRNNI." Appx90934-Appx90935.

> **A.    CBP's Claim that the Newtrend Group "Orchestrated" All the Transactions in the Importers' Supply Chain Is Nothing More Than Guilt by Association, Leads to a Speculative Conclusion, and Does Not Amount to Substantial Evidence of Transshipment.**

CBP's assertion that Chinese Newtrend Group employees "orchestrated all the transactions in the Importers' glycine supply chain," Appx90934-Appx90935, does not constitute substantial evidence.  None of the interested parties to this investigation has denied the nature of business relationships between them and the Newtrend Group at any point in the investigation; there is simply nothing either deceptive or sinister about the corporate structures.  CBP insinuates guilt by association (or more specifically, guilt by affiliation) to persuade the Court that transshipment somehow must be occurring from China because there is a Chinese affiliate. Guilt by association, however, is "impermissibly speculative" and "does not suffice" under a substantial evidence test.  *Yusupov v. Att'y Gen. U.S.*, 650 F.3d 968, 983 (3rd Cir. 2011).

The arbitrary and capricious nature of CBP's speculation is all the more egregious in light of an earlier EAPA investigation in 2019 that also involved the Newtrend Group – more specifically importer Newtrend USA and the Newtrend Group's affiliated Thai facility, Newtrend Food Ingredient (Thailand) Co., Ltd. ("Newtrend Thailand") – where the agency found sufficient production and no evasion despite the existence of similar business relationships.  *See* TRLED, EAPA Case Number: 7270, Notice of Final Determination as to Evasion (Newtrend Thailand) (Sept. 25, 2019), available at

https://www.cbp.gov/sites/default/files/assets/documents/2019-Oct/TRLED%20-

%20Final%20Determination%20%287270%29%20-%20PV%20%28508%20Compliant%29.pdf

(last visited February 29, 2024) (attached hereto as Annex 1), at 8 (discussing Newtrend's

Chinese affiliates and noting that Department of Commerce's independent verification found no

affiliated company sales of Chinese-produced crude of finished glycine to Newtrend Thailand).

In other words, in that 2019 EAPA case, CBP examined allegations that Newtrend Thailand was

transshipping Chinese-origin glycine to evade the antidumping and countervailing duty orders on

glycine from China, examined the same Newtrend companies in China, and concluded that,

notwithstanding the corporate relationships, Newtrend Thailand was not engaged in

transshipping Chinese-origin glycine.  The notion that now, all of a sudden, those same corporate

relationships with Chinese glycine producers in the Newtrend Group are evidence that PTNNI is

transshipping is simply arbitrary and capricious, and unsupported by substantial evidence.

> **B.    CBP's Assertion Regarding "Data from Diverse Sources" Is Misleading and Speculative and Does Not Constitute Substantial Evidence of Transshipment.**

CBP surmises that "data from diverse sources indicates that the Newtrend Group

exported glycine to Indonesia and that Chinese glycine from the Newtrend Group was available

to PTNNI." Appx90935.  Yet, as discussed above, throughout this investigation, CBP has

repeatedly pointed to import statistics based on a basket tariff schedule subheading covering

"amino acids" and has deliberately mischaracterized the data as "glycine," even though glycine

is just one of many products within the basket "amino acids" category.

CBP initially claims that "aggregate public trade data from official Indonesian sources

show{s} increasing quantities of *glycine shipments from China* to the Indonesian port closest to

PTNNI's facility just before PTNNI began exporting glycine from Indonesia to the United

States" and that the same data "shows that China was the largest source country for Indonesia's

*glycine imports*."  Appx90935 (emphasis added).  These data make no such representation

NONCONFIDENTIAL VERSION

regarding *glycine*, thereby undermining any so-called conclusion that CBP is attempting to draw from the data.  The Importers have repeatedly corrected CBP's mischaracterization of these data throughout every phase of this investigation. The cited Indonesian import statistics show Chinese-origin *amino acids* from Indonesia's Central Statistics Agency, Budan Pusak Statistik. Appx90033, Appx9870, Appx9872-Appx9911.  As Plaintiffs explained in the underlying investigation, the underlying administrative review, and in comments on CBP's Draft Remand Redetermination, the import statistics were for a broad category of undifferentiated amino acids, and the data for glycine could not be isolated.  Appx89900.

The statistics also have no link whatsoever to PTNNI or the Importers.  TRLED's speculation that PTNNI *may have* imported Chinese-origin glycine because of an increase in Chinese-origin amino acids through the port of Jakarta—by far the largest port in Indonesia—should be afforded no weight as evidence, particularly in light of the affirmative evidence against such speculation.

### C.    GEO's Investigative Report is Also Speculative.

CBP also places weight on GEO's investigative report, which quotes a [          ] that

[

                                        ].  Appx80203, Appx80505.  But what some [          ]

allegedly told a consultant as to what PTNNI [                                    ] does not mean

that PTNNI actually did [                                        ] to the consultant or any actual

customer.  The statement is not only third-hand hearsay and thus presumptively unreliable, but it

is also speculative because there is no evidence that anybody connected to PTNNI told the

consultant (or anybody else) that PTNNI actually [                                ], much less

that it did so through transshipment.

NONCONFIDENTIAL VERSION

As part of the remand proceeding, the Alleger attempts to bolster the credibility of this report by providing a declaration naming the investigating firm and attesting to its accuracy. Appx90590. The declaration, however, fails to provide any additional detail that would lift this allegation from mere conjecture to substantial evidence. Ultimately, all that the declaration provides is that a [

                                                          ]. Appx80203, Appx80505, Appx90590.

**D.    CBP's Allegations Regarding Alleged Shipments from a Newtrend Group Company to [                           ] Are Unsupported by Substantial Evidence.**

CBP next states that publicly available company and shipment-specific data show that a Chinese Newtrend Group affiliate sold a greater quantity of glycine to Indonesian companies than the quantity the Importers have previously disclosed. Appx90912. The data are both unreliable and inadequate to prove receipt and export of Chinese-origin glycine. CBP claims that the Alleger's publicly available import data from third party sources purportedly showing exports from [                                    ] to an Indonesian company, [

  ] is evidence that PTNNI received that glycine and then sold it to the Importers. Appx90921. CBP then goes on to claim that this data further shows larger quantities of glycine, *i.e.* [      ] were shipped to [                        ] than were disclosed in PTNNI and the Importers' February 14, 2022 reconciliation for 2020, *i.e.* [        ], thereby making that submission incomplete and unreliable. Appx90914-Appx90915.

Although CBP acknowledges that such publicly available import data from third party sources can be unreliable with respect to the port of lading, *i.e.* country of origin, Appx90916, it credits Panjiva data with respect to the shipper and infers country of origin based on the shipper's country and such nuanced data as quantity when it comes to shipments to [

].  Appx90914-Appx90915.  It justifies its reliance on the data by speculating that the data might be reliable because "there is no indication {. . .} that all data from vendors based on bills of lading are unreliable" and noting that the Importers' rebuttal information is from Panjiva's competitor. Appx90932.  The fact that a forecaster is not wrong every single time does not make any forecast reliable.  Worse, the only way CBP can persist in its rejection of the data as unreliable is to ignore the fact that the information provided expressly notes that Panjiva data is not taken directly from government sources and may be altered. Appx90827, Appx10961-Appx10962.

For ease of reference, the Importers provide below a portion of the relevant data on which CBP appears to be relying (taken from the Defendant-Intervenor's November 17, 2023 submission in the remand proceeding):

[



]

Appx90588.  CBP surmises from these data that [                    ] received [        ] kg of glycine from [                        ], but the import data shows shipments were made to [

].  Appx90588. Next, the data provided make no reference to [

], rather all that is provided is a [                ].  Appx90588.  Neither GEO nor CBP provide any context as to what the [                ] actually references or how it would tie to sales records as reported in the sales reconciliations provided by PTNNI and the Importers. It should be noted that the [                ] for two of the three referenced

16

NONCONFIDENTIAL VERSION

shipments are in early January and could reasonably be related to sales actually made in 2019. Appx90588.

CBP also claims that [                    ] is "linked" to the Newtrend Group, but provides no citation to this purported link other than to a citation of exhibits showing Newtrend Group's corporate structure with no reference to [                    ]. Appx90912.[5]  There is no source in the record linking the two at all.  Of additional note, for the first time in its Remand Redetermination, CBP repeatedly refers to [                    ] as a trading company despite no evidence on the record that [                    ] is a trading company.  Appx90912, Appx90918.  Again, there is nothing that approaches the level of substantial evidence to back CBP's assertions.  Moreover, as stated above, CBP reviewed thousands of pages of documents and records during its verification of PTNNI.  Nevertheless, CBP points to nothing indicating that somehow PTNNI purchased or received glycine from the alleged trading company.  Again, this is a prime example of the agency ignoring its verification of PTNNI where it found absolutely no evidence of any purchases of glycine and instead substituting speculation as the basis for its evasion determination.  As such, this Court should place no weight on CBP's speculation.  It certainly does not amount to evidence, let alone substantial evidence.

---

[5] The allegation that [                    ] is "linked" to the Newtrend Group is buried in footnote 55 of the Redetermination.  As evidence, that footnote points to "BC Document 53 at 5, Exhibit 3, and Exhibit 5".  Appx90912.  "BC Document 53" is PTNNI's December 3, 2021 Response to CBP's October 27, 2021 Request for Information.  Appx84039-Appx84040.  Page 5 of that document does not mention [                    ].  Appx84049.  Exhibit 3 of the document shows the worldwide legal structure of PTNNI, but it does not mention [                    ].  Appx84098.  Exhibit 5 of the document shows general information of affiliated companies within the Newtrend Group, but nowhere does this document mention [                    ].  Appx84102.

### E. The Bill of Lading Data on Which CBP Relies Does Not Constitute Substantial Evidence of Transshipment.

CBP's final stated piece of evidence supporting its position that the "Newtrend group exported glycine to Indonesia and that Chinese glycine was available to PTNNI" is related to "bill of lading data showing that the Indonesian companies importing glycine from China included PTNNI's chemical supplier." Appx90935. But the referenced data (footnote 169, which refers to Exhibit 4 of Defendant-Intervenor's November 17, 2023 letter to CBP), do *not* show imports of *glycine* from China, but rather show imports of the basket category *amino acids*. Appx90586. As discussed above, they are not interchangeable. Worse, earlier in its Redetermination, CBP more candidly summarizes Exhibit 4 of Defendant-Intervenor's November 17, 2023 submission, correctly stating that the referenced data shows PTNNI's supplier [                                        ] "received shipments of the *broad amino acid HS category* that includes glycine from China." Appx90914 (emphasis added). Having acknowledged that they show "amino acids" CBP has no justification for recasting them in the Conclusion as showing *glycine*. Appx90935. As such, CBP's finding is not supported by substantial evidence.

### F. CBP's Conduct in This Case Is Inconsistent with Its Past Practice in Other EAPA Investigations.

It is also worth noting that CBP's disregard of the documents produced at the verification is inconsistent with its practice. For example, in EAPA case number 7356, ORR reversed TRLED's findings of evasion despite evidence that the exporter had in its possession both subject and non-subject merchandise (based on country of origin). *See* ORR, Enforce and Protect Act ("EAPA") Case Number 7356; 19 U.S.C. § 1517; Minh Phu Group (Feb. 11, 2021), available at https://www.cbp.gov/sites/default/files/assets/documents/2022-Aug/EAPA%207356%20Final%20Administrative%20Determination.pdf ("EAPA 7356

Administrative Review Determination") (Attached hereto as Annex 2).  Therein, ORR found that the exporter was able to adequately trace subject and non-subject merchandise such that there was no substantial evidence that evasion occurred.  *Id.*  Here, CBP does not even reach the question of traceability because there is simply no evidence PTNNI possessed Chinese origin glycine at any point during the period of investigation.  CBP has simply looked at the record in the light of the conclusion it had already reached, not, as it was required to, to determine whether taken together, and weighing the quality of the evidence, there was substantial evidence of transshipment from China.

IV.   **CBP'S CONCLUSION THAT PTNNI "COULD NOT HAVE PRODUCED ALL THE GLYCINE" THAT IT SOLD TO THE IMPORTERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.**

   A.   **The EAPA Statute Requires Customs to Bear the Ultimate Burden of Proof That Evasion Occurred.**

   As discussed above, forcing Importers to change CBP's mind is inconsistent with the statutory allocation of the burden of proof to CBP.  Misplacing the burden of proof is "an egregious error of law."  *Wright v. Dep't of Transp.*, 900 F.2d 1541, 1545 (Fed. Cir. 1990).

   The Federal Circuit generally places the *burden of proof* by the weight of the evidence on the agency, even though the Court's standard of review is for substantial evidence.  Accordingly, in this case, CBP bore the burden to prove that the glycine at issue was made in China.  Courts have been clear, "Nowhere in our jurisprudence have we discerned acceptance of a standard of proof tolerating 'something less than the weight of the evidence.'" *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir. 1976); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 379–83 (Fed. Cir. 1983) (Nies, J., concurring).  Indeed, even where a statute uses the term substantial evidence, as in the case of section 7(c) of the Administrative Procedures Act (5 U.S.C. § 556(d), the Supreme Court has "refused to substitute that standard for 'the traditional

preponderance-of-the-evidence standard' as the burden of proof." *Rodriguez v. Dep't Veterans Affairs,* 8 F.4th 1290, 1300 (citing *Steadman v. SEC*, 450 U.S. 91, 102 (1981).

Yet all that CBP can muster, in light of its rejection of substantial evidence and its embracing of speculation, is to postulate from the speculation: "{a}t time of importation, PTNNI *may not have had* production capabilities to produce glycine in Indonesia," Appx89568 (emphasis added), or the statement in the TRLED Determination that "PTNNI *may not have produced* all of the intermediate glycine it claimed in some months," Appx90006 (emphasis added), or the statement in the TRLED Determination that "PTTNI *may not be capable* of the precise pH monitoring needed to sustain industrial-scale glycine production," Appx90012 (emphasis added), or the statement in the TRLED determination that PTNNI "*may not have had adequate training* for large-scale glycine production," Appx90015 (emphasis added), or the statement in ORR's Administrative Review that "PTNNI *possibly may not have procured* sufficient [                    ]," Appx90301 (emphasis added).[6]  This is not proof; it does not satisfy CBP's burden, and CBP has done nothing to substantiate its surmise on remand, except to accept and reject evidence according to its consistency with the story CBP had already decided to tell.  And, of course, it is even more egregious when the burden is shifted and the agency dismisses evidence that it had in its possession, *i.e.*, the June 15, 2022 memorandum, which answered the very question the agency was asking.

Said differently, by statute and regulation, CBP is charged with *verifying* the records of importers and adducing *proof* of violations.  *See, e.g.,* 19 C.F.R. § 165.27(a).  The question the

---

[6] Even ORR, in its Administrative Review, conceded that its speculation that PTNNI "possibly may not have procured sufficient [                    ]" was a bridge too far, recognizing that "such evidence is not particularly probative of whether evasion occurred given the fact that this shortfall in procurement can be explained by a relatively minor discrepancy in consumption rate."  Appx3010.

EAPA statute asks is an objective one: "whether such covered merchandise was entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(c)(1)(A). It is not answered by saying that if evidence inconsistent with CBP's preferred story is ignored or downplayed, CBP cannot preclude the possibility that there might have been transshipments. Yet that is precisely what CBP has done here, particularly with regard to PTNNI's production capacity.

> **B.    CBP's Determination that PTNNI Was Incapable of Production is Arbitrary and Capricious as Substantial Evidence Supports Only the Conclusion That PTNNI Produced Glycine Throughout the Period Examined.**

Once given access to the full confidential record, Plaintiffs have been able to easily and directly rebut TRLED's and ORR's factual errors, faulty analysis, and biased interpretations of PTNNI's facility and its ability to produce. Even ORR in its administrative review determination came to the conclusion that there was evidence to rebut certain alleged inconsistencies TRLED flagged during verification, such as the apparent use of gas ammonia (rebutted by the fact that the stenciling on the liquid ammonia tank is actually a [

         ] in Indonesian which reads [                    ]), discrepancies in gas and electricity consumption (rebutted by a calculation showing differing usage pursuant to the stage of glycine production), and mislabeled merchandise with the wrong date of production (rebutted by the fact that TRLED did not understand the process for labeling merchandise). *See* Appx. 90303 -04. And yet, ORR found that the Importers direct rebuttal of these facts was not "particularly probative on the ultimate question of whether PTNNI was capable of producing glycine on the claimed production start date of October 2020." Appx. 90304. Likewise, when given pictures from both KNIC and PTNNI showing equipment installed in the facility in August 2020, at a time when the building had been alleged to be incapable of holding equipment, App90299, CBP nonetheless disregards it as evidence, and then finds there is no evidence of capacity *two months*

NONCONFIDENTIAL VERSION

*later*, because the picture from that date is of the exterior of the facility, Appx90911, and

concluding that "the mere existence of a building does not disprove" other purported evidence

that the building was not used for glycine production.  Appx90919.  These are, once again,

manipulations of the evidence to support a post hoc rationalization, not an objective assessment

of the quality and quantity of evidence and what it shows, contrary to the requirements of

Brenner and other cases.  *See* 990 F.3d at 1325-26 n.7.

Generously, the agency at the outset was unfamiliar with the record and the glycine

production process.  *See, e.g.,* Appx89881.  But if that is so, the evidence adduced during the

process and on remand should have been viewed with the ultimate question before it—is there

proof of evasion—not whether any one piece of evidence compels a change in position.

1.    **CBP Failed to Adequately Analyze the Record With Respect to Evidence Supporting PTNNI's October 2020 Production Start Date.**

CBP's failure to consider detracting evidence from its predetermined positions is

illustrated in its skepticism of PTNNI's ability to produce glycine during the period of

investigation by not just discounting PTNNI's photographic evidence but crediting photographs

that were never intended to and do not document a lack of capacity.  Both TRLED's

determination and ORR's determination cite to photographic evidence of construction equipment

to claim that PTNNI's facility was not operational as of October 2020.  Appx90029; Appx

90056.  Instead of the direct photographic evidence discussed above, TRLED relies on

photographs of the factory from the website of the manufacturing development where PTNNI is

located, Karawang New Industry City ("KNIC"), which it alleges show construction equipment

on-site during production.  Appx 90029.  The construction equipment can clearly be seen to be

not on-site, but rather *outside* the factory walls.  Appx 82389.  Thus, there is no inference to be

drawn from the photograph except that there is commercial development in the area.

Both TRLED and ORR also rely on photographs included in the investigative report within GEO's allegation which were not publicly summarized and which were only made available to Plaintiffs when the confidential version of the administrative record was transmitted to the Court.  Appx 90029; Appx 90299.  ORR summarizes the report as containing "extensive photographic evidence of [



]."  Appx 90299.  The willingness to infer incapability from such indirect evidence while rejecting direct evidence cannot possibly satisfy the standard set forth in *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) and *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380-81 (Fed. Cir. 2008).

Moreover, CBP misinterprets information provided by PTNNI regarding certain, limited production equipment installed after October 1, 2020 as indicative of PTNNI's inability to produce glycine. *See* Appx 90029; Appx 90299-300.  In its administrative review request, Newtrend USA explained why TRLED's interpretation of the installation timing as problematic did not align with the record:  TRLED also questions the records provided by PTNNI showing equipment installed after October 1, 2020, citing to PTNNI's discussion in its second supplemental RFI response (even though such evidence has been on the record since the CF-28 responses). While TRLED did not ask questions regarding the timing of this installation, the correct explanation is evident on the record. Specifically, the equipment installed after October 1, 2020 included the [                                        ] installed on [                    ]. This is completely consistent with PTNNI's production records, which do not indicate the production of finished glycine for which this machine is used until [                    ]. ORR

23

should not rely on this information as substantial evidence that PTNNI's facility was not operational when production began.  Appx 90057.

ORR did not address this point, but rather doubled down on its inference that there was no production in 2020, because [

].

Appx 90299-300.

This inference is made only by ignoring the evidence of the production process and primary production equipment, included in multiple places on the record, without the equipment that was installed after [                    ].  *See, e.g.,* Appx 87205; Appx 87207.  *That* equipment includes [    ] items not necessary for *production*, including a "control electrical cabinet" and "alarm system equipment."  There were two pieces of production-related equipment installed on October 1, 2021 (notably, less than a year after claimed production start date), a "titanium lining tank" and an "electromotor elevator."  Appx87214.  And there was supplemental equipment installed in February and September 2021.  Although it was told that the equipment was supplemental, and in the underlying investigation, TRLED never asked about this equipment either in a supplemental request for information or at verification, for the first time as part of the Remand Redetermination, CBP identifies as "essential equipment" [

] Appx90919.  CBP surmises counterfactually that no equipment serving that purpose was present before [        ], making the equipment "necessary for the production process", Appx90919.

NONCONFIDENTIAL VERSION

To draw that unsupported inference, CBP ignores the evidence that the [



]. Appx90772. In fact, PTNNI's original RFI exhibit shows that an

[                                    ] was first installed on [                    ]. As part of the

Remand, the Importers explained that the referenced [

                          ] and PTNNI's original submission notes that this is related to the

[                          ]. Appx90772; Appx85970-71. Here, too, PTNNI's original RFI

exhibit shows that an [                              ] related to the [

      ] was first installed on [                  ]. Appx85970-71. Finally, as part of the

Remand Redetermination, the Importers confirmed that the referenced [

        ]. Appx90772. PTNNI's original RFI exhibit shows that a [                        ]

related to the [                                        ] was first

installed on [                  ]. Appx85970-Appx85971. Logic and experience—which is what

must be applied to an evidentiary record, *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999)—dictate

that the inference from the entire record shows that there was ongoing and increasing production

throughout the period of investigation, which is why supplemental and spare parts were needed,

not, as CBP would have it, that there was no production for a year after production began.

## 2.    CBP's Analysis of PTNNI's Methanol Consumption is Flawed.

CBP also dismisses PTNNI 's production amounts based on PTNNI 's purchase of

[        ] kg of methanol during the POI. Appx90300. While *still* not disclosing the source of

its calculations, TRLED estimates that [      ] kg of methanol is required to produce 1 kg of

intermediate glycine. Appx89583. TRLED then reasons that if its calculation is correct, PTNNI

did not purchase enough methanol to produce its total reported intermediate glycine production

for the period of investigation. Because PTNNI uses a combination of purchased and recycled

methanol in its production but does not track the exact volume of recycled methanol—a fact openly disclosed on the record—PTNNI would never show that it *purchased* sufficient methanol for consumption.

Again, drawing unfavorable inferences from evidence that supports PTNNI, ORR disregards the fact that the chart on which it relies shows a [                  ] recovery of methanol and water in the intermediate glycine production stage, which *supports* PTNNI's reporting of a significantly lower purchased methanol consumption rate of [          ].  Appx90300, Appx84582. It instead compares PTNNI's reported *purchased* methanol consumption rate of [               ] and calls it "unrealistically low" compared to the methanol consumption rate to produce intermediate glycine as that of a third-party glycine producer in India which amounts to [        ] kg per one kg of intermediate glycine.  Appx90300.  For the Court's convenience, Plaintiffs have included the relevant portion of the record below for reference.

[


                                                                        ].

Appx84582.

Following its same pattern of going to great lengths to read evidence to rationalize the original decision and to discredit evidence that does not, ORR blames the Importers for failing to account for methanol recycling when calculating [                                              ] in their CBP Form CF-28 responses, prior to their even having been provided notice of the EAPA

investigation.  Appx90301. ORR also discounts PTNNI's construction and staffing of its

methanol recycling tower as solely for the verification, or not operational at all, because

employees had "limited understanding of its controls and the methanol recycling process."

Appx90300.  To do so, CBP has to ignore the contemporaneous hand-written methanol recycling

records obtained during verification, which confirm PTNNI's usage of an operational tower to

recycle during the period of investigation. Appx89096.  The Court does not even need to

discredit CBP's characterization of these individual data points, given that record as a whole

supports PTNNI's reporting that methanol is able to be successfully recycled at a nearly [

] basis in the production of intermediate glycine.

Finally, ORR cites to TRLED's conclusion that PTNNI did not receive the invoiced

methanol and lacks production capacity because it had outstanding invoices for methanol during

the course of the POI.  Appx90301, Appx89580.  Rather than viewing the invoices as evidence

of purchases—which they are—both TRLED and ORR looked at the outstanding invoices

without acknowledging the paid invoices, payments, raw material receipts, raw material

requisition forms, import documentation, inland freight to factory, weight verification for liquid

materials, *etc.*  Appx89887.  It then claims that it was *PTNNI's* burden to prove the methanol

recovery rate on the record, even though CBP has acknowledged in other EAPA determinations,

that even when CBP requests (and it did not here) data, it cannot draw a reasonable inference of

evasion if a company's system makes it impossible for it to report data in the desired way.

EAPA 7356 Administrative Review Determination.  This burden shifting is thus not only

contrary to *Rodriguez,* 9 F.4th at 1300; it is contrary to CBP's own acknowledged practice.

CBP's mishandling of data cannot survive scrutiny.

### 3.    CBP Does Not Address PTNNI's Activated Carbon Consumption.

CBP's Remand Redetermination does not address PTNNI's activated carbon

consumption directly, which Plaintiffs rebutted thoroughly.  Instead, the agency purports to

incorporate its prior determinations by reference,[7] in blatant disregard of Royal Brush's

requirement that rebuttal be taken into account.

### 4.    CBP's Analysis of PTNNI's Labor Force Intentionally Disregards Substantial Evidence in Support of its Sufficiency for Production.

CBP's Remand Redetermination continues its arbitrary and capricious position that

PTNNI did not have a sufficient labor force to support production as it misrepresents the record

and applies a "Goldilocks" standard to PTNNI's employment records.  ORR implies that PTNNI

---

[7] ORR accepted TRLED's analysis without question.  Appx 90300 (accepting TRLED's calculated consumption rate of [      ] kg of methanol per [      ] of glycine despite no underlying source citations or explanation of the methodology used to calculate this rate provided by TRLED).  PTNNI's glycine production method is split into three main phases from both a functional production record standpoint and PTNNI's accounting.  Appx89890-Appx89892. The three phases are the production of intermediate glycine, production of refined glycine (itself a two-part process that includes an undried refined glycine batch and a drying batch), and the production of finished glycine.  Appx89890-Appx89892.  Each step builds on the prior one and may combine multiple batches produced at an earlier stage into a single batch at a subsequent stage.  Appx89890-Appx89892.  PTNNI does not recycle activated carbon, which caused the errors in TRLED's calculations.  Without access to the confidential data purportedly supporting this conclusion, PTNNI initially provided evidence showing its actual consumption and projected consumption was within bounds of its activated carbon purchases.  Appx89924. PTNNI also noted that TRLED's calculation must be inherently flawed since it analyzed activated carbon consumption in relationship to finished glycine production when activated carbon is used in the earlier, refined glycine production step.  Appx89892.  In its initial determination TRLED did not address the contrary supporting evidence placed on the record in the Importers' written arguments, but ORR ultimately dismissed the difference between TRLED's calculated consumption rate of [      ] compared to PTNNI's reported consumption rate of [      ] as a potential "minor discrepancy" that is not "particularly probative" to a finding of evasion without analyzing the reliability of TRLED's calculation.  Appx90301.  Appx90014. To the extent it is before the Court, the flawed analysis is arbitrary and capricious. *See Linyi Chengen Imp. & Exp. Co. Ltd. v. United States*, 43 CIT ___, 391 F. Supp. 3d 1283, 1293-1294 (2019).

did not have a sufficient workforce when production began in October 2020 because the

Company only had [        ] Chinese employees and had asserted that it relied on their experience

for production operations when the factory was first operational. Appx90301, Appx85789.  ORR

further implies that these workers did not have the requisite experience in production operations

as they were largely filling [                                        ] and were not

"directly involved in the production of glycine." Appx90301.  Yet, their roles involving

production are explicitly listed in PTNNI's January 18, 2022 supplemental RFI response which

ORR relies on.  Appx85789.  Namely, the employees' roles include "overseeing {. . .}

operation"; "supervising production management"; "management of machinery maintenance and

workshop supervisor of intermediate glycine production"; "management of technical quality

department and production of refined glycine." Appx85789.

      Without looking at the evidence, ORR's determination reads as though PTNNI operated

its facility with merely these [        ] employees.  However, ORR fails to recognize the [    ] local

Indonesian employees that were present in October 2020, including [    ] responsible for

[                                        ] work.  Appx85789.  ORR appears to reject the evidence

of these employees based on PTNNI's statement that it relied on the *expertise* of its foreign

employees, but reliance on expertise and labor is precisely what all manufacturing businesses do,

and ORR's stubborn refusal to apply logic and experience to this evidentiary record is contrary

to the Supreme Court's mandate.  *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999).  The record

shows that [    ] production managerial staff supervised and trained [    ] unskilled local

workers, a ratio of approximately [                                        ].  Appx85080.

      PTNNI put forward evidence, including payment records, sign-in sheets, and production

records that demonstrate an adequate labor force throughout the entirety of the POI, but CBP

NONCONFIDENTIAL VERSION

dismissed them as "internal records" despite knowing that employment records are almost always internal by nature.  Appx90301.  It should also be noted that during this critical period in October 2020 when ORR claims that [      ] managerial staff and [    ] local staff were not sufficient for operations, PTNNI did not even claim production of finished glycine, and as of November 2020, only claimed production of [  ] kg of finished glycine.  Appx89924.

Finally, ORR relies on the unfounded assertion that PTNNI's workers were incapable of engaging in production due to the potentially "lethal consequences of exposure to monochloracetic acid ("MCA")" as based on a National Research Council article on exposure to MCA.  Appx90302.  The report details "acute lethality," based on "oral intoxication" and "after dermal exposure to hot, liquid {MCA}" and even then, few case studies are provided. Appx9933.  The article specifically concludes "{n}o studies are available reporting severe toxic effects in humans after inhalation exposure to {MCA}." Appx9933.  It was thus unreasonable and unsupportable to infer that the *solid* MCA flakes PTNNI uses in its production process (indeed, at no point is the MCA in a hot, liquid form)[8] made it impossible to have an adequate labor force.

As discussed at the outset, the Remand Redetermination relies on a news article provided by the alleger as its sole basis for inferring that the Newtrend Group employees responsible for management of PTNNI's production, [                    ] and [              ], were unable to enter Indonesia.  Appx90917.  PTNNI provided detailed information regarding its employee's visas and never once described them as the purportedly banned "single entry visas", nor did PTNNI state that these employees arrived in Indonesia from China as CBP claims.  Appx90917.

---

[8] Instead, it is dissolved in water *and* ammonia during the first step of production.  Appx89573 (incorrectly asserting this stage of production is dangerous).

Although the allegers also provided the relevant law, which provides six potential exceptions that would have allowed foreigners to enter Indonesia during this time period, Appx10942, CBP simply concluded that they could not have entered. Appx90928. Notably, the Importers were not provided an opportunity to submit rebuttal information regarding the newspaper article.

As stated above—and throughout—the opportunity CBP was given on remand was to look at the whole of an open evidentiary record, weighing the quality and quantity of the evidence to determine whether TRLED met its burden to demonstrate evasion. Instead, CBP measured individual pieces of evidence against its pre-determined conclusion and accepted or rejected it accordingly. This does not satisfy the statute—or due process, and it only obscures the failure to find evidence of evasion.[9]

## V.    CONCLUSION AND PRAYER FOR RELIEF.

For all of the above reasons, Plaintiffs respectfully request that the Court:

1)    Enter judgment in favor of Plaintiffs;

2)    Set aside CBP's determination on remand and declare that its determination on remand that China was the "true" country of origin of glycine is unsupported by substantial evidence and therefore CBP's Remand Redetermination is arbitrary and capricious;

---

[9] Plaintiffs' refutations of the findings above address specifically those facts on which ORR relied on to conclude that there was evasion. ORR already dismissed several other of TRLED's erroneous conclusions in its administrative review determination, (*see* Appx90303-Appx90304), and a myriad of other inaccuracies by TRLED in its verification report and initial determination are addressed in the Importers' written arguments and administrative review requests. Appx89861-Appx89924, Appx90035-Appx90111.

3)      Hold and declare that CBP's conclusion that PTNNI "could not have produced all the glycine" that it sold to the Plaintiffs is unsupported by substantial evidence and therefore CBP's Remand Redetermination is arbitrary and capricious;

4)      Remand CBP's Remand Redetermination with instructions to reconsider its ultimate finding of evasion and all subsidiary findings in a manner that is supported by substantial evidence and is no longer arbitrary and capricious; and

5)      Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Richard P. Ferrin
Douglas J. Heffner
D. Alicia Hickok
Wm. Randolph Rucker
Richard P. Ferrin
Carrie Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs Newtrend USA, Co., Inc., Starille Ltd, and Nutrawave Co., Ltd.*

March 4, 2024

NONCONFIDENTIAL VERSION

**Certification of Compliance with Standard Chamber Procedures**

The undersigned hereby certifies that the foregoing brief contains 9,724 words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitation of 10,000 for comments in opposition to and supporting the agency's remand determination, as set forth in Paragraph 2(b)(1)(b) of the Standard Chamber Procedures.

/s/ Richard P. Ferrin
Douglas J. Heffner
D. Alicia Hickok
Wm. Randolph Rucker
Richard P. Ferrin
Carrie Bethea Connolly
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs Newtrend USA, Co., Inc.,
Starille Ltd, and Nutrawave Co., Ltd.*