**PUBLIC VERSION DOCUMENT**

**FINAL REMAND REDETERMINATION**
***Newtrend USA Co., Ltd., et al. v. United States***
Court No. 22-00347 (Court of International Trade October 20, 2023)
EAPA Consolidated Case No. 7647

## I.    SUMMARY

U.S. Customs and Border Protection (CBP) has prepared this remand redetermination

pursuant to the remand order, dated October 20, 2023, issued by the U.S. Court of International

Trade (the Court) in *Newtrend USA Co., Ltd., et al. v. United States*, Court No. 22-00347

(hereinafter the Remand Order).[1] This remand concerns CBP's affirmative determination of

evasion[2] as to three importers, Newtrend USA Co., Ltd., Starille Ltd., and Nutrawave Co., Ltd.

(collectively, the Importers or Plaintiffs), of the antidumping (AD) and countervailing duty

(CVD) orders on glycine[3] from the People's Republic of China (China). The Court granted the

Government's motion for voluntary remand to reconsider or further explain its determination of

evasion in light of the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit) decision

in *Royal Brush Mfg. v. United States* (Royal Brush)[4] relative to the treatment of confidential

information. Specifically, the Court ordered that CBP "should correct any errors required by

*Royal Brush*; and that Plaintiffs may make any arguments they wish about what *Royal Brush*,

due process generally, or Customs' regulations require."[5] The Court further instructed CBP to

---

[1] *See* Order, Newtrend USA Co., Ltd., et al v. United States, No. 22-00347, (Ct. Int'l Trade Oct. 20, 2023), ECF No. 68 ("Remand Order").
[2] *See* Notice of Determination as to Evasion in EAPA Case Number (No.) 7647 (July 22, 2022) (Public (Pub.) Document (Doc.) Number (No.) 287) ("Determination"); *see also* Administrative Review Decision (Nov. 30, 2022) (Pub. Doc. No. 300) ("Admin. Review").
[3] *See* Antidumping Duty Order: Glycine from the People's Republic of China, 60 Fed. Reg. 16115 (Dep't Commerce, March 29, 1995) ("AD Order"); *see also* Glycine from India and the People's Republic of China: Countervailing Duty Orders, 84 Fed. Reg. 29173 (Dep't Commerce, June 21, 2019) ("CVD Order").
[4] 75 F.4th 1250 (Fed. Cir. 2023).
[5] *See* Remand Order, at 10.

"consider all Plaintiffs' due process and evidentiary claims and either grant relief or put on the record in detail why such relief is not required."[6]

As explained below, after reviewing the information placed on the administrative record as part of the remand proceeding, CBP concludes that substantial evidence of evasion exists. In compliance with the Remand Order, CBP required the alleger and defendant-intervenor, Geo Specialty Chemical, Inc. (Geo or Alleger), to place revised public versions, including public summaries of business confidential documents, on the administrative record. CBP also provided access, subject to the amended judicial protective order (JPO), to business confidential information contained in the administrative record of the investigation which was not previously made available to the Importers and Geo.[7] On remand, the Importers and Geo were provided an opportunity to submit rebuttal information to this previously withheld business confidential information and make arguments. For the reasons discussed below, CBP affirms its determination as to evasion.

## II.    BACKGROUND

On July 22, 2022, CBP issued an affirmative determination of evasion finding that Newtrend USA Co., Ltd. (Newtrend USA), Starille, Ltd. (Starille), and Nutrawave Co., Ltd. (Nutrawave) imported covered merchandise into the customs territory of the United States through evasion.[8] Based on the substantial evidence on the record, CBP found that Newtrend, Starille, and Nutrawave each imported merchandise subject to the AD and CVD orders on glycine products from China by transshipping the glycine through Indonesia before importing the

---

[6] *Id.*
[7] *See* Amended Judicial Protective Order, Newtrend USA Co., Ltd., et al v. United States, No. 22-00347, (Ct. Int'l Trade Oct. 31, 2023), ECF No. 72 (amended JPO).
[8] *See* Determination.

merchandise into the United States.[9] The Regulations and Rulings Directorate (R&R) affirmed this determination of evasion in its administrative review.[10]

The Importers sought judicial review of the administrative decision. In challenging CBP's determination of evasion, and as relevant for purposes of this remand, the Importers argued that they were deprived of certain procedural due process rights; specifically, that they were denied the right to respond to certain business confidential information that CBP relied upon in finding evasion.[11]

On July 27, 2023, after the instant matter was already before the Court, the Federal Circuit issued the *Royal Brush* decision.[12] In that case, the Federal Circuit held that there "is no legitimate government interest {} in refusing to provide confidential business information.... when any concerns about the necessity of secrecy can be alleviated by issuing a protective order{.}"[13] Therefore, on September 14, 2023, the Government, after conferring with Plaintiffs' counsel, filed a Partial Consent Motion for Voluntary Remand (Motion) to "reconsider or further explain its determination of evasion in light of {Royal Brush}" regarding the treatment of confidential information. On October 20, 2023, the Court granted the Motion.

## III.    REMAND PROCEDURE

On November 6, 2023, CBP advised the Importers and Geo, the parties to the remand proceeding, that CBP was reopening the administrative record for a limited period of time.[14]

---

[9] *Id*.

[10] *See* Admin. Review.

[11] *See* Complaint, Newtrend USA Co., Ltd., et al. v. United States, Court No. 22-00347 (Ct. Int'l Trade Dec. 23, 2022) ECF No. 2, at ¶¶ 49-56. In their complaint, Plaintiffs also claimed that certain exculpatory documents were arbitrarily and capriciously excluded from the administrative record. *Id*. at ¶¶ 69-77. The Importers were provided the opportunity to submit both rebuttal information and arguments during the remand proceeding.

[12] 75 F.4th 1250.

[13] *Id*. at 1259.

[14] *See* Email from Paul J. Walker to Counsel for Newtrend USA and Counsel for Geo, Re: EAPA 7647 Remand (7884) - Opportunity to Submit Additional Evidence under JPO (Nov. 6, 2023; 04:58 EST).

CBP advised that it would permit the parties to submit public versions of certain documents on the administrative record for which adequate public summaries were not previously provided.[15] Specifically, CBP requested that Geo submit revised public versions of the allegations, and instructed Geo to ensure that any revised documents include public summaries with sufficient detail to permit a reasonable understanding of the substance of the bracketed information in accordance with 19 C.F.R. § 165.4(a)(2).[16] CBP also instructed that if there are documents for which confidential information cannot be summarized, Geo should submit an explanation as to why the document was not susceptible to public summarization.[17] CBP issued Geo a deadline to submit these documents no later than 5:00 pm Eastern Daylight Time (EDT) on November 9, 2023.[18]

On November 6, 2023, CBP also informed the parties that, in compliance with the Remand Order, CBP would grant the parties access to confidential information on the administrative record, via CBP's electronic Case Management System (CMS) under EAPA Remand Case Number 7884, and would allow the parties to submit rebuttal information and make arguments with respect to information that parties did not have access to during the investigation.[19] CBP reminded the parties that they must comply with the requirements related to public summarization of business confidential information in accordance with the requirements of 19 C.F.R. §§ 165.4 and 165.26.[20] Finally, CBP reminded parties that they are bound by the terms of the Court's amended JPO issued on October 31, 2023.[21] CBP issued a deadline for

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* Note, CBP inadvertently referenced "EDT" in this communication although as of the date of the email, the time was Eastern Standard Time (EST).
[19] *Id.*
[20] *Id*.
[21] *Id.*

submission of rebuttal information at 5:00 PM Eastern Standard Time (EST) on November 17, 2023, and informed the parties that it did not anticipate extending this deadline.[22]

On November 9th, Geo submitted revised public versions of the allegations against the Importers, including revised summaries.[23]

On November 16, 2023, CBP advised the parties that they could submit written arguments regarding the confidential information to which they did not have access during the initial investigation and in response to any rebuttal information to that information.[24] CBP advised that the deadline for submitting these written arguments was 5:00 PM EST on November 27, 2023.[25]

On November 17, 2023, the parties submitted rebuttal factual information in response to the business confidential information.[26]

On November 21, 2023, the Importers requested that CBP provide an opportunity for the parties to submit additional rebuttal factual information in response to the information submitted by the parties on November 17th.[27] The Importers requested until November 27, 2023 to submit this information.[28] The Importers explained that this opportunity to submit rebuttal factual information to the November 17th submissions was "warranted in order to preserve due process

---

[22] *Id. See also* Email from Paul J. Walker to Counsel for the Importers and Counsel for Geo, Re: EAPA 7647 Remand (7884) – Opportunity to Submit Additional Evidence under JPO (Nov. 9, 2023; 16:28 EST).
[23] *See* Letter from Counsel for Geo to Derek King and Paul Walker, Re: EAPA 7647 Remand (7884): Submission of Allegations with Revised Public Summaries (Nov. 9, 2023).
[24] *See* Email from Derek King to Counsel for the Importers and Counsel for Geo, Re: Written Arguments Deadline for EAPA 7647 Remand (Nov. 16, 2023; 10:01 EST).
[25] *Id.*
[26] *See* Letter from Counsel for the Importers to Derek King, Re: EAPA Case No. 7884 (7647 REMAND) - Rebuttal Information Concerning Confidential Record (Nov. 17, 2023) ("Nov. 17 Letter from Importers"). *See also* Importers' Exhibits (Nov. 17, 2023); Letter from Counsel for Geo to Derek King and Paul Walker, Re: EAPA 7647 Remand (7884): Submission of GEO's Rebuttal Evidence Addressing the Confidential Administrative Record (Nov. 17, 2023) ("Nov. 17 Letter from Geo"); Geo's Exhibits (Nov. 17, 2023).
[27] *See* Email from Carrie B. Connolly to Derek King, Re: RE: Written Arguments Deadline for EAPA 7647 Remand (Nov. 21, 2023; 14:49 EST).
[28] *Id.*

and prevent prejudice to the parties."[29] That same day, CBP granted the request and advised that any rebuttal information was to be submitted by 5:00 PM Eastern Time (ET) on Friday, November 24, 2023.[30] CBP also reminded the parties that written arguments were still due by 5:00 PM ET, November 30, 2023.[31]

On November 24, 2023, the Importers and Geo submitted rebuttal information to the factual information placed on the record on November 17th.[32]

On November 27, 2023, the Importers sought clarity from CBP as to whether the written arguments were bound to conform to the requirements of 19 C.F.R. § 165.26(d).[33] The Importers also requested that CBP "confirm that 19 C.F.R. {§} 165.26(b) applies with respect to responses to the written arguments such that responses are due on December 15, 2023."[34] On November 28, 2023, CBP advised that given the limited timeframe allowed for the remand procedure, the parties would not be permitted to respond to written arguments.[35] However, CBP advised the parties that in lieu of responses to written arguments, they would be afforded the opportunity to comment on CBP's draft remand redetermination.[36] CBP further advised that the format requirements of 19 C.F.R. § 165.26(d) did not apply to the written arguments to be submitted on remand.[37]

---

[29] *Id.*

[30] *See* Email from Patricia Tran to Counsel for the Importers and Counsel for Geo, Re: EAPA 7467 Remand (Nov. 21, 2023; 16:16 EST).

[31] *Id.*

[32] *See* Letter from Counsel for Importers to Derek King, Re: EAPA Consol. Case No. 7884 (7647 REMAND) – Rebuttal Information re: November 17, 2023 Submission (Nov. 24, 2023) ("Nov. 24 Letter from Importers"); Letter from Counsel for Geo to Derek King and Paul Walker, Re: EAPA 7647 Remand (7884): GEO's Rebuttal Evidence to Information Placed on the Remand Record (Nov. 24, 2023) ("Nov. 24 Letter from Geo").

[33] *See* Email from Carrie B. Connolly to Derek King, Re: Re: EAPA 7647 Remand (7884) – Opportunity to Submit Additional Evidence under JPO (Nov. 27, 2023: 13:39 EST).

[34] *Id.*

[35] *See* Email from Derek King to Counsel for Importers and Counsel for Geo, Re: EAPA 7647 Remand (7884) – Opportunity to Submit Additional Evidence under JPO (Nov. 28, 2023: 15:23 EST).

[36] *Id.*

[37] *Id.*

On November 30, 2023, the Importers and Geo submitted written arguments.[38]

On December 22, 2023, CBP issued a draft remand redetermination to the parties informing them that they could submit comments on the draft and that any comments were due no later than January 5, 2024, at 5:00 PM EST.[39] The Importers and Geo submitted their written comments by the stated deadline.[40]

## IV.    ISSUES ON REMAND

### 1.  Rebuttal Information in Response to the Business Confidential Record

During the remand, CBP reviewed the rebuttal information (RI) that the parties placed on the record. This RI consists of mainly trade data that is similar to data already available on the record. Therefore, CBP continues to find evasion.

#### a.  Importers' RI

As part of their RI, the Importers submitted company-specific shipment data from the Indonesian government for PT Newtrend Nutrition Ingredient (PTNNI) during the period from July 2020 to June 2022 which shows that PTNNI did not import any glycine into Indonesia.[41] The administrative record already included a statement from the Indonesian government that they could find no record of glycine imports into Indonesia by PTNNI, which CBP did not find persuasive in the original investigation.[42] PTNNI's official import data is not definitive proof that

---

[38] *See* Letter from Counsel for Importers to Derek King, Re: EAPA Consol. Case No. 7884 (7647 REMAND) – Importers' Written Argument (Nov. 30, 2023) ("Nov. 30 Letter from Importers"); *see also* Letter from Counsel for Geo to Derek King and Paul Walker, RE: EAPA Consol. Case No. 7647 Remand (7884): Geo Specialty Chemicals, Inc.'s Written Arguments ("Nov. 30 Letter from Geo").

[39] *See* Email from Derek King to Counsel to Counsel for Importers and Counsel for Geo, RE: EAPA 7647 (Remand 7884) – Opportunity to comment on Draft Remand Redetermination – PD (Dec. 22, 2023; 16:28 EST) ("December 22, 2023 Email").

[40] *See* Letter from Counsel for the Importers to Derek King, Re: EAPA Consol. Case No. 7884 (7647 REMAND) – Comments on Draft Remand Redetermination (Jan. 5, 2024) ("The Importers' Comments"); *see also* Letter from Counsel for Geo to Derek King and Paul Walker, Re: EAPA Consolidated Case No. 7647 Remand (7884): GEO Specialty Chemicals, Inc.'s Comments on Draft Remand Redetermination (Jan. 5, 2024) ("Geo's Comments").

[41] *See* Nov. 17 Letter from Importers, at Exhibit 1.

[42] *See* Confidential Document No. 104. *See also* Determination, at 3, 12; Admin Review, at 14.

PTNNI did not export Chinese-origin glycine to the Importers because import data specific to PTNNI would only include import shipments where PTNNI is the declared importer on Indonesian customs declarations. In the initial determination of evasion, CBP reasoned that trading companies in Indonesia likely acted as importers for PTNNI and facilitated importation of vast quantities of glycine into Indonesia on PTNNI's behalf without a single kilogram (kg) of glycine imported under PTNNI's name.[43] Therefore, given other record evidence, including other rebuttal information described below, this information did not persuade CBP to reverse its determination of evasion.

In their rebuttal submission, the Importers also included a construction contract showing that the company constructing PTNNI's Indonesian facility agreed to complete construction and installation of equipment by [    date    ].[44] However, the contract provided for late completion of the facility, and allowed for the payment of damages in the event of late completion.[45] Therefore, the contract is not sufficient to prove that the facility was in fact fully operational and constructed with all equipment installed by [    date    ]. On remand, the Importers also placed on the administrative record an affidavit from Hao Wang stating that the construction contract "included a deadline to complete equipment installation and all works" by [    date    ].[46] However, the affiant does not attest that he witnessed the actual completion of construction, and he acknowledged that due to COVID-19 travel restrictions, he never visited the location of PTNNI's Indonesian facility until 2022, in preparation for CBP's verification.[47] Further, information from PTNNI's responses to requests for information (RFI) during the

---

[43] See Determination, at 12 and 34.
[44] See Nov. 17 Letter from Importers, at Exhibit 2.
[45] Id.
[46] Id., at Exhibits 2 and 3.
[47] Id., at Exhibit 3.

original investigation already showed that all equipment was not installed on PTNNI's purported production start date and, in fact, new equipment continued to be installed almost a year after the [    date    ] deadline for installing equipment.[48] Therefore, the construction contract and affidavit do not detract from CBP's determination of evasion.

As part of the rebuttal information, the Importers also submitted photographs of the factory construction process as ostensible proof that PTNNI's facility was fully constructed, and all equipment installed by October 2020.[49] However, one photograph dated August 2020 shows equipment installed inside the factory but it also shows that the walls are not fully constructed, indicating that the building was not yet complete on that date.[50] Another photograph from October 2020 shows a facility from the outside with completed walls, but does not show the inside of the building.[51] During the original investigation, CBP reviewed photographs from the public website of PTNNI's landlord in the industrial zone showing a completed building exterior of PTNNI's facility prior to the notice of initiation and interim measures.[52] The photographs provided by PTNNI on remand are similar, except that they appear to show some equipment installed inside the factory in August 2020. PTNNI placed installation records for some equipment, on the record of the investigation through its voluntary submission of factual information.[53] In the final determination of evasion, CBP considered such information, finding it unpersuasive, noting that additional equipment was installed after PTNNI's reported production

---

[48] *See* Determination, at 30.
[49] *See* Nov. 17 Letter from Importers, at Exhibit 9.
[50] *Id.*
[51] *Id.*
[52] *See* Notice of Initiation of Investigation and Interim Measures – EAPA Consolidated Case Number 7647 (October 26, 2021).
[53] *See* Confidential Document No. 57 PTNNI and Importers' Letter "EAPA Consol. Case No. 7647 – Submission of Rebuttal to GEO's December 21, 2021" dated January 3, 2022, at Exhibit 3.

start date.[54] Therefore, the photos and affidavit PTNNI submitted as rebuttal factual information for the remand proceeding do not alter CBP's determination of evasion.

### b. Alleger's RI

As rebuttal, the Alleger also submitted various forms of trade data, consisting of six Exhibits, numbered 1 through 6, to purportedly demonstrate that trading companies in Indonesia received significant quantities of glycine just before the time PTNNI began exporting glycine to the United States. This data generally supports CBP's original determination of evasion because this information documents substantial shipments of glycine from a Chinese affiliate of Newtrend Group, [ company name          ] (hereinafter, the Chinese Newtrend Group Affiliate), to Indonesia. Notably, the data shows that the Chinese Newtrend Group Affiliate supplied larger quantities of glycine to the Indonesian trading company [ company name     ][55] than the quantity reported in the Importers' February 14, 2022 factual information submission.[56] Given this information provided by Geo on remand, CBP now finds that the Importers' February 14, 2022 submission[57] is incomplete and unreliable because the information received on remand shows that Newtrend Group exported greater quantities of Chinese-origin glycine to Indonesia than the amount that PTNNI and the Importers previously claimed. Notably, CBP already pointed out in its evasion determination that the sales reconciliations for Newtrend Group companies that PTNNI placed on the administrative record as part of its February 14, 2022

---

[54] *Id. See also* Determination at, 3 and 30.
[55] [name] is linked to the Newtrend Group (the parent of both Newtrend USA and PTNNI). BC Document 53 at 5, Exhibit 3 and Exhibit 5.
[56] *See* Confidential Document No. 73.  *See also* Nov. 17 Letter from Geo, at Exhibit 5 and compare with Letter from Importers to Derek King, Re: EAPA Consol. Case No. 7647 -- Voluntary Submission of Factual Information (Feb. 14, 2022) ("Feb. 14, 2022 Letter").
[57] *See* Feb. 14, 2022 Letter.

submission omitted two trading companies that were affiliated with the Newtrend Group, [
company name    ] and [    company name    ].[58]

Exhibit 1 of the Alleger's submission consists of U.S. import data showing that U.S. consignees received shipments of glycine from PTNNI where the port of lading was [    place ]. The Alleger asserts that this is evidence of transshipment. However, this evidence is not dispositive because cargo from East and Southeast Asia is often consolidated in Chinese ports and laden aboard large vessels for the voyage across the Pacific to the United States. While this evidence is not sufficient, by itself, to prove transshipment, it also does not detract from CBP's determination of evasion.[59]

Exhibit 2 consists of UN Comtrade data, which depicts an increase in Indonesian imports of a Harmonized System (HS) heading covering amino acids, including glycine, during and before the period of investigation (POI). This HS heading is a very broad basket category of amino acids which includes glycine in addition to other chemicals, so this evidence is merely suggestive, but not dispositive of transshipment.[60] Similar data was already on the record of the original investigation.[61]

Exhibit 3 consists of Panjiva data showing the Indonesian import-export trading firm [    company name    ] received [    #    ] kg of Chinese glycine in 2021. Notably, the data shows that these shipments consisted of merchandise described specifically as glycine, although classified under a broad HS classification for the category of amino acids; thus, this is evidence that Chinese-origin glycine was imported to Indonesia before and during the

---

[58] *See* Determination at 12.
[59] *See* Nov. 17 Letter from Geo, at Exhibit 1.
[60] *Id.* at Exhibit 2
[61] *See* Confidential Document No. 106.

period of investigation.[62] This information is similar to the Chinese export data provided in the original determination.[63] Therefore, this data does not detract from CBP's determination of evasion.

Exhibit 4 contains Panjiva data showing that [ company name ], PTNNI's supplier of ammonia and other raw materials, received shipments of the broad amino acid HS category that includes glycine from China. In total, [ name ] received [ # ] kg of amino acids from China in October and November 2020, during the two months after PTNNI purportedly began production of glycine.[64] This data is similar to the data in the original investigation showing increasing imports of amino acids into Indonesia during the period just before PTNNI began shipping glycine to the United States[65] and provides further evidence suggesting that [ name ], with a history of receiving shipments on PTNNI's behalf, likely received shipments of Chinese glycine and imported them into Indonesia, supporting CBP's determination of evasion.

Exhibit 5 consists of Panjiva data showing that [ company name ] received [ # ] kg of glycine from the Chinese Newtrend Group Affiliate in 2020, the same year PTNNI began shipping glycine to the Importers.[66] Like Exhibit 3, this data shows specific shipments explicitly described as glycine, that fall within the broader amino acid HS category received by a specific trading company from the Chinese Newtrend Group affiliate. But in addition, this data also shows that [ name ] received [ # ] kg of glycine *specifically* from the Chinese Newtrend Group Affiliate, while the Importers' voluntary factual submission in the

---

[62] *See* Nov. 17 Letter from Geo, at Exhibit 3.
[63] *See* Confidential Document No. 106, at Exhibit 2.
[64] *See* Nov. 17 Letter from Geo, at Exhibit 4.
[65] *See* PD Document 268.
[66] *See* Nov. 17 Letter from Geo, at Exhibit 5. PTNNI is an Indonesian affiliate of Newtrend Group. *See* Determination, at 5. *See also* Confidential Document No. 53, at 5 and 10.

original investigation dated February 14, 2022 only reported sales of [    #    ] kg of glycine to [company name] in 2020.[67] This suggests that the sales reconciliations the Importers placed on the record of the investigation were incomplete and unreliable, especially when considered along with the fact that the Importers claimed to provide sales reconciliations for all Newtrend Group affiliates in their February 14, 2022 factual submission while omitting two Newtrend Group companies.[68] This data provides further support for CBP's decision to sustain its determination of evasion.

Finally, Exhibit 6 consists of an Affidavit from [  name  ], Managing Director of [  company name  ], the firm that prepared the market research report in the allegation attesting to its accuracy and truthfulness.[69] The firm that produced the report has now been named and identified in the affidavit, countering the Importers' argument that "the agency prioritizes the investigative report submitted by Geo despite that it is [  description  ]."[70]

**2.** **The Parties' November 24, 2023 Rebuttal Information**

Both the Alleger and the Importers submitted additional information in rebuttal to the information the parties placed on the remand record.[71] The Importers placed a guide to bills of lading and shipment data from Panjiva showing imports from PTNNI (in Indonesia) to U.S. importers with [  place  ] as the port of lading and China as the country of origin to show that the port of lading can be an unreliable indicator of the country of origin.[72] However, CBP is aware that the port of lading for goods shipped from Southeast Asia to the United States through Chinese ports will often list China as the port of lading because the goods are consolidated in

---

[67] *See* Confidential Document No. 73.
[68] *See* Determination at 12.
[69] *See* Nov. 17 Letter from Geo, at Exhibit 6.
[70] *See* Nov. 30 Letter from Importers, at 20.
[71] *See* Nov. 24 Letter from Importers; Nov. 24, 2023 Letter from Geo.
[72] *See* Nov. 24 Letter from Importers, at Exhibit 2.

Chinese ports before being shipped across the Pacific to the United States. Therefore, this information does not persuade CBP to reverse its determination of evasion because the port of lading where glycine was consolidated before final shipment to the United States was not the basis for CBP's finding that PTNNI sold Chinese-origin glycine to the Importers in the original determination of evasion.[73]

The Importers also placed on the record an advertisement from Import Genius, a competitor of Geo's trade data vendor, Panjiva.[74] According to the advertisement, both Import Genius and Panjiva provide shipment data based on bills of lading.[75] The advertisement claims that Panjiva data is taken from bill of lading or third-party sources which can be "outdated" in contrast to Import Genius data, which are "unmodified".[76] This information does not alter CBP's determination as to evasion because it does not explain how Panjiva data is "outdated" and serves merely as support for the information in Exhibit 3 of the Importers' submission, showing that the port of lading is not an accurate indicator of the country of origin.

The Alleger submitted a news article showing that during the COVID-19 pandemic, Indonesia implemented restrictions on the entry of foreigners and the types of visas foreign nationals could obtain to enter Indonesia.[77] These restrictions began in March 2020 and included a ban on single-entry visit visas which was not lifted until October 2020.[78] This information is significant because PTNNI told CBP during the original investigation that several Chinese employees entered Indonesia on visit visas in [ date ] before the ban on these visas was lifted.[79] Further, Hao Wang, the son of the president of the Newtrend Group and a former

---

[73] *See* Determination, at 34.
[74] *See* Nov. 24 Letter from Importers at Exhibit 1.
[75] *Id.*
[76] *Id.*
[77] *See* Nov. 24 Letter from Geo, at Exhibit 1.
[78] *Id.*
[79] *Id.*; *see also* Confidential Document No. 69, at Exhibits SQ-V-14 and SQ-V-15.

executive of Newtrend USA, also attested that he was unable to travel to Indonesia until a few weeks before verification due the COVID-19 travel restrictions in place.[80] This information provided by Geo on remand, which indicates there was a total moratorium on the issuance of single-entry visit visas, calls into question statements made in RFI responses during the original investigation that Newtrend Group employees, including [    name    ], the manager in charge of equipment maintenance and intermediate glycine production, and [   name   ], the refined glycine production manager, indicating that they first[81] arrived in Indonesia from China on [    date    ] on short-term visit visas.[82] According to the news article, the date these managers claimed they arrived in Indonesia, [    date    ], was before they could have legally entered the country on this particular type of visa, and Hao Wang has confirmed that he could not enter Indonesia during this time.[83] Therefore, this information bolsters CBP's inference that PTNNI began shipping glycine to the United States before the start of large-scale production.

3. **The Parties' Written Arguments**

**a. The Importers' Written Arguments**

The Importers' main argument is: "{t}he administrative record lacks substantial evidence that PTNNI received or purchased *Chinese-origin* glycine, let alone sold such glycine to the Importers."[84] The Importers allege that "CBP's finding of transshipment of Chinese-origin glycine through Indonesia is not only unsupported by substantial evidence on the record, but is moreover, squarely refuted by *prima facie* evidence that PTNNI did not import Chinese-origin

---

[80] *See* Importers' 2nd Remand Rebuttal Information.
[81] *See* Confidential Document No. 69, at Exhibit SQ-V-14.
[82] *See* Confidential Document No. 69, at Exhibit SQ-V-15.
[83] *See* Nov. 24 Letter from Geo, at Exhibit 1.
[84] *See* Nov. 30 Letter from Importers, at 4.

glycine {}" and that CBP's finding that PTNNI lacked production capacity for the glycine shipped to the {I}mporters "is based on fundamentally flawed logic and a selective and incoherent reading of the record which certainly does not amount to substantial evidence."[85] To support these claims, the Importers primarily rely on import data from official Indonesian trade statistics for the period from July 2020 to June 2022, showing no imports of glycine by PTNNI into Indonesia.[86] The Importers further claim that although CBP obtained data on PTNNI's imports from the Indonesian government showing no imports of glycine, CBP "inexplicably did not acknowledge—much less credit—that evidence" in the initial determination of evasion.[87]

CBP disagrees with the Importers' claims that its determination of evasion is not based on substantial evidence. Nothing submitted by the Importers, neither during the investigation nor as part of the remand proceedings, detracts from the overwhelming record evidence of evasion. CBP considered the more detailed official trade data from the Indonesian government and provided by the Importers on remand. But the agency determined that even though "mainland Chinese affiliates of the Group had no direct sales to PTNNI{…}{,} PTNNI has also stated on the record that it has imported goods from [ description ] through a trading company in [ place ]", suggesting that the lack of imports of glycine by PTNNI directly, does not necessarily mean that PTNNI did not export Chinese-origin glycine to the Importers.[88] CBP also incorporates by reference the Determination of Evasion where the facts supporting the finding of evasion are discussed in depth and further incorporates by reference the Administrative Review Decision.

---

[85] *Id*. at 1.
[86] *See* Nov. 17 Letter from Importers at 5-6, 9-10.
[87] *See* Nov. 30 Letter from Importers, at 10.
[88] *See* Determination, at 12.

The Importers also argue that "neither TRLED nor ORR's {sic} determination address the evidence placed on the record by PTNNI supporting its October 2020 production start date – namely PTNNI's New Exporter Verification, dated October 1, 2020 and produced by the Indonesian Ministry of Trade."[89] But the initial determination of evasion from TRLED stated clearly that "{s}ince the Indonesian official did not witness any equipment in use, his attestation merely confirms the existence of the factory. The mere existence of a building does not disprove the extensive evidence on the administrative record, and discussed in the Determination of Evasion, that there were not enough trained workers, raw materials, or fully installed and operational equipment for production of glycine inside the factory building at that time."[90]

The Importers contend that the equipment installed after the claimed production start date of October 2020 consisted merely of replacement parts or equipment not necessary for production.[91] However, Exhibit SQ-V-18B of PTNNI's supplemental RFI response shows that some equipment essential for production did not arrive until after production began. This includes [

description

] [92] This information proves that even [    description    ] necessary for the production process were not installed until almost one year after the claimed production start date of October 1, 2020.

The Importers further claim that the shortage of methanol, a chemical used in the production of glycine, described in the verification report can be explained by the recycling of

---

[89] *See* Nov. 30 Letter from Importers, at 19.
[90] *See* Determination, at 19.
[91] *See* Nov. 30 Letter from Importers, at 22-24.
[92] *See* Confidential Document No. 71, at Exhibit SQ-V-18B. *See also* Determination, at 30.

methanol.[93] The Importers contend that "{b}ecause PTNNI uses a combination of purchased and recycled methanol in its production, but does not track the exact volume of recycled methanol – a fact openly disclosed on the record – TRLED's analysis would preclude PTNNI from ever showing that it **_purchased_** sufficient methanol for consumption."[94]

However, this is a misleading representation of the verification report. As indicated in its determination of evasion, which is incorporated by reference, CBP concluded that PTNNI did not purchase an adequate quantity of methanol to produce the quantity it claimed.[95] The purpose of the verification was to verify the accuracy of PTNNI's and the Importers' RFI responses. As noted in TRLED's initial determination, "{t}he manufacturer provided no information on the record tying any production batches at PTNNI to recycling of methanol or any information about how many times methanol can be recycled. Instead, each production batch ties to newly purchased methanol."[96] The original determination of evasion also pointed out that "even if PTNNI could consume every kilogram of methanol purchased [  #  ] times, there would still be a shortage of methanol."[97] Therefore, CBP relied on information placed on the record by the Alleger showing that PTNNI could not have recycled that much methanol. TRLED also noted in the initial determination that the administrative record contained information showing that "methanol is a material recycled continuously during the MCAA glycine production process" and that "it is impossible to recycle methanol periodically in batches."[98] TRLED pointed out that since PTNNI frequently stopped production during the POI, its rate of methanol recovery

---

[93] *See* Nov. 30 Letter from Importers, at 24-25.
[94] *Id.* at 25.
[95] *See* Determination, at 14, 19, 30-31.
[96] *Id.* at 19.
[97] *Id.* at 20.
[98] *See* Determination, at 28. *See also* Letter from Counsel for Geo to Derek King and Paul Walker, Re: EAPA Case No. 7647: Resubmission of GEO's June 27, 2022 Factual Information in Rebuttal to CBP's June 15, 2022 Memorandum (June 30, 2022); Confidential Document No. 115.

through methanol recycling would be lower than the recovery rate of the Indian factory whose methanol recovery rate the Alleger placed on the record.[99] TRLED also noted in the initial determination that PTNNI could not demonstrate its ability to recycle methanol at verification and "{w}hen CBP interviewed the workers in this room {the methanol distillation tower control room} ostensibly controlling the methanol recycling process, CBP found that the workers had almost no knowledge of this process and that the room had no controls other than an on/off switch."[100] Notably, during this remand proceeding, the Importers did not place any information about PTNNI's methanol recovery rate on the record and did not provide any records to substantiate their claim that PTNNI could recycle enough methanol to explain the shortage in purchased methanol CBP observed at verification. CBP already addressed the Importers' arguments regarding methanol in the initial determination which is incorporated here by reference.[101]

During the investigation, CBP determined that based on the entirety of the record, PTNNI supplied the Importers with Chinese-origin glycine. CBP determined that PTNNI did not produce enough glycine to sell to the Importers based on PTNNI's shortage of raw materials, evidence that PTNNI's equipment was not fully installed at the production start date, and PTNNI's insufficient number of trained workers.[102] CBP further determined that at least some of the glycine PTNNI sold to the Importers was Chinese because of (1) a clear statement in the Alleger's market research report that PTNNI's owner had tried to sell Chinese-made glycine to the market researcher; (2) the large increases in Indonesian imports of an HS category for amino acids which includes glycine from China and the corresponding increase in Chinese

---

[99] *See* Determination at 31.
[100] *Id*. at 27.
[101] *See id.*, at 30-32.
[102] *See id.*, at 30-33; Admin Review, at 11-13.

exports of merchandise described specifically as glycine (more specific than "amino acids") to Indonesia; (3) the affiliation between the Chinese Newtrend Group, PTNNI, and U.S. importer Newtrend USA; and (4) record evidence showing that PTNNI had previously purchased Chinese merchandise imported through trading companies.[103] The Importers failed to submit any information on remand that warrants a reversal of CBP's determination of evasion**.**

### b. Geo's Written Arguments

On remand, Geo argues that CBP should affirm its determination of evasion because the administrative record contains substantial evidence that the Importers "entered Chinese-origin glycine into the customs territory of the United States through Indonesia to evade the antidumping and countervailing duties on glycine imports from China."[104] Geo claims that the record evidence demonstrates that PTNNI lacked the production capacity for the glycine it shipped to the Importers in the United States.[105] Further, Geo claims that the record evidence shows that PTNNI transshipped Chinese-origin glycine through Indonesia to the United States.[106]

Geo also argues that the record shows that PTNNI did not have an adequate workforce on the purported October 2020 production start date. Geo points out that PTNNI told CBP that it takes [    #    ] to train new employees. PTNNI and the Importers respond by claiming that PTNNI began production in October 2020, before the arrival of the Chinese and Thai supervisors responsible for directly supervising production and training the Indonesian workers.[107] However, Geo states that the first Thai worker responsible for training the Indonesian staff did not arrive in

---

[103] *See* Confidential Document No. 77 at 2. *See also* Determination, at 12, 24; Admin. Review, at 10-15.
[104] *See* Nov. 30 Letter from Geo at 1 (citations omitted).
[105] *Id.* at 1.
[106] *Id.* at 1-2.
[107] *Id.* at 7-8.

Indonesia until [    date    ], even though PTNNI claimed that it produced [    description    ] before the arrival of the first Thai supervisor.[108] Geo also says that the only Chinese workers present at PTNNI before [    date    ] were accounting, and administrative staff not involved in supervising production.[109] Geo further argues that according to the information it placed on the record of the remand proceeding, and the affidavit from Hao Wang placed on the record of the remand proceeding by the Importers, Chinese and Thai employees needed to supervise the Indonesian staff would not have been allowed to enter Indonesia before November 2020.[110] The rebuttal information that Geo placed on the administrative record as part of this remand proceeding supports CBP's continued finding that PTNNI likely sold Chinese-origin glycine to the Importers even though official company-specific trade data does not show any record of PTNNI importing Chinese glycine. Because of this information and other record evidence, CBP affirms its determination of evasion. CBP addresses the parties' comments to the draft remand redetermination, in the context of its determination, below.

## V.    COMMENTS FROM PARTIES TO THE INVESTIGATION

As part of the remand proceedings, on December 22, 2023, CBP issued its draft remand redetermination and afforded the parties an opportunity to comment.[111] Both parties submitted comments timely.[112] The Importers' Comments largely disagreed with CBP's findings on remand, while Geo's Comments generally supported CBP's findings.

### 1.    __The Alleger's Comments__

---

[108] *Id.* at 8.
[109] *Id.* at 8.
[110] *Id.* at 8. *See also* Nov. 24 Letter from Geo, at Exhibit 1.
[111] *See* December 22, 2023 Email.
[112] *See* Importers' Comments; *see also* Geo's Comments.

Geo stated that it "fully supports {} CBP's draft remand redetermination."[113] Geo asserted that the administrative record contained substantial evidence of evasion inasmuch as PTNNI could not have produced the amount of glycine it shipped to the United States during the POI and PTTNI purchased Chinese-origin glycine.[114] Geo claimed that the additional evidence it submitted on remand "call{ed} into question the accuracy and completeness of the information provided by the Importers and PTNNI during the underlying investigation,"[115] and therefore, Geo claimed the application of adverse inferences was appropriate,[116] but in the alternative, "CBP should continue to find…that substantial evidence supports its affirmative finding of evasion."[117] More specifically, Geo asserted that substantial evidence demonstrated: (1) PTNNI could not have produced the amount of glycine it shipped to the United States during the early part of the POI because it neither had the employees to train and supervise the production of glycine in Indonesia nor was its production facility completed at the time of the alleged dates of production; and (2) PTNNI shipped Chinese-origin glycine to the United States because its suppliers and other Newtrend Group business associates were involved in importing glycine from China to Indonesia.[118]

Finally, Geo claimed that CBP should address additional inconsistencies in its final remand redetermination.[119] First, Geo alleged that the dates of certain photographs submitted as part of rebuttal on remand were questionable, specifically photographs of the production facility

---

[113] Geo's Comments at 1.
[114] *Id.*
[115] *Id.* at 2-3.
[116] *Id.* at 2.
[117] *Id.*; *see also id.* at 4. ("The significant discrepancies in PTNNI's employee records and sales reconciliations raise concerns about the veracity of the responses provided by PTNNI and warrant the application of adverse inferences against PTNNI in this final remand redetermination.")
[118] *Id.*
[119] *Id.* at 5.

and allegedly installed equipment.[120] Geo alleged that although the PTNNI production facility

should have been fully constructed by August 2020, photographs demonstrated otherwise, and

therefore, the photographs dated August 2020, that Importers submitted on remand were

"dubious."[121] Geo made similar allegations about photographs the Importers submitted that were

dated December 2020 allegedly showing the production facilities with installed equipment

claiming that PTNNI "could not have produced [      #      ] of finished glycine between

[      dates                      ] and could not have shipped [      #      ] of finished glycine

to the United States in [      date      ]."[122] Because Geo claimed that the photographs of

PTNNI's production facility and equipment installation records were inaccurate and unreliable,

thereby highlighting inconsistencies in PTNNI's responses during the investigation, Geo urged

CBP to apply adverse inferences.[123]

Geo advised that it submitted evidence that the primary supplier of PTTNI's raw

materials, [      company name                  ], "also likely acted as a conduit to import the

glycine that PTNNI did not produce but shipped to the United States between [      dates      ]

]."[124] Geo asserted that this evidence was consistent with CBP's findings during

the investigation inasmuch as "'trading companies in Indonesia likely acted as importers for

PTNNI and facilitated importation of vast quantities of glycine into Indonesia on PTNNI's behalf

without a single kilogram of glycine under PTNNI's name'[125] and that [name] has a 'history of

receiving shipments on PTNNI's behalf.'"[126] As such, Geo urged CBP to "address its concerns

---

[120] *Id.*
[121] *Id.*
[122] *Id.* at 6.
[123] *Id.*
[124] *Id.* at 7.
[125] *Id.* (citing Verification Report, Confidential Document No. 103, and Public Doc. No. 261, at 6).
[126] Geo's Comments at 7 (citing Verification Report, Confidential Document No. 103, and Public Doc. No. 261, at 12).

regarding PTNNI's transactions with [ name], which has imported significant volumes of Chinese-origin glycine into Indonesia during the time that PTNNI allegedly produced and shipped comparable volumes of glycine to the United States."[127]

**CBP Position**

CBP declines to apply adverse inferences on remand, to either the Importers or PTNNI. The application of adverse inferences is appropriate if an importer or foreign producer of covered merchandise "fails to cooperate and comply to the best of its ability with a request for information made by CBP."[128] During both the investigation and remand proceedings, the Importers provided information requested by CBP. In addition, CBP recognizes that PTNNI allowed the agency to conduct verification during the investigation. So, while some information submitted on remand contradicts statements made by the Importers and PTNNI during the investigation, CBP has determined that the application of adverse inferences is not warranted here. That said, CBP continues to find substantial evidence of evasion because there is overwhelming evidence – including insufficient supply of methanol and insufficient numbers of trained workers – that PTNNI did not produce all the glycine it sold to the Importers and there is substantial evidence that the glycine PTNNI did not produce was Chinese-origin.[129] To Geo's point about [ name] importing significant amounts of Chinese-origin glycine into Indonesia during the same timeframe that PTNNI purportedly produced and shipped comparable amounts of glycine to the United States, CBP finds the evidence Geo submitted on remand persuasive when considered in conjunction with other record evidence. As noted by CBP during the underlying investigation, [ name] was the primary supplier for which payments for raw materials

---

[127] Geo's Comments at 7-8.
[128] 19 C.F.R. § 165.6(a).
[129] *See* Determination at 30-34.

were outstanding.[130] Indeed, CBP questioned whether "a raw material vendor would keep providing raw materials if some of the outstanding invoices are older than a year."[131] This investigatory finding, coupled with the information that Geo submitted on remand about [ name ] imports into Indonesia of certain Chinese-origin raw materials,[132] further supports CBP's determination of evasion.

### 2. **The Importers' Comments**

**Importers' Comment: Substantial Evidence**

The Importers asserted that CBP should reverse its determination of evasion because of "continued failures by the agency to engage the record and meet its burden to prove evasion by substantial evidence."[133] The Importers alleged that CBP's determination of evasion is based on "speculative conclusions {that} do not meet {the} substantial evidence standard, {and} the agency provides no explanations as to how its {sic} adequately drew such conclusions."[134]

The Importers further alleged that CBP's claims regarding the totality of the record are flawed and do not constitute substantial evidence of evasion.[135] More specifically, the Importers disagree with CBP's findings about the construction and operational capacity of PTNNI's production facility, including the installation of equipment.[136] The Importers further claimed CBP did not fairly weigh contrary evidence under the substantial evidence standard when the agency discredited a document in which an Indonesian official claimed that PTNNI's facility was complete as of October 1, 2020.[137]

---

[130] *See* Confidential Document No. 103 and Public Doc. No. 261, at 12-13.
[131] *Id.*
[132] *See* Nov. 17 Letter from Geo, at Exhibit 4.
[133] Importers' Comments at 1.
[134] *Id.* at 2.
[135] *Id.* at 5.
[136] *Id.* (citing Draft Remand Redetermination at 8, 24 and Nov. 17 Letter from Importers at Exhibit 6).
[137] Importers' Comments at 5-6 (citing Draft Remand Redetermination at 15).

**CBP's Position**

CBP weighed all evidence, including the New Exporter Verification, which is the document by which an Indonesian official attested to purportedly visiting PTNNI's factory,[138] but as already indicated, this official never witnessed any production and acknowledged that he could not attest to whether or not the equipment was operational. As explained in the initial determination, the mere existence of a physical building does not constitute proof of production capacity because all equipment must be properly installed and workers with adequate training to operate the equipment must be present. The New Exporter Certification from the Indonesian Ministry of Trade does not provide any information about these matters.[139]

**Importers' Comment: Single-Entry Visas**

The Importers also argued that "CBP claims that PTNNI's responses show employees entered the country on impermissible single-entry visas pursuant to a news article placed on the record by the Alleger. However, this is not the case; rather, it is the result of more 'inference' drawn by CBP unfairly against PTNNI and the Importers. PTNNI provided detailed information regarding its employee's {sic} visas and never once described them as the purportedly banned 'single entry visas'".[140]

**CBP's Position**

According to the news report that Geo placed on the record in its November 24, 2023 factual information submission, in October 2020, the Indonesian government reopened applications for some kinds of "single-entry *visit visas* {emphasis added}" which had been previously banned.[141] Although PTNNI did not explicitly describe the visas of the Chinese

---

[138] *See* Confidential Document No. 53 at Exhibit 2, Confidential Document 103 at 14, and Determination at 23.
[139] *See* Determination, at 19 and 23.
[140] *See* Importers' Comments at 6.
[141] *See* Geo's Nov. 24 Letter at Exhibit 1.

supervisors as "single-entry," it used the term "[ name ]" to describe the visas.[142] Further, the question of whether or not the Chinese supervisors' visas were single-entry is not pertinent because the article also explained that the Indonesian government relaxed restrictions on foreign travelers in October 2020 after a more stringent set of restrictions were put in place in March 2020 which were a complete "{p}rohibition of entry to the {t}erritory of the Republic of Indonesia for {f}oreigner{s}.[143] Therefore, publicly available information strongly indicates that the type of visa supposedly obtained by the Chinese supervisors was not allowed when these supervisors purportedly entered in [ date ] because the even more restrictive March regulations were still in effect.[144] Further, Hao Wang also stated in his affidavit that there were Chinese travel restrictions in effect throughout 2020[145] that would have further hindered the Chinese supervisors from traveling to Indonesia during that time.

### Importers' Comment: Methanol Calculations

The Importers contended that they "explained in calculated detail why PTNNI purchased adequate amounts of methanol citing information placed on the record (and previously withheld as confidential) by the alleger, yet CBP now contends that PTNNI failed to include its own information, so these arguments are dismissed out of hand."[146] Here, the Importers referred to their written arguments for this remand proceeding. In the written arguments, the Importers presented part of a table from the Alleger's December 13, 2021, rebuttal factual information to claim that there is a "[ description ] recovery of methanol and water in the intermediate glycine production stage" at PTNNI.[147]

---

[142] *See* Confidential Document No. 69 at SQ-V-15.
[143] *See* Geo's Nov. 24 Letter at Exhibit 1.
[144] *See* Confidential Document No. 69 at SQ-V-15 and Geo's Nov. 24 Letter at Exhibit 1.
[145] *See* Importers' Nov. 17 Letter at Exhibit 3.
[146] *See* Importers' Comments at 7.
[147] *See* Importers' Nov. 30 Letter at 25.

**CBP's Position**

The Importers' calculation is not based on methanol recycling at PTNNI but is instead based on information from an Indian glycine producer that continuously recycles methanol. Notably, Geo already placed information on the record of the original investigation showing that PTNNI's methanol recovery rate would likely be very low, compared to the recovery rate of other glycine producers because "methanol is a material recycled continuously during the MCAA glycine production process" and "it is impossible to recycle methanol periodically in batches."[148] Therefore, the frequent periods when PTNNI halted production throughout the POI would have made it impossible for PTNNI to have a [ description ] methanol recovery rate. The Importers still have not placed any information about the methanol recovery rate at PTNNI on the record, even when given the opportunity to do so on remand, and it is not reasonable to use the methanol recovery rate of a continuous glycine producer as a stand-in for the methanol recovery rate at PTNNI, where production stopped frequently.

**Importers' Comment: Credibility of the Alleger's Research Report is Not Addressed**

The Importers also contended that CBP's draft redetermination "fails to address other credibility issues with the {Alleger's} investigative report, including the inconsistent information contained therein."[149] Here, the importers reference their remand written arguments where they pointed out that the Alleger's market research report stated that "[ description

][150] was present when the market researcher visited PTNNI. The Importers claimed that the report in the allegation is therefore not credible because Hao Wang was not present in Indonesia at that time.

---

[148] *See* Determination at 28.
[149] *See* Importers' Comments at 7.
[150] *Id. See also* Confidential Document No. 1 at Exhibit 1.

**CBP's Position**

CBP made many efforts to investigate the credibility of the market research report throughout the course of the investigation. These efforts included conducting a verification at PTNNI, where CBP officials observed first-hand that the factory photos shown in the Alleger's report show PTNNI. CBP also reviewed photographs of PTNNI that the agency found on the website of Karawang New Industry City (KNIC), the company that runs the industrial zone where PTNNI is located. These photographs show the same building in the photographs that accompanied the Alleger's report. Notably, these photographs also show evidence of construction ongoing at PTNNI in photographs of PTNNI's facility with the caption "Tenant Building Construction Progress Per December 2020."[151]

Although there are minor inconsistencies in the market report, the photos on KNIC's website support the report's primary finding that PTNNI was not fully operational on the October 2020 purported production start date. Further, PTNNI's own RFI responses support this conclusion because the company told CBP that [

description

]<sup>152</sup>

**Importers' Comment: Reliability of the Alleger's Trade Data**

The Importers alleged that CBP used unreliable data to draw two unsupported conclusions in finding evasion: (1) publicly available import data supplied by the Alleger that documents exports from [    company name    ] to an Indonesian company [company name

---

[151] *See* Determination at 3, Confidential Document No. 1 at Exhibit 1, and Confidential Document No. 27 at Attachments 2 and 3.
[152] *See* Confidential Document No. 71, at Exhibit SQ-V-18B. *See also* Determination, at 30.

] is evidence that PTNNI received glycine and then sold it to the Importers;[153] and (2) CBP's finding that this same data "shows larger quantities of glycine were shipped to [ company name ] than were disclosed in the Importers' February 14, 2022 reconciliations thereby making that submission incomplete and unreliable."[154] The Importers alleged that CBP's finding of evasion was "unfounded" because the agency acknowledged that third-party sourced import data may be unreliable as to the port of lading (which the Importers seemingly equate to country of origin) yet CBP "inexplicably provides {the data} full faith and credit with respect to both country of origin and…quantity."[155]

**CBP's Position**

The Importers did not place evidence on the record that bill of lading data from third-party vendors such as Panjiva and Import Genius are unreliable. Instead, Exhibit 1 of the Importers' November 17, 2023, rebuttal factual information includes a claim by Import Genius, a vendor of bill of lading data, that data from its competitor, Panjiva, is less reliable than Import Genius. Notably, there is no indication in this exhibit that all data from vendors based on bills of lading are unreliable. Further, the data provided by the Importers in Exhibit 2 of November 24, 2023, rebuttal factual information only demonstrates that the country of origin cannot be inferred from the port of lading alone.[156]

**Importers' Comment: Official Indonesian Trade Data**

The Importers argued that the official Indonesian trade data they placed on the record of the remand proceeding "constitutes substantial evidence, a burden that is not PTNNI or the

---

[153] Importers' Comments at 2-3.
[154] *Id.* at 3 (citing Draft Remand Redetermination at 7).
[155] Importers' Comments at 3 (citing Draft Remand Redetermination at 10).
[156] *See* Nov. 24 Letter from Importers at Exhibits 1-4.

Importers to bear, that PTNNI never received Chinese origin glycine. CBP must show substantial evidence that PTNNI received Chinese origin glycine. "[157] The Importers further argued that:

> publicly available import data from third party sources can be unreliable with respect to the port of lading, *i.e.* country of origin, yet inexplicably provides it full faith and credit with respect to both country of origin and something so nuanced as quantity. Notably, the Importers put forth significant information that such data is generally unreliable and does not meet a substantial evidence standard…[158]

**CBP's Position**

The trade data from the Indonesian government do not constitute substantial evidence that PTNNI did not receive Chinese glycine. This evidence merely shows that PTNNI did not act as the declared Indonesian importer of Chinese glycine and is similar to evidence already on the record of the initial investigation.[159] As already explained above, there is substantial evidence on the record of the original investigation that Chinese-origin glycine was available to PTNNI in Indonesia, even though PTNNI was not the declared importer in Indonesian customs declarations. On remand, Geo provided additional evidence, which CBP finds persuasive, that supports the conclusion that the glycine PTNNI sold to the Importers was Chinese. This information consisted of trade data showing that Newtrend Group affiliates exported larger quantities of glycine to Indonesia than what PTNNI and the Importers have previously acknowledged and evidence that PTNNI's chemicals supplier also likely imported Chinese glycine on PTNNI's behalf.[160]

**Importer's Comment: No Evidence that PTNNI Received Glycine from China**

---

[157] *See* Importers' Comments at 2.
[158] *Id.* at 3.
[159] *See* Nov. 17 Letter from Importers at Exhibit 5; compare with Determination at 3, 28, 34.
[160] *See* Nov. 17 Letter from Geo at Exhibits 3, 4, and 5.

The Importers claimed that "{t}here is simply no evidence that PTNNI received any glycine from [ company name        ], let alone Chinese origin glycine, nor that the glycine was subsequently exported to the United States."[161] The Importers claimed that contrary to the third-party publicly available information that Geo submitted showing that [ company name

] may have imported Chinese-origin amino acids into Indonesia, "there is no evidence that PTNNI received anything beyond the disclosed raw materials it purchased from [ name ].[162]

**CBP's Position**

CBP continues to find that PTNNI did not produce all the glycine it sold to the Importers during the POI, and to support its finding, CBP determined the true country of origin for the glycine the Importers purchased from PTNNI. Record evidence shows that the origin of the glycine which PTNNI sold to the Importers but did not produce itself is China and such evidence includes:

1. The fact that PTNNI company officials told the Alleger's investigator that PTNNI

   [          description          ] but "could provide [      description

   ]."[163]

2. Evidence that Chinese Newtrend Group employees orchestrated all the transactions in

   the Importers' glycine supply chain and controlled the key players. This includes: (a)

   The fact that the Chinese Newtrend Group directly owns Newtrend USA and PTNNI

   while the [name] of the Newtrend Group's president, Hao Wang and his [ name

   ] were CEOs of Nutrawave;[164] (b) Newtrend Group President [ name

   ] and Group affiliates lent Starille and Nutrawave money on non-commercial

---

[161] Importers' Comments at 3-4.
[162] *Id.* at 4.
[163] *See* Determination at 35.
[164] *Id.* at 4.

terms to cover their [ description ] while they imported PTNNI's glycine;[165] and

(c) Starille and Nutrawave subsequently resold almost all the glycine imported from

PTNNI to Newtrend USA at [ name ]'s direction.[166]

3.  Data from diverse sources indicates that the Newtrend Group exported glycine to

Indonesia and that Chinese glycine from the Newtrend Group was available to

PTNNI. This includes: (a) aggregate public trade data from official Indonesian

sources showing increasing quantities of glycine shipments from China to the

Indonesian port closest to PTNNI's facility just before PTNNI began exporting

glycine from Indonesia to the United States;[167] (b) the fact that this data shows that

China was the largest source country for Indonesia's glycine imports; (c) publicly-

available, company and shipment-specific data showing that a Chinese Newtrend

Group affiliate sold a greater quantity of glycine to Indonesian companies than the

quantity the Importers have previously disclosed;[168] and (d) bill of lading data

showing that the Indonesian companies importing glycine from China included

PTNNI's chemical supplier.[169]

## VI.    CONCLUSION

In accordance with the Court's Remand Order, CBP provided the Importers and Geo with

access to confidential information withheld during the investigation. CBP also required

compliance with the relevant regulations governing the treatment of business confidential

information. After revised public versions of certain business confidential documents were

---

[165] *Id.* at 34.
[166] *Id.* at 6.
[167] *Id.* at 34.
[168] *See* Nov. 17 Letter from Geo at Exhibit 5.
[169] *Id.* at Exhibit 4.

placed on the record, and after granting access to the confidential business information not available to the parties during the investigation, CBP provided the parties an opportunity to submit rebuttal information and additional arguments as part of its remand proceedings. CBP incorporates its initial determination of evasion and the administrative review decision by reference. Upon review of the entire administrative record, CBP affirms its determination of evasion.

/s/ VICTORIA Y CHO
Digitally signed by VICTORIA Y CHO
Date: 2024.01.18 20:31:15 -05'00'

Victoria Cho

Director – Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
Office of Trade
U.S. Customs and Border Protection

/s/ ALICE A KIPEL
Digitally signed by ALICE A KIPEL
Date: 2024.01.18 20:49:42 -05'00'

Alice A. Kipel

Executive Director
Regulations and Rulings
Office of Trade
U.S. Customs and Border Protection