IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |
|---|---|
| NEWTREND USA CO., LTD., STARILLE, LTD., and NUTRAWAVE CO., LTD., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) **PUBLIC VERSION** ) |
| UNITED STATES, Defendant, | ) Court No. 22-00347 ) ) |
| and | ) ) |
| DEER PARK GLYCINE, LLC, Defendant-intervenor. | ) ) ) |

---

### DEFENDANT'S CORRECTED RESPONSE IN SUPPORT OF THE REMAND REDETERMINATION

---

BRIAN M. BOYNTON
Deputy Principal Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:
JENNIFER L. PETELLE
Attorney
U.S. Customs and Border Protection
  Office of the Chief Counsel

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7571
Email: kara.m.westercamp@usdoj.gov

June 4, 2024

Attorneys for Defendant

**TABLE OF CONTENTS**

BACKGROUND ..............................................................................................2

I.    Underlying Investigation .....................................................................2

    A.  Initiation Of Investigation And Requests For Information .................2

    B.  On-Site Verification Of PTNNI And Verification Report ..................2

        1.  PTNNI Corporate Organization And Operations ........................2

        2.  Sales Documentation ...................................................................4

        3.  Unsupported Third-Party Records And Missing Documentation .................4

        4.  Other Matters ...............................................................................5

    C.  TRLED Issued A Finding Of Affirmative Evasion ..........................6

        1.  Missing Equipment And Unfinished Construction By The Production Start Date ...............................................................7

        2.  Insufficient Purchases Of Raw Materials ...................................8

        3.  Insufficient Labor Supply ...........................................................9

        4.  Facts Suggesting That PTNNI's Glycine Was Chinese-Origin .................10

    D.  On Appeal, ORR Affirmed TRLED's Finding Of Affirmative Evasion ..........12

II.    The Court's Remand Order ...............................................................16

III.    CBP's Remand Redetermination ......................................................16

    A.  Rebuttal Information In Response To The Business Confidential Record .......16

    B.  Additional Rebuttal Information Placed On The Record .................19

    C.  CBP Continued To Find Evasion .....................................................20

ARGUMENT ...............................................................................................22

I.    Standard Of Review .........................................................................22

II.    CBP's Remand Redetermination Complies With The Court's Remand Order ......23

III.    The Court Should Reject Plaintiffs' Various Arguments ......................................26

        A.  CBP's Remand Results Are A New Agency Action ......................................26

        B.  CBP's Remand Results Were Not "Speculative" ...........................................27

        C.  Plaintiffs Failed To Exhaust Their Administrative Remedies With Their
            Remaining Arguments ......................................................................................30

CONCLUSION ....................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Ad Hoc Shrimp Trade Enforcement Comm. v. United States*,
632 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) ............................................ 29

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)............................................................................... 23

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)............................................................................... 23

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007)............................................................. 30

*Dep't of Homeland Sect'y v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)............................................................................ 26, 27

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015)............................................................. 22

*Gov't of Argentina v. United States*,
542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ............................... 27, 28, 29

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) .......................................... 22

*Newtrend USA Co., Ltd. v. United States*,
Ct. No. 22-00347 (Ct. Int'l Trade Oct. 20, 2023) ...................................... 1

*Paul Muller Industrie GmbH & Co. v. United States,*
502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007) .......................................... 30

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990)............................................................. 30

*Royal Brush Manufacturing v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) ............................................................. 16

**Statutes**

19 U.S.C. § 1516a(b) ................................................................................ 22

19 U.S.C. § 1517................................................................................ 16, 29

**Regulations**

19 C.F.R. § 165.26(a)(1) ................................................................................. 30

19 C.F.R. § 165.4 ........................................................................................... 23

**Administrative Determinations**

*Glycine from India and the People's Republic of China*,
    84 Fed. Reg. 29,173 (Dep't of Commerce June 21, 2019) ....................... 2

*Glycine from Thailand*,
    84 Fed. Reg. 55,912 (Dep't of Commerce Oct. 18, 2019) ........................ 3

*Glycine from the People's Republic of China*,
    60 Fed. Reg. 16,115 (Dep't of Commerce Mar. 29, 1995) ....................... 2

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| NEWTREND USA CO., LTD., STARILLE, LTD., and NUTRAWAVE CO., LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **PUBLIC VERSION** |
| UNITED STATES, | ) | Court No. 22-00347 |
| Defendant, | ) ) | |
| and | ) ) | |
| DEER PARK GLYCINE, LLC, | ) ) | |
| Defendant-intervenor. | ) ) | |

## DEFENDANT'S CORRECTED RESPONSE IN SUPPORT OF THE REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments filed by the plaintiffs Newtrend USA Co., Ltd. (Newtrend USA), Starille, Ltd. (Starille), and Nutrawave Co., Ltd. (Nutrawave) (collectively, plaintiffs or importers), Newtrend Cmnts., ECF No. 84, concerning the U.S. Customs and Border Protection's (CBP) final remand results filed in accordance with this Court's decision and remand order in *Newtrend USA Co., Ltd. v. United States*, Ct. No. 22-00347 (Ct. Int'l Trade Oct. 20, 2023), ECF No. 68 (Remand Order). *See* Final Remand Redetermination, Jan. 18, 2024 (Remand Results), ECF No. 73. For the reasons explained below, we respectfully request that the Court sustain CBP's remand results and enter judgment for the United States.

## BACKGROUND

## I.   Underlying Investigation

### A.   Initiation Of Investigation And Requests For Information

In 2021, GEO Specialty Chemicals, Inc. (GEO)[1] filed Enforce and Protect Act (EAPA) allegations with CBP, alleging that Nutrawave, Starille, and Newtrend USA were importing glycine of Chinese origin into the United States via transshipment through Indonesia. Appx80421, Appx80426, Appx80644. The U.S. Department of Commerce had previously issued both antidumping and countervailing duty orders covering glycine from China, with an antidumping duty rate of 155.89 percent and a countervailing duty rate of 144.01 percent. *See Glycine from the People's Republic of China*, 60 Fed. Reg. 16,115 (Dep't of Commerce Mar. 29, 1995); *Glycine from India and the People's Republic of China*, 84 Fed. Reg. 29,173 (Dep't of Commerce June 21, 2019).

### B.   On-Site Verification Of PTNNI And Verification Report

From May 3 through 6, 2022, officials of CBP's Trade Remedy & Law Enforcement Directorate (TRLED) conducted an on-site verification of PT Newtrend Nutrition Ingredient's (PTNNI) responses to TRLED's requests for information at its Indonesian glycine factory. Appx89567. In a verification report, dated June 7, 2022, TRLED summarized the evidence and observations made by the CBP investigation team, explaining that "{a}t time of importation, PTNNI may not have had production capabilities to produce glycine in Indonesia." *Id.*; *see also* Appx90010-90018.

---

[1] After CBP filed the remand results, GEO notified the Court that its name had changed to Deer Park Glycine, LLC, ECF Nos. 78-80, and the caption was accordingly amended. For consistency, we use GEO throughout this brief.

# 1.    PTNNI Corporate Organization And Operations

During an interview with Mr. Hao (Edward) Wang, Newtrend Group's vice president, he stated that the Newtrend Group is the largest glycine producer in the world with operations in China and Indonesia. Appx89569. Newtrend Group had recently closed its factory in Thailand in 2019 after an antidumping duty order covering glycine from Thailand was issued[2] but stated that the PTNNI factory was completed in September 2020 and started production in October 2020. *Id.* The ultimate parent company of PTNNI is [          ], which is a Chinese company. *Id.* Moreover, although PTNNI is affiliated with Newtrend USA, it is unaffiliated with Nutrawave and Starille, and "PTNNI sold glycine to new customers Nutrawave and Starille because they had prior business relationships with the Newtrend Group." *Id.* CBP noted, however, that Mr. Wang served as Nutrawave president from [          ]. Appx89580.

In terms of operations, CBP officials toured the factory, quality control laboratory, and offices of PTNNI, and Mr. Wang explained that PTNNI's glycine production process has 12 stages. Appx89570. The verification team was only able to see eight of the 12 production stages, but each day PTNNI explained that certain stages would take place in the evening, and as a result, the team was unable to observe the use of activated carbon and methanol. Appx89571-89572. Some general observations included that employees lacked safety equipment, employees were mishandling mono chloroacetic acid (MCA) solid flakes, there was no use of purified or de-ionized water, there were pumps with visible signs of rust/corrosion, no employees filled out production records, there were no lab technicians present in the quality control department, and

---

[2] Commerce determined that Newtrend Thailand was dumping its glycine and imposed a dumping duty margin of 227.17 percent based on facts available with an adverse inference. *Glycine from Thailand*, 84 Fed. Reg. 55,912 (Dep't of Commerce Oct. 18, 2019).

some finished goods in a warehouse had a label showing a production date that was after the company had shut down production.  Appx89571.  There was also a storage tank that supposedly contained methanol but was labeled as containing hydrochloric acid instead.  Appx89572.

2.      **Sales Documentation**

PTNNI explained that it purchases raw materials from several vendors, but uses one primary vendor, [███████████████████].  Appx89572.  PTNNI also sold primarily to [█] importers in the United States during most of the period of investigation.  Appx89573.  CBP observed that there were some differences in the amounts of glycine that PTNNI had sold to U.S. customers versus declared to CBP, such as "{f}or Newtrend USA, PTNNI sold [██████] {kilograms} of glycine, but only [██████] {kilograms} were declared to CBP, a difference of [██████] {kilograms}."  *Id.*

CBP also reviewed invoices and supporting documents for the purchases of raw materials and sales to U.S. customers.  Appx89573-89574.  CBP "had concerns regarding the validity of the raw material purchases" and many invoices "older than 19 months," with "most" of the outstanding invoices owed to PTNNI's primary supplier, [████].  Appx89575.  Also, "{s}ome production steps in sales traces appeared to have been completed by workers after their shifts ended and they were no longer present in the factory" and the amount of MCA withdrawn from inventory exceeded actual MCA consumption in sales traces.  *Id.*  Moreover, maintenance records were spotty and there was recorded maintenance on only [██] equipment pieces even though PTNNI's responses to information requests referred to [█] different equipment pieces.  *Id.*

### 3. Unsupported Third-Party Records And Missing Documentation

CBP also observed that some of PTNNI's activities could not be verified by independent third-party evidence (such as bank statements) because payments for [███████████ ███████████████████████████████] were paid with [███]. Appx89577. The financial manager maintained a [███] journal but prior to when she started in [███████], she relied on documents from her predecessors to make entries in the [███] journal. *Id.* There were no bank statements, checks, wire transfer documentation, *etc.* to support the [███] journal. *Id.* This was because the president of the Newtrend Group would provide cash to an unidentified person in China in Chinese currency (yuan), the "President would contact [███████ ███████] via [███████] to pick up a corresponding amount of [███] in Indonesian currency (i.e., Rupiah) from another individual in Indonesia," and then the PTNNI employee would get the [███] from the Indonesian individual and "bring the [███] to a [███████████ ███████████████████]." *Id.*

There were also no supporting records for [███] payments made for utilities and for production workers. Appx89578. As for why PTNNI used [███], its vice general manager explained that its suppliers initially "preferred to be paid [███████]" and that "it is difficult to get money out of China." *Id.* CBP also observed that some raw material invoices were unpaid and it had "concerns whether the transactions with the missing payments are bonafide sales" because "{i}f the supplier is providing poor quality material as PTNNI claims, most customers would switch suppliers or expect the current vendor to reduce their price." Appx89579.

### 4. Other Matters

CBP listed a myriad of other concerns it had from the factory visit, primarily concerning employee payroll and factory safety. Appx89579-89583. With respect to employees, among

other things, employee records/lists could not be validated, the production workers could only do one task each (versus the claim, in an information response, that they could do all production steps), the workers assigned to methanol "could not explain the chemistry of methanol recycling," and none of the Indonesian accountants or office staff who had helped prepare the information request responses were present. Appx89579-89581. PTNNI management also could not "name a single Indonesian office employee" except for the translator who was present. Appx89581.

Regarding other production expenses, both natural gas consumed and electricity usage per kilogram showed increases in [████████] but the reasons why supposedly occurred in [██████]. Appx89579. Production records were also only filled out "after production steps occurred," and the production records "had no ammonia or hexamine smell," which would be expected if they came from the production floor. Appx89580. And although production records had precise pH levels, PTNNI used pH strips that could only provide ranges. Appx89581. And despite asking on three consecutive days to see the finished glycine recrystallization stage and being told that the step "would not take place until 8:00 pm," the CBP team noted that when they left at 7:30 pm on the last day, "most of the workers' mopeds parked in front of the office building were gone, indicating that workers had left for the day." Appx89580-89581. Relatedly, production records claimed that some production steps "were carried out by workers after they had finished their shifts for the day, according to attendance records also included in these sales traces." Appx89581.

Importantly, records showed that there were also insufficient raw material purchases of MCA, hexamine, methanol, and activated carbon. Appx89582-89583. Indeed, one of the tanks

listed as storing methanol also had a pH content that indicated it was "correct for hydrochloric acid." Appx89582.

## C. TRLED Issued A Finding Of Affirmative Evasion

On July 22, 2022, in an extensive and detailed decision, TRLED determined that the importers evaded the antidumping and countervailing duty orders covering glycine from China by "transshipping Chinese glycine through Indonesia because there is substantial evidence that demonstrates the purported Indonesian manufacturer could not have produced the volume of glycine it supplied the importers." Appx90028. For example, an insufficient volume of methanol was purchased and even though PTNNI "had produced a sufficient quantity of intermediate glycine at its factory in Indonesia, it still did not consume enough [          ] to produce the volume of finished glycine sold." *Id.* "Further, substantial evidence on the record shows that not all the equipment in PTNNI's factory was installed on {the} production start date, the manufacturer did not have an adequate workforce, and they have mislabeled their glycine." *Id.*

### 1. Missing Equipment And Unfinished Construction By The Production Start Date

First, TRLED considered that, although PTNNI claimed that all equipment was "fully installed on October 1, 2020," photos in the allegation showed construction was still "ongoing in [          ]." Appx90028. CBP's own research of the Karawang New Industry City (where PTNNI is located) also showed "construction equipment still present at the factory in November 2020, which supports the information in the allegation." *Id.* TRLED noted that PTNNI never reconciled why construction equipment and construction workers were still present after the

supposed completion of the building and concluded that the factory was not fully constructed on October 1, 2020.  Appx90028.

Relatedly, TRLED noted that PTNNI admitted that equipment installation in the factory continued past the alleged production start date, with [ ▮ ] pieces of equipment installed from [ ▮▮▮▮▮ ] until as recently as [ ▮▮▮▮ ], which was "[ ▮▮▮▮ ] after production started."  *Id.*  This meant that a "substantial percentage" of equipment was not even installed on the production start date since "PTNNI has indicated that it had a total of [ ▮▮ ] pieces of equipment."  *Id.*; *see also* Appx90014.

## 2.    Insufficient Purchases Of Raw Materials

Second, TRLED determined that PTNNI had not purchased sufficient quantities of methanol or [ ▮▮▮▮ ] to produce the volume of finished glycine it sold to the importers during the period of investigation.  Appx90028-90030.  With respect to methanol, PTNNI reported that it consumed [ ▮▮ ] kilograms per kilogram of intermediate glycine produced, but it only purchased [ ▮▮▮ ] kilograms of methanol.  Appx90028.  With a claimed production of [ ▮▮▮▮ ] kilograms of intermediate glycine, TRLED calculated that PTNNI "needed [ ▮▮▮ ] {kilograms} of methanol ([ ▮▮▮▮ ] * [ ▮▮ ] = [ ▮▮▮▮ ])," which leaves a shortage of [ ▮▮▮ ] {kilograms} of methanol."  *Id.*

And even if PTNNI recycled its methanol, it "did not recycle enough methanol to compensate for the shortfall of purchased methanol" because "PTNNI frequently stopped production during the {period of investigation}" and it goes "out of balance within three hours."  Appx90029.  CBP also observed "that the workers in PTNNI's methanol distillation tower control room did not know much about methanol recycling and did not have any controls for the tower except for an on/off switch, all indications that PTNNI could not really recycle methanol."

8

*Id.* Even the production records were silent about recycled methanol and only referred to "newly purchased methanol." *Id.*

Further, when TRLED compared PTNNI's reported consumption rate to a comparable factory in India using the same production process, the Indian factory consumed at least [ ██ ] kilograms of methanol per kilogram of intermediate glycine produced, which was more than [ ██ ] PTNNI's reported rate. *Id.* PTNNI offered no explanation for this discrepancy other than saying that [ ██ ] of its "production workers had [ ████████████████████ ] before they were hired," and that its "raw materials are of poor quality." *Id.* With PTNNI's equipment also in poor condition, TRLED determined that it was "likely" that its actual consumption rate would be much higher, and, indeed, "{a}ctual production batches reviewed by CBP show [ ██ ] {kilograms} of methanol consumed per {kilogram} of intermediate glycine production, which supports this conclusion." *Id.*

TRLED further explained that PTNNI was missing information to support both its purchases and consumption of methanol, with [ ████ ] of the methanol invoices unpaid. Appx90029-90030. For example, "PTNNI refused to show CBP any use of methanol during verification and CBP officials observed that PTNNI's methanol storage tank likely contained hydrochloric acid instead of methanol." Appx90030. TRLED noted that it was "very significant" that all these problems applied to methanol, and "{w}hile PTNNI might be able to explain away *some* of these shortcomings, the evidence on the record does not support a conclusion that it has purchased or consumed a sufficient quantity of methanol to produce the volume of glycine it claims." *Id.* (emphasis added).

With respect to [ ██████ ], TRLED determined that there was a shortage of [ ██ ] kilograms because PTNNI needed to consume [ ██ ] kilograms but only purchased

[████] kilograms.  *Id.*  Similar to methanol, PTNNI also failed to pay "[███] the invoices for [████████] that CBP reviewed."  *Id.*

### 3.    <u>Insufficient Labor Supply</u>

Third, TRLED determined that there were "repeated examples" where employee attendance records could not be reconciled with other records.  For example, some production reports listed certain employees performing specific tasks, but attendance records did not show the employees working during that time.  *Id.*  It determined that "PTNNI's attendance records do not match monthly wage calculations, payroll records, production records, or the WhatsApp chat workers used to record their presence at the factory and are thus, likely false."  *Id.*  Similarly, PTNNI had no bank records to show it paid workers from [████████] to [████████] and the individual who recorded transactions in the [███] journal possessed no first-hand knowledge of the transactions, such that the [███] journal for this time period was a "second-hand set of memories rather than a record of any kind."  *Id.*

Moreover, TRLED determined that PTNNI failed to show that its workers even had adequate training.  Appx90031.  For example, although PTNNI claimed that Newtrend Thailand employees trained its own employees, the "Thai workers did not arrive in Indonesia until [████████], [███] weeks after production start date," although PTNNI somehow "began producing large batches of glycine on the same day it started operating."  *Id.*  PTNNI could not explain how it could have produced on day one considering that "[████] of its workers had previous experience in the chemicals industry and only [███] of the supervisors tasked with training [████] Indonesians could speak their language above a [████] level."  *Id.*  There were also discrepancies with whether workers were trained on more than one piece of equipment and tasks, because PTNNI claimed that its workers were trained on multiple pieces of equipment

but workers interviewed at verification "told CBP officials that they can only perform one task each and always perform the same task." *Id.* Thus, TRLED determined that "even if PTNNI had workers present on all days when it claims glycine was produced, it is still likely that there were not workers capable of doing each production step." *Id.*

### 4. Facts Suggesting That PTNNI's Glycine Was Of Chinese-Origin

Finally, TRLED explained other facts which support a conclusion that PTNNI's glycine was of Chinese-origin. Appx90032. First, the Newtrend Group made all the glycine that the importers purchased and Newtrend USA helped Nutrawave and Starille find [█] their customers, and the Newtrend Group loaned Nutrawave and Starille [████] and [██████], respectively. *Id.* Also, "{a}ll the importers' glycine that declared Indonesia as the country of origin must have come from the Newtrend Group because there is no large-scale supplier of glycine in Indonesia other than PTNNI" and the importers purchased [█] of their glycine from [████]. *Id.* TRLED determined that it was "unlikely" that Newtrend USA, which is a wholly owned subsidiary of the Newtrend Group, would source glycine from a competitor and that Newtrend Group "would provide loans, [████████████], and find customers for a competitor's glycine." *Id.*

Second, the only Newtrend Group affiliates who produced glycine during the period of investigation were Chinese because "Newtrend Thailand stopped producing glycine in [█████████]" and public trade data for Indonesia showed no imports of glycine from Thailand. *Id.*

Third, TRLED determined that trade data and sales reconciliations show exports of glycine from Chinese Newtrend Group affiliates to Indonesia and, in fact, "Chinese glycine entered Indonesia in increasing quantities in 2021 compared to 2020, through the ports closest to

PTNNI's facility, the [████████████████████████████████████]." *Id.*; *see also* Appx9870-9911. Finally, TRLED explained that GEO's market researcher reported that "[████████████████] attempted to sell [████████████]" to the researcher and a [████████████] told the researcher that the "manufacturer [████████████████████] but 'could provide [████████████████].'" Appx90032-90033; *see also* Appx80466-80517 (market researcher report).

Thus, TRLED determined that "the totality of the evidence" demonstrated that the glycine PTNNI sold was of Chinese origin because "PTNNI could not have produced all the glycine sold to the importers." Appx90033. In other words, TRLED determined that "substantial evidence exists" that the importers and PTNNI misrepresented the glycine's country of origin "by claiming Indonesia rather than China as the country of origin, and thus evaded" the antidumping and countervailing duty orders covering glycine from China. *Id.*

### D. On Appeal, ORR Affirmed TRLED's Finding Of Affirmative Evasion

On November 30, 2022, in a *de novo* administrative review, the Office of Trade, Regulations and Rulings (ORR) affirmed TRLED's affirmative finding of evasion because the "administrative record reveals substantial evidence of evasion." Appx90298. To wit, ORR explained that each of the importers acknowledged that they entered glycine sourced from PTNNI during the period of investigation and "made the entries as [████████████████] consumption entries, rather than [████████████████████████████] [████]." *Id.* PTNNI had shipped the entries to the importers between [████████████] through [████████], and the importers had entered the shipments of glycine between [████] through [████████]. *Id.*

First, ORR explained that substantial evidence supports a finding that PTNNI "was incapable of producing glycine at the times during which the Importers claim such capacity" because various photographic images showed the factory as incomplete as of August and December 2020. Appx90299. It found GEO's investigative report to be "reliable and corroborated by other record evidence" in that PTNNI's factory was incomplete several months after the October 1, 2020, production start date with the report including extensive photographic evidence of "[███████████████████████████████████████████████████████████████████████████████████████████████████████████████████]." *Id.* Even PTNNI admitted that it installed production equipment one year after the start date "as well as {had} [████████████████████████████████████████████████████████████████]." *Id.*

However, ORR considered evidence from PTNNI suggesting that the factory was complete but determined that its own photographs "do little to rebut what the photographs elsewhere in the record show," and that even a PTNNI October 2020 photograph "depicts a completed factory exterior, but provides no indication of whether production equipment was installed *inside* the factory at that time." *Id.* (emphasis added). Although PTNNI claimed that later-installed equipment was used to produce finished glycine and did not detract from an October 2020 production start date, ORR observed that "PTNNI claims significant finished glycine production in [███████████] at a time when [█████████████████████ ██████████████]." Appx90300. Thus, weighing the evidence, ORR determined that it was "highly improbable" that PTNNI's factory was operational in October 2020 and even if it was operational, "PTNNI's facility almost certainly could not have supported production of the glycine entered by the Importers into the United States between [███████████████]." *Id.*

Second, ORR determined that record evidence suggested that PTNNI failed to purchase sufficient methanol to support its claimed production.  Appx90300-90301.  ORR rejected Newtrend USA's argument that PTNNI's "correct" consumption rate of methanol per kilogram of intermediate glycine was actually [████] rather than the reported [███], because "evidence elsewhere in the record indicates this claimed consumption rate is unrealistically low." Appx90300.  For example, TRLED and CBP Regulatory Audit and Agency Advisory Services officials estimated that [████] kilograms of methanol would be needed to produce one kilogram of intermediate glycine, and GEO submitted record evidence from an Indian producer showing a methanol consumption rate of [███] kilogram per one kilogram of intermediate glycine.  *Id.*

ORR also rejected the importers' argument that CBP failed to consider PTNNI's methane recycling because "CBP officials noted during verification (which occurred a full 19 months after PTNNI's claimed production start date) that workers responsible for the methanol distillation tower had limited understanding of its controls and the methanol recycling process." *Id.*  Also, record evidence showed that PTNNI had outstanding invoices for methanol "raising doubts as to whether the invoiced methanol was actually received."  Appx90301.  Thus, ORR determined that PTNNI "probably did not procure sufficient methanol to support its claimed intermediate glycine production."  *Id.*

Third, ORR found that the record "indicates that PTNNI did not have a workforce capable of supporting glycine production when it claimed production began."  Appx90302. Although PTNNI claimed that it relied on former Thai and Chinese workers to operate the factory and train workers, visa records showed that "only [████] Chinese workers and [███] Thai workers had arrived in Indonesia as of October 2020 when PTNNI claims production began."  *Id.*  Also, *all* the Chinese workers "filled [███████████████████████

■ ] and did not appear to [███████████████████████████████].” *Id.*  And on

[███████████████], when PTNNI made its first export of glycine to the importers, “only [██]

Chinese workers and [███] Thai workers had a valid Indonesian work visa.” *Id.*  ORR noted

that the importers failed to address the “absence of these critical foreign employees in their

requests for review,” and that even if there were internally generated records for production

employees, the “claimed period of production raises particular doubts given PTNNI’s statement

that it takes about [████████████] for new workers to sufficiently familiarize themselves

with the production process to work independently.”  Appx90301-90302.

Fourth, although there was not “direct evidence” that PTNNI “openly imported glycine

from China into Indonesia,” ORR explained “there is nevertheless substantial evidence in the

record to support a finding that PTNNI transshipped Chinese origin glycine{.}”  Appx90302.  To

wit, ORR explained that there are facts “showing intertwined relationships that would enable

transshipment strategies to be executed as to glycine produced in China.”  *Id.*  Indeed, shortly

before it began importing glycine from PTNNI, Starille was incorporated on September 23,

2020, and it sold all its imported glycine to [████████], who subsequently resold it to

[███████████].  *Id.*  Nutrawave likewise sold [████] percent of its imported glycine to

[███████████].  Appx90303.  ORR found it significant that both Starille and Nutrawave also

received interest-free loans from [███████████████] president.  *Id.*  Also, as previously

mentioned, one individual served as both a Nutrawave executive and Newtrend USA general

manager at different points during the period of investigation.  *Id.*  “Indeed, Newtrend USA

acknowledged that [████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████].”  *Id.*  Thus, ORR determined that these “facts support a conclusion

that the Newtrend Group exercised control over Nutrawave and Starille during the {period of investigation}." *Id.*

Therefore, ORR determined that the "weight of the evidence supports a conclusion that PTNNI could not have produced all of the glycine that was shipped to the United States and claimed to be of Indonesian origin." Appx90304. Because the importers incorrectly entered the glycine imports as not subject to duties, this was "material and false" and, pursuant to 19 U.S.C. § 1517, and ORR affirmed TRLED's determination of evasion. Appx90306.

## II.     The Court's Remand Order

Plaintiffs timely filed their complaint contesting the affirmative determination of evasion on December 23, 2022. Compl., ECF No. 2. After plaintiffs filed their motion for judgment on the administrative record, ECF No. 57 (Pls. MJAR), the Court of Appeals for the Federal Circuit decided *Royal Brush Manufacturing v. United States*, 75 F.4th 1250 (Fed. Cir. 2023), which addressed arguments directly relating to due process and confidentiality arguments that plaintiffs had made in their brief. Specifically, plaintiffs argued that CBP inappropriately withheld confidential information because certain business proprietary information could not be understood with the public summaries. Pls. MJAR at 22-31. Plaintiffs also argued that certain exculpatory documents should have been placed on the record that CBP had received at verification. *Id.* at 31-33. Without confessing error, the United States filed a motion for a voluntary remand, ECF No. 62, which the Court granted. Appx1-10. In the remand order, the Court ordered CBP to "correct any errors required by *Royal Brush*; and the plaintiffs may make any arguments they wish about what *Royal Brush*, due process generally, or Customs' regulations require." Appx10.

## III.    CBP's Remand Redetermination

In its remand redetermination, consistent with the Court's remand order, CBP reopened the administrative record, granted the parties access to confidential information, and allowed the parties to submit rebuttal information and make written arguments with respect to information that parties did not have access to during the investigation.  Appx90905-90906.  CBP also thoroughly addressed all issues the parties raised in their comments on the draft remand. Appx90917-90935.

### A.    Rebuttal Information In Response To The Business Confidential Record

First, CBP analyzed the rebuttal information that plaintiffs placed on the record in response to the business confidential record.  Appx90909-90912.  CBP determined that although the plaintiffs had submitted company-specific shipment data from the Indonesian government that PTNNI had not imported any glycine into Indonesia from July 2020 to June 2022, CBP explained that this was duplicative of information already on the record, "which CBP did not find persuasive in the original investigation."  Appx90909.  And this data was not "definitive proof that PTNNI did not export Chinese-origin glycine to the Importers" because CBP determined that other Indonesian trading companies "likely acted as importers for PTNNI and facilitated importation of vast quantities of glycine into Indonesia on PTNNI's behalf without a single kilogram" ever being "imported under PTNNI's name."  Appx90910.

The importers also included a construction contract, along with an affidavit from Hao Wang supporting this contract, allegedly showing that construction should have been complete by [         ] and that any delays would have resulted in damages.  *Id.*  CBP found that Mr. Wang did "not attest that he witnessed the actual completion of construction" and that he had never actually visited the facility before 2022 due to COVID-19 travel restrictions.  *Id.*

Further, CBP explained that PTNNI's responses to information requests "already showed that all equipment was not installed on PTNNI's purported production start date and, in fact, new equipment continued to be installed almost a year after the [███████████] deadline for installing equipment." Appx90910-90911.

CBP also found unpersuasive the new photographs that plaintiffs placed on the record because the photographs did not show that the factory was fully constructed. Appx90911. For example, one August 2020 photograph showed equipment installed in the factory, but that walls were not fully constructed, and another photograph from October 2020 showed completed walls, but not the interior of the building. *Id.*

Second, CBP considered the six exhibits of rebuttal information that GEO placed on the record to "purportedly demonstrate that trading companies in Indonesia received significant quantities of glycine just before the time PTNNI began exporting glycine to the United States." Appx90912-90915. CBP found that the exhibits supported a finding that the Importers' previous factual submissions had been "incomplete and unreliable because the information received on remand shows that Newtrend Group exported greater quantities of Chinese-origin glycine to Indonesia than the amount that PTNNI and the Importers previously claimed." Appx90912. Of the six exhibits, CBP particularly focused on Exhibits 4 and 5 which provided further evidence suggesting transshipments. Appx90914-90915.

For example, Exhibit 4 was data from a global trade company, Panjiva, "showing that [████████████████████], PTNNI's supplier of ammonia and other raw materials, received shipments of the broad amino acid HS category that includes glycine from China." Appx90914. For the two months after PTNNI allegedly began glycine production, [████] received [██████] kilograms of China amino acids and CBP found that this "provides further

evidence suggesting that [██], with a history of receiving shipments on PTNNI's behalf, likely received shipments of Chinese glycine and imported them into Indonesia, supporting CBP's determination of evasion." *Id.* Next, data in Exhibit 5 showed that [████████ ██] "received [████] {kilograms} of glycine *specifically* from the Chinese Newtrend Group Affiliate, while the Importers' voluntary factual submission in the original investigation . . . only reported sales of [████] {kilograms} of glycine to [████] in 2020." Appx90914-90915 (emphasis in original). CBP concluded that the importers' sales reconciliations were therefore "incomplete and unreliable." Appx90915.

### B.     Additional Rebuttal Information Placed On The Record

CBP also considered other rebuttal information that both the importers and GEO placed on the record. Appx90915-90917. The importers placed a Panjiva guide to bills of lading and shipment data showing "imports from PTNNI (in Indonesia) to U.S. importers with [████████ ██] as the port of lading and China as the country of origin to show that the port of lading can be an unreliable indicator of the country of origin." Appx90915. CBP explained that it was already aware that China is "often" the port of lading for Southeast Asian goods shipped to the United States through China because the goods are consolidated in China before shipment. Appx90915-90916. Therefore, CBP found that this Panjiva guide "does not persuade CBP to revise its determination of evasion" because the port of lading was not the "basis for CBP's finding that PTNNI sold Chinese-origin glycine to the Importers in the original determination of evasion." Appx90916.

Next, CBP considered an advertisement from Import Genius, a competitor of Panjiva, that Importers placed on the record. *Id.* The advertisement claimed that its information was "unmodified" whereas Panjiva's data was "outdated." *Id.* But CBP found that the advertisement

did not explain how the Panjiva data was outdated, and, in any event, the port of lading was not an accurate country of origin indicator. *Id.*

Finally, CBP examined a news article about visa restrictions during the COVID-19 pandemic that GEO placed on the record, which CBP found "significant." Appx90916-90917. The article claimed that restrictions for foreign nationals "began in March 2020 and included a ban on single-entry visit visas which was not lifted until October 2020." Appx90917. PTTNI had previously told CBP in the investigation that "several Chinese employees entered Indonesia on visit visas in [█████████]," which was before the ban was lifted. *Id.* The news article stated that there was a "total moratorium on the issuance of single-entry visit visas," and this information contrasted with statements from employees of the Newtrend Group who claimed that they "first arrived in Indonesia from China on [█████████] on short-term visit visas." *Id.* Whereas even Hao Wang, the son of the president of the Newtrend Group and a former executive of Newtrend USA, could not travel to Indonesia until "just a few weeks before verification" in May 2022. Appx90916-90917.

### C. CBP Continued To Find Evasion

Consistent with the remand order, Appx10, CBP invited the parties to submit written arguments prior to issuance of the draft remand redetermination, Appx90909, which CBP summarized in the remand redetermination. Appx90917-90923. CBP also thoroughly addressed the parties' comments on the draft remand and continued to find evasion in the final remand results. Appx90923-90936.

With respect to GEO's arguments, CBP declined to apply an adverse inference to either the Importers or PTNNI, because they both cooperated in the investigation. Appx90926. "That said, CBP continues to find substantial evidence of evasion because there is overwhelming

evidence—including insufficient supply of methanol and insufficient numbers of trained workers—that PTNNI did not produce all the glycine it sold to the Importers and there is substantial evidence that the glycine PTNNI did not produce was Chinese-origin." *Id.* CBP also found it "persuasive" that [███], PTNNI's primary supplier of raw materials, imported "significant amounts of Chinese-origin glycine into Indonesia during the same timeframe that PTNNI purportedly produced and shipped comparable amounts of glycine to the United States." Appx90926-90927.

The Importers argued that substantial evidence did not support an evasion finding, but CBP explained that it weighed all evidence and found to the contrary. Appx90927-90928. First, CBP determined that "publicly available information strongly indicates that the type of visa {PTNNI} supposedly obtained by the Chinese supervisors was not allowed when these supervisors purportedly entered in [████████████] because the even more restrictive March regulations were still in effect. Appx90929. CBP also rejected Importers' argument that PTNNI had sufficient methanol because "the frequent periods when PTNNI halted production throughout the {period of investigation} would have made it impossible for PTNNI to have a [███████] methanol recovery rate." Appx90930. Although given the opportunity to place such information on the remand record, the Importers failed to do so, and "it is not reasonable to use the methanol recovery rate of a continuous glycine producer as a stand-in for the methanol recovery rate at PTNNI, where production stopped frequently." *Id.*

Next, CBP rejected the Importers' challenges to GEO's market research report, because "{a}lthough there are minor inconsistencies" in the report, CBP officials observed firsthand that the photographs showed the PTNNI factory. Appx90931. Also, PTNNI's own responses to

information requests demonstrated that certain equipment was not installed until [███]

production supposedly began.  *Id.*

Further, CBP disagreed that GEO's trade data was unreliable because even the Importers'

own data related to port of lading only demonstrated that "the country of origin cannot be

inferred from the port of lading alone."  Appx90932.  Likewise, CBP explained that the official

Indonesian Trade data the Importers placed on the record was not substantial evidence that

PTNNI did not receive Chinese glycine.  Appx90933.  Rather, the "evidence merely shows that

PTNNI did not act as the declared Indonesian importer of Chinese glycine and is similar to

evidence already on the record of the initial investigation."  *Id.*  But what was more persuasive,

was the additional trade date from GEO which showed that "Newtrend Group affiliates exported

larger quantities of glycine to Indonesia than what PTNNI and the Importers have previously

acknowledged" and was "evidence that PTNNI's chemical suppliers also likely imported

Chinese glycine on PTNNI's behalf."  *Id.*

Finally, CBP found that there was substantial evidence to find that PTNNI did not

produce all the glycine it sold to the Importers during the period of investigation.  Appx90934.

For example, PTNNI officials told GEO's investigator that "PTNNI [████████████████████

████] but 'could provide [████████████████████].'"  *Id.*  Also, there was evidence that

Chinese Newtrend Group employees "orchestrated all the transactions in the Importers' glycine

supply chain and controlled the key players."  *Id.*  CBP also referred to record sources to support

the finding that the Newtrend Group exported Chinese glycine to Indonesia and that this glycine

was available to PTNNI.  Appx90935.

## ARGUMENT

### I.     Standard Of Review

In remand proceedings, the Court will sustain an agency's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  Substantial evidence means evidence that a "reasonable mind might accept as adequate to support a conclusion." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Under this standard, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

### II.     CBP's Remand Redetermination Complies With The Court's Remand Order

Consistent with the Court's opinion, CBP (1) corrected any errors required by *Royal Brush* because it requested revised public summaries and allowed all parties access to business proprietary information, (2) reopened the record to allow parties to place rebuttal information in response to the business proprietary information, and (3) made its affirmative final determination of evasion based on the entire record, which included both the underlying investigation record and the remand record.  *See* Appx10; Appx90903-90936.  Substantial evidence supports CBP's determination that the PTNNI factory was not capable of producing the claimed amount of glycine in October 2020, PTNNI failed to purchase sufficient methanol to produce glycine, there was an insufficient labor force, and that the intertwined relationship among the plaintiffs was intended to disguise transshipment of glycine from China.  Appx90289-90306

First, CBP complied with the public summary requirement set forth in 19 C.F.R. § 165.4. On remand, CBP requested interested parties to submit revised public versions of certain business confidential documents. Appx90906. CBP also granted the parties access to confidential information on the administrative record and allowed them to submit rebuttal information and make arguments with respect to that proprietary information. Appx90906-90907. Upon request from the importers, CBP also allowed the submittal of additional rebuttal factual information to rebut the factual information placed on the remand record in response to the proprietary information. Appx90907-90908. The parties then were permitted to submit written arguments as to the rebuttal factual information, in addition to having the opportunity to comment on the draft remand results. Appx90908-90909. Because the Importers do not raise any due process arguments or allege that CBP unfairly prohibited them from placing additional rebuttal factual information on the record, *see generally* Newtrend Cmnts., the Court should find that CBP complied with the Court's remand order with respect to this issue.

Second, substantial evidence supports CBP's affirmative decision of evasion. Appx90000-90034, Appx90289-90306, Appx90903-90936. Not only was there photographic evidence that the PTNNI factory was not actually completed by the alleged production start date of October 1, 2020, but PTNNI also conceded that some equipment was installed after the production start date. Appx90010, Appx90928. CBP also determined that PTNNI was "incapable of producing glycine at the times during which the Importers claim such capacity" due to the photographic evidence and that PTNNI did not have all necessary equipment installed by October 2020. *See* Appx90299, Appx90925-90926, Appx90931.

Also, methanol is a necessary raw material of glycine manufacturing and PTNNI simply did not procure enough to support its claimed production, even assuming PTNNI's claimed

consumption and recycling rates.  Appx90300, Appx90930.  TRLED had noted the unreliability of PTNNI's consumption rate, which varied by as much as [███] percent from [█████] kilograms to [████] kilograms.  Appx90018.  As CBP explained, "the frequent periods when PTNNI halted production throughout the {period of investigation} would have made it impossible for PTNNI to have a [████████] methanol recovery rate," and the Importers placed no information on the remand record to refute that finding.  Appx90930.  Indeed, when compared to various outstanding invoices from its main supplier, [█████], TRLED determined that it likely purchased less than [█████] of the methanol it consumed, because even its claimed methane recycling could not be substantiated.  Appx90019, Appx90300-90301.

Additionally, there is substantial evidence that PTNNI simply did not have the necessary labor force to produce glycine by the claimed production start date.  Appx90301.  PTNNI operated on a [████] basis with respect to production employees and it had no records prior to [██████] to document payment for employees, or even after that date.  *See* Appx90024-90025.  CBP also determined that there were conflicting attendance records and employees that it interviewed at verification did not know how to do more than one task/job, and lacked a knowledge of basic protective equipment.  *See* Appx89568-89600.  There was also substantial evidence that PTNNI's claims that certain Chinese supervisors helped with training "was not allowed when these supervisors purportedly entered {Indonesia} in [████████]" because there were COVID-19 pandemic restrictions still in place and such single-entry visas were not allowed.  Appx90928-90929.  Indeed, even Mr. Wang "stated in his affidavit that there were Chinese travel restrictions in effect throughout 2020 that would have further hindered the Chinese supervisors from traveling to Indonesia during that time."  Appx90929,

Moreover, there is uncontroverted evidence that the importers are intertwined with each other and Newtrend Group. Appx90302, Appx90934-90935. It boggles the mind that a newly-created company, without any advertising, could sell *all* of its product and also get interest-free loans from an unrelated company: yet that is what Starille accomplished. Appx90302-90303. Nutrawave also received interest-free loans from [███████████]. Appx90303. And the record also shows that both Starille and Nutrawave sold the [██████] of their imported glycine from PTNNI to Newtrend USA. *Id.*, Appx90935.

Viewed in the entirety, substantial evidence supports CBP's decision that PTNNI did not have the capability to produce glycine and the true country of origin was China. *See* Appx89900-90034, Appx90289-90306.

## III. The Court Should Reject Plaintiffs' Various Arguments

Plaintiffs' various arguments challenging CBP's determination that substantial evidence supports CBP's evasion determination are without merit. *See* Newtrend Cmnts. at 3-30.

### A. CBP's Remand Results Are A New Agency Action

Consistent with the Court's remand order, CBP's remand results are new agency action. Appx1-10, Appx90903-90936. Plaintiffs' arguments that CBP instead engaged in *post hoc* rationalizations contrary to *Dep't of Homeland Sect'y v. Regents of the Univ. of Cal.*, 591 U.S. 1, 140 S. Ct. 1891 (2020), are meritless. Newtrend Cmnts. at 3-11.

In *Regents*, the Supreme Court reiterated the well-established principle that, when the existing record of agency decision making is insufficient, the agency may "do one of two things" on remand: (1) "the agency can offer a fuller explanation of the agency's reasoning at the time of the agency action;" and (2) "the agency can deal with the problem afresh by taking new agency action." 591 U.S. at 20-21 (internal citations omitted). Here, CBP took new agency action when

it reopened the record on remand, requested the parties to submit new rebuttal factual information and written arguments, and then drafted new remand results continuing to find evasion, which is perfectly appropriate under the second option in *Regents*, and the *post hoc* rationalization rule does not apply. *Id.* (internal citations omitted); *see* Appx90903-90936.

Plaintiffs emphasize CBP's references to earlier findings in the investigation as support that CBP made *post hoc* rationalizations, Newtrend Cmnts. at 3-11, but point to no authority that an agency cannot make a *new* decision and reference the existing record in support. Rather, plaintiffs appear to challenge *how* CBP weighed the evidence in the remand results, and their mere disagreement with CBP's weighing of the record evidence is not a basis to overturn CBP's determination. *See Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021). For example, plaintiffs question how CBP could possibly credit a news article that GEO placed on the record showing visa restrictions for travel to Indonesia due to the pandemic versus PTNNI's documentation of supervisory visits, Newtrend Cmnts. at 6-7, which is itself contradicted by other record evidence. Appx90928-90929. Plaintiffs' other *post hoc* rationalization examples are also transparent challenges to how CBP weighed record evidence, *see id.* at 8-11, and do not support a finding that CBP did not make a new agency decision. *See Regents*, 140 S. Ct. at 2546.

**B.**     **CBP's Remand Results Are Not "Speculative"**

Plaintiffs' arguments that CBP's various findings in the remand results are speculative are meritless. Newtrend Cmnts. at 11-18.

First, plaintiffs argue that they cannot be "guilty by association" merely due to the Chinese affiliates and cite a 2019 EAPA investigation where CBP previously found similar business relationships to be acceptable. *Id.* at 12-13. However, plaintiffs ignore the substantial

record evidence showing that Newtrend Group exercised control over the other entities during the period of investigation. Appx90303, Appx90934-90935. They cannot explain the "intertwined relationships" among Starille, Nutrawave, Newtrend USA, and Newtrend Group that enabled transshipment of Chinese glycine. Appx90303. ORR explained in detail the likely significant control that Newtrend Group had over the importers, especially when it came to the purchase and importation of glycine from PTNNI, which was also funded by [█████████ ████████]. *Id.* Plaintiffs have offered no explanation for why Starille and Nutrawave had such favorable financing terms from [███████████████], why their U.S. customers were [███████] affiliates of the Newtrend Group, and why they did not even have to advertise for customers. *Id.* Also, the plaintiffs' cited EAPA investigation is inapposite because CBP found sufficient production in that case, whereas it did not do so here. Appx90935.

Second, plaintiffs take issue with CBP's statement that "data from diverse sources" support an evasion finding, Newtrend Cmnts. at 13-14, but regardless of how CBP summarized these sources, it does not undermine the fact that the cited sources support a finding of evasion. Appx90935. Indeed, glycine shipments from China, the largest source country for Indonesia's glycine imports, mysteriously increased just prior to the PTNNI factory beginning its export of glycine to the United States, and publicly available data showed that a "Chinese Newtrend Group affiliate sold a greater quantity of glycine to Indonesian companies than the quantity the Importers have previously disclosed," *and* bill of lading data showed that PTNNI's chemical supplier imported Chinese glycine. *Id.*

Third, plaintiffs argue that GEO's investigative report is unreliable and speculative. Newtrend Cmnts. at 14-15. This is, again, a mere disagreement with CBP's weighing of the record evidence. *See Gov't of Argentina*, 542 F. Supp. 3d at 1395. And even so, CBP had

already taken the report with a grain of salt and even noted that there were "minor inconsistencies in the market report," but overall corroborated "the report's primary finding that PTNNI was not fully operational on the October 2020 purported production start date" based on PTNNI's responses to information requests.  Appx90931.

Fourth, plaintiffs argue that alleged shipments from a Newtrend Group affiliated company, [███████████████████], are unsupported by substantial evidence because the amount CBP credited to [████] include another company, [████████████████].  Newtrend Cmnts. at 15-17.  Even if CBP mistakenly included [████████████] from a different company, it does not detract from CBP's finding that PTNNI had only reported [████████] from [████] whereas it actually received [████] that amount, which made its response to information requests inaccurate.  Appx90588, Appx90912.

Relatedly, plaintiffs misunderstand how CBP treated information related to bills of lading.  Newtrend Cmnts. at 18.  CBP found that record evidence from *both* GEO and importers was not particularly relevant because "the country of origin cannot be inferred from the port of lading alone."  Appx90932.  And although plaintiffs argue that CBP was inconsistent with past practice because it never even "reach{ed} the question of traceability" of glycine because it just relied on its prior conclusion of evasion, Newtrend Cmnts. at 18-19, this argument is meritless. In reviewing a prior EAPA determination, this Court agreed with CBP that because the "Minh Phu Group explained that it has a specific tracing system to track imported shrimp," the Court sustained CBP's determination that the company did not evade duties.  *Ad Hoc Shrimp Trade Enforcement Comm. v. United States*, 632 F. Supp. 3d 1369, 1383 (Ct. Int'l Trade 2023).  Here, there is no such similar allegation of commingling or any traceability issues that were present in *Ad Hoc Shrimp*.

Finally, plaintiffs argue that CBP is inappropriately "forcing Importers to change CBP's mind" and that is inconsistent with the applicable burden of proof. Newtrend Cmnts. at 19-21. That is incorrect. The Enforce and Protect Act requires that CBP determine whether evasion has occurred "based on substantial evidence." 19 U.S.C. § 1517. CBP used the substantial evidence standard in both the investigation and the remand results and has never shifted the burden, as plaintiffs claim. Newtrend Cmnts. at 20; *see also* Appx90903-90936. Rather, again, plaintiffs incorrectly characterize this so-called burden shifting with CBP's *weighing* of the evidence, and that is not a basis to overturn CBP's determination. *See Gov't of Argentina*, 542 F. Supp. 3d at 1395.

## C. Plaintiffs Failed To Exhaust Their Administrative Remedies With Their Remaining Arguments

Plaintiffs' remaining arguments are largely copied near-verbatim from its prior motion before this Court. Pls. MJAR at 35-48. But plaintiffs failed to raise these *specific* arguments before CBP. Appx90891-90901. Thus, plaintiffs have failed to exhaust their administrative remedies and are precluded from now making these arguments. *See* 19 C.F.R. § 165.26(a)(1) (stating that a party must submit "written arguments that contain all arguments relevant to the determination as to evasion"); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (recognizing that the exhaustion requirement protects administrative agency authority and promotes judicial efficiency). Indeed, the Federal Circuit has held that a party's obligation to exhaust its administrative remedies in proceedings before Commerce applies both to broad issues and arguments related to those issues, which would also apply to CBP. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (disagreeing with contention that courts can consider new arguments so long as the general issue was raised at the agency level); *Paul Muller Industrie GmbH & Co. v. United States,* 502 F. Supp. 2d 1271, 1275 (Ct. Int'l Trade

2007) (holding that when a party raises a general issue, but fails to incorporate a specific argument among other arguments that relate to the same issue, it fails to exhaust administrative remedies with respect to that argument).

In any event, should the Court entertain these arguments, which it should not, substantial evidence supports CBP's determination. First, substantial evidence does not support plaintiffs' assertion that PTNNI was capable of production due to both its alleged production start date and methanol consumption. Newtrend Cmnts. at 20-27. Plaintiffs conflate an Indonesian Ministry of Trade and Industry official's attestation that the facility was fully functional before the production start date (viewing a constructed building) with a business operating *within* that building. For example, TRLED explained that just because the exterior of the factory was shown, that did not mean that the factory could operate. Appx90022. Also, it is undisputed that the Indonesian official visited the building *before* the claimed production start date of October 1, 2020; thus, the Indonesian official's attestation is unhelpful to the extent of confirming when PTNNI may have started production. *Id.* CBP also considered other photographic evidence from plaintiffs and determined that it was not as persuasive as other evidence on the record. Appx90029.

Regarding methanol consumption and methanol recovery rates, it is curious that plaintiffs did not make more robust arguments to CBP, and instead relied on a bullet point referencing their earlier submissions, Appx90901, because then CBP could have engaged with the data they *now* present to the Court. Indeed, CBP even repeatedly noted that plaintiffs could have placed PTNNI's methanol recovery rates (aka recycling) on the remand record but failed to do so. Appx90921, Appx90930. Nonetheless, their methanol consumption claims ring untrue. Substantial evidence supports CBP's decision that PTNNI failed to procure sufficient methanol,

even considering the conversion rate that the importers had suggested was more appropriate to use. Appx90300. The plaintiffs also could not explain how PTNNI allegedly recycled methanol, especially considering that certain workers had no familiarity with how to operate the equipment and the factory did not operate continuously. *Id.*

Relatedly, plaintiffs also argue that CBP failed to address PTNNI's activated carbon consumption, Newtrend Cmnts. at 28, but that is puzzling considering that ORR determined that any minimal discrepancies in the consumption of [███████████] was not probative to the ultimate question of whether evasion occurred. Appx90301.

Finally, plaintiffs allege that CBP erroneously focused on the lack of management and foreign-country personnel instead of records showing that PTNNI had sufficient personnel to produce glycine. Newtrend Cmnts. at 28-31. Specifically, plaintiffs argue that CBP ignored PTNNI's domestic Indonesian labor force and argues that its employee records are sufficient. *Id.* This argument is again meritless because plaintiffs cannot explain how PTNNI could produce glycine when production allegedly started in October 2020 with very few foreign workers present to train Indonesian employees, considering that PTNNI itself had disclosed that it took one to two months to train employees. Appx90301. Also, the employee attendance records largely did not match production records and the on-site interviews of employees revealed that they were poorly trained and could not perform more than one stage of production, unlike what PTNNI had claimed in responses to CBP's information requests. Appx90015-90016.

Thus, the Court should find that CBP's determination that plaintiffs evaded the Chinese orders covering glycine is supported by substantial evidence. Appx90289-90306; Appx90903-90936.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain CBP's affirmative evasion determination on remand and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Deputy Principal Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:
JENNIFER L. PETELLE
Attorney
U.S. Customs and Border Protection
  Office of the Chief Counsel

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7571
Email: kara.m.westercamp@usdoj.gov

June 4, 2024

Attorneys for Defendant

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

_____
                                              )
NEWTREND USA CO., LTD., STARILLE, LTD.,  )
and NUTRAWAVE CO., LTD.,                )
                                              )
     Plaintiff,                       )
                                              )
     v.                               )       **BPI VERSION**
                                              )
UNITED STATES,                         )       Court No. 22-00347
     Defendant,                       )
                                              )
     and                              )
                                              )
DEER PARK GLYCINE, LLC,                )
     Defendant-intervenor.            )
_____)


<u>ORDER</u>

Upon consideration of the U.S. Customs and Border Protection's final results of

redetermination pursuant to remand, defendant's response in support thereto, and all other

pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety.


Dated  _____                    _____
     New York, N.Y.                                              Judge

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief contains 8,976 words.  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

*/s/Kara M. Westercamp*
KARA M. WESTERCAMP