**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE**

NEWTREND USA CO., LTD., STARILLE, LTD.,
and NUTRAWAVE CO., LTD.,

<div style="text-align:center">Plaintiffs,</div>

v.

UNITED STATES,

<div style="text-align:center">Defendant,</div>

and

DEER PARK GLYCINE, LLC,

<div style="text-align:center">Defendant-Intervenor.</div>

Court No. 22-347

**PUBLIC VERSION**

**REPLY BRIEF OF PLAINTIFFS**
**IN OPPOSITION TO U.S. CUSTOMS AND BORDER PROTECTION**
**REMAND REDETERMINATION**

Douglas J. Heffner
D. Alicia Hickok
Wm. Randolph Rucker
Richard P. Ferrin
Carolyn Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel for Plaintiffs*

Dated: July 29, 2024

## <u>TABLE OF CONTENTS</u>

I.   NEITHER DEFENDANT NOR DEFENDANT-INTERVENOR ARE ABLE TO REASON PAST CBP'S SPECULATIVE REDETERMINATION............................................................... 1

   A.   Neither Defendant nor Defendant-Intervenor Point to Any Substantial Evidence That PTNNI Shipped Chinese Origin Glycine to the United States. ............................................... 1

     1.   A Finding of Affiliation Is Not Substantial Evidence of Transshipment. ............................ 1

     2.   CBP's Reliance on Generic Import Data Does Not Constitute Substantial Evidence of Transshipment............................................................................................................ 2

   B.   Neither Defendant nor Defendant-Intervenor Point to Any Substantial Evidence That PTNNI Could Not Produce Glycine During the POR. .......................................................... 6

     1.   At Issue Is Not How CBP Weighed the Evidence, But Rather That CBP Prioritizes Unfavorable Conjecture in Lieu of Record Evidence. ......................................... 7

     2.   CBP's Focus on Limited Aspects of PTNNI's Production Fails to Consider Significant Substantial Evidence that PTNNI Did Produce Glycine During the Period of Review. ...... 11

   C.   Conclusion. ................................................................................................................ 15

II.   THE PLAINTIFFS FULLY EXHAUSTED THEIR ADMINISTRATIVE REMEDIES............ 15

III.   CONCLUSION AND PRAYER FOR RELIEF. ..................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alum. Extrusions Fair Trade Committee v. United States*, No. 22-236, slip op. (Ct. Int'l Trade June 13, 2024)................................................................................................ 2, 6, 14

*Consol. Bearings Co. v. United States*, 412 F.3d 1266 (Fed. Cir. 1995)...................................... 15

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). ........................ 7

*Dak Americas LLC v. United States*, 44 CIT ___, 456 F.Supp.3d 1340 (2020)............................ 6

*DuPont Teijin Films USA v. United States*, 407 F.3d 1211 (Fed. Cir. 2005) .............................. 6

*Echjay Forgings Private Ltd. v. United States*, 44 CIT ___, 475 F.Supp.3d 1350 (2020)......... 6, 8

*Elysium Tiles, Inc., et. al. v. United States*, No. 23-41, slip op. (Ct. Int'l Trade July 18, 2024)................................................................................................................. 7, 10

*Giorgio Foods v. United States*, No. 24-79, slip op. (Ct. Int'l Trade July 17, 2024). ................. 15

*Gov't of Argentina v. United States*, 45 CIT ___, 542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021).... 1

*Interlake Iron Corp. v. NLRB*, 131 F.2d 129 (7th Cir. 1942) ...................................................... 1, 4

*Luoyang Bearing Corp. v. United States*, 28 CIT 733, 347 F. Supp. 2d 1326 (2004)................. 16

*China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*, 771 F. Supp. 407 (Ct. Int'l Trade 1991) ....................................................................................................... 7

*NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939)........................................................................................................... 5

*Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292 (1937)................................... 12

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)................................................ 6

*Universal Camera Corp. v NLRB*, 340 U.S. 474 (1951) ............................................................ 11

**Other Authorities**

Areski Flissi, *et. Al.*, *Nucleic Acids Research*, "Norine: Update of the Nonribosomal Peptide Resource" (2020), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7145658/...... 3

**Administrative Determinations**

ORR, Enforce and Protect Act ("EAPA") Case Number 7356; 19 U.S.C. § 1517; Minh Phu Group (Feb. 11, 2021)............................................................................................ 8

## I.    NEITHER DEFENDANT NOR DEFENDANT-INTERVENOR ARE ABLE TO REASON PAST CBP'S SPECULATIVE REDETERMINATION.

Plaintiffs' contention with CBP's redetermination goes beyond "mere disagreement" with how CBP weighed the evidence.  *See* Def.'s Brief at 27 (citing *Gov't of Argentina v. United States*, 45 CIT ___, 542 F. Supp. 3d 1380, 1395 (2021)).   Rather, the fundamental issue with CBP's redetermination is that the agency elevated its own collection of speculative theories, not evidence, over affirmative substantial evidence against a finding of evasion.

> But an inference cannot be piled upon inference, and then another inference upon that, as such inferences are unreasonable and cannot be considered as substantial evidence.  Such a method could be extended indefinitely until there would be no more substance to it than the soup Lincoln talked about that was 'made by boiling the shadow of a pigeon that had starved to death.'

*Interlake Iron Corp. v. NLRB*, 131 F.2d 129, 133 (7th Cir. 1942).  CBP's remand redetermination is such a soup, and this Court must reject Defendant and Defendant-Intervenor's attempts to palatably ladle it.

### A.    Neither Defendant nor Defendant-Intervenor Point to Any Substantial Evidence That PTNNI Shipped Chinese Origin Glycine to the United States.

#### 1.    A Finding of Affiliation Is Not Substantial Evidence of Transshipment.

In an attempt to claim that CBP's determination is not based on speculation, the Defendant and Defendant-Intervenor continue to espouse unsupported theories and misstate the record to form a results-driven analysis.  To start, Defendant claims that "substantial record evidence show{s} that the Newtrend Group exercised control over the other entities during the period of investigation."  Def.'s Brief at 28; *see also* Def.-Intervenor's Brief at 18 (claiming that the Newtrend Group's involvement in the operations of all the Plaintiffs and PTNNI is substantial evidence that PTNNI shipped Chinese origin glycine to the United States).  A finding of affiliation is distinct from and cannot support a finding of transshipment.  Yet, this forms one

of the three pillars of alleged "evidence" used by CBP to buttress its evasion determination.  *See* Appx90934-90935.  CBP's adoption of this standard directly contradicts its weighing of similar evidence in *Alum. Extrusions Fair Trade Committee v. United States*, No. 22-236, slip op. (Ct. Int'l Trade June 13, 2024).  Therein, the Court summarized CBP's position that "the information on the record showing that Kingtom {the foreign producer} sourced some materials from China did not constitute evidence of evasion" despite record evidence that "Kingtom employs Chinese workers, has Chinese ownership, and sources equipment and certain materials from China." *Id.* at 24 (internal citations omitted).  Indeed, both CBP and the Court found these connections between Kingtom and China were not "material to the issue of evasion."  *Id.* at 29.

Although plaintiffs disagree that there is control of all of the plaintiffs by the Newtrend Group, even assuming, *arguendo*, that this Court were to find that substantial evidence exists as to affiliation, that conclusion does not answer the central question of whether evasion occurred. Thus, contrary to Defendant and Defendant-Intervenor's contention that there is a "mere disagreement" with how CBP weighed the evidence, Defendant and Defendant-Intervenor's contention concerning affiliation is vastly different than a finding of evasion.  Instead, CBP's finding concerning affiliation and its leap of logic to finding evasion is like two ships passing in the night – in a dense fog.

### 2.    CBP's Reliance on Generic Import Data Does Not Constitute Substantial Evidence of Transshipment.

The Defendant attempts to characterize Plaintiffs' arguments against the import data relied on by CBP in its redetermination as one of semantics – an issue with the summarization of these data sources as "diverse."  *See* Def.'s Brief at 28.  But, this is simply not the case.  At issue is CBP's disparate treatment of import data, elevating generic evidence that basket categories of amino acids were imported into Indonesia without any link to PTNNI, *i.e.* speculative evidence,

over direct evidence from the Government of Indonesia confirming that [



],  Appx89604, and direct evidence obtained during the

verification where CBP found no evidence of any purchases of glycine by PTNNI.  Accordingly,

while CBP brushes away the evidence provided by the Government of Indonesia on the basis

that "the evidence merely shows that PTNNI did not act as the declared Indonesian importer of

Chinese glycine," it must accept this substantial evidence over its speculation that "Chinese-

origin glycine was available to PTNNI in Indonesia."  Appx90933.

Moreover, Defendant continues to mischaracterize the record as it relates to these data

sources.  Without citation, Defendant claims that "glycine shipments from China, the largest

source country for Indonesia's glycine imports, mysteriously increased just prior to the PTNNI

factory beginning its export of glycine to the United States."  Def.'s brief at 28.  No such

evidence exists on the record.  As the Plaintiffs have had to consistently remind the agency, the

only reliable record evidence of imports of glycine from China (other than those voluntarily

disclosed by PTNNI) are of basket categories of amino acids.  *See, e.g.,* Appx89900.  Moreover,

Defendant further misstates the record claiming that "bill of lading data showed that PTNNI's

chemical supplier imported Chinese glycine."  Def.'s brief at 28.  Here, too, as the Plaintiffs have

reminded Defendants, no such data exists on the record.  *See* Plaintiffs' Brief at 18.  The

evidence merely shows that PTNNI's supplier, an unaffiliated Indonesian chemical trading

company, imported amino acids.

Over 500 amino acids exist in nature.  Areski Flissi, *et. Al.*, *Nucleic Acids Research*,

"Norine: Update of the Nonribosomal Peptide Resource" (2020), available at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7145658/ (attached hereto as Annex 1).  Neither

Defendant nor Defendant-Intervenor cite to anything in the record showing that out of 500 amino acids, these imports by PTNNI's supplier, [                    ], are glycine. Instead, it is simply just conjecture by the agency that, therein, the basket category of amino acids is the equivalent of glycine. Neither Defendant nor Defendant-Intervenor cite to anything in the record showing these imports were subsequently sold to PTNNI. It must be inferred. Inference piled upon inference cannot amount to substantial evidence. *Interlake Iron Corp.*, 131 F.2d at 133. Please recall that CBP conducted an extensive verification of PTNNI. Yet CBP can cite to nothing – not a scintilla of evidence – indicating that PTNNI purchased or received any glycine from any source whatsoever.

The Defendant also claims that amongst the data supporting CBP's evasion determination is that a "'Chinese Newtrend Group affiliate sold a greater quantity of glycine to Indonesian companies than the quantity the Importers have previously disclosed.'" Def.'s Brief at 28 (citing Appx90935); *see also* Def.-Intervenor's Brief at 19. Defendant's statement is not an accurate reflection of the record as it stands. The record includes unreliable publicly available bill of lading data provided by the Defendant-Intervenor showing three transactions between PTNNI's affiliate, [                    ], and two unaffiliated Indonesian companies, [                    ] in early 2020. Plaintiffs' Opening Brief at page 16 addresses the inconsistencies within this reporting providing a vague [                    ] from which CBP draws conclusions as to date of sale, rather than a date of invoice as reported by [                    ] in the sales reconciliation submitted to CBP.

Moreover, during the underlying remand, Plaintiffs put forward significant information that publicly available bill of lading data is unreliable and does not meet the substantial evidence standard, as CBP itself acknowledged with respect to port of lading in this investigation and

generally in other investigations.  *See* Appx90895.  CBP waived this evidence away, however, claiming only that the Plaintiffs provided information that Panjiva (the data source on which it relies) is less reliable than Import Genius.  Appx90932.

Ultimately though, as stated in Plaintiffs' opening brief, once again, the contention by Defendant and Defendant-Intervenor that any potential entry of glycine into Indonesia amounts to evasion by the Plaintiffs is mere speculation.  Despite performing an extensive verification, nowhere does CBP point to actual evidence that PTNNI received any glycine from any source whatsoever. This data is not evidence of evasion.  Neither Defendant nor Defendant-Intervenor point to any transactions on the record between PTNNI and [

          ], let alone transactions involving glycine.  If there were, CBP's verification report would have disclosed them.  There is simply no link between these purported imports into Indonesia and the Plaintiffs' imports more than a year later into the United States.  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939).

Comparing CBP's treatment of this evidence to its treatment of identical evidence in *Alum. Extrusions Fair Trade Committee* once again demonstrates the CBP's disparate treatment of nearly identical evidence as substantial here, but immaterial there.  Therein, the Court summarized CBP's findings with respect to import data as follows:

> {CBP} also found that its negative evasion finding was further supported by 'the total lack of any record evidence of any *imports by Kingtom into the Dominican Republic, during the relevant period of investigation, of aluminum extrusions manufactured in China*.' {. . .} {T}he Allegation 'only provided overall import data of aluminum extrusions from other countries, in other countries, including China, into the Dominican Republic. It does not show Kingtom as the importer of such goods into the Dominican

Republic," and that "Kingtom also stated in the {Request For
Information} Response that it did not import any aluminum
extrusions from China into the Dominican Republic"). Further,
{CBP} noted that "the record does not show that Kingtom sourced
any aluminum ingots or scrap, the main raw materials from which
aluminum extrusions are created, from China."

*Alum. Extrusions Fair Trade Committee*, No. 22-236, slip op., at 24-5 (internal citations

omitted) (emphasis added). Just as with Kingtom, the record lacks any evidence that PTNNI

imported glycine manufactured in China. Further, there is no evidence that PTNNI sourced

finished or intermediate glycine from China, yet CBP reached disparate conclusions.

"{C}onsistency has long been a core interest of administrative law, and inconsistent treatment is

inherently significant." *See Echjay Forgings Private Ltd. v. United States*, 44 CIT ___, 475

F.Supp.3d 1350, 1375 (2020) (citing *Dak Americas LLC v. United States*, 44 CIT ___, 456

F.Supp.3d 1340, 1355-56 (2020)). As such, the inconsistency between CBP's determinations is

proof that a finding of evasion here is not based on substantial evidence such that a reasonable

mind might accept it as adequate to support a conclusion. *See DuPont Teijin Films USA v.

United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Indeed, "an agency action is arbitrary

when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF

USA Inc. v. United States*, 263 F.3d 1369, 1383 (Fed. Cir. 2001).

### B.    Neither Defendant nor Defendant-Intervenor Point to Any Substantial Evidence That PTNNI Could Not Produce Glycine During the POR.

The Defendant states that "substantial evidence does not support plaintiffs' assertion that

PTNNI was capable of production due to both its alleged production start date and methanol

consumption." Def.'s Brief at 31. With respect to each point, CBP mischaracterizes the record

to assign substantial weight to alleged facts that are not evidence, and neither Defendant nor

Defendant-Intervenor provide any justification for this characterization. The Courts have

rejected such treatment. "Mere uncorroborated hearsay or rumor does not constitute substantial

evidence." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30.  "Guesswork is no substitute for

substantial evidence in justifying decisions." *China Nat'l Arts & Crafts Imp. & Exp. Corp. v.

United States*, 15 CIT 417, 424, 771 F. Supp. 407, 413 (1991).

**1.    At Issue Is Not How CBP Weighed the Evidence, But Rather That
CBP Prioritizes Unfavorable Conjecture in Lieu of Record Evidence.**

Plaintiffs' concerns regarding CBP's treatment of GEO's investigative report are more

than a "mere disagreement" with CBP's weighing of the record evidence.  *See* Def.'s Brief at 28.

At issue in this case is that CBP elevated this document as substantial evidence of evasion listing

the report as key evidence in its determination without analysis.  CBP fails to consider other

detracting evidence contained within the document itself or the reliability of the document, and

instead chooses to impermissibly draw conclusions of substantial evidence from the hearsay

contained therein.  *See* Appx90934; *see also Consol. Edison Co.*, 305 U.S. at 229-30.

"Reasonable minds may accept inconsistent conclusions from evidence as a whole, but not from

a single piece of evidence that provides equal support for each conclusion."  *See Elysium Tiles,

Inc., et. al. v. United States*, No. 23-41, slip op., at fn. 12 (Ct. Int'l Trade July 18, 2024).

Specifically, CBP relies on a quote from a [          ] in the report stating that [


]. Appx80062; *see also*

Appx90934.  However, as Plaintiffs have stated before that some [          ] allegedly told a

consultant as to what PTNNI [                              ] to an unknown destination at

some unknown point in time prior to the initiation of the investigation does not mean that PTNNI

actually did [                                   ] to the consultant or any actual

customer.

Even assuming, *arguendo*, that the Newtrend Group could provide glycine directly to PTNNI (despite no record evidence of any such transaction), in order to find substantial evidence of evasion, CBP must prove by substantial evidence that the imported glycine at issue in this investigation is indeed Chinese origin and not Indonesian (despite tracking to PTNNI's detailed handwritten production records and electronic accounting records). Possession of both subject and non-subject merchandise (based on country of origin) is not substantial evidence in and of itself of evasion. *See* ORR, Enforce and Protect Act ("EAPA") Case Number 7356; 19 U.S.C. § 1517; Minh Phu Group (Feb. 11, 2021), available at https://www.cbp.gov/sites/default/files/assets/documents/2022Aug/EAPA%207356%20Final%2 0Administrative%20Determination.pdf (attached as Annex 2 to Plaintiffs' Opening Brief). Moreover, that CBP found evasion on unvalidated suspicion of PTNNI's potential possession of subject merchandise but found no evasion with respect to the Minh Phu Group that had subject merchandise in its possession is further evidence of CBP's abuse of discretion in this case. *See Echjay Forgings Private Ltd.*, 44 CIT at ___, 475 F.Supp.3d at 1375 (finding that while Commerce "enjoy{s} wide latitude in its application of the AD and CVD statute, {. . .} its discretion is limited by the need to provide an adequate explanation for any deviation from its past practice and interpretations.")

The Defendant also claims that Plaintiffs "conflate" an official document from the Indonesian Ministry of Trade dated October 1, 2020 as evidence that the facility was "fully functional before the production start date." Def.'s Brief at 31. Plaintiffs do no such thing. Rather, this document provides direct contradiction to the photographs relied on by CBP from the investigative report that the facility was not complete at PTNNI's claimed production start date. During verification, CBP officials actually interviewed the Indonesian Ministry official

that prepared this document, and he confirmed his visit to the factory and witness of equipment therein (though it was not in use at the time of his visit which aligns with PTNNI's reports as to the start of production).  *See* Appx89581.  Yet, ever shifting the goalposts of what constitutes substantial evidence, the Defendant claims that "viewing a constructed building" is not equivalent to knowledge that "there is a business operating within that building" and accordingly this document is "unhelpful."

Of course, this document and the interview conducted by CBP during verification are helpful as they provide a direct, reliable foil to undated photographs showing PTNNI's facility at various stages of construction.  *See* Def.'s Brief at 24.  Indeed, both Defendant and Defendant-Intervenor mischaracterize photographic evidence on the record to state that photographs support the theory that PTNNI's factory was not complete at the start of production.  For example, Defendant-Intervenor claims that photographs of PTNNI's facility within the investigative report provided in the allegation are from [        ] and show ongoing construction.  While the report itself is dated [        ], there is no date on the accompanying photographs.  Moreover, regarding the [

].  *See* Appx80168.

Further, as Plaintiffs pointed out in their written argument during the remand proceeding,

[

].  *See* Appx90837.

In fact, [

]. *Id.*  The photo included in Defendant-Intervenor's brief shows the same thing: a fully completed facility, raw material storage tanks, and exterior groundwork plus the presence of a single bucket loader (nothing out of the ordinary for a manufacturing facility). *See* Def.-Intervenor's Brief at 13.

Ultimately, though, if CBP is going to dismiss record evidence like the Ministry of Trade report for essentially failing to be contemporaneous video of production (again despite a record from verification that the Indonesian government official personally witnessed equipment therein), then so too must it dismiss the photographs provided by the Defendant-Intervenor on the record for the same reasons.  Moreover, the Defendant-Intervenor's photographs do not amount to *substantial evidence* that production is *not occurring.  At most*, these two similar sets of photographs can be read as providing equal support for concluding that production is or is not occurring, but that cannot constitute substantial evidence, because "{r}easonable minds may accept inconsistent conclusions from evidence as a whole, but not from a single piece of evidence that provides equal support for each conclusion."  *See Elysium Tiles, Inc.*, No. 23-41, slip op. at fn. 12 (Ct. Int'l Trade July 18, 2024).

CBP's "heads I win, tails you lose" finding as described above is all the more egregious in consideration of the significant record evidence otherwise affirmatively proving production that exists on the record.  For example, additional photographs exist on the record taken during verification of samples of glycine from PTNNI's initial production run.  Appx89753; Appx89754.  Further, CBP officials observed the samples kept from *every* production run at PTNNI's facility during verification.  Appx89666.  Record evidence of a virtual audit taking place in [            ] by PTNNI's client [                ] is also included on the record and

was presented during verification to CBP officials.  Appx89750.  Accordingly, CBP's position

that PTNNI was not producing glycine during this time because photographs show exterior

groundwork around its fully constructed facility cannot constitute substantial evidence because it

does not take into account evidence that "fairly detracts from its weight," *Universal Camera*

*Corp. v NLRB*, 340 U.S. 474, 488 (1951), including the record evidence showing that PTNNI

arranged for audits of its facility, prepared samples of merchandise, and kept thousands of pages

of handwritten documentation on its production process, all during the period of time that CBP

and Defendant-Intervenor claim that the facility was not yet operational.

> ### 2. CBP's Focus on Limited Aspects of PTNNI's Production Fails to Consider Significant Substantial Evidence that PTNNI Did Produce Glycine During the Period of Review.

While the Defendant and Defendant-Intervenor both harp on the fact that PTNNI did not

take the opportunity of the remand to place evidence on the record concerning its methanol

recovery rates, to do so is a red herring.  PTNNI has long provided that its rate of methanol

recycling is not a record kept in the normal course of business, rather the factory just tracks its

consumption of purchased methanol.  *See, e.g.,* Appx89531-89532. The Defendant goes on to

claim that Plaintiffs "could not explain how PTNNI allegedly recycled methanol, especially

considering that certain workers had no familiarity with how to operate the equipment and the

factory did not operate continuously."  Defendant-Intervenor too claims, as follows:

> PTNNI was unable to recycle sufficient methanol to make up for
> the deficit amount because methanol is a material recycled
> continuously during the MCAA glycine production process at a
> bulk glycine manufacturing facility, and that it is impossible to use
> recycled methanol to produce glycine in batches: If methanol
> recycling is stopped during glycine production, it would be out of
> balance within three hours.

Def.-Intervenor's Brief at 15-16 (internal quotations omitted).

However, this analysis once again misses the point.  Specifically with respect to methanol, PTNNI indicated that based on its production [     ] kgs of *purchased* methanol is needed to produce [     ] kgs of intermediate glycine.  *Id.*  If PTNNI's methanol recycling was perfect and the facility was continuously operating, then it would never have needed to purchase methanol after its first production run.  *See* Appx89918.

Yet, PTNNI makes no claims for perfect, continuous production with 100% methanol recycling, though there were significant periods during the investigative period where the facility was running continuously.  *See, e.g., id.*  Rather, both Defendant and Defendant-Intervenor continue to perpetuate an inaccurate view of PTNNI's production process and cost accounting as it relates to methanol.  An agency may not "content{} itself with saying that . . . ' I looked at the statistics . . . and they teach me thus and so.' This will never do if hearings and appeals are to be more than empty form." *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 303 (1937).

Indeed, PTNNI's cost records show that it electronically tracks its inventory of purchased methanol through inventory in and inventory out receipts which is from where the [     ] reported monthly consumption rate of methanol comes.  *See, e.g.,* Appx85482 (summarizing PTNNI's raw material costs from June 2020 to November 2021 with beginning, ending, and purchased monthly quantities and values).  Production records show PTNNI denotes the total amount of methanol consumed in each production batch which is a function of both purchased and recycled methanol, but this is not electronically maintained in PTNNI's accounting system.  *See, e.g.,* Appx85197.

Accordingly, PTNNI's position that its purchases of methanol are consistent with a production process that employs recycling is wholly reasonable.  Alternate figures which

consider total methanol consumption – both recycled and purchased – have no bearing on the accuracy of PTNNI's reporting of its purchased methanol consumption.[1] *See, e.g.,* Def.-Intervenor's Brief at 14-15. Indeed, in a chemical process for which record evidence shows that the ideal scenario is zero losses, that PTNNI had a loss rate of just over one-tenth which it renewed via additional purchases, is certainly reasonable.

CBP's focus on limited aspects of production in light of the thousands of original documents including bank records, records of cash transactions, purchase orders for raw materials, invoices for the purchase of raw materials, payments for raw materials, raw material receipts (indicating delivery of the raw materials into inventory), raw material requisition forms (indicating delivery of the raw materials into inventory), inventory reports, and freight transactions observed while on site at verification.  If this were just an elaborate scheme to transship glycine from China to the United States via Indonesia, why would PTNNI have a significant production facility, purchased raw materials, inventory reports, employee payment records, etc. if it were not producing glycine?  Indeed, it would be a foolhardy and expensive way to try to evade the payment of antidumping duties.  Common sense says that CBP's conclusion is wrong.  Attempts by Defendant and Defendant-Intervenor to prove otherwise simply cannot overcome these basic facts.  CBP's conclusion that PTNNI did not produce the glycine that it shipped to the United States is unreasonable.

---

[1] Notably, however, if the Court considers the total methanol consumption of the Indian factory, at [    ] kilograms of methanol per [ ] kilogram of intermediate glycine alongside the other record evidence of a [          ] methanol to intermediate glycine consumption, PTNNI's purchased methanol consumption of [    ] kilograms per [ ] kilogram of intermediate glycine is indeed reasonable.  In other words, the Indian factory, likely purchased [   ] kilograms of methanol per [ ] kilogram, a degree only slightly higher than PTNNI's reported consumption.

Moreover, when compared against CBP's findings in the investigation underlying *Alum.*

*Extrusions Fair Trade Committee v. United States*, that CBP found and the Court agreed that

nearly identical facts do not amount to substantial evidence tellingly undermines CBP's position

here.  Namely, therein CBP weighed its observations at verification as substantial evidence of

non-evasion:

> 1) actual production was observed, 2) the presence of claimed
> machinery was verified, 3) the ability of the equipment to
> manufacture the products exported to the United States was
> verified, 4) monthly production reports were provided, and 5) the
> differences between production versus sales/export figures have
> been explained.

*Alum. Extrusions Fair Trade Committee*, No. 22-236, slip op., at 20.

Kingtom was by no means a perfect respondent.  Verifiers observed missing records

during verification.  *Id.* at 11.  Verifiers observed and recorded several "variances" or differences

based on Kingtom's documents provided during verification compared to its responses,

summarized by the Court as follows:

> For five out of the ten work orders, {CBP} found that more units
> were shipped and invoiced than produced. For four work orders,
> {CBP} found that more units were produced than were shipped
> and invoiced, and as to the remaining one order, {CBP} found that
> the units had been produced but not shipped due to the EAPA
> investigation.

*Id.* at 14, fn. 17.  CBP even initially made an affirmative finding of evasion on the basis that

there was no reliable record evidence that Kingtom could operate at full capacity to produce the

amount of aluminum extrusions it exported to the United States.  *Id.* at 15.  CBP also noted "bulk

payments" to suppliers, and even intimidation of and reports of mistreatment by its workers

during the verification process.  *Id.* at 16-17.  However, in its administrative review as supported

by the Court, CBP recognized that these issues must be considered in light of the record as a

whole, stating:

> {CBP} acknowledged discrepancies in production data, but found that, when considered in the context of other record evidence showing that "Kingtom produced aluminum extrusions in the quantities that it sold and exported to the United States," the "small anomalies" in the production capacity data did not equal substantial evidence of evasion. The court does not find {CBP} unreasonably focused its analysis on data discrepancies relevant to production instead of employment, wage, and other data which has less direct bearing on the question of whether substantial evidence of evasion exists on the record.

For these reasons, the Court must find that CBP's finding that PTNNI lacked production capability during the POR are not supported by substantial evidence, and amount to an abuse of discretion.

> ### C.    Conclusion.

"Congress has not authorized {CBP} to exercise its {EAPA} powers based on speculation, conjecture, divination, or anything short of factual findings based on substantial evidence." *Giorgio Foods v. United States*, No. 24-79, slip op. at 19 (Ct. Int'l Trade July 17, 2024).  As evidenced above, CBP's redetermination effectively asks this Court to accept all such methods of clairvoyance, soothsaying, and prediction  as substantial evidence that PTNNI transshipped Chinese glycine.  This simply does not rise to the level of substantial evidence upon which CBP was supposed to base its conclusions.  This Court should accordingly conclude that CBP's factual findings, failing the substantial evidence test, led to a conclusion that constitutes an abuse of discretion.  *See Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 1995) (holding that an abuse of discretion occurs when agency decision is based on factual findings that are not supported by substantial evidence).

## II.    THE PLAINTIFFS FULLY EXHAUSTED THEIR ADMINISTRATIVE REMEDIES.

The Defendant claims that Plaintiffs failed to exhaust their administrative remedies on the basis that the arguments raised before CBP were not specific enough.  While Plaintiffs' summary

of its previously raised arguments were brief, there is no doubt that they met the requirements for exhaustion.

> While a plaintiff cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument, plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it.

*Luoyang Bearing Corp. v. United States*, 28 CIT 733, 347 F. Supp. 2d 1326, 1352 (2004). Plaintiffs' summaries of the relevant issues were not broad, but rather touched on specific evidence refuting CBP's claim that PTNNI could not produce glycine including with respect to CBP's treatment of the investigative report, methanol consumption, activated carbon consumption, and employment records.

Finally, Plaintiffs note that its comments on the draft remand cited to these detailed arguments supporting each point raised during the underlying investigation and administrative review. *See* Appx90900. Plaintiffs raised these points in their written arguments before TRLED's initial finding of evasion. *Id.* Plaintiffs raised these points in their request for an administrative review. *Id.* Plaintiffs raised these points in their written arguments before ORR's administrative review determination. *Id.* Plaintiffs then raised these arguments as comments on the draft remand, *id.*, yet CBP made no mention of exhaustion for purposes of its final determination. *See, e.g.,* Appx90903-90936. Accordingly, there is no basis to allege that the agency was not put on notice of the issue and did not have the opportunity to resolve this issue. To allege as such now is a post hoc effort to avoid Plaintiffs' valid contentions with CBP's remand redetermination.

## III.    CONCLUSION AND PRAYER FOR RELIEF.

For all of the above reasons, Plaintiffs respectfully request that the Court:

1)    Enter judgment in favor of Plaintiffs;

2)    Set aside CBP's determination on remand and declare that its determination on remand that China was the "true" country of origin of glycine is unsupported by substantial evidence and therefore CBP's Remand Redetermination is arbitrary, capricious, and an abuse of discretion;

3)    Hold and declare that CBP's conclusion that PTNNI "could not have produced all the glycine" that it sold to the Plaintiffs is unsupported by substantial evidence and therefore CBP's Remand Redetermination is arbitrary, capricious, and an abuse of discretion;

4)    Remand CBP's Remand Redetermination with instructions to reconsider its ultimate finding of evasion and all subsidiary findings in a manner that is supported by substantial evidence and is no longer arbitrary, capricious, or an abuse of discretion; and

5)    Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Richard P. Ferrin
Douglas J. Heffner
Wm. Randolph Rucker
Richard P. Ferrin
Carrie Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs Newtrend USA, Co., Inc., Starille Ltd, and Nutrawave Co., Ltd.*

July 29, 2024

PUBLIC VERSION

**Certification of Compliance with Standard Chamber Procedures**

The undersigned hereby certifies that the foregoing brief contains 5,043 words, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum word count limitation of 7,000 for reply briefs, as set forth in Paragraph 2(b)(1)(a) of the Standard Chamber Procedures.

<div style="margin-left:40%;">

/s/ Richard P. Ferrin
Douglas J. Heffner
Wm. Randolph Rucker
Richard P. Ferrin
Carrie Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel to Plaintiffs Newtrend USA, Co., Inc.,*
*Starille Ltd, and Nutrawave Co., Ltd.*

</div>