UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| NEWTREND USA CO., LTD., STARILLE, LTD., and NUTRAWAVE CO., LTD.,<br><br>        Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>  and<br><br>DEER PARK GLYCINE, LLC,<br><br>        Defendant-Intervenor. | Court No. 22-347<br><br>**PUBLIC VERSION**<br>Business Proprietary Information deleted from within Brackets [ ] |

## PLAINTIFFS' LETTER BRIEF

Douglas J. Heffner
Wm. Randolph Rucker
Richard P. Ferrin
Carolyn Bethea Connolly
**FAEGRE DRINKER BIDDLE & REATH LLP**
1500 K Street, N.W.
Washington, DC 20005
(202) 230-5803

*Counsel for Plaintiffs*

Dated: February 18, 2025

**PUBLIC VERSION**

**TABLE OF CONTENTS**

I. CBP'S REMAND REDETERMINATION FAILS TO PROVE THE IMPORTERS EVADED THE ORDERS ON CHINESE GLYCINE AS THERE IS NO SUBSTANTIAL EVIDENCE THE GLYCINE THAT ENTERED THE UNITED STATES—EVEN ASSUMING *ARGUENDO* THAT IT WAS NOT PRODUCED IN INDONESIA – WAS PRODUCED IN CHINA. ...................................................................................................................... 1

    A.    Even When Taken as True, the Statement in the Investigative Report Shows No Indication that PTNNI Intended to Transship Glycine Through Indonesia to the United States. ............................................................................................................................ 2

    B.    The Import Statistics Upon Which CBP Relies for Its Determination Do Not Amount to Substantial Evidence That the Importers' Imports Are Chinese Origin, and Thus Are Not Substantial Evidence of Evasion. ................................................................................... 4

        1.    Even When Conflating Basket Category Imports of Amino Acids from China as Imports of Glycine from China, CBP's Analysis Still Fails to Provide Substantial Evidence of Evasion. ......................................................................................................................... 5

        2.    Even When Treating Unreliable Panjiva Data as Definitive Proof of Chinese Origin Glycine Entering Indonesia, CBP's Analysis Still Fails to Provide Substantial Evidence of Evasion. .......................................................................................................................... 7

        3.    Panjiva Data on the Record Simply Indicates that PTNNI's Raw Material Chemical Supplier Imported Amino Acids, *i.e.* Chemical Products, from an Unknown Source Company and Country. ............................................................................................................ 9

    C.    The Plaintiffs' Affiliation, or Lack Thereof, to the Newtrend Group is Immaterial to the Issue of Evasion. ............................................................................................................ 10

II. CONCLUSION AND REQUEST FOR RELIEF. ......................................................... 10

**PUBLIC VERSION**

## TABLE OF AUTHORITIES

**Cases**

*Aluminum Extrusions Fair Trade Comm. v. United States*, 48 CIT ___, 714 F. Supp. 3d 1332 (2024) .................................................................................................................. 10

*Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318 (Fed. Cir. 2020) ................ 7

*Consol. Bearings Co. v. United States*, 412 F.3d 1266 (Fed. Cir. 1995) ....................................... 5

*Interlake Iron Corp. v. NLRB*, 131 F.2d 129 (7th Cir. 1942) ........................................................ 2

*NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292 (1939) ....................................... 9

*OCP S.A. v. United States*, 47 CIT ___, 658 F. Supp. 3d 1297 (2023) ......................................... 2

*SeAH Steel VINA Corp. v. United States*, 950 F.3d 833 (Fed. Cir. 2020) .................................... 7

*Siemens Energy, Inc. v. United States*, 806 F.3d 1367 (Fed. Cir. 2015) ....................................... 7

**Statutes**

19 U.S.C. § 1517(c)(1)(A) ............................................................................................................. 1

**PUBLIC VERSION**

I. **CBP'S REMAND REDETERMINATION FAILS TO PROVE THE IMPORTERS EVADED THE ORDERS ON CHINESE GLYCINE AS THERE IS NO SUBSTANTIAL EVIDENCE THE GLYCINE THAT ENTERED THE UNITED STATES—EVEN ASSUMING *ARGUENDO* THAT IT WAS NOT PRODUCED IN INDONESIA – WAS PRODUCED IN CHINA.**

In order to make an affirmative determination that the Importers evaded the antidumping and countervailing duty Orders on Chinese glycine, U.S. Customs and Border Protection ("CBP") must show, by substantial evidence, that the glycine imported into the United States by the Plaintiffs during the period of investigation was specifically Chinese in origin. 19 U.S.C. § 1517(c)(1)(A). It is not enough to merely claim that PT Newtrend Nutrition Ingredient ("PTNNI") lacked the ability to produce the glycine in Indonesia, an allegation that the Importers contest.[1] CBP's affirmative remand redetermination ultimately fails as there is simply no credible evidence, let alone substantial evidence, linking the Plaintiffs' imports of glycine into the United States to Chinese origin glycine entering Indonesia. *See, e.g.,* Appx89574-Appx89575 (CBP's Verification Report) (listing relevant raw material receipt and inventory movement documentation verified by CBP).

CBP's contention that the Plaintiffs' imports were Chinese glycine rests on three categories of evidence: (1) an alleged statement made in the investigative report that PTNNI had no Indonesian glycine to sell, but "could provide glycine directly from China; " (2) import statistics allegedly showing imports of Chinese origin glycine entering Indonesia; ; and (3) the affiliation between Newtrend USA and the Newtrend group and a potential affiliated relationship between Starille and Nutrawave and the Newtrend group import statistics allegedly showing imports of Chinese origin glycine entering Indonesia. Appx90934-90935 (CBP's Remand

---

[1] Notably, during the oral argument proceeding before this Court on February 12, 2025, counsel for the government importantly stated that CBP "confirmed" production records during verification showing glycine production in October 2020. Oral Arg. Tr. 109:14 – 109:25.

Redetermination). However, as explained below, each of these justifications amounts to nothing more than speculation. *OCP S.A. v. United States*, 47 CIT ___, 658 F. Supp. 3d 1297, 1313 (2023) ("speculation does not amount to reasonable inference, as it provides no factually-grounded basis for sustaining an agency's determination") (cleaned up); *Interlake Iron Corp. v. NLRB*, 131 F.2d 129, 133 (7th Cir. 1942) (inference piled upon inference does not meet substantial evidence standard).

> **A. Even When Taken as True, the Statement in the Investigative Report Shows No Indication that PTNNI Intended to Transship Glycine Through Indonesia to the United States.**

GEO's investigative report quotes a source, allegedly [          ], that allegedly told the investigator that [

]² Appx80062. No written documentation of any kind supports this interaction or any subsequent, related sale. No quotes, no purchase order, no subsequent invoice exist on the record. Oral Arg. Tr. 97:16 – 97:24. Nonetheless, even presuming its accuracy, this statement fails to amount to substantial evidence of PTNNI's participation in a transshipment scheme on several counts.

First, and most notably and conspicuously absent from this alleged interaction is any indication as to place of delivery for the alleged transaction. *See* Appx80062. The alleged proposal could have just as easily be interpreted as a request for delivery to Indonesia as to the United States. Indeed, the company responsible for preparing the report is based in [       ], and there is no indication that the investigator even appeared to be working for a United States company as the report was prepared by "company staff" and "trusted contacts and operatives" "routinely use{d}" by the [       ] firm. *See* Appx90590.

---

² Note that other record evidence detracts from the credibility of this report and the attribution of this statement to [          ] as Hao Wang did not visit PTNNI until verification took place. Appx90708-90709.

2

Second, the timing and location of this conversation is unspecified. PTNNI openly acknowledges that it was not fully operational for the entirety of the period of investigation. Indeed, PTNNI did not start producing intermediate glycine until October 2020. *See, e.g.,* Appx89573 (CBP's Verification Report). While the investigative report is dated [

], there is no indication that this conversation took place on that date. *See* Appx80024; *see also* 90590. This conversation would have had to take place prior to the issuance of the report, and indeed it is reasonable to assume that a report of this nature took significant time to gather information for and prepare, which suggests that the alleged conversation may have taken place many months before [            ], even before October 2020.

Indeed, other statements allegedly made during this conversation indicate that it *likely* took place prior to the start of PTNNI's production, *i.e.* prior to October 2020. Specifically, the source explicitly stated that the Company was "[

]" and "[

]." Appx80061-80062. Yet, elsewhere in the same report, the [         ] is visibly constructed based on the layout also contained therein.

[



















].

3

Other record evidence, including the KNIC photos posted online in December 2020 and taken in November 2020 also show the laboratory completed. *See, e.g.,* Appx82389 (CBP's Initiation Letter Feb. 28, 2019, Attachment 3).

Accordingly, this conversation presumably took place at a minimum at some point prior to November 2020, and likely prior to the start of PTNNI's production. For these reasons, even assuming the validity of the investigative report on which CBP relies, the investigative report provides no evidence, let alone substantial evidence, that PTNNI was involved in a transshipment scheme of Chinese glycine to the United States during the period of investigation.

> **B.    The Import Statistics Upon Which CBP Relies for Its Determination Do Not Amount to Substantial Evidence That the Importers' Imports Are Chinese Origin, and Thus Are Not Substantial Evidence of Evasion.**

The government relies on import statistics to make its finding that the glycine imported by the Plaintiffs was Chinese in origin, summarizing its findings as follows:

> "(a) aggregate public trade data from official Indonesian sources showing increasing quantities of *glycine shipments* from China to the Indonesian port closest to PTNNI's facility just before PTNNI began exporting glycine from Indonesia to the United States; (b) the fact that this data shows that China was the largest source country for Indonesia's *glycine imports*; (c) publicly-available, company and shipment-specific data showing that a Chinese Newtrend Group affiliate sold a greater quantity of glycine to Indonesian companies than the quantity the Importers have previously disclosed; and (d) bill of lading data showing that the Indonesian companies importing *glycine* from China included PTNNI's chemical supplier.

Appx90935 (internal citations omitted) (emphasis added). Beyond being an inaccurate summary of the record, none of this data provides substantial evidence that the Plaintiffs' imports were Chinese in origin as the data ultimately stops at the shores of Indonesia with no link to the exports made by PTNNI to the Plaintiffs during the POI.

4

1.  **Even When Conflating Basket Category Imports of Amino Acids from China as Imports of Glycine from China, CBP's Analysis Still Fails to Provide Substantial Evidence of Evasion.**

CBP's so-called factual findings in points (a) and (b) are a blatant misstatement of the record and relying on this inaccurate presentation of the facts is an egregious abuse of discretion. *See Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 1995) ("{a}n abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors"). To be clear, there are *no* aggregate public trade data from official Indonesian sources showing increasing quantities of *glycine shipments* from China to the Indonesian port closest to PTNNI's facility on the record. There are *no* data that show that China was the largest source country for Indonesia's *glycine* imports on the record.

Rather, as the Importers explained to CBP at multiple times and in the multiple stages of the underlying investigation and in the remand redetermination, the referenced data contains statistics related to HS 2922.49.00, a basket category of amino acids that is not specific to glycine. *See, e.g.,* Appx89900; Appx90044; Appx90822-Appx90826; Appx90896 (explaining to CBP this error numerous times on the record). As noted on page 3 of the Importers' Reply Brief, there are over 500 amino acids that exist in nature, and it is simply conjecture by the agency that these statistics represent glycine.

However, even if this Court were to give credence to CBP's erroneous findings that PTNNI was incapable of production and that these Indonesian imports of amino acids represent imports of glycine, there is still no substantial evidence that these imports of purported Chinese origin glycine *into Indonesia* are the same as the glycine *exported* from Indonesia and then *imported into the United States* by the Importers. Indeed, there is significant record evidence that other sources of amino acids entered Indonesia under HS 2922.49.00 both preceding and

5

during the period of investigation. *See, e.g.,* Appx89670-89708, summarized below.

| | 2020 | July 2020 - Dec. 2020 | 2021 |
|---|---|---|---|
| ARGENTINA | 17,210.00 | 4,299.00 | 8,608.00 |
| AUSTRALIA | 3,672.00 | 1,194.00 | 916.00 |
| BELGIUM | 45.00 | 45.00 | 48.00 |
| BRAZIL | 61,600.00 | 19,000.00 | 454,113.00 |
| CANADA | 5,325.00 | 3,822.00 | 5,238.00 |
| CHINA | 20,543,021.00 | 7,706,063.00 | 27,983,065.00 |
| FRANCE | 24,667.00 | 371.00 | 27,290.00 |
| GERMANY, FED. REP. OF | 2,360,263.00 | 934,227.00 | 1,682,736.00 |
| HUNGARY | 4,112.00 | 1,641.00 | 824.00 |
| INDIA | 6,578,444.00 | 2,643,655.00 | 7,001,778.00 |
| IRELAND | 229.00 | 35.00 | 0.00 |
| ITALY | 13,188.00 | 709.00 | 23,685.00 |
| JAPAN | 2,043,952.00 | 1,070,224.00 | 2,650,616.00 |
| KOREA, REPUBLIC OF | 1,330,447.00 | 633,618.00 | 2,026,106.00 |
| LITHUANIA | 0.00 | 0.00 | 91.00 |
| MALAYSIA | 583,594.00 | 572,349.00 | 21.00 |
| MONACO | 21,127.00 | 8,480.00 | 8,834.00 |
| MONGOLIA | 0.00 | 0.00 | 5,608.00 |
| NETHERLANDS | 702,984.00 | 119,848.00 | 1,596,567.00 |
| POLAND | 265,178.00 | 0.00 | 190,260.00 |
| PORTUGAL | 0.00 | 0.00 | 247.00 |
| SINGAPORE | 151,808.00 | 119,382.00 | 295,024.00 |
| SLOVENIA | 0.00 | 0.00 | 436.00 |
| SPAIN | 22,359.00 | 310.00 | 10,015.00 |
| SWITZERLAND | 5,003,409.00 | 31,041.00 | 1,226,748.00 |
| TAIWAN | 229,580.00 | 110,494.00 | 366,277.00 |
| UNITED KINGDOM | 510,020.00 | 389,082.00 | 495,041.00 |
| UNITED STATES | 344,490.00 | 96,504.00 | 275,971.00 |
| **OVERALL TOTAL** | **40,820,724.00** | **14,466,393.00** | **46,336,163.00** |
| **TOTAL EXCLUDING CHINA** | **20,277,703.00** | **6,760,330.00** | **18,353,098.00** |

These imports of amino acids from sources other than China significantly outnumber the volume of imports made by the importers during the period of investigation, which amounts to a mere [     ] kilograms according to ACE data.[3] Using CBP's logic, the country of origin of the Plaintiffs' imports could just have easily been Germany or Korea as it could China. Accordingly, the Court cannot rest on this logic that the Plaintiffs' imports are necessarily

---

[3] We note that CBP claims that there is a difference between the amount of glycine reflected in ACE import data and PTNNI's sales data, however, PTNNI explained this difference is unsurprising given that date of sale is not equivalent to date of import.

Chinese in origin as substantial evidence requires CBP's evasion finding must be "determined on the entirety of the record, taking into account the evidence that supports and the evidence that detracts from the agency's conclusion" *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015); *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 840, 848 (Fed. Cir. 2020) (same).

> 2. **Even When Treating Unreliable Panjiva Data as Definitive Proof of Chinese Origin Glycine Entering Indonesia, CBP's Analysis Still Fails to Provide Substantial Evidence of Evasion.**

Point (c) of CBP's conclusion, that Panjiva data shows that a Chinese Newtrend Group affiliate sold glycine to unaffiliated Indonesian companies prior to the period of investigation similarly fails to amount to substantial evidence when considered against the record as a whole. *See Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (cleaned up). Specifically, CBP relies on Panjiva data showing [ ] apparent imports of glycine from PTNNI's Chinese affiliate into Indonesia to claim that the glycine imported by the Plaintiffs during the period of investigation was of Chinese origin. As discussed in the Plaintiffs' opening brief on pages 15 to 17, these data do not amount to substantial evidence as CBP has acknowledged the unreliability of Panjiva data within this proceeding. However, even if this court were to treat this evidence as definitive proof of Chinese origin glycine entering Indonesia, CBP's analysis would still fail.

There is simply no evidence that these purported imports by [            ] and [            ] were ever subsequently purchased by or delivered to PTNNI. During the course of its verification as the Court noted, CBP made findings questioning PTNNI's production and records. However, CBP made no such findings with respect to PTNNI's material receipt and inventory tracking, rather stating that it observed the following without issue:

7

- "Raw material receipts (indicating delivery of raw material into inventory)"
- "Raw Material requisition forms (indicating movement of raw material from inventory to be used in production)"
- "Computer-generated inventory reports from PTNNI's accounting system confirming the movement of raw materials"
- "Receipt forms documenting the receiving of intermediate glycine from inventory"
- "Requisition forms documenting the issuance of intermediate glycine from inventory"
- "Computer-generated inventory report from PTNNI's accounting system confirming the movement of intermediate glycine in and out of inventory"
- "Receipt/release forms documenting the receiving/issuance of finished glycine into and out of inventory"
- "Computer-generated inventory report from PTNNI's accounting system confirming the movement of finished glycine into and out of inventory." Appx89574-89575.

Beyond the lack of any transactional link between these Indonesian imports and the Plaintiffs' imports, these data show that the imports in question were imported into Indonesia long before the period of investigation, *i.e.*, the period beginning with the date that the Plaintiffs began importing the glycine at issue into the United States from Indonesia. Based on the [                    ], presumably a reference to the date upon which the merchandise entered Indonesia's customs territory, these imports took place between [

]. Based on the latest date, these imports occurred six months prior to the start of the period of investigation, eight months prior to when PTNNI began production, nine months prior to when PTNNI produced its first batch of finished glycine, and ten months prior to the Plaintiffs' first purchases of subject merchandise. *See, e.g.,* Appx89570; Appx89573. Indeed, these alleged Indonesian imports apparently took place prior to when construction *even began on PTNNI's facility. See* Appx90777 (Rebuttal Information Concerning Confidential Record of Starille Ltd. et al., June 16, 2022, Ex. 9) (showing ceremonial groundbreaking in February 2020).

Glycine, as a food additive, does have a shelf life, *see, e.g.,* Appx89548, further stretching the credulity of CBP's speculation that these imports into Indonesia were subsequently transshipped by the Importers into the United States. Accordingly, there is simply no way that

8

these data meet the substantial evidence standard, and by relying on them to form the basis for its affirmative evasion determination, CBP abused its discretion. Substantial evidence "must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

### 3. Panjiva Data on the Record Simply Indicates that PTNNI's Raw Material Chemical Supplier Imported Amino Acids, *i.e.* Chemical Products, from an Unknown Source Company and Country.

As with points (a) and (b) of CBP's conclusion, point (d) also mischaracterizes the record. There is *no* bill of lading data showing that the Indonesian companies importing glycine from China included PTNNI's chemical supplier on the record. To start, the evidence cited by CBP is not direct bill of lading data, but rather sourced from Panjiva – a global import datamining vendor. *See, e.g.,* Appx90586. In addition to conflating imports under HS 2922.49.00, a basket category of amino acids, with imports of glycine, the only indication that these imports are Chinese origin is the listed origin country within the Panjiva data.[4] However, CBP elsewhere in its remand redetermination recognized that this Panjiva data may be unreliable, particularly with respect to country of origin, stating "CBP is aware that the port of lading for goods {(equivalent to origin country in Panjiva data)} shipped from Southeast Asia {. . .} through Chinese ports will often list China as the port of lading because the goods are consolidated in Chinese ports." Appx90915-90916. By this logic, the only thing that this data upon which CBP rests its determination shows is that PTNNI's chemical supplier imported amino acids from some country and CBP's findings that this instead represents glycine from China amount to nothing more than guesswork. "Guesswork is no substitute for substantial

---

[4] The listed shipper is indicated as [         ]. Other record information indicates that the suffix [   ] is used by [         ] business entities, not Chinese. *See* GEO Rebuttal Submission Nov. 17, 2023 (indicating the [         ] investigatory firm used by the alleger is [         ]). Appx 90590.

9

evidence in justifying decisions." *SeAH Steel Vina Corp. v. United States*, 950 F.3d at 847.

### C. The Plaintiffs' Affiliation, or Lack Thereof, to the Newtrend Group is Immaterial to the Issue of Evasion.

As discussed in the Plaintiffs' opening brief, CBP's theory that the affiliation between Newtrend USA and the Newtrend group and a potential affiliated relationship between Starille and Nutrawave and the Newtrend group amounts to nothing more than a theory of guilt by association. Reviewing another EAPA determination, this Court found that connections between an exporter and China were not "material to the issue of evasion." *Aluminum Extrusions Fair Trade Comm. v. United States*, 48 CIT ___, 714 F. Supp. 3d 1332, 1349 (2024). Here, too, relying on any apparent connections between the Importers, PTNNI, and the Newtrend group to speculate that the glycine which was entered into the United States by the Importers during the period of investigation was necessarily Chinese in origin does not meet the substantial evidence standard.

## II. CONCLUSION AND REQUEST FOR RELIEF.

CBP's determination that the glycine imported by the Plaintiffs is Chinese origin is arbitrary and capricious. The statement from the investigative report, the record import statistics, and the business relationships between the Importers are the Newtrend group, both individually and in total, fail to amount to substantial evidence that PTNNI was involved in any transshipment scheme. The Court should determine that CBP's finding that plaintiffs entered Chinese-origin glycine is unsupported by substantial evidence, remand the determination, and order CBP to either change its determination or identify substantial evidence on the existing administrative record—something *other* than the insubstantial "evidence" CBP has identified to date—that shows that glycine entered in the U.S. by plaintiffs was of Chinese origin.

**PUBLIC VERSION**

                     Respectfully submitted,

                     <u>/s/ Carrie Bethea Connolly</u>
                     Douglas J. Heffner
                     Wm. Randolph Rucker
                     Richard P. Ferrin
                     Carrie Bethea Connolly
                     **FAEGRE DRINKER BIDDLE & REATH LLP**
                     1500 K Street, N.W.
                     Washington, DC 20005
                     (202) 230-5803

                     *Counsel to Plaintiffs Newtrend USA, Co., Inc., Starille Ltd, and Nutrawave Co., Ltd.*

February 18, 2025