IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| NEWTREND USA CO., LTD., STARILLE, LTD., and NUTRAWAVE CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br> Defendant, <br><br> and <br><br> DEER PARK GLYCINE, LLC, <br> Defendant-intervenor. | Court No. 22-00347 <br><br> **PUBLIC VERSION** <br><br> Business Proprietary Information <br> Bracketed and Removed [ ] at pages 3-9 |

## DEFENDANT'S LETTER BRIEF

Defendant, the United States, respectfully submits this letter brief following oral argument in response to the letter brief filed by the plaintiffs Newtrend USA Co., Ltd. (Newtrend USA), Starille, Ltd. (Starille), and Nutrawave Co., Ltd. (Nutrawave) (collectively, plaintiffs or importers), Newtrend Br., ECF Nos. 125-126.  *See also* Minute Order, ECF No. 22.  For the reasons explained below, substantial record evidence supports the U.S. Customs and Border Protection's (CBP) determination that the glycine imported into the United States came from China.

I.  Standard Of Review

Under the Enforce and Protect Act, this Court's review is limited to "whether any determination, finding, or conclusion" CBP made is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  19 U.S.C. § 1517(g)(2)(B); *see also Ikadan Sys. USA, Inc. v. United States*, 639 F. Supp. 3d 1339, 1351 (Ct. Int'l Trade 2023) (emphasizing

the distinction between "arbitrariness review" and "substantial evidence" review and noting that this Court applies the former in EAPA cases). "'While the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency, the agency nevertheless must examine the relevant data and articulate a satisfactory explanation for its action.'" *Diamond Tools Tech. LLC v. United States*, 609 F. Supp. 3d 1378, 1382 (Ct. Int'l Trade 2022) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983)). "The question is therefore whether the administrative record shows that Customs applied substantial evidence review—not whether substantial evidence supports the agency's findings." *Am. Pacific Plywood, Inc. v. United States*, Consol. Ct. No. 20-03914, 2023 WL 4288346, at *4 (Ct. Int'l Trade June 22, 2023).

II.     Substantial Evidence Supports CBP's Determination That The Glycine Was From China

As CBP explained in the final determination, "based on the entirety of the record," PT Newtrend Nutrition Ingredient (PTNNI) "supplied the Importers with Chinese-origin glycine" because: (1) it did not produce enough glycine to sell,[1] (2) the Chinese Newtrend Group, PTNNI, and the importers were significantly affiliated and interconnected, (3) Deer Park Glycine, LLC's (DPG) (formerly known as GEO Specialty Chemicals, Inc.) market research report had a "clear statement" that PTNNI's owner had tried to sell Chinese-made glycine, and (4) there were large increases in Indonesian imports for amino acids which includes glycine from China. Appx90921-90922; *see also* Appx90289-90306, Appx90934-90935. As we explain below, "there is a surfeit of evidence supporting CBP's evasion determination." *Leco Supply,*

---

[1] We do not brief this point based on our understanding that the Court was satisfied at oral argument with CBP's explanation about PTNNI's lack of production capacity, and plaintiffs also omitted discussion about this topic in their letter brief.

*Inc. v. United States*, 619 F. Supp. 3d 1287, 1300 (Ct. Int'l Trade 2023); *see also CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369, 1381 (Ct. Int'l Trade 2023) (holding that "CBP examined the relevant data and articulated a satisfactory explanation for its decision").

First, plaintiffs give short shrift to the extensive affiliation of the various companies, Newtrend Br. at 10, but the extensive affiliation underpins how it was reasonable for CBP to find that PTNNI received Chinese glycine from its Chinese affiliates and sold it to the U.S. importers. Appx90004-90008, Appx90023, Appx90033. "Newtrend Group is the largest glycine producer in the world with operations in China and Indonesia," and the ultimate parent company of PTNNI is [          ], which is a Chinese company and part of the Newtrend Group. Appx89570; *see also* Appx90033, Appx90302-90303. During the period of investigation, "Chinese Newtrend Group affiliates continued to produce glycine." Appx90033. Newtrend USA is also an affiliate and helped the importers, including one owned by the son of Newtrend USA's president, find [ ] their customers and the importers received very favorable loan terms from the Newtrend Group president with "[          ] for repayment, no written loan agreement, and [          ]."[2] Appx90033. Also, "[ ] glycine imports by the importers were packaged and/or shipped by [     ]." *Id.* Plaintiffs minimize this evidence, but this evidence clearly points to a significantly intertwined personal, financial, and commercial relationship between the close family of companies to which PTNNI and plaintiffs belong.

These close relationships would explain why PTNNI and importers were less-than-forthcoming with their sales reconciliations. PTNNI is [ ] percent owned by [          ] and [ ] percent owned by [          ]. Appx81776, Appx84098. But PTNNI

---

[2] CBP cited evidence that the Newtrend Group "likely exercised significant control over Nutrawave and Starille," although they claimed not to be affiliated with Newtrend Group. Appx90303; *see also* Appx90005, Appx90007.

3

never provided sales reconciliations from these affiliates, Appx90023, despite a submission showing "glycine sales from Chinese companies to [           ] in [         ]," with other sales reconciliations also showing that PTNNI "imported goods from affiliated companies through a trading company in [       ]."  Appx90023; *see also* Appx86345, Appx86360-86407 (sales reconciliations), Appx90011.  Importantly, PTNNI sold [     ] kilograms, its largest amount, to its affiliate [              ] during the period of investigation but pointedly failed to provide sales reconciliations of these purchases.  Appx89574.

CBP explained that although there was not "direct evidence" that PTNNI "openly imported glycine from China into Indonesia," there are facts "showing intertwined relationships that would enable transshipment strategies to be executed as to glycine produced in China." Appx90302; *see also* Appx90934-90935.  As CBP wryly explained, it "would not expect any entity engaged in evasion to document it so blatantly."[3]  Appx90023.  Thus, it was reasonable for CBP to find "that Chinese Newtrend Group employees orchestrated all the transactions in the Importers' supply chain and controlled the key players."  Appx90934; *see also Am. Kitchen Cabinet Alliance v. United States*, No. 23-00140, 2024 WL 4824242, at *8 (Ct. Int'l Trade Oct. 31, 2024) (holding that an "existence of an interrelated company relationship warrants" CBP's examination); *Phoenix Metal Co., Ltd. v. United States*, No. 23-00048, 2024 WL 2891503, at *4 (Ct. Int'l Trade June 10, 2024) (finding past transshipment by "interrelated" companies a relevant consideration for an evasion determination).

---

[3] In fact, plaintiffs, perhaps knowing this reality, went to great lengths to prepare numerous pages of business records that CBP later determined to either be incomplete, *see* Appx86345, Appx86360-86407, or dubious based on CBP's weeklong verification at PTNNI's factory.  Appx89573.

4

Second, plaintiffs dismiss DPG's investigative report and claim that the timing of the conversation with PTNNI representatives was likely before PTNNI began production and note that there is no "indication as to place of delivery for the alleged transaction." Newtrend Br. at 2-4. Plaintiffs' speculation about *when* the site visit occurred is directly contradicted by the investigative report, which states that the in-person visit was on [         ], approximately [  ] months after PTNNI allegedly began production in October 2020. Appx80052, Appx89570. The lack of ability to produce glycine is also a key fact considering that the investigative report stated that PTNNI's "[                                                                                      ]," Appx80053, and that PTNNI "[                                                       ]" Appx80062. The apparent inoperability of the PTNNI factory in [         ] is buttressed by other evidence showing that the factory was not fully constructed on October 1, 2020, the claimed production start date. Appx90014, Appx90028.

And although there was no specified place of delivery for the glycine, it is notable that PTNNI offered to "[                                                                                                                                                                                              ]"[4] *Id.* The Court should not ignore that PTNNI offered *Chinese* glycine. Not glycine from Indonesia, Germany, Korea nor glycine from any of the other various countries listed on the import statistics.[5] *Chinese* glycine. Moreover, apart from a miniscule amount PTNNI sold to Newtrend Thailand, [     ] percent of PTNNI's glycine was sold to U.S. customers. Appx89574. PTNNI officials were offering to sell Chinese glycine to the investigator at a time

---

[4] Also, it begs the question how, if PTNNI allegedly did not have its own [      ] in [         ], it delivered the [      ] kilograms of finished glycine in December 2020. Appx89573; *see also* Appx86347.

[5] The glycine could not have been from the Thailand affiliate because that factory closed in 2019 following Thailand being subject to an anti-dumping duty order. Appx89570.

when PTNNI would later claim it was supposedly producing its own glycine.  Appx89573.  It is more than reasonable that CBP considered this a pertinent piece of evidence suggesting that China was the true country of origin for the glycine the importers purchased from PTNNI.  Appx90934; *see also CEK Grp. LLC*, 633 F. Supp. 3d at 1381.

Third, plaintiffs argue that the import statistics upon which CBP relies do not amount to substantial evidence that PTNNI transshipped Chinese glycine.  *See* Newtrend Br. at 4-9.  Plaintiffs claim that the import "data ultimately stops at the shores of Indonesia with no link to the exports made by PTNNI to the Plaintiffs during the {period of investigation}." *Id.* at 4.  In other words, plaintiffs claim that there is not substantial evidence "that these imports of purported Chinese origin glycine *into Indonesia* are the same as the glycine *exported* from Indonesia and then *imported into the United States* by the Importers." *Id.* at 5 (emphasis in original).  Put simply, plaintiffs would have CBP (and the Court) "silo" or partition separate pieces of evidence without considering that evidence in the tapestry of other evidence; but CBP appropriately considered the import statistics against the backdrop of the totality of other cumulative evidence suggesting that the glycine sold to the importers was of Chinese origin.  *See* Appx90000-90034, Appx90289-90306, Appx90934-90935; *see also Ad Hoc Shrimp Trade Enforcement Comm. v. United States*, 632 F.Supp.3d 1369, 1375 (Ct. Int'l Trade 2023) (holding that a CBP determination must be "based on the whole record") (citing *JSW Steel (USA) Inc. v. United States*, 466 F. Supp. 3d 1320, 1328–29 (Ct. Int'l Trade 2020)); *Metro–North Commuter Rr. Co. v. Dep't of Labor*, 886 F.3d 97, 111 (2d Cir. 2018) ("Certainly, to meet the substantial evidence standard, an agency need not find a smoking gun.").

Turning to plaintiffs' specific complaints, they argue that CBP conflates basket categories of amino acids as glycine imports from China and that imports from countries other than China

"significantly outnumber the volume of imports made by the importers during the period of investigation." Newtrend Br. at 6. This is a red herring. It is unsurprising that the importers did not account for *all* the Chinese glycine imported into Indonesia during the period of investigation, especially considering that the importers accounted for approximately [ ] percent of PTNNI's glycine sales.[6] Appx89574. Also, plaintiffs have repeatedly argued that the basket category of amino acids is not specific to glycine but use this basket category to support its argument that its glycine could have come from a country other than China. Regardless, based on the plaintiffs' summarized chart, China still accounted for *more than half* of all amino acids imported into Indonesia. Newtrend Br. at 6 (citing Appx89670-89708).

More importantly, what plaintiffs' chart also demonstrates is a pattern of increasing Chinese imports from 2020 to 2021 of the amino acids category that *includes* glycine, which certainly indicates that glycine imports likely increased as well. *Id.* Even if only a small percentage of the amino acids were glycine (the percentage of glycine in the amino acids basket is not on the record), Indonesia would have imported from China many times more glycine than what PTNNI sold to the importers. *Id.* There is no getting around that China exported more glycine to Indonesia than any other country *by far*. *Id.*; *see also H&E Home, Inc. v. United States*, 714 F. Supp. 3d 1353, 1378 (Ct. Int'l Trade 2024) (holding it was proper for CBP to reconsider evidence on remand "within a larger evidentiary context").

Other record evidence also supports the dramatic increase of Chinese glycine imports into Indonesia in 2020 and 2021. For example, CBP placed on the record public Indonesian statistics from 2019, 2020, and 2021 of Chinese imports of amino acids containing glycine. Appx9870-

---

[6] Another affiliate, [           ], accounted for [     ] kilograms of PTNNI's [      ] kilograms of glycine sales, or approximately [  ] percent. Appx89574. Altogether, thus, PTNNI sold approximately [  ] percent of its glycine sales to affiliates. *Id.*

7

9901. CBP's analysis of this data showed that there was a 31.7 percent *increase* of Chinese imports into Jakarta specifically from 2020 to 2021. Appx9902-9911. As CBP explained, "{t}his is notable because all of PTNNI's glycine exports to the U.S. were [         ], the same [                                        ]." Appx90017.

    Next, plaintiffs downplay the data from Panjiva, a global trade company, which DPG placed on the remand record, which showed that a Chinese Newtrend Group affiliate sold glycine to Indonesian companies prior to the period of investigation. Newtrend Br. at 7-9; *see* Appx90572, Appx90585-90588. Without a record citation, plaintiffs claim that these imports all took place between [                          ], before production started in October 2020, and suggest that the shelf-life of glycine is too short for the glycine to later be transshipped by PTNNI. Newtrend Br. at 8. However, as to shelf-life, plaintiffs undermine their own argument, as the expiration date of PTNNI's glycine is approximately two years, Appx89548[7], which would presumably be more than enough time for any of the imported Chinese glycine to be transshipped by PTNNI to the importers. *See* Appx89574 (according to the verification report, PTNNI sold its first batch of finished glycine in December 2020), Appx89605 (PTNNI's confidential export data); *see also* Appx90910 (CBP determining that other Indonesian trading companies "likely acted as importers for PTNNI and facilitated importation of vast quantities of glycine into Indonesia on PTNNI's behalf without a single kilogram" ever being "imported under PTNNI's name.").

---

    [7] In order to see the production and expiry dates, one has to zoom in on the image of the glycine bag.

8

Importantly, although plaintiffs acknowledge that an affiliate, [ ], PTNNI's supplier of ammonia and other raw materials, received only [ ] "apparent imports of glycine," Newtrend Br. at 7, plaintiffs omit that these imports were in [ ], and amounted to [ ] kilograms of glycine, Appx90588, more than the [ ] kilograms of glycine PTNNI finished and shipped in December 2020. Appx89573. Plaintiffs also argue that that there is no evidence that "purported imports by [ ] and [ ] were ever subsequently purchased by or delivered to PTNNI." Newtrend Br. at 7. But the *shipper* of this Chinese glycine was a Newtrend Chinese affiliate, [ ] and it shipped [ ] kilograms of Chinese glycine into Indonesia. Appx90588.

Plaintiffs attempt to obfuscate this data showing imports of Chinese glycine into Indonesia by Newtrend Group affiliates, by arguing that CBP made no findings at verification questioning PTNNI's material receipt and inventory tracking. *See* Newtrend Br. at 7-8. But CBP concluded that the importers' sales reconciliations were "incomplete and unreliable." Appx90915. Indeed, CBP found it "persuasive" that [ ], PTNNI's primary supplier of raw materials, imported "significant amounts of Chinese-origin glycine into Indonesia during the same timeframe that PTNNI purportedly produced and shipped comparable amounts of glycine to the United States." Appx90926-90927; *see also* Appx90586.

Finally, plaintiffs challenge CBP's determination that bill of lading data showed that the Indonesian companies importing glycine from China included [ ], because "{t}here is ***no*** bill of lading data," but only Panjiva data. Newtrend Br. at 9 (emphasis in original). Although CBP may have inadvertently characterized the cited exhibit as a "bill of lading," the exhibit nonetheless definitively shows that [ ], an affiliate, sourced a substantial amount of glycine

9

from China. Appx90586.

Ultimately, throughout their letter brief, plaintiffs continue to challenge *how* CBP weighed the evidence in the remand results, and their mere disagreement with CBP's weighing of the record evidence is not a basis to overturn CBP's determination. *Cf. Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021). Indeed, contrary to plaintiffs' repeated assertions criticizing the evidence CBP cited suggesting evasion, *see generally* Newtrend Br., there is no "single piece of evidence" that is "equally authoritative in its support of an opposite conclusion," *Elysium Tiles, Inc. v. United States*, 719 F. Supp.3d 1289, 1301–02 (Ct. Int'l Trade 2024), that is, that the importers did *not* purchase glycine from PTNNI that originated from China.

Rather, when the record is viewed as a whole, substantial evidence supports CBP's decision that PTNNI did not have the capability to produce glycine, and the true country of origin was China. *See* Appx90289-90306, Appx90903-90936. Indeed, CBP determined that there was "*overwhelming evidence*—including insufficient supply of methanol and insufficient numbers of trained workers—that PTNNI did not produce all the glycine it sold to the Importers and there is *substantial evidence* that the glycine PTNNI did not produce was Chinese-origin." Appx90926 (emphasis added). CBP undisputedly applied substantial evidence review in its meticulous and thorough review of the entire record. *See* 19 U.S.C. § 1517(c)(1)(A).

Accordingly, the Court should find that CBP's determination is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2)(B).

## CONCLUSION

For these reasons, we respectfully request that the Court sustain CBP's affirmative evasion determination on remand and enter final judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Deputy Principal Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:
NICOLAS MORALES
Attorney
U.S. Customs and Border Protection
  Office of the Chief Counsel

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7571
Email: kara.m.westercamp@usdoj.gov

February 21, 2025

Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court, the Court's Standard Chamber Procedures, and the Court's minute order in that it is 10 pages or less, including text, footnotes, and headings.

                        /s/Kara M. Westercamp
                        KARA M. WESTERCAMP