# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NEWTREND USA CO., LTD., STARILLE, LTD., and NUTRAWAVE CO, LTD., *Plaintiffs*, v. UNITED STATES, *Defendant*, *and* DEER PARK GLYCINE, LLC, *Defendant-Intervenor*. | Before: Stephen Alexander Vaden, Judge<br><br>Court No. 1:22-cv-00347 (SAV) |

## <u>OPINION</u>

[Affirming Customs' finding that Plaintiffs evaded U.S. anti-dumping and countervailing duties on glycine from the People's Republic of China.]

Dated: July 3, 2025

*Carrie Bethea Connolly* of Faegre Drinker Biddle & Reath LLP, Washington, DC, for Plaintiffs Newtrend USA Co., Ltd., Starille, Ltd., and Nutrawave Co., Ltd. With her on the briefs were *Richard P. Ferron*, *Douglas J. Heffner*, *D. Alicia Hickok*, and *Wm. Randolph Rucker*.

*Kara M. Westercamp*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, New York, NY, for Defendant United States. With her on the briefs were *Patricia M. McCarthy*, Director, *Franklin E. White*, Assistant Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Jennifer L. Petelle*, Attorney, Office of the Chief Counsel, U.S. Customs and Border Protection.

*David M. Schwartz* of Thompson Hine LLP, Washington, DC, for Defendant-Intervenor Deer Park Glycine, LLC.  With him on the briefs was *Kerem Bilge*.

**Vaden, Judge:**  Before the Court is the second installment in a case about glycine of disputed origin.  In 2021, Geo Specialty Chemicals, Inc. (Geo) alleged that Newtrend USA Co., Ltd; Starille, Ltd.; and Nutrawave Co., Ltd. (collectively, Plaintiffs) imported glycine from China without paying the required antidumping and countervailing duties.  The Plaintiffs responded that PT Newtrend Nutrition Ingredient (PT Newtrend), a subsidiary of the China-based Newtrend Group, manufactured the disputed glycine at a factory in Indonesia.  Customs and Border Protection (Customs) initiated an investigation under the Enforce and Protect Act (EAPA) to determine the origin of the glycine.  Customs determined that substantial evidence showed the glycine was from China and entered the United States without receipt of the required antidumping and countervailing duties.  Plaintiffs challenged that determination in this Court.  The Court granted Customs' Motion for a Voluntary Remand to reconsider its decision in light of the Federal Circuit's opinion in *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023).  Order Granting Def.'s Mot. for Vol. Remand (*Newtrend I*) at 10, ECF. No. 68.  On remand, Customs accepted new evidence and arguments from both parties but maintained its position that substantial evidence showed Plaintiffs engaged in evasion.  Plaintiffs now argue Customs' determination is arbitrary and capricious.  The Court disagrees.  Customs' Remand Determination will be **SUSTAINED**.

## FACTUAL BACKGROUND

### I.    Statutory Framework

Antidumping and countervailing duties exist to protect American producers and workers from unfairly traded imports sold into the American market. *See* 19 U.S.C. §§ 1671, 1673. Antidumping duties address foreign goods sold "in the United States at less than [their] fair value." 19 U.S.C. § 1673(1); *see also Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1225 (Fed. Cir. 2018) ("Antidumping duties … provide relief from market distortions caused by foreign producers who sell their merchandise in the United States for less than fair market value[.]"). Countervailing duties address the "unfair advantage" that arises when governments "subsidize domestic industries to benefit the production or exportation of merchandise." *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 48 CIT __, 633 F. Supp. 3d 1276, 1278 (2023) (citing 19 U.S.C. § 1671(a)); *see also Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States*, 37 CIT 319, 326 (2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014) ("CVDs … address the harms caused by foreign subsidies.").

In 2015, Congress passed the Enforce and Protect Act (EAPA) to address growing "evasion of antidumping [and countervailing] duties." *Royal Brush*, 75 F.4th at 1255; *see also Diamond Tools Tech. LLC v. United States*, 45 CIT __, 545 F. Supp. 3d 1324, 1351 (2021) ("The purpose of the EAPA was to empower the U.S. Government and its agencies with the tools to identify proactively and thwart evasion at earlier stages to improve enforcement of U.S. trade laws, including by ensuring

full collection of [antidumping] and [countervailing] duties and, thereby, preventing

a loss in revenue.").  EAPA established a process for determining whether "covered

merchandise was entered into the … United States through evasion."  19 U.S.C. §

1517(c)(1)(A).  As defined by the statute, "evasion" means:

> [E]ntering covered merchandise into the customs territory
> of the United States by means of any document or
> electronically transmitted data or information, written or
> oral statement, or act that is material and false, or any
> omission that is material, and that results in any cash
> deposit or other security or any amount of applicable
> antidumping or countervailing duties being reduced or not
> being applied with respect to the merchandise.

*Id.* § 1517(a)(5)(A).  "Covered merchandise" is merchandise that is subject to an

antidumping or countervailing duty order.  *Id.* § 1517(a)(3).  Customs has

promulgated regulations providing the requirements for filing allegations of evasion,

establishing investigation procedures, and providing for administrative review of

evasion determinations.  *See* 19 C.F.R. § 165.0.

Customs' Office of Trade handles evasion proceedings.  *See* 19 U.S.C. §

4371(a)(3) (authorizing the Office of Trade to direct EAPA enforcement efforts).

EAPA requires Customs to initiate an investigation and implement interim measures

within "15 business days after receiving an allegation … [that] reasonably suggests

that covered merchandise has been entered into … the United States through

evasion."  19 U.S.C. § 1517(b)(1).  Customs must then determine whether the

allegation is true.  *Id.* § 1517(c)(1)(A).  That determination must be "based on

substantial evidence[.]"  *Id.*  Once Customs makes its initial determination, EAPA

permits an administrative appeal by either party.  *See id.* § 1517(f)(1) ("[A] person

determined to have entered ... covered merchandise through evasion or [the] interested party that filed [the] allegation ... may file an appeal with the Commissioner....").  Customs' Office of Regulations and Rulings considers the appeal under a *de novo* standard of review.  *Id.* § 1517(f)(1).  Parties may then contest Customs' final decision in this Court.  *See id.* § 1517(g).

## II.  Customs' Initial Evasion Determination

Since March 29, 1995, Commerce has imposed antidumping and countervailing duties on glycine from the People's Republic of China.  *See Antidumping Duty Order:  Glycine from the People's Republic of China*, 60 Fed. Reg. 16,116 (Dep't of Com. Mar. 29, 1995); *Glycine from India and the People's Republic of China:  Countervailing Duty Orders*, 84 Fed. Reg. 29,173 (Dep't of Com. Jun. 21, 2019).  These duties apply to "glycine of all purity levels ... and precursors of dried crystalline glycine ...."  84 Fed. Reg. at 29,174.  Glycine is "a non-essential amino acid" that "is a white, odorless, crystalline powder with a sweet taste ... widely used as the main raw ingredient for flavoring, sweeteners, feed additives for pets, [and] nutritional supplements ...."  Pls.' Reply to Customs' Req. for Information at 2, ECF No. 32.  Glycine fit for human consumption is manufactured using a multi-step process that involves different chemicals, raw materials, equipment, and labor.  Final Determination at 13, J.A. at 90,012, ECF No. 104.

Plaintiffs began receiving shipments of glycine from PT Newtrend in early 2021.  *Id.* at 2, J.A. at 90,001.  On April 30 and September 7, 2021, Geo filed allegations with Customs claiming that Plaintiffs were "evading the [anti-dumping

and countervailing duty] orders on glycine from China." *Id.* at 1, J.A. at 90,000.  They asserted that Plaintiffs imported glycine from PT Newtrend "before [PT Newtrend's Indonesian] factory was capable of glycine production." *Id.* at 1–2, J.A. at 90,000–01. Geo claimed it had evidence the imported glycine came from China rather than Indonesia.  *Id.*

Customs requested information from Plaintiffs beginning in August 2021.  *Id.* at 3, J.A. at 90,002.  It asked for information on PT Newtrend's Indonesian production facility, including "an estimate of the capacity of the entire factory, [and] photos of … equipment[.]"  *Id.*  at 5, J.A. at 90,004.  Plaintiffs' responses to these requests, as well as research by Customs, raised doubts that the imported glycine was from the Indonesian factory.  *See id.* at 3–5, J.A. at 90,002–04.  Every Plaintiff confirmed to Customs that it purchased glycine from PT Newtrend, and PT Newtrend told Customs the Chinese Newtrend Group is its owner.  *See id.* at 5–6, J.A. at 90,004–05. Customs found evidence suggesting that PT Newtrend began shipping glycine to the United States before its Indonesian factory was capable of production.  *Id.* at 3, J.A. at 90,003.  The agency also obtained evidence that Plaintiffs may have had undisclosed financial ties with each other and with the Chinese Newtrend Group.  *Id.* at 5–6, J.A. at 90,004–05.

On October 26, 2021, Customs issued a notice of investigation.  *Id.* at 4, J.A. at 90,003.  It determined "there was reasonable suspicion that the importers entered covered merchandise into … the United States through evasion, and therefore imposed interim measures."  *Id.*  These included suspending liquidation of certain

entries and "additional measures … necessary to protect the revenue of the United States," such as requiring the posting of additional bonds and cash deposits. *See* Notice of Initiation of Investigation and Interim Measures at 10, J.A. at 82,539, ECF No. 99.

Customs submitted requests for information to both the Plaintiffs and PT Newtrend, asking them to provide further information on their "corporate structures," "accounting/financial practices," "sales[,]" "supplier[s,]" and glycine production capacity. Final Determination at 5, J.A. at 90,004, ECF No. 104. The agency delved into PT Newtrend's consumption of raw materials, the nature of its workforce, and the relationship between Plaintiffs and the Newtrend Group. *Id.* at 6–10, J.A. 90,005–09. PT Newtrend's responses indicated that it may have lacked "an adequate volume" of certain raw materials needed to make glycine. *Id.* at 7, J.A. at 90,006. Customs also saw "inconsistencies" in PT Newtrend's "labor, payroll, and attendance records" for its Indonesian factory. *Id.* at 8, J.A. at 90,007. The information indicated extensive affiliations between PT Newtrend, the Plaintiffs, and the Chinese Newtrend Group. These ties included coordination on business transactions, overlapping personnel, and loans given on non-commercial terms. *Id.* at 8–9, J.A. at 90,007–08.

From May 3 through May 6, 2022, Customs conducted an onsite verification of PT Newtrend's Indonesian glycine factory. *Id.* at 12, J.A. at 90,011. Customs "interviewed [PT Newtrend's] employees …, toured [PT Newtrend's] facility to witness glycine production, and reviewed accounting records of production and sales

… associated with imports of glycine by the [Plaintiffs]." *Id.* Verification revealed "serious problems" with PT Newtrend's factory that undermined Plaintiffs' claim that the facility could produce glycine. *Id.* Customs found that PT Newtrend lacked the ability, raw materials, and workforce needed to carry out key steps in the glycine production process. *See id.* at 12–18, J.A. at 90,011–17.

Customs accepted and considered written arguments from the parties alongside the information it gathered during its investigation. *Id.* at 19, J.A. at 90,018. After responding to extensive comments from the Plaintiffs, Customs issued its determination on July 22, 2022, finding that the Plaintiffs entered covered merchandise into the United States without paying the proper duties. *See id.* at 1, J.A. at 90,000. Its conclusion rested on two findings. *Id.* at 29–35, J.A. at 90,028–34. First, "substantial evidence … demonstrates the purported Indonesian manufacturer [PT Newtrend] could not have produced the volume of glycine it supplied the [Plaintiffs]." *Id.* at 30, J.A. at 90,0029. Second, evidence "indicate[d] that the glycine [PT Newtrend] sold the [Plaintiffs] was Chinese-origin and therefore covered by [antidumping and countervailing duty] orders." *Id.* at 34, J.A. at 90,033.

Customs' first finding rested on an analysis of PT Newtrend's production process, supplies, and labor force. It found that the Indonesian factory lacked the ability to produce glycine during the period in question because it did not have the necessary equipment. *Id.* at 13–15, J.A. at 90,012–14. The factory also did not possess the necessary amount of methanol. *Id.* at 30, J.A. at 90,029. PT Newtrend needed large quantities of methanol in order to manufacture the amount of glycine

Plaintiffs purchased. *Id.* at 7, J.A. at 90,006. Finally, Customs found that PT Newtrend did not have an adequate workforce to produce glycine at a large scale. *Id.* at 32–33, J.A. at 90,031–32.

Customs' second finding rested on an analysis of the connections between PT Newtrend, the Chinese Newtrend Group, and the Plaintiffs. In Customs' view, these connections showed that the Chinese Newtrend Group made all the glycine Plaintiffs purchased. *Id.* at 34, J.A. at 90,033. Newtrend Group's only viable glycine production facilities were in China. *Id.* Evidence in the record also showed that PT Newtrend had access to and offered to sell Chinese-origin glycine. *Id.* at 34–35, J.A. at 90,033–34.

Plaintiffs filed an administrative appeal of the agency's initial determination on September 1, 2022. *See* Customs' Appeal Decision at 1, J.A. at 90,289, ECF No. 104. Customs affirmed its evasion finding on November 30, 2022. *See id.* After conducting a *de novo* review of the evidence, Customs confirmed that "the record supports a finding that [PT Newtrend] was incapable of producing glycine at the times during which the [Plaintiffs] claim such capacity." *Id.* at 11, J.A. at 90,299. It also again concluded that "record evidence further indicates that the glycine [PT Newtrend] sold to the [Plaintiffs] was likely of Chinese origin." *Id.* at 14, J.A. at 90,302.

### III.  The Initial Dispute

Plaintiffs filed their Complaint challenging Customs' evasion determination on December 23, 2022.  *See* Compl., ECF No. 2.  Plaintiffs argued that Customs violated their due process rights because the agency redacted alleged confidential business information and failed to provide Plaintiffs with adequately detailed summaries of the redacted data.  *See* Mem. of Points and Authorities of Pls. in Support of Rule 56.2 Mot. for J. on the Agency R. (Pls.' Br.) at 3, 29–31, ECF No. 58.  The Plaintiffs also argued that Customs failed to include in the administrative record or consider in the final decision "exculpatory documents" that Plaintiffs provided at verification.  *Id.* at 4.

While this case was pending, the United States Court of Appeals for the Federal Circuit decided *Royal Brush Mfg., Inc. v. United States*.  *See* 75 F.4th 1250 (Fed. Cir. 2023).  There, the Federal Circuit addressed Customs' evasion determination on pencils from the Philippines.  *Royal Brush*, 75 F.4th at 1255. Customs found that Royal Brush transshipped its Chinese pencils through the Philippines to evade antidumping duties.  *See id.* at 1254.  It made that determination based on confidential information it withheld from Royal Brush and without providing Royal Brush an opportunity to review and rebut the secret evidence.  *See id.*  The Federal Circuit held that Customs "violate[d] Royal Brush's due process rights by failing to provide the information on which it relied …."  *Id.* at 1262.  The appellate court also found that Customs violated its own regulations by failing to provide Royal Brush with an opportunity to submit rebuttal information.  *See id.*

Plaintiffs filed a Notice of Supplemental Authority informing the Court of the Federal Circuit's decision. Pls.' Notice of Suppl. Authority 1–2, ECF No. 61. All parties agreed that a voluntary remand was appropriate to consider the implications of *Royal Brush*. *See* Def.'s Mot. at 3–4, ECF No. 62; Pls.' Resp. at 1, ECF No. 63; Def.-Int.'s Reply at 1, ECF No. 65. However, they disputed the breadth of the voluntary remand's scope. *Compare* Def.'s Mot. at 1, ECF No. 62, *with* Pls.' Resp. at 2, ECF No. 63. The Government requested a remand in order "reconsider or further explain its evasion determination … relative to the treatment of confidential information." Def.'s Mot. at 1, ECF No. 62. The Government also asked the Court for a Protective Order so that Plaintiffs could access the confidential information. *See id.* at 4–5. Plaintiffs requested that the remand (1) "[allow] the parties … to submit new briefs … based on the complete information disclosed under any protective order[,]" and (2) "[allow] Plaintiffs … to place on the record additional exculpatory documents and rebuttal factual information rebutting the verification report[.]" Pls.' Resp. at 3–4, ECF No. 63. The Government and Geo opposed Plaintiffs' request. *See* Def.'s Mot. at 1, ECF No. 62; Def.-Int.'s Reply at 3, ECF No. 65.

The Court granted Customs' Motion for a Voluntary Remand. *Newtrend I* at 10, ECF No. 68. However, it "decline[d] at this time to opine on what *Royal Brush* or constitutional due process requires for the Plaintiffs' arguments to be fully heard" because "[a]dministrative practice generally requires the agency to present its views first …." *Id.* at 9. The Court's Remand Order instead directed Customs to "correct any errors required by *Royal Brush*" and to "consider all Plaintiffs' due process and

evidentiary claims and either grant relief or put on the record in detail why such relief is not required." *Id.* at 10.

## IV.   The Remand Determination

On remand, Customs reopened the record and took steps to remedy the procedural problems with its evasion determination. *See* Remand Determination at 1, 3, ECF No. 73. It required petitioner Geo to place revised public versions of its complaint against Plaintiffs on the administrative record. *Id.* at 2. Customs also provided Plaintiffs with access to the confidential business information it had previously withheld. Both Plaintiffs and Geo received "an opportunity to submit rebuttal information to this previously withheld … information and make arguments." *Id.*

Plaintiffs submitted information to show that PT Newtrend could have produced the glycine in Indonesia. *See id.* at 7–10. The new documents included a construction contract that called for completion of the factory and installation of all equipment by fall 2020 and photographs purporting to document the existence of a completed factory by October 2020. *See id.* at 8–9. They argued that any later-installed equipment was not necessary to commence glycine production. *See id.* Plaintiffs also offered evidence regarding the origin of the glycine they imported. *See id.* at 7–8. This evidence included data from the Indonesian government showing that PT Newtrend did not import any glycine into the country between July 2020 and June 2022. *See id.* at 7. They also submitted shipping records to challenge contrary information Geo placed on the record. *See id.* at 13–14.

Geo received the same chance to submit new evidence on remand. *See id.* at 10–13. It presented information purporting to show "trading companies in Indonesia received significant quantities of glycine just before … [PT Newtrend] began exporting glycine to the United States." *Id.* at 10. The filing included multiple exhibits listing both imports of Chinese glycine to Indonesia during the relevant timeframe and imports of Chinese "amino acids" to Indonesia. *Id.* at 10–13. Amino acids are a "broad basket category" in the tariff classification schedule that "include[es] glycine[.]" *Id.* at 11. Geo also submitted evidence that, because of COVID-related visa restrictions, certain PT Newtrend employees could not have legally entered Indonesia during the time at which they claimed to be at the factory. *See id.* at 14–15. It argued this information "bolsters" the conclusion that PT Newtrend began shipping glycine to the United States before its Indonesian factory was capable of large-scale production. *Id.* at 15.

Customs issued its Remand Determination on January 18, 2024, which continued to conclude Plaintiffs entered glycine in the United States through evasion. *See id.* at 34. After considering the new evidence and arguments the parties submitted, Customs determined that PT Newtrend "did not produce all the glycine it sold to the [Plaintiffs] during [Period of Investigation]." *Id.* at 32. It maintained, "Record evidence shows that the origin of the glycine which [PT Newtrend] sold to the [Plaintiffs] but did not produce itself is China …." *Id.*

## V.   The Present Dispute

Plaintiffs submitted comments opposing the Remand Determination to the Court.  *See* Pls.' Comments in Opposition to the Remand Results (Pls.' Comments), ECF No. 97.  They challenge it on two grounds.  First, they argue that the Remand Determination contains a series of impermissible *post hoc* rationalizations, which constitute procedural error and require another remand.  *See id.* at 3–11.  Second, Plaintiffs claim that — even if procedurally proper — the Remand Determination is unsupported by substantial evidence.  *See id.* at 11–30.

The Government and Geo argue that Customs' Remand Determination complies with the Court's order and is supported by substantial evidence.  *See* Def.'s Resp. in Supp. of the Remand Determination (Def.'s Resp.), ECF No. 87; Def.-Int. Resp. in Supp. of the Remand Determination (Def.-Int. Resp.), ECF No. 91.  They contend that by reopening the record, considering new evidence, and issuing a new remand determination, Customs complied with the procedural requirements for new agency action.  *See* Def.'s Resp. at 26–27, ECF No. 87; Def.-Int.'s Resp. at 20–23, ECF No. 91.  They also argue that a reasonable mind could conclude that [PT Newtrend] shipped Chinese glycine to the United States without paying the proper duties.  *See* Def.'s Resp. at 27–30, ECF No. 87; Def.-Int.'s Resp. at 10–20, ECF No. 91.

The Court held Oral Argument on February 12, 2025.  *See* Oral Arg. Tr., ECF No. 127.  Following argument, the Court asked the parties to submit letter briefs elaborating on "whether there is substantial record evidence to support Customs' determination that the glycine imported into the United States came from China."

Order, ECF No. 122. Plaintiffs submitted a letter brief arguing that, even if PT Newtrend did not produce the glycine, Customs did not cite sufficient evidence the glycine came from China. Pls.' Suppl. Br. at 1, ECF No. 125. Both Defendant and Defendant-Intervenor's briefs argued the lack of glycine production at PT Newtrend's Indonesia factory meant that the glycine had to come from the Chinese parent company. Def.'s Suppl. Br. at 2 – 3, ECF No. 130; Def.-Int.'s Suppl. Br. at 1, ECF No. 128.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 19 U.S.C. § 1517(g) and 28 U.S.C. § 1581(c). Under the Enforce and Protect Act, the reviewing court must examine Customs' final determination and administrative review. *Id.* § 1517(g) (providing for court review of both determinations). In its review of Customs' determinations, the Court examines "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 1517(g)(2)(B). Agency action constitutes an abuse of discretion "where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence,[1] or represents an unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281

---

[1] Plaintiffs argued in their opening comments that Customs' evasion determination needed to be supported by a preponderance of the evidence rather than substantial evidence. Pls.' Comments at 19–21, ECF No. 97. That argument runs counter to the statutory text. 19 U.S.C. § 1517(c)(1)(A) directs Customs to make an evasion determination "based on substantial evidence," which this Court reviews under the arbitrary and capricious standard. *See* 19 U.S.C. § 1517(g)(2). Tellingly, Plaintiffs do not reference this argument in their reply brief and did not raise it at oral argument. *See generally* Pls.' Reply Br., ECF No. 95; Or. Arg. Tr., ECF No. 127.

(Fed. Cir. 2005).  Where the agency "offers insufficient reasons for treating similar situations differently," such actions are arbitrary.  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).

When reviewing agency action, it is "the duty of the courts to determine in the final analysis and in the exercise of their independent judgment, whether on the whole record the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action as a matter of law." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351–52 (Fed. Cir. 2006) (citations omitted). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted).  Additionally, "The court reviews remand determinations for compliance with the court's [remand] order." *Bonney Forge Corp. v. United States*, No. 1:20-cv-03837, 47 CIT __, 2023 Ct. Intl. Trade LEXIS 125 at *7 (Aug. 21, 2023) (quoting *Nakornthai Strip Mill Pub. Co. Ltd. v. United States*, 32 CIT 1272, 1274 (2008)).

## DISCUSSION

In *Newtrend I*, the Court ordered Customs to comply with the Federal Circuit's opinion in *Royal Brush*.  Now that Customs has given Plaintiffs access to previously confidential information and allowed them to submit rebuttal information as they had requested, no party disputes that Customs has complied with the Court's remand order.  *See* Pls.' Comments, ECF No. 97; Def.'s Resp., ECF No. 87; Def.-Int.'s Resp.,

ECF No. 91. Plaintiffs instead argue that (1) Customs' Remand Determination did not comply with the requirements of *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), and (2) the Remand Determination is unsupported by substantial evidence. The Court disagrees. The Remand Determination is **SUSTAINED**.

## I.

An agency has two possible paths on remand: "[It] can offer a fuller explanation of its reasoning at the time it made the decision," or it "can take new agency action…." *Ellwood City Forge Co. v. United States*, 47 CIT __, 654 F. Supp. 3d 1268, 1277 (2023) (citing *Regents*, 591 U.S. at 20–21). When an agency chooses to elaborate on its prior decision, it is "limited to the agency's original reasons" for the decision. *Regents* 591 U.S. at 21. By contrast, when an agency takes new action, it may bolster the justification for its action with "new reasons." *Id.* An agency's decision to take new action does not require ignoring the record as it existed before remand. Rather, when taking new action, an agency need only reexamine the administrative record and deal with the problem "afresh." *Fisher v. Pension Benefit Guar. Corp.*, 994 F.3d 664, 670 (D.C. Cir. 2021). It "is not limited to its prior reasons but must comply with … procedural requirements." *Ellwood City*, 47 CIT __, 654 F. Supp. 3d at 1277 (quoting *Regents*, 591 U.S. at 21).

Plaintiffs argue that Customs did not take new agency action when it issued the Remand Determination. They maintain that Customs "appears to imply … that it is choosing to explain its original determination in greater detail." Pls.' Comments

at 3, ECF No. 120. In their view, Customs offers new reasons for its original determination, making the Remand Determination an impermissible *post-hoc* rationalization. *See id.* at 3–5. Plaintiffs take aim at Customs' repeated statements that it "continues to find evasion" or that new information "bolster[ed]," "support[ed]," or did "not detract" from the original determination. *Id.* at 5 – 6. They also claim that Customs attempts to give a "fuller" explanation of decisions it never explained in the first place — violating the scope of what is possible when an agency chooses not to take new action. *Id.* at 5 (citing *Bonney Forge Corp. v. United States*, 46 CIT __, 560 F. Supp. 3d 1303, 1313 (2022)).

The Government and Geo respond that Customs took new agency action. *See* Def.'s Resp. at 26–27, ECF No. 87; Def.-Int.'s Resp. at 20–23, ECF No. 91. The Government notes that Plaintiffs provide no support for their contention that agencies may not reference the existing record when making a new decision. *See* Def.'s Resp. at 26–27, ECF No. 87. Geo adds that, even if Customs were limited to its original rationale, the explanation given by Customs is not a *post-hoc* rationalization. *See* Def.-Int.'s Resp. at 20–23, ECF No. 91.

The Court is unpersuaded by Plaintiffs' arguments. An agency takes "new action" whenever it chooses to "deal with the problem afresh" rather than just provide further explanation for its original action. *Regents*, 591 U.S. at 20–21 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)). Here, Customs "reopen[ed] the administrative record" and allowed the parties "to submit rebuttal information and make arguments" regarding the evasion allegations. Remand Determination at 3–4,

34, ECF No. 73. Following "review of the entire administrative record" — including the new information — Customs issued its Remand Determination. *Id.* That Determination explained how the new information affected Customs' view of the evidence gathered during its original investigation. *See, e.g.*, *id.* at 12–13 (explaining that Customs now viewed information Plaintiffs submitted in the original investigation regarding the Chinese Newtrend Group's sales as "incomplete and unreliable" because it was contradicted by new information from Geo).

True, the Remand Determination reached the same conclusion as Customs' original determination. But *Regents* does not mandate that new agency action is *different* agency action. *See Regents*, 591 U.S. at 21 (explaining that the Government can take new action bolstered by new reasons but which results in the same policy outcome). Nor does *Regents* require the agency to pretend the original determination never happened. That Customs said it "continues to find evasion" does not mean that it failed to take new action. Remand Determination at 7, ECF No. 73. New agency action does not require the recitation of magic words and phrases. *Cf. Fisher*, 994 F.3d at 670 ("Although [the agency] claimed to modif[y] [its] decision by more fully responding and providing a revised and more complete explanation, its substance made clear that it was a new agency action.") (internal quotation marks omitted). Customs reopened the record, accepted new evidence, and allowed the parties to file additional written arguments before it made its decision. By any rational definition, the agency took new action. Because Customs properly "deal[t] with the problem afresh," it complied with *Regents*' procedural requirements; and Plaintiffs' arguments

to the contrary are meritless.  *Regents*, 591 U.S. at 20–21 (citing *Chenery*, 332 U.S. at 201).

## II.

EAPA empowers Customs to investigate if a "material and false" act or omission causes merchandise subject to antidumping or countervailing duties to enter the United States without the "applicable … duties … being applied[.]"  19 U.S.C. § 1517(a)(5).  Although Customs' investigation must result in a determination "based on substantial evidence," *id.* § 1517(c)(1)(A), the Court reviews the decision under an arbitrary and capricious standard.  *Id.* § 1517(g)(2)(B).  Here, Customs determined that Plaintiffs evaded duties on Chinese glycine by mislabeling glycine they imported from PT Newtrend as made in Indonesia.  The evasion determination rested on two findings:  That (1) PT Newtrend's Indonesian factory could not produce all the glycine the company shipped to the United States, and (2) at least some of PT Newtrend's exported glycine came from China rather than Indonesia.  Plaintiffs contend that both findings are unsupported by record evidence.  They argue Customs ignored that PT Newtrend could produce the required quantity of glycine in favor of weaker, more circumstantial evidence.  They also insist that Customs' determination rests on inferences, guilt by association, and speculation.  The Court takes each of these arguments in turn.

## A.

The first issue is whether Customs properly found that substantial evidence indicated PT Newtrend's Indonesian factory could not produce the glycine it exported

to the United States. Customs visited PT Newtrend's Indonesian facility because Plaintiffs claim the glycine they imported into the United States was manufactured there instead of China. *See* Final Determination at 3–6, J.A. at 90,003–05, ECF No. 104. If the factory could not produce the amount of glycine Plaintiffs imported, it would support a finding of evasion.

Customs' assessment rested on its understanding of the glycine production process. Producing glycine "is a multi-step process that requires specific equipment, labor, and raw materials." *Id.* at 13, J.A. at 90,012. First, a volatile input chemical has to be processed. *See id.* That chemical must then be mixed with other chemicals "to create a chemical reaction that produces a liquid slurry …." *Id.* The "liquid slurry … must [next] be transferred … [and] mixed with methanol … to separate the intermediate glycine into crystals[,]" which are removed. *Id.* This step in the process is critical because the quality of glycine PT Newtrend claimed to produce requires large quantities of methanol. *See id.* at 14, J.A. 90,013. Finally, activated carbon filters the "intermediate glycine" crystals "to increase [their] purity level so that the finished product can meet the [relevant] grade standard." *Id.*

Evidence Customs' officials gathered during their on-site verification raised serious doubts about PT Newtrend's ability to perform this process. Officials witnessed personnel mishandling the volatile input chemical in such a way it "endangered [Customs'] staff." *Id.* at 13, J.A. at 90,012. The portions of the factory that allegedly mixed chemical inputs into a liquid slurry had imprecise pH meters, "suggest[ing] that [PT Newtrend] may not be capable of the precise pH monitoring

needed to sustain industrial-scale glycine production." *Id.* Customs also requested — on three separate days — to observe PT Newtrend use methanol to separate intermediate glycine crystals from the liquid slurry. *Id.* at 14, J.A. at 90,013. Despite these repeated requests, officials "did not witness" this stage of the manufacturing process. *Id.* Finally, Customs "did not observe" the use of active carbon to filter intermediate glycine despite again asking on three separate days. PT Newtrend "refused" to show Customs the process. *Id.* at 14–15, J.A. at 90,013–14. Customs therefore never witnessed the successful manufacturing of any quantity of glycine at the Indonesian factory during its visit. *See id.* at 13–15, J.A. at 90,012–14 (outlining that Customs "could not observe" or "did not witness" essential steps in the glycine manufacturing process).

Verification also uncovered deficiencies in PT Newtrend's raw material supply. In its pre-verification investigation, Customs determined — based on PT Newtrend's own data — that PT Newtrend "did not purchase enough methanol to produce the volume of glycine they claim to have produced." *Id.* at 14, J.A. at 90,013. Plaintiffs claim Customs' calculation is flawed because it does not account for how efficiently PT Newtrend recycles methanol. Pls.' Comments at 25–27, ECF No. 97. However, at verification, the "methanol distillation tower control room" contained only a computer that "did not control anything and could neither save nor print any records." Final Determination at 15, J.A. at 90,014, ECF No. 104. The employees present "could not explain … methanol recycling … and claimed to have learned their jobs in only a few weeks." *Id.* PT Newtrend showed Customs a storage tank containing

"methanol," but Customs discovered the tank actually contained hydrochloric acid. *Id.* at 14, J.A. at 90,013. Customs also reviewed PT Newtrend's raw material and utilities purchases and found that, for every input PT Newtrend claimed to purchase, there were unpaid invoices dating back nearly two years that PT Newtrend could not explain. *Id.*

Customs' verification also suggested that PT Newtrend lacked the workforce needed to operate the factory. Only a handful of PT Newtrend's listed employees appeared in the factory's timekeeping system. *Id.* at 17, J.A. at 90,016. Employee attendance records did not match production records, implying that workers oversaw production steps while not at the factory. *Id.*; *see also id.* at 4, J.A. at 90,003. PT Newtrend's payroll records contradicted its attendance records, as PT Newtrend paid workers for work done on days when the factory was closed. *Id.* at 17, J.A. at 90,016. Further, the factory lacked any office staff. *Id.* PT Newtrend claimed this was because every employee was on vacation; but when asked for the names of the vacationing employees, their supervisor could not name one. *Id.* To answer the question, the supervisor needed to phone a Newtrend Group official who did not work in Indonesia for help. *Id.* More broadly, interviews with PT Newtrend's factory employees revealed that each could "perform one task … at one production step." *Id.* at 16, J.A. at 90,015. PT Newtrend, by contrast, claimed in papers filed with Customs before verification that "workers have no fixed task and could perform all tasks needed for production." *Id.*

The verification evidence aligned with the written submissions Customs received from the parties. For example, documents submitted by PT Newtrend showed that essential equipment needed for glycine production did not arrive until months after PT Newtrend began shipping glycine to the United States. Remand Determination at 17, ECF No. 73. Record evidence also showed that PT Newtrend would need to recycle methanol in a physically impossible manner to have enough for its claimed level of production. *Id.* at 17–19. PT Newtrend claimed that foreign supervisors trained its factory workers. Final Determination at 7, J.A. at 90,006, ECF No. 104. But Customs found (1) PT Newtrend began production at a time when COVID-19 restrictions would have prohibited them from entering Indonesia; (2) PT Newtrend did not pay these supervisors until after it began shipping glycine to the United States; and (3) almost none of the supervisors who supposedly trained the Indonesian employees could speak the local language. *Id.* at 9–10, J.A. at 90,008; Remand Determination at 14–15, ECF No. 73.

Customs' view did not change on remand. Plaintiffs submitted rebuttal information and written arguments when Customs reopened the record. Plaintiffs' arguments largely centered on showing that the Indonesian factory was operational by fall 2020 and that PT Newtrend purchased enough raw materials to produce its claimed quantity of glycine. Remand Determination at 7–9, 17–18, ECF No. 73. Customs did not find this evidence persuasive. It explained that the new evidence either did not represent new information or was outweighed by other evidence in the record. *Id.*

Plaintiffs now contend that Customs' assessment ignored record evidence showing PT Newtrend could produce large quantities of glycine at its Indonesian factory. Plaintiffs point to photographs showing the factory was operational by fall 2020 as well as written records documenting it possessed an adequate labor force. *See* Pls.' Comments at 22–25, ECF No. 120. They also claim that Customs' evasion finding rests on miscalculations of key data such as the factory's raw material consumption rate. *Id.* at 25–28. The Government and Defendant-Intervenor disagree. They argue that the more persuasive evidence cited by Customs outweighed Plaintiffs' submissions. *See, e.g.*, Def.'s Resp. at 27–30, ECF No. 87; Def.-Int.'s Resp. at 11–18, ECF No. 91.

This Court must uphold Customs' determination unless it was "arbitrary or capricious." 19 U.S.C. § 1517(g)(2)(B). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgement for that of the agency." *State Farm*, 463 U.S. at 43. Nonetheless, Customs' decision must have "reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Customs' finding easily surmounts this bar. The agency reviewed the written evidence in the record and found numerous inconsistencies that verification only magnified. Evidence from both Geo and PT Newtrend indicated that the Indonesian factory was not capable of producing glycine at the levels necessary to account for the amount Plaintiffs imported. Customs did not rely solely on written evidence. It conducted a three-day, in-person verification where it sought to examine PT

Newtrend's production process, raw materials, and labor. *See* Final Determination at 12, J.A. 90,011, ECF No. 104. Verification not only confirmed the written evidence but also revealed larger deficiencies in PT Newtrend's production capacity. The factory lacked key inputs such as methanol, had no support staff, and could not perform crucial phases of production. *Id.* at 13–17, J.A. at 90,012–16.

Plaintiffs claim Customs "fail[ed] to consider" photographs showing the factory was completed by fall 2020 as well as documents claiming the factory conducted production runs and purchased raw materials. Pls.' Comments at 22, ECF No. 120; Pls.' Reply at 8–13, ECF No. 95. Plaintiffs argue that this written evidence is so overwhelming "[c]ommon sense says [Customs'] conclusion is wrong." Pls.' Reply at 13, ECF No. 95. Not so.

Customs went to the Indonesian factory to see if this documentary evidence matched reality. It did not. Employees mishandled chemicals; important measurement tools were missing; and workers could not demonstrate or explain entire stages of the glycine production process. Plaintiffs ask Customs agents to believe paperwork over their lying eyes. The law does not require such a result. *See Prometheus Radio*, 592 U.S. at 423 (requiring the agency reach a "reasonable" conclusion).

This is especially true given that verification occurred nearly eighteen months after the factory would have needed to be operational to produce the glycine Plaintiffs purchased. *See* Final Determination at 1, 12, J.A. at 90,000, 90,011, ECF No. 104. Plaintiffs do not claim that something went wrong at the factory between fall 2020

and the May 2022 verification.  Presumably, like most factories, PT Newtrend's Indonesian facility became better equipped and more efficient as time passed.  *Cf.* Pls.' Comments at 30, ECF No. 120 (arguing that Customs' conclusion about PT Newtrend's labor force rests on evidence from a time when the factory was slowly ramping up glycine production).  Thus, Customs could properly determine that the factory would have been even less capable of glycine production in fall 2020 than it was in May 2022.  *See* Oral Arg. Tr. at 42:17 – 43:5, ECF No. 127 (Ms. Westerkamp: "[W]e're talking, you know, we're nearly like a year and a half [after fall 2020]. But even at that verification, there were numerous problems.").  Its conclusion that the factory could not have produced the imported glycine was not only supported by substantial evidence, it was also the most rational conclusion one could draw from the evidence.

Plaintiffs maintain PT Newtrend "put forward … payment records, sign-in sheets, and production records that demonstrate an adequate labor force."  Pls. Comments at 29, ECF No. 120.  They would have the Court believe Customs ignored that evidence.  Far from it.  Customs used much of its time during verification to investigate the company's workforce.  Its examination revealed that PT Newtrend paid employees for work done on days that the factory was closed, conducted production runs with employees who had not clocked in, and only had time records for a handful of workers.  Plaintiffs' documentary evidence, when compared to this on-site evidence, was little more than wastepaper.  Customs did not ignore Plaintiffs' documents; the agency simply determined they did not withstand scrutiny.

Plaintiffs' remaining two arguments are red herrings. They first claim Customs failed to consider the factory's efficient methanol recycling system when it concluded PT Newtrend lacked an adequate methanol supply. Pls.' Comments at 25–28, ECF No. 120; Pls.' Reply at 11–13, ECF No. 95. This argument assumes the factory possessed, used, and recycled methanol. That is not what Customs found. Customs officials asked to see methanol, but PT Newtrend showed it hydrochloric acid. Final Determination at 14, J.A. at 90,014, ECF No. 104. When Customs asked on three different days to watch the factory's equipment use methanol to separate glycine crystals from the liquid slurry, the company's employees refused each request. *Id.* at 14–15, J.A. at 90,013–14. Customs also asked to see the methanol recycling system at work and found a control room full of employees who could not explain the recycling process they supposedly oversaw. *Id.* at 15, J.A. at 90,014. Even if Plaintiffs are correct that PT Newtrend *purchased* enough methanol to make the glycine in question, Customs had evidence that PT Newtrend could not actually *use* it to make glycine. Remand Determination at 32, J.A. 90,031, ECF No. 73 ("[T]he evidence on the record does not support a conclusion that [PT Newtrend] purchased *or consumed* a sufficient quantity of methanol.") (emphasis added).

Plaintiffs advance a similar argument to discount Customs' activated carbon calculations. They assert that Customs only concluded PT Newtrend did not have enough activated carbon because it miscalculated how much the factory needed to use. But whether the factory purchased enough activated carbon is unimportant. Customs asked on three different days to see PT Newtrend use activated carbon to

filter the glycine. Final Determination at 14, J.A. at 90,013–14, ECF No. 104. PT Newtrend refused each request. *Id.* at 14–15, J.A. at 90,013–14. PT Newtrend needed to show Customs it could produce glycine. Simply possessing the necessary raw materials — even if in adequate quantities — is insufficient.

### B.

Plaintiffs finally question Customs' determination that PT Newtrend exported mislabeled Chinese glycine to the United States. Because the allegedly evaded order applies to glycine from China, Customs must not only show that PT Newtrend could not have manufactured the glycine in Indonesia. It also must demonstrate that the glycine PT Newtrend did sell originated in China. Plaintiffs claim PT Newtrend did not ship any Chinese glycine to the United States. Customs concluded otherwise. Final Determination at 34–35, J.A. at 90,033–34, ECF No. 104.

Customs' determination rests on its conclusion that the Newtrend Group produced the glycine. *See id.* at 34, J.A. at 90,033 ("All of the glycine purchased by the importers was made by the Newtrend Group."); Remand Determination at 32–33, ECF No. 73. Plaintiffs told Customs that the disputed glycine was produced by PT Newtrend in Indonesia. *See* Final Determination at 4–6, J.A. at 90,003–05, ECF No. 104. No party disputes "the Chinese Newtrend Group directly owns … [PT Newtrend]." Remand Determination at 32, ECF No. 73; *see also* Final Determination at 5, J.A. at 90,004, ECF No. 104 ("[PT Newtrend] told [Customs] that it is owned by the [Newtrend] Group."). One of the Plaintiffs, Newtrend USA, "is a wholly owned subsidiary" of Newtrend Group. Final Determination at 34, J.A. at 90,033, ECF No.

104. Another Plaintiff, Nutrawave, is run by the son of Newtrend Group's president. *Id.* at 9, J.A. at 90,008; *see also* Oral Arg. Tr. at 10:13–21, ECF No. 127. Evidence showed that Newtrend Group loaned two of the Plaintiffs — Nutrawave and Starille — money on non-commercial terms to help them import glycine into the United States. Newtrend Group also helped the Plaintiffs find customers for the glycine they purchased. *See id.*; *see also* Remand Results at 32–33, ECF No. 73. In other words, Newtrend Group's fingerprints were on every part of the transactions at issue. Customs reasoned, "It is unlikely that[] the Newtrend Group would provide loans … and find customers for a competitor's glycine." Final Determination at 34, J.A. at 90,033, ECF No. 104.

Evidence gathered by Customs showed that, during the period of investigation, Newtrend Group's only active glycine factories were in China. Newtrend Group claims to have production facilities in China, Thailand, and Indonesia. *See id.* The Thai facility stopped production before the period of investigation, and sales data revealed "Newtrend Thailand did not sell any glycine to Indonesia." *Id.* Customs also reasonably found that PT Newtrend's Indonesian factory could not have produced glycine in the quantities necessary to fulfill Plaintiffs' orders. Customs thus concluded that the only Newtrend Group facilities "that could have produced the [disputed] glycine … are Chinese[.]" *Id.*

Statements from PT Newtrend's employees supported this conclusion. Geo hired market researchers to investigate PT Newtrend and its Indonesian factory. *See id.* The researchers contacted PT Newtrend and asked to purchase glycine. *See*

Remand Results at 19, ECF No. 73; *see also* Final Determination 34–35, J.A. at

90,033–34, ECF No. 104.   Rather than offering glycine from its Indonesian factory,

PT Newtrend's owner offered to sell the researchers Chinese-made glycine.   *See*

Remand Results at 19, ECF No. 73; *see also* Final Determination 34–35, J.A. at

90,033–34, ECF No. 104.

Import data further suggested that PT Newtrend had access to Chinese-origin

glycine during the period in question.   The port closest to PT Newtrend's Indonesian

factory saw an increase in Chinese glycine imports just before PT Newtrend began

shipping glycine to the United States.   *See* Final Determination at 34, J.A. at 90,033,

ECF No. 104.   Data also showed that the Chinese Newtrend Group sold large

quantities of glycine to an Indonesian trading company in the period just before PT

Newtrend began shipping glycine to the United States.   *See* Remand Determination

at 12, ECF No. 73; Final Determination at 34, J.A. at 90,033, ECF No. 104.   Plaintiffs

did   not   disclose   these   shipments   when   they   claimed   to   submit   "[all]   sales

reconciliations" for the Newtrend Group to Customs.   Remand Determination at 13,

ECF No. 73.   PT Newtrend's chemical supplier also received large quantities of

"amino acids" from China around the time PT Newtrend claims to have begun glycine

production.   *Id.* at 12.   Amino acids are a broad customs classification category that

includes, but is not limited to, glycine.   *See id.* at 11.   PT Newtrend "stated on the

record that it has imported goods … through a trading company."   *Id.* at 16.

The evidence Plaintiffs submitted on remand did not alter Customs' decision.

Plaintiffs provided documents from the Indonesian government showing that PT

Newtrend did not import any glycine into the country during the relevant time period. *Id.* at 7. They also attempted to discredit the reliability of the import data on which Customs relied in its original determination. *Id.* at 13–14. Customs did not find the effort persuasive. It explained that the documents from the Indonesian government only served as evidence that PT Newtrend was not the declared importer of any glycine. *Id.* at 31. It did not demonstrate that PT Newtrend never received Chinese glycine from a third-party importer, as Customs found. Customs also explained that the Plaintiffs' attacks on the import data's credibility went to discrepancies unrelated to Customs' conclusion. Def.'s Comments at 19, ECF No. 87; *see also* Remand Determination at 12, ECF No. 73.

Plaintiffs now argue Customs ignored evidence that PT Newtrend did not import glycine from China in favor of speculation and "guilt by association." Pls.' Comments at 3, 12, ECF No. 120. They point to the Indonesian government documents confirming that, during the relevant period, PT Newtrend did not import any glycine into Indonesia. *Id.* at 3. Plaintiffs also contend that Customs' theory for how PT Newtrend imported glycine rests on unreliable data and inferences based on corporate affiliations alone. *Id.* at 12–15. Customs and Geo disagree. They again argue that Plaintiffs' evidence is "contradicted by other record evidence." *See, e.g.*, Def.'s Comments at 27, ECF No. 91; Remand Determination at 16, ECF No. 73 ("Nothing submitted by the [Plaintiffs] … detracts from the overwhelming record evidence of evasion.").

To be sustained, Customs must have reached a conclusion that "reasonably considered the relevant issue and reasonably explained the decision." *Prometheus Radio*, 592 U.S. at 423. Customs' determination meets this threshold. Evidence in the record demonstrates that the Chinese-based Newtrend Group controls PT Newtrend and at least one of the Plaintiffs, Newtrend USA. Those facts, combined with the financial assistance Newtrend Group provided to help Starille and Nutrawave import glycine into the United States, reasonably suggest that the glycine at issue originated from the Newtrend Group. Because Newtrend Group only produced a sufficient quantity of glycine in China, the disputed glycine logically would have originated from Newtrend Group's Chinese factories. Statements suggesting PT Newtrend had access to Chinese glycine, coupled with import data showing increased Chinese glycine exports to Indonesia during the period of investigation, solidify the reasonableness of Customs' conclusion.

Plaintiffs cite "company-specific import data from the Government of Indonesia … show[ing] that … [PT Newtrend] did not import any glycine into Indonesia." Pls.' Comments at 3, ECF No. 120. Plaintiffs refer to these documents as *prima facie* evidence, but *prima facie* evidence creates only an "inference from previously uncontradicted evidence." *In re Piasecki*, 745 F.2d 1468, 1472 (Fed. Cir. 1984). It does not, as Plaintiffs claim, "squarely refute[]" other record evidence merely by virtue of its existence. Pls.' Comments at 3, ECF No. 120. Here, Customs explained that the "trade data from the Indonesian government" did not displace the "overwhelming record evidence of evasion." Remand Determination at 16, ECF No.

73.  This evidence of evasion included:  (1) Newtrend Group's only working glycine factories were in China; (2) PT Newtrend's employees claimed they could sell customers Chinese-origin glycine, and (3) import data suggested PT Newtrend could access Chinese glycine through other trading companies.  *See id.* at 32–33. Administrative law does not require an agency to fixate on one piece of evidence in disregard of the rest of the record.  *See Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 32 (D.D.C. 2022) (holding that, under the arbitrary and capricious standard, it is "enough that the evidence when viewed as a whole provides a sufficient basis to understand" the agency action) (internal quotation marks omitted).

Plaintiffs' arguments about Customs' use of import data are similarly flawed. First, they argue some of the data is too broad because it only demonstrates Indonesian imports of "amino acids," a category not limited to glycine.  Pls.' Suppl. Br. at 5, ECF No. 125.  Second, Plaintiffs assert data that identifies a product's origin by its port of lading is unreliable because an item's port of lading often represents only where it was loaded onto its final cargo ship, not where it was produced.  *See id.* Many goods produced in Southeast Asia have a port of lading in China because that is where they are consolidated with other shipments before being sent across the Pacific.  Remand Determination at 11, ECF No. 73.

Customs considered both issues.  It admitted that the "amino acid" import data was broad and "merely suggestive" of evasion.  *Id.*  The agency's determination also referenced data showing that Indonesian companies imported shipments specifically marked as Chinese glycine, some of which were from Newtrend Group's Chinese

affiliates. *Id.* at 11–13.  Customs similarly agreed that port-of-lading evidence on its

own "is not dispositive." *Id.* at 11.  Customs credited information Geo submitted from

a third-party vendor that uses port-of-lading evidence as part of how it tracks

aggregate import data. *Id.* at 11–14.  Although Plaintiffs now attack that data, they

"did not place evidence on the record that bill of lading data from third-party vendors

… are unreliable." *Id.* at 30.  Instead, Plaintiffs submitted an advertisement from a

rival firm, which also uses port-of-lading data, attacking Geo's vendor as an inferior

data source. *Id.*  They did not submit alternative data to controvert the information

Geo tendered.  It was not legal error for Customs to find that Geo's data was more

probative than a rival's advertisement unaccompanied by a contrasting dataset. *See*

*Phoenix Metal Co. v. United States*, 48 CIT __, No. 1:23-cv-00048, 2024 Ct. Intl Trade

LEXIS 69, at *11–17 (Jun. 10, 2024) (holding that Plaintiffs did not discredit

Customs' evidence of evasion with attacks devoid of contrary evidence).

Plaintiffs also challenge Customs' reference to the statements PT Newtrend's

employees made to Geo's investigator.  They argue that these statements are not

probative of whether PT Newtrend evaded the orders because the investigator did

not specify a place for delivery. Pls.' Suppl. Br. at 2, ECF No. 125.  Plaintiffs suggest

the employees would not have offered to sell Chinese glycine had they known the

investigator was asking about shipments to the United States. *See id.*  But the

evidence still demonstrates that PT Newtrend had access to Chinese glycine and was

willing to sell it even when it did not know the goods' destination. *See* Def.'s Suppl.

Br. at 5–6, ECF No. 130.

The standard of review is determinative here. A court reviewing an agency's decision under the substantial evidence standard cannot disturb the agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice." *Universal Camera Corp.*, 340 U.S. at 488. Customs had ample evidence that PT Newtrend misrepresented the capabilities of its Indonesian factory. It also had evidence that affiliates of the Newtrend Group sold the glycine; the Newtrend Group only produced glycine in China; and PT Newtrend was willing and able to sell Chinese glycine. It was reasonable for Customs to find that PT Newtrend misrepresented the glycine's origin just as it had misrepresented its factory's capabilities. Under the substantial evidence standard, an agency can make judgment calls without second-guessing from the Court. *See id.* It validly did so here.

## CONCLUSION

Customs' evasion finding rests on simple logic: PT Newtrend purchased glycine from its Chinese parent company because it could not produce enough of its own. Customs conducted an extensive in-person verification of PT Newtrend's Indonesian factory, which revealed it could not produce glycine at the scale PT Newtrend and Plaintiffs claimed. Written evidence also demonstrated extensive financial and personal ties between Plaintiffs, the Newtrend Group, and PT Newtrend. Plaintiffs resist the obvious implication of these facts — that PT Newtrend acquired glycine from its parent company to fulfill Plaintiffs' orders. They offer no alternative explanation for how PT Newtrend acquired its glycine. *See* Pls.' Suppl. Br. at 1–9, ECF No. 125. Glycine is not manna. It is the result of a multi-step

manufacturing process that needs to occur somewhere. Customs reasonably determined that it occurred at Newtrend Group's factories in China. Given the standard of review, Customs' Remand Determination is **SUSTAINED**.


  /s/ Stephen Alexander Vaden
Stephen Alexander Vaden, Judge


Dated:  July 3, 2025
      New York, New York